COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, S.S.                                    BUSINESS LITIGATION
SESSION
                                                Civil Action No. _____

<table>
<tr><td>

AP MA FUNDING LLC,

Plaintiff,

v.

133 SALEM STREET, LLC and
WEST REVERE HEALTH CENTER, LLC

Defendants.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td></tr>
</table>

## VERIFIED COMPLAINT AND REQUEST FOR APPOINTMENT OF RECEIVER

AP MA Funding LLC (the "Agent"), by and through its counsel, files this Verified Complaint and Request for Appointment of Receiver against 133 Salem Street, LLC (the "Owner Defendant") and West Revere Health Center, LLC (the "Operator Defendant" and together with the Owner Defendant, the "Defendants") and states as follows in support thereof:

### NATURE OF THE CASE

1.      This is an action for breach of contract and for the appointment of a receiver to operate a 140-licensed bed skilled nursing facility within the Commonwealth of Massachusetts.

2.      The Owner Defendant is in payment default on its obligations to the Agent and lenders under its loan agreement and has been unable to cure the defaults despite a forbearance agreement, which has now expired. The Operator Defendant pledged its assets to the Agent as security for the loan to the Owner Defendant. The Operator Defendant has jeopardized its pledged collateral by failing to pay its vendors, its manager, and the Commonwealth of Massachusetts. As a result, vendors have threatened to terminate services. The manager has

threatened to terminate its agreement with the Operator Defendant, which would leave the nursing facility without a manager. The Operator Defendant further risks termination of its operating license by the Commonwealth of Massachusetts due to unpaid bed taxes. The Defendants do not have the funds to maintain their operations. There is an imminent danger that the Agent's collateral will be lost or diminished in value. A receiver is needed to assume the financial management of the nursing facility, to stabilize the operations, and to ensure that the residents will continue to receive care.

3.     The United States District Court for the District of Massachusetts has already appointed a receiver over four affiliates of the Defendants in *Capital Finance, LLC, et al. v. 22 Maple Street, LLC*, 18:CV 10172 – RWZ, a case originally filed in this Court as Case No. SUCV2018-00156-BLS1, and removed to the Federal Court (the "22 Maple Case"). A copy of the order appointing the receiver in the 22 Maple Case is attached hereto as **Exhibit A**. The Superior Court in Middlesex County also recently appointed a receiver over another affiliate of the Defendants. *See Oxford Finance LLC v. 90 West Street LLC and Woodbriar Health Center LLC*, Case No. 1781CV03295 (the "Woodbriar Case"). A copy of the order from the Woodbriar Case is attached hereto as **Exhibit B**.

4.     The Agent seeks appointment of the same receiver that was appointed in the 22 Maple Case and the Woodbriar Case.

**PARTIES**

5.     Plaintiff AP MA Funding LLC (the "Agent") is a Delaware limited liability company with its principal place of business in Maryland. AP MA Funding LLC and Bancalliance, Inc. provided a mortgage loan to the Owner Defendant that was used to acquire the property on which the nursing facility is located.

6.      Defendant 133 Salem Street, LLC (the "Owner Defendant") is a Delaware limited liability company with an address at 2363 Lakewood Road, Suite 200, Toms River, NJ 08755 and owns the real property located at 133 Salem Street, Revere, Massachusetts 02151 (the "Property").

7.      Defendant West Revere Health Center, LLC (the "Operator Defendant") is a Delaware limited liability company with an address at 2363 Lakewood Road, Suite 200, Toms River, NJ 08755 and operates the skilled nursing facility on the Property (the "Nursing Facility").

8.      Upon information and belief, the Defendants are majority owned by Avi (Zisha) Lipshutz and Larry Lipschutz.  Avi (Zisha) Lipschutz guaranteed the mortgage loan.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction to hear this case pursuant to M.G.L. c. 212, §§ 3-4 and M.G.L. c. 214, § 1.

10.     This Court has personal jurisdiction over the Defendants because they have conducted, and continue to conduct, ongoing business operations, and own real and/or personal property located, within the Commonwealth of Massachusetts.

11.     Venue in the Business Litigation Session in Suffolk County is appropriate because this is a commercial claim, involving rights and obligations under a mortgage and related loan documents, pledges, and security interests.  The Agent has simultaneously filed a similar action against another affiliated facility located in Plymouth County.  In the interest of judicial economy and efficiency, the two actions should proceed simultaneously in the Business Litigation Session and to provide the Courts of Massachusetts jurisdiction to protect the residents in the nursing facilities while the litigation is pending.

12.     The amount in controversy exceeds the jurisdictional threshold of this Court.

## FACTUAL BACKGROUND

**A.     Loan**

13.     AP MA Funding LLC and Bancalliance Inc. (collectively, the "Mortgage Loan Lenders") provided a $6,850,000 loan (the "Mortgage Loan") to the Owner Defendant pursuant to that certain Loan Agreement dated as of March 12, 2015, (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement") and all loan documents related thereto (the "Loan Documents").  A true and correct copy of the Mortgage Loan Agreement is attached hereto as **Exhibit C**.

14.     The Mortgage Loan was used to purchase the Property.

15.     The Owner Defendant's obligations and performance under the Loan Agreement are secured by a first priority lien on, among other things, the Property, the Owner Defendant's personal property, and the Operator Defendant's real and personal property (as more fully defined in the Loan Agreement, the "Collateral").   Loan Agreement § 2.9 (Definition of "Collateral").

16.     The Agent perfected its security interest in the Property and other Collateral by, among other things, recording that certain Mortgage, Assignment of Rents, Security Agreement and Fixture Financing Statement (the "Mortgage", a true and correct copy of which is attached hereto as **Exhibit D**) and filing financing statements (as specifically set forth in **Exhibit E**) against the Owner Defendant and the Operator Defendant with the Secretary of State for each Defendant's state of incorporation.

17.     The Agent further entered into deposit account control agreements with the Operator Defendant and the Owner Defendant and their banking institution, The Private Bank

and Trust Company, which agreements provide the Agent full dominion and control over the Defendants' bank accounts and cash following an event of default under the Loan Agreement. Copies of the account control agreements are attached hereto at **Exhibit F**.

18.     The Owner Defendant's performance under the Loan Agreement is guaranteed by Avi (Zisha) Lipschutz (the "Guarantor") pursuant to that certain Guaranty Agreement dated as of March 12, 2015.

19.     The Agent holds a first priority security interests in the Collateral.

20.     The Operator Defendant initially retained Synergy Health Centers, LLC ("Synergy"), which has common ownership to the Defendants, to provide operational, clinical, and back-office management services pursuant to that certain Billing and Human Resources Consulting Agreement dated as of March 1, 2015.

**B.     The Forbearance Agreement.**

21.     Just over a year after entering into the Loan Agreement, the Owner Defendant defaulted on its obligations to the Agent.   The Agent sent the Owner Defendant numerous notices of default and reserved its rights with respect thereto.

22.     In an effort to provide the Defendants time to turn around their financials, on December 30, 2016 the Agent, the Mortgage Loan Lenders and the Owner Defendant entered into a forbearance agreement (the "Forbearance Agreement").   A true and correct copy of the Forbearance Agreement is attached hereto as **Exhibit G**.   The Agent and the Mortgage Loan Lenders agreed to forbear from exercising their rights and remedies with respect to the existing events of default for one year in consideration for the Owner Defendant's and guarantor's covenants and agreements set forth in the agreement.

23.     Pursuant to the Forbearance Agreement, the Owner Defendant acknowledged its defaults under the Loan, the existence of the amounts owing to the Mortgage Loan Lenders and the first priority security interest of the Agent in the Collateral.  Forbearance Agreement § 2.2, 2.3 and 2.4.  The parties further agreed, among other things: (i) to extend the maturity date of the Loan until December 30, 2017 or the date a default first occurs under the Forbearance Agreement, at which time all amounts due under the Loan Documents would be immediately due and payable, (ii) to revised EBITDAR testing covenants, (iii) that the Defendants would replace Synergy with Next Step Healthcare, LLC ("Next Step") to provide operational and clinical management services; and (iv) that Synergy would phase out its provision of back-office services and fully transition those services to a new party no later than September 30, 2017.  Second Forbearance Agreements §§ 4 and 5.

24.     Notwithstanding the forbearances granted under the Forbearance Agreement, further defaults occurred under the Loan Agreement.

25.     The Agent provided the Owner Defendant written notice of the defaults on July 24, 2017, August 29, 2017, October 10, 2017, October 27, 2017 and November 21, 2017.  The defaults[1] are fully set forth in the letters and include, without limitation:

a.      Owner Defendant's failure to satisfy the EBITDAR covenant for the months of April through August 2017; and

b.      failure of the Defendants to phase out Synergy's back office services and to replace Synergy in the agreed upon timeline

(as more specifically set forth in the letters the "Events of Default").  True and correct copies of the letters notifying the Defendants of defaults are attached hereto as **Group Exhibit H**.

---

[1] All capitalized terms used in this paragraph and not otherwise defined shall have the meaning set forth in the Loan Agreement.

**C.**     **Amounts Due and Owing to Agent**

26.     On December 30, 2017, the Forbearance Agreement expired on its terms, the Loan matured and payment was due in full.   The Owner Defendant has failed to fulfill its requirement to repay the Loan in full.

27.     As of the filing of this Complaint, $6,860,465.28 was due and payable under the Loan Agreement, which amount is exclusive of interest, fees and other charges payable under the Loan Agreement and that continue to accrue.

**D.**     **Threats to Operator Defendant's Operations.**

28.     Aside from the Owner Defendant's defaults under the Loan Agreement, the Defendants are not paying their debts and do not have the funds to pay their debts.   The situation will continue to deteriorate because the Operator Defendant's monthly revenues have been less than its operating expenses for at least the last year.   For 2017, the Operator Defendant's revenue was $9,774,913 and its operating expenses were $10,684,339, resulting in a deficiency of $909,426.   **Exhibit I** hereto provides summaries of the Defendants' financials from the financial information submitted by the Defendants to the Agent.

29.     The Operator Defendant has been funding its operations by stretching its accounts payable.   However, its accounts' payable have been stretched so thin, and have been stretched for so long, that this practice cannot continue.   During 2017, the dollar amount of the Operator Defendant's accounts payable increased from $444,073 in January 2017 to $1,094,382 in December 2017.   *See* **Exhibit I**.

30.     The Defendants' financial problems also threaten the continued operations of the Nursing Facility.   The Massachusetts Executive Office of Health and Human Services ("EOHHS") issued a bulletin on January 29, 2018, that it intends to institute an offset procedure

against delinquent operators to collect the unpaid bed taxes beginning on February 1, 2018. See, http://www.mass.gov/eohhs/docs/eohhs/eohhs-regs/adminbull-2017/ab-18-03.pdf. As of December 2017, the Operator Defendant owed over $582,244.42 in past due bed taxes. As a result, the offset procedure will further impact the Operator Defendant's cash flows.

31.     The EOHHS also sent a letter to Operator Defendant on September 18, 2017 stating "[i]f EOHHS does not receive payment after the final notice, your facility will be referred to DPH for revocation of your licensure." See 9/18/17 letter attached hereto as **Exhibit J**.

32.     The Operator Defendant has failed to timely pay Next Step its management fees. Next Step has threatened to terminate the management agreement if such fees are not paid. *See* letters dated October 20, 2017 and November 7, 2017 attached hereto as **Exhibit K**.

33.     The Operator Defendant is behind on its rent payments owed to the Owner Defendant.

34.     Vendors have threatened to terminate services or require payment in advance before providing services. For example, in early March 2018, Partners Pharmacy threatened to terminate the facility's credit due to the non-payment of over $129,000.

35.     The Defendants have been non-responsive to the Agent's requests for the Defendants to address their financial distress, the potential loss of their operating licenses, and the potential loss of Next Step as the manager.

36.     The Defendants have sought to raise additional capital or to obtain an equity infusion from their owners over the last year. However, all of those efforts have been unsuccessful as the owners of the Defendants have refused to provide the necessary cash for the Nursing Facility to maintain smooth operations.

**E.     The Defendants' Management Gridlock.**

37.     Upon information and belief, there is no lead decision maker for the Defendants. Synergy previously provided all management services to the Defendants.   In December 2016, Synergy contracted with Next Step to have Next Step provide the clinical and operational management of the Operator Defendant.   Synergy continued to provide the back-office services, including the financial management of the Defendants and Next Step looked to Synergy for guidance on the overlap between operation and financial management.   Avi (Zisha) Lipschutz is and/or was the manager of Synergy and held himself out as the main contact and decision maker for the Defendants with respect to the Agent.

38.     However, on February 7, 2018, Avi (Zisha) informed Agent that he was no longer the decision maker for the Defendants and that some of the subordinate lenders to the Owner Defendant (referred to as the "Brach Family") were now making the decisions for the Defendants.[2]  Avi (Zisha) Lipschutz's admission of termination was consistent with statements made to the Agent by an attorney claiming to represent the Defendants at a meeting with the Agent on February 9, 2018 and with a filing made in the bankruptcy case of the entity that owns the real property in the Woodbriar Case[3] and the entities that own the real property in the 22 Maple Case.[4]  *See* Declarations of Y.C. Rubin attached hereto as **Exhibit L** at ¶¶ 9-10.

---

[2] Upon information and belief, the subordinate lenders are MA Center LLC, Larry Lipschutz, Zigmond Brach, Jeremiah Brach, Abigail Weiss, Pearl Friedman, Rachel Weisner, Joel Brach, Jennie Brach and Abraham Brach.

[3] On the eve of the hearing to establish a sale process for the real property in the Woodbriar Case, the owner of the property filed a Chapter 11 bankruptcy petition in an effort to stall the sale.  The bankruptcy case was filed in the United States Bankruptcy Court for the Eastern District of New York, Case No. 18-40515.

[4] On the eve of the hearing to appoint a receiver in the 22 Maple Case, the owners of the real property filed Chapter 11 bankruptcy petitions to avoid appointment of a receiver.  The bankruptcy cases were filed in the United States Bankruptcy Court for the Eastern District of New York, Case No. 18-40816 (Jointly Administered).

39.     At such a critical time for the Defendants given their dire financial situation, the Defendants need a decision maker and cannot risk further mismanagement by failing to have a decision maker.

**E.      Appointment of Receiver.**

40.     The Owner Defendant agreed that, upon an event of default under the Loan Agreement, the Agent was entitled to the appointment of a receiver.   The Loan Agreement provides:

> upon the occurrence and during the continuance of any Event of Default, Agent shall have the right to apply for and have a receiver appointed by a court of competent jurisdiction in any action taken by Agent to enforce its or any Lender's rights and remedies in order to manage, protect and preserve the Property and continue the operation of the business of Borrower and to collect all revenues and profits thereof and apply the same to the payment of all expenses and other charges of such receivership including the compensation of the receiver and to the payments as aforesaid until a sale or other disposition of such Property shall be finally made and consummated.

Loan Agreement § 8.4; *see also*, Mortgage § 6(j)(vi).

41.     The Agent brings this action for an appointment of a receiver as provided in the Loan Agreement, to recover its damages as a result of the Owner Defendant's breaches under the Loan Agreement and, of utmost importance, to protect the operations of the Nursing Facility, which is paramount to maintaining the health and welfare of the Nursing Facility's residents.

## COUNT I – BREACH OF CONTRACT (MORTGAGE LOAN)

42.     The Agent repeats and incorporates the allegations set forth in paragraphs 1 through 41 above as if fully set forth herein.

43.     The Loan Documents are all enforceable agreements supported by valid consideration pursuant to which the Owner Defendant is obligated to pay certain specified amounts and perform certain obligations owed to the Agent and the Lenders.

44.     The Loan matured on December 30, 2017.

45. The Owner Defendant has not paid the amounts due under the Loan Agreement to Agent or Lenders.

46. The Owner Defendant's failure to pay the amounts due under the Loan Agreement is a breach of the Loan Agreement.

47. As of the date of this Complaint, the principal amount outstanding under the Loan Agreement is $6,860,465.28.

48. Under the Loan Agreement, the Owner Defendant is required to pay the Agent interest, costs, expenses, and attorneys' fees.

49. As a result of the Owner Defendant's breach of the Loan Agreement, the Agent and the Lenders have suffered significant actual damages, which damages are increasing and ongoing, and have incurred and continue to incur, significant costs, fees and expenses, including attorneys' fees, which the Agent and the Mortgage Lenders are entitled to recover from the Owner Defendant and from the Operator Defendant's real and personal property.

## COUNT II – APPOINTMENT OF RECEIVER

50. The Agent repeats and incorporates the allegations set forth in paragraphs 1 through 49 above as if fully set forth herein.

51. This Court has jurisdiction under its general equity powers to appoint a receiver over the Defendants to provide for the conservation of assets and other appropriate purposes at the instance of a creditor. *Albre v. Sinclair Const. Co.*, 345 Mass. 712, 716 (1963).

52. A receiver should be appointed when defendants are wasting and/or losing property that otherwise might be made available for the payment of the debts of the defendants. *Id.* at 717-18. Insolvency, coupled with mismanagement, so that there is a danger that assets will be wasted or lost, supports the appointment of a receiver. *Id.* at 717.

53.     The Defendants have demonstrated a lack of resources to preserve and protect the Collateral from waste and loss.  Not only has the Owner Defendant defaulted under the Loan, but, in addition, the Operator Defendant has failed to make payments to the manager, Next Step, to the Commonwealth of Massachusetts and to its vendors.

54.     These defaults create a substantial risk to the residents at the Nursing Facility and to the Agent's Collateral.  If Next Step were to cease providing management services or if the Commonwealth of Massachusetts were to terminate the Operator Defendant's licenses, the health, safety and welfare of the over 100 residents at the Nursing Facility would be in jeopardy.

55.     Moreover, the Defendants' defaults, their failure to address grave issues (such as the risk of losing of their manager and/or operating license and lack of available funding), and their repeated failure to timely provide reliable information on the performance of the Nursing Facility, are clear statements of mismanagement.

56.     Given the Defendants' financial distress, defaults and mismanagement and the resulting potential harm to residents and the Collateral, the immediate appointment of a receiver by this Court is necessary to marshal the Defendants' assets to pay their debts, protect the residents, and to preserve the Collateral.

57.     The Agent requests that the Court appoint KCP Advisory Group, LLC ("KCP") of Burlington, Massachusetts, by and through Jacen Dinoff, its Principal and Co-Founder, as the receiver in this action.  KCP is prepared to serve immediately upon appointment by this Court. KCP has already been appointed as receiver in the 22 Maple Case and the Woodbriar Case.

58.     Mr. Dinoff has over twenty (20) years of experience in corporate restructuring and turnaround management advisory services as well as liquidation analysis and recovery.  Mr. Dinoff has participated in financial and operational restructurings, asset divestures through sale

and liquidations and senior debtor/creditor advisory roles for many well-known companies, both publicly and privately held. In February 2015, Mr. Dinoff was appointed by the Suffolk County Superior Court as receiver for Radius Specialty Hospital, LLC, et al., case SUCV2015-00353. The Agent believes that KCP has the experience and expertise to be appointed and serve as receiver in this civil action. A summary of KCP's experience and qualifications and Mr. Dinoff's resume, which illustrates KCP's suitability to serve as Receiver by virtue of his and its experience, is attached hereto as **Exhibit M.**

## REQUEST FOR RELIEF

**WHEREFORE**, the Agent respectfully requests judgment be entered in its favor and against the Defendants, and that this Court grant the Agent the following relief:

(a)     enter judgment on Count I in the Agent's favor and against the Owner Defendant in the amount of at least $6,860,465.28, plus pre-judgment and post-judgement interest, costs, expenses, attorneys' fees and all other amounts to which the Agent is entitled;

(b)     enter an order substantially in the form attached as **Exhibit N**, appointing a receiver to assume possession, custody and control of the Collateral, as requested in Count II;

(c)     award the Agent all costs of collection, including reasonable attorneys' fees incurred by the Agent; and

(d)     grant the Agent such other relief as this Court deems just and proper.

AP MA FUNDING LLC,

_____
John O. Mirick
BBO # 349240
Eva M. Zelnick
BBO #676890
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608
508-860-1550
jmirick@mirickoconnell.com


Dated:  April 3, 2018

## **VERIFICATION**

I, _John Gray_, as an _EVP_ of AP MA Funding LLC certify that the statements

contained herein are true and based on my personal knowledge and my review of the relevant

documents of the Agent, except as to those statements stated upon information and belief.  With

respect to statements based upon my information and belief, I believe those statements to be true.

Signed under the pains and penalties of perjury this _2_ day of _April_ , 2018.


_John Gray_ , EVP

AP MA Funding LLC


State of Maryland

_Montgomery_ County

On this _2nd_ day of _April_ , 2018 before me, the undersigned Notary Public,
personally appeared _John Gray_ , proved to me through satisfactory evidence of
identification which was  photographic identification with signature issued by a federal or state
governmental agency,  oath or affirmation of a credible witness,  personal knowledge of the
undersigned, to be the person whose name is signed on the attached document, and acknowledged
to me that he signed it voluntarily and for its stated purpose.


_Carol D. Baker_ , Notary Public

My Commission Expires: _Sept 25, 2021_


CAROL  D.  BAKER
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
MY COMMISSION EXPIRES SEPT. 25, 2021

## <u>INDEX OF EXHIBITS</u>

A.  22 Maple Order Appointing Receiver

B.  Woodbriar Order Appointing Receiver

C.  Mortgage Loan Agreement

D.  Mortgage

E.  Financing Statements

F.  Account Control Agreements

G.  Forbearance Agreement

H.  Default Letters

I.  Financial Information

J.  EOHHS Letter

K.  Next Step Letters

L.  Declarations of Y.C. Rubin

M.  KCP's Experience and Qualifications

N.  Proposed Order

## **Exhibit A**

22 Maple Order

(see attached)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO 18-10172-RWZ

CAPITAL FINANCE, LLC, *et al.*

v.

22 MAPLE STREET, LLC, *et al.*

<u>MEMORANDUM OF DECISION</u>

March 9, 2018

ZOBEL, S.D.J.

Plaintiff-lenders Capital Finance, LLC and Capital Funding, LLC move for appointment of a receiver of "owner" defendant-borrowers 22 Maple Street, LLC; 25 Oriol Drive, LLC; 59 Coolidge Road, LLC; and 20 Kinmonth Road, LLC (the "Owner Defendants") and "operator" defendant-borrowers Waban Health Center, LLC; Merrimack Valley Health Center, LLC; Watertown Health Center, LLC; and Worcester Health Center, LLC (the "Operator Defendants"). Defendants own and operate skilled nursing facilities at their Massachusetts properties. Though all defendants are distinct corporate entities, each is controlled and managed by non-party Synergy Health Centers, LLC ("Synergy"). <u>See</u> Docket # 1-2 at 88, 89.

On January 16, 2018, plaintiffs filed a complaint in the Business Litigation Session of the Suffolk Superior Court alleging defendants had breached their loan agreements and seeking appointment of a receiver of the properties and nursing home operations. Defendants subsequently removed the action to this court. After briefing

the receivership motion but the day before this court's scheduled hearing, each Owner Defendant filed a petition for bankruptcy under Chapter 11 in the Eastern District of New York. That stayed this litigation with respect to the Owner Defendants. See 11 U.S.C. § 362(a). Since the Operator Defendants did not file for bankruptcy, plaintiff Capital Finance LLC's motion for appointment of a receiver of their businesses is properly before this court.[1]

## I.   Factual Background

Following are the facts as set forth in the pleadings and the parties' submissions to the pending motion.

### A.   The Loan and Forbearance Agreements; Breach Thereof

On March 4, 2014, Capital Funding, LLC and other non-party lenders provided a $36,856,627 mortgage loan to Owner Defendants for the purchase of four Massachusetts properties. Shortly thereafter, on March 28, 2014, Capital Finance, LLC and other non-party lenders provided a $7,500,000 revolving credit "AR Loan" to the Operator Defendants, who have a combined total of over 500 beds at their respective nursing facilities on the four properties.[2] The Mortgage Loan is secured by the properties and the AR Loan is secured by all of the Operator Defendants' assets, which include all accounts and other personal property. Plaintiffs have perfected these interests and hold first priority to them over other creditors.

Plaintiffs allege that Owner and Operator Defendants defaulted on their loan

---

[1]      Hereinafter, "plaintiff" refers to Capital Finance, LLC and "defendants" refers to the Operator Defendants.

[2]      The AR Loan originally provided up to $7,500,000 to fund the operation of the facilities, but was later limited to $4,000,000.

2

obligations just over a year after entering into the contracts.  The parties thereafter entered into a set of First Forbearance Agreements, which were later allegedly breached, and a set of Second Forbearance Agreements, which were also allegedly breached.  As of January 2, 2018, $31,110,090.97 was due on the mortgage loan and, as of January 5, 2018, $2,669,060.90 was due on the AR Loan.[3]  Both amounts are exclusive of interest, fees, and other charges that continue to accrue.

**B.   Operator Defendants' Financial Picture**

Beyond the Operator Defendants' defaults under the AR Loan and Forbearance Agreements, plaintiff alleges that "Defendants are not paying their debts and do not have the funds to pay their debts."  Docket # 25 at 6.  The situation will continue to deteriorate, plaintiff says, because "Operator Defendants' monthly revenues have been less than their operating expenses for at least the last year."  Docket # 32 at 2.  Philip Moylan, a Director at Capital Finance, LLC, examined defendants' balance sheets and income statements and calculated that their 2017 operating expenses were $4,410,542 greater than their total revenues.  See Docket ## 32-1 ¶ 6; 32-2 at 1.

Plaintiff further alleges that defendants' financial problems threaten the continued operation of the defendants' nursing homes and, by extension, the viability of the assets securing the AR Loan.  By Administrative Bulletin 18-03, the Commonwealth of Massachusetts Executive Office of Health and Human Services ("EEOHS") has

---

[3]      Defendants state that they made further payments subsequent to plaintiff's complaint such that, as of February 6, 2018, the total balance on the AR Loan was $1,953,374.66.  See Docket # 22-1 ¶ 9.  They also state that additional payments of $307,471.47 were made as of February 8, 2018. Id.  Those statements are disputed, however, by the sworn affidavit of Capital Finance, LLC Director Philip Moylan, which contends that "over $2.7 million is outstanding [on the AR Loan] as of the end of day Feb 15, 2018."  Docket # 32-1.

3

warned that nursing facilities with unpaid bed taxes (also called "user fees") may be referred to the Department of Public Health for license revocation. <u>See</u> Docket # 25-1 at 3.  Furthermore, by letter dated January 26, 2018, EOHHS specifically notified defendants Worcester Health Center and Watertown Health Center that, given their outstanding user fees totaling $434,453 and $367,240, respectively, EEOHS would begin to offset MassHealth payments to the centers by 15% to begin recouping the outstanding debts.  <u>See</u> Docket # 25-2 at 2, 5.  In addition, defendants' management company Next Step has threatened to cease providing services because of defendants' failure to timely pay them.  Docket ## 1-1 ¶ 51; 1-6 at 6-17.  Other vendors are similarly dissatisfied.  For example, plaintiff's Managing Director, Glen Dywer, submitted a sworn affidavit stating that, on February 9, 2018, he learned that the regular HVAC service provider for the Waban Health Center had refused to come fix problems with the heating system, apparently because defendants owed money to the company.  Docket # 25-3 ¶ 9.  Finally, plaintiff alleges that "Defendants do not have a decision maker in charge and running their operations, instead they are experiencing management deadlock, which further threatens any viability of their operations."  Docket # 25 at 3.  In support, Mr. Dwyer stated that while one Zisha Lipschutz historically held himself out as the main contact and decision maker for defendants, Mr. Dwyer was informed on February 9, 2018 that Mr. Lipschutz no longer has decision-making authority.  Docket # 25-3 ¶¶ 11, 13.

Defendants generally dispute the severity of the financial deficiencies alleged by plaintiff.  According to defendants, they are "consistently" making payments "without any issue" on the outstanding Massachusetts bed taxes and the management fees

owed to Next Step.  Docket # 22 at 7.  Though they concede that the outstanding bed taxes amount to $1,166,953.75 across the four facilities, defendants say they are "making monthly payments in response to these charges on a consistent and continuing basis" and note that the Commonwealth has not yet initiated procedures to revoke their licenses.[4]  Docket 22-1 ¶ 5.  With respect to the AR Loan itself, defendants argue that the balance is being "automatically paid down whenever Synergy collects on accounts receivables," including payments as recent as February 8, 2018.  Docket # 22 at 7.

## II.    Legal Standard

"This Court has inherent equitable power to appoint a receiver to manage or preserve property pending judgment."  U.S. Bank Nat'l Ass'n v. Pendleton Westbrook SPE, LLC, No. 2:16-CV-00411, 2016 WL 6808141, at *3 (D. Me. Nov. 17, 2016) (citing United States v. Quintana-Aguayo, 235 F.3d 682, 686 & n.8 (1st Cir. 2000)).  Receivership is an extraordinary remedy, justified only when a clear showing is made that an "emergency exists, in order to protect the interests of the plaintiff in the property."  Commodity Futures Trading Comm. v. Comvest Trading Corp., 481 F.Supp. 438, 441 (D. Mass. 1979).  To warrant the appointment of a receiver to manage and operate a business, "there must be at the least a 'sufficient showing' of something more than the inadequacy of the security and the doubtful financial standing of the debtor."  Chase Manhattan Bank, N. A. v. Turabo Shopping Ctr., Inc., 683 F.2d 25, 26 (1st Cir. 1982) (quoting Garden Homes, Inc. v. United States, 200 F.2d 299, 301 (1st Cir. 1952)).  In determining the presence vel non of "something more," courts look to factors

---

[4]    Mr. Moylan's affidavit and the supporting documents filed therewith estimate the total outstanding bed taxes to be $2,418,101 inclusive of interest.  Docket ## 32-1 ¶ 11; 32-6 at 1.

5

such as "fraudulent conduct on the part of the defendant; imminent danger that property would be lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and the plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property." Id. at 26-27.  Ultimately, "the decision to appoint a receiver clearly lies within the discretion of the court."  Consol. Rail Corp. v. Fore River Ry. Co., 861 F.2d 322, 326 (1st Cir. 1988).

## III.   Discussion

Plaintiff argues that a receiver is necessary because "[d]efendants' careless and negligent behavior has not only jeopardized the Agent's Collateral, but it has put the residents at their nursing facilities at risk."  Docket # 17 at 2.  In addition to being in default on their loan obligations, plaintiff contends that defendants are unable to keep up with payments to vendors such that there exists a real and alarming threat that the facilities will falter and all revenues will cease.  Plaintiff also suggests that a receivership is in the public interest, given the threat to patients if the nursing homes fail.  Finally, plaintiff notes that a separate Massachusetts nursing facility affiliated with Synergy is already in receivership.

Defendants counter that although they are in default on their obligations to plaintiff and do have certain outstanding balances with vendors, appointment of a receiver is unnecessary because "Plaintiffs present no allegations or evidence to demonstrate that the Defendants are insolvent and provide the Court with no showing whatsoever that the Properties provide inadequate security to satisfy the total debt

6

owed."  Docket # 22 at 6.  They argue that their financial position is not as grim as

plaintiff claims and that, in any event, plaintiff has failed to show the requisite

"something more" which would justify receivership.

Contrary to defendants' arguments, I am persuaded that receivership is fully

warranted.  This conclusion is based on the complaint; the parties' briefs, affidavits, and

related papers; the loan agreements; and supplemental financial information regarding

defendants' accounts receivable and payable; as well as the parties' arguments at the

hearing on plaintiff's motion.[5]

To begin, "plaintiff's probable success in the action" is considerable.  See

Turabo, 683 F.2d at 27.  Breach of the loan and forbearance agreements is not

seriously in dispute, nor is the fact that the entire AR Loan balance is presently due and

owing.  That defendants "continue to perform on and pay the loans" is immaterial

because, as they admit, the alleged breaches concern "certain reporting requirements,

covenants and agreements" which they failed to satisfy.  Docket # 22 at 6, 7.

Turning to the "possibility of irreparable injury to [plaintiff's] interest in the

property," it is clear that the viability of defendants' operations is seriously threatened

because their current income stream is insufficient to cover their operating expenses

and outstanding debts.  For example, defendants' 2017 revenue was $39,028,687 and

their operating expenses were $43,439,228.  Docket ## 32-1 ¶ 6; 32-2 at 1.  Consistent

with this pattern of negative net income, over half of defendants' current accounts

payable are 90 days past due.  Docket ## 32-1 ¶ 8; 32-4 at 1.  Because vendors are

---

[5]     Because equity justifies a receivership here, the court need not consider any separate
contractual grounds.

likely to cease providing services if these debts are not paid, and because the
Commonwealth may revoke defendants' licenses if the bed tax debt isn't remedied, the
continued operation of the nursing facilities is at risk.

While defendants present financial data purporting to show that "the existing
receivables … are sufficient to cover all vendor payables," Docket # 33 at 2, their
proffer is highly misleading for several reasons.  First, the data excludes several large
debts, including the outstanding Massachusetts bed taxes and large (though disputed)
fees owed to Woodmark Pharmacy.  When those debts are included, the conclusion
that defendants are insolvent becomes inescapable.[6]  Second, defendants provide no
information on the certainty of collecting the purported receivables, which is doubtful
because (i) Massachusetts has threatened to withhold a portion of MassHealth
payments to offset the overdue bed taxes; and (ii), in any event, the AR Loan
agreement requires that all of defendants' collections be paid to a lock box and used to
repay the outstanding loan debt before any other payables.  Defendants acknowledge
that the AR Loan is "automatically paid down whenever Synergy collects on accounts
receivables," Docket # 22 at 7, but fail to address how this situation impacts their ability
to pay vendors.  Notably, plaintiffs are not prepared to forbear exercising this right or to
lend additional funds (though they would extend credit to a receiver) and defendants
have not identified any other source of funding.  Defendants' contention that "[a]ny
threat of the nonpayment of vendors is extinguished by the uncontroverted fact that
upon receipt of each facility's receivables, all vendors will be adequately and

---

[6]      It is also unclear whether defendants' data accounts for any fees or interest being
charged by vendors due to the various delinquencies.

satisfactorily paid" is therefore disingenuous and irreconcilable with the evidence. Docket # 33 at 3.

Finally, while the Operator Defendants are separate legal entities from the Owner Defendants, the latters' recent bankruptcies further underscore the gravity of defendants' financial problems given that both sets of companies are owned and managed by Synergy. The bankruptcies and surrounding facts also lend credence to plaintiff's allegations of gridlock and disarray within Synergy's management. For instance, defendants submitted an affidavit of Zisha Lipschutz dated February 9, 2018 in which he described himself as "Manager for Synergy Health Centers." Docket # 22-1 at 2. That same day, however, plaintiff was informed that Mr. Lipschutz no longer has decision-making authority for the organization. Furthermore, while defendants cited the Lipschutz affidavit on February 12, 2018 and contended that "Synergy...will continue [to] make payments without any issue" on the mortgage loan, Docket # 22 at 7, the Owner Defendants filed for bankruptcy just two days later. Bankruptcy filings and a new affidavit in this case list one Y.C. Rubin as defendants' "Chief Restructuring Officer" and do not mention Mr. Lipschutz. Such management disarray further supports appointment of a receiver to operate the nursing homes.

In sum, defendants' financial situation is "something more" than "doubtful"—it is dire. See Turabo, 683 F.2d at 26. I am persuaded that there is an "imminent danger" that the relevant property, i.e. the accounts and other assets securing plaintiff's loan, will be "lost" or "diminished in value." See id. at 26-27. These circumstances, when considered alongside plaintiff's probable success in the underlying action as well as Synergy's management turmoil and the bankruptcy of the Owner Defendants, justify a

9

receivership.  Moreover, the court is mindful that defendants operate skilled nursing homes with hundreds of patients.  Operational mishaps, service interruptions, and license revocations may well affect the health and safety of patient-residents.  That fundamentally distinguishes this case from those involving, for instance, commercial office buildings, see U.S. Bank Nat. Assoc. v. DePietri, Sr., No. 10-cv-10920, 2010 WL 3259979 (D. Mass. Aug. 18, 2010), or media businesses, see Alta Subordinated Debt Partners II, L.P. v. Tele-Media Co. of the Carolinas, No. 95-cv-11105, 1995 WL 464925 (D. Mass. July 26, 1995).

## IV.    Conclusion

Plaintiff Capital Finance, LLC's Emergency Motion for Appointment of Receiver is ALLOWED as to Waban Health Center, LLC, Merrimack Valley Health Center, LLC, Watertown Health Center, LLC, and Worcester Health Center, LLC.

The parties shall confer and, within seven days from the date of this Memorandum of Decision, submit to the court a Joint Proposed Order Appointing Receiver that is specific to this case and these defendants.

_____March 9, 2018_____
DATE

_____
RYA W. ZOBEL
SENIOR UNITED STATES DISTRICT JUDGE

## **Exhibit B**

Woodbriar Order

(see attached)

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                              SUPERIOR OURT
                                           CIVIL ACTION
                                           No. 1781CV03295


OXFORD FINANCE LLC,

v.

90 WEST STREET LLC and
WOODBRIAR HEALTH CENTER LLC


**MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S
MOTION FOR APPOINTMENT OF RECEIVER**

This matter came before the court on November 20, 2017, on plaintiff Oxford
Finance LLC's ("Oxford") request for appointment of a receiver for certain property
(described below), including the real property located at 90 West Street, Wilmington,
MA ("Property").  The defendants, 90 West Street LLC ("90 West Street") and
Woodbriar Health Center LLC ("Woodbriar") (collectively "Defendants") were notified of
the hearing, but failed to appear. Paul Valentine, senior managing director of the
prospective receiver, KCP Advisory Group LLC, testified in support of Oxford's request.

As more fully explained below, after hearing and thorough review of Oxford's
Verified Complaint and Request for Appointment of Receiver ("Complaint") and the
voluminous exhibits attached thereto, Oxford's request for appointment of a receiver is
**ALLOWED in part.**


## BACKGROUND

Defendant 90 West Street owns the Property and leases it to Woodbriar.
Woodbriar operates a 142 bed nursing home at the Property, although day-to-day
management thereof is performed by Next Step Healthcare LLC ("Next Step") pursuant
to an agreement between Woodbriar and Next Step.

On March 10, 2015, the Defendants and Oxford entered into loan agreements in
which Oxford lent the Defendants $19,300,000.00 (in total). To secure performance of

the defendants' obligations, the Defendants executed a security agreement, pursuant to which, among other things, each Defendant granted Oxford a security interest in and to substantially all of their assets (including their accounts receivable).  In connection with the loan agreements 90 West Street granted Oxford a mortgage (on the Property), assignment of rents, and a security agreement in certain assets. Further, on the same date, the Defendants and Oxford also entered into another agreement by which Oxford extended a line of credit to Defendants in the principal amount of up to $2,000,000.00. The Defendants provided Oxford with security substantially in the same form as the aforementioned loans of $19.3M.

On or around October 28, 2016, Oxford and the Defendants entered into a Forbearance Agreement ("Forbearance Agreement"), in connection with, among other things, Defendants acknowledged the occurrence and continuation of certain defaults of the loan agreements and events of default thereof. The terms of the Forbearance Agreement provided that, upon termination of the forbearance period, all of Defendants' obligations due to Oxford "shall be immediately due and payable without further notice or demand" and Oxford "shall be free in its sole and absolute discretion to exercise any of its rights and remedies" without further notice or demand to Defendants, unless such obligations were satisfied in full. The Forbearance Agreement expired by its own terms on October 29, 2017.  Oxford's security interest in certain collateral is said to be perfected and enforceable, first priority, senior security interest in all of Defendants' assets.

KCP Advisory Group LLC, the proposed receiver has experience serving as a receiver of an in-patient acute care facility in Boston pursuant to an order of this court sitting in Suffolk County.

## DISCUSSION

"'A receivership is an equitable remedy designed to protect and preserve the assets of a corporate debtor for those creditors who the court ultimately decides are entitled to them.'" Charlette v. Charlette Bros. Foundry, 59 Mass. App. Ct. 34, 45 -46 (2003) (quoting Shapiro, Perlin, & Connors, Collection Law § 13.1 (3d ed. 2000)); see also New England Theatres, Inc. v. Olympia Theatres, Inc., 287 Mass. 485, 492 (1934); Lopez v. Medford Community Center, Inc., 384 Mass. 163, 169 (1981); Jae Corp. v.

Massachusetts Port Realty Co., 3 Mass. App. Ct. 704, 704 (1975). "'[I]n order to justify the appointment of [a receiver] on the application of a creditor, it should at least appear that [it] has a valid claim against the [debtor], that there are assets applicable to its payment, and that [it] has exhausted his legal remedies, or that the circumstances are such that to deny the application would lead to a wasting and loss of property which otherwise might be made available for the payment of the debts of the [debtor], and which could not be availed of in any other manner so satisfactorily as by the appointment of a receiver.'" George Altman, Inc. v. Vogue Intl., Inc., 366 Mass. 176, 180 (1974) (quoting Falmouth Natl. Bank v. Cape Cod Ship Canal Co., 166 Mass. 550, 568-569 (1896)).

The court is mindful that a receivership is generally a remedy of last resort and should be granted sparingly.  Perez v. Boston Housing Auth., 379 Mass. 703, 733 (1980). To be sure, "[a] decree appointing a receiver can often have irreversible and far-reaching consequences for the [entity placed in receivership] and others. Therefore, particular care must be exercised by a judge in order to ascertain that facts exist which justify, and in the judge's discretion require, the appointment of a temporary or permanent receiver.'" Lopez v. Medford Community Center, Inc., 384 Mass. 163, 169 (1981) (citations omitted).

Here, the court finds that, under the circumstances, the remedy of a receivership is warranted.  In the loan documents, the Defendants granted Oxford the power to seek appointment of a receiver.  Oxford has established a likelihood of success on its claims that Defendants are in default of their obligations under the loan documents and Forbearance Agreement for, *inter alia*, failing to pay sums due thereunder in the amount of $16,324,283.70, as of November 6, 2017, plus late fees, interest, other charges, and expenses, including, without limitation, costs and attorneys' fees, which have accrued or that will be incurred to which Oxford is entitled under the loan documents.  Oxford has established a likelihood of success on its allegation that all conditions precedent to Oxford's rights of recovery in this action have been performed or have occurred.

Oxford has also established a risk of irreparable harm should the requested relief of the appointment of a receiver not be allowed.  Specifically, there is a risk of irreparable harm to the value of the collateral securing Defendants' indebtedness, and a

material risk of harm to the health of non-party residents of the Woodbriar facility, should a receiver not be appointed to secure the responsible management of the Woodbriar facility during the pendency of this litigation. Oxford has also established that Defendants will not suffer irreparable harm should a receiver be appointed, given the Defendants' acknowledgment of the existence of uncured defaults and their contractual agreement to the appointment of a receiver in such circumstances.

Moreover, the public interest favors the appointment of a receiver, who can report to the Court on the circumstances at the in-patient healthcare facility located and operated at the Property, and preserve the stable maintenance of the facility for the benefit of all its residents during the pendency of this litigation.  Oxford has also established that the proposed receiver has the appropriate experience overseeing the operation of a similarly sized nursing home in Boston.

## ORDER

For the above reasons, Oxford's request for appointment of a receiver is **ALLOWED in part.**  As such, the court hereby Orders the following, without prejudice to the Receiver and parties seeking to vacate or modify this Order as the circumstances reasonably warrant:

> 1.   KCP Advisory Group LLC, 2400 District Avenue, Suite 215, Burlington, MA 01803, by and through Jacen Dinoff, its Principal and Co-Founder, is hereby appointed receiver ("Receiver") of each of the Defendants and all of Defendants' assets, including, without limitation, the Property and accounts receivable (collectively, the "Collateral"), with all of the powers and obligations set forth herein.
>
> 2.   As of the date of this Order, the Receiver is authorized to take immediate possession and full control of (subject to the following paragraph) all of the Collateral and to take such other actions as the Receiver deems reasonable and appropriate to take possession of, to exercise full control over, to prevent waste, and to preserve, manage, secure, and safeguard the Collateral.  The Defendants shall have neither possession nor control of, nor any right to, the Collateral or money or other proceeds derived from the Collateral unless and

until the receivership is terminated and the Receiver is discharged. Furthermore, without the consent of the Receiver, none of the Defendants, the Guarantors, or any agents of the Defendants or Guarantors shall enter or be present at the Property, communicate in any manner with the tenants or any prospective tenant of the Property, or modify, terminate or cause to be modified or terminated any license, permit, lease, easement, contract or agreement, if any, relating to the Property.  The Receiver shall manage the Collateral as would a prudent person.  The Receiver may, without an order of the Court, delegate managerial functions to a person in the business of managing real estate of the kind involved who is financially responsible and prudently selected.

3.    Notwithstanding anything to the contrary contained in this Order, the Collateral shall not include any medical or patient information and records of any kind or nature and in whatever form kept (paper, microfilm, or electronic), as those terms are used in the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act ("HIPAA"), and together with such other applicable state and federal laws, including, without limitation, .L. c. 111, §§ 70, et seq., and regulations promulgated thereunder (collectively "Privacy Laws").  Neither the Receiver nor Oxford shall access, inspect, or take possession or control of any medical or patient information and records protected by Privacy Laws.

4.    Until further order of this Court, all persons or entities, including but not limited to all current and future tenants in possession of the Property or any portion thereof, if any, any persons liable therefor, and any other persons or entities who owe any sum of money on an account receivable by either Defendant or both, shall be obligated pay to the Receiver all rents, income, or other amounts now due and

unpaid or other amounts hereafter to become due, on their respective accounts receivable.

5.   The Receiver shall make an initial report to this Court and to Oxford on or before December 15, 2017, to inform the Court of the financial and operational status of the Collateral and the nursing home, including without limitation the status of the Next Step Healthcare contract and services, and such further additional reports as directed by the Court;

6.   Subject to the terms hereof, the Receiver shall have and may exercise the following powers, and such additional powers that are provided by law and that the Court may from time to time direct or confer:

(i)     To collect the rents, issues, accounts receivable, insurance claim proceeds, real estate tax refunds, utility deposits, security deposits, proceeds, earnest money deposits and profits from the Collateral, if any, from any time period whether historical, current or prospective, and receive any such assets presently in the possession of either Defendant and/or their agents;

(ii)    To retain Next Step Healthcare as manager of the healthcare facility located and operated at the Property, or any qualified replacement healthcare facility management company should the Next Step Healthcare contract be terminated or should it otherwise cease performing its management services, and any construction managers, general contractors, subcontractors, architects, engineers, consultants, title companies, environmental consultants and personnel, asset managers, property managers, leasing agents, brokers, administrative support, attorneys, security companies, custodians, janitors, maintenance workers, repairmen, assistants, agents, realtors, appraisers, accountants and other employees and/or contractors and enter into agreements with any other third parties, including Oxford, as the Receiver reasonably

deems necessary, appropriate, or desirable to assist the Receiver in diligently executing the duties imposed upon the Receiver by this Order, including but not limited to the maintenance and operation of the Collateral, without further approval of this Court.  Additionally, the Receiver may terminate or enter into vendor or other contracts pertaining to the Collateral as the Receiver may determine are necessary, with no further obligation or liability (including not having to pay any termination fees) under any terminated contract;

(iii)     To use all tax identification numbers of the Defendants and cause to be filed all federal, state, and local income tax returns of Defendants for the period through termination of this receivership, including, without limitation, for the calendar year 2016.  The Receiver is authorized to communicate with, negotiate with, and serve as nonexclusive representative of Defendants to all taxing authorities, provided, however, the Receiver shall keep all members and managers of both Defendants apprised of all communications with taxing authorities, and shall not enter into or suffer any agreements or adjustments to either of the Defendants' tax returns (including those filed by the Receiver) that would materially change the tax consequences without agreement of the affected Defendant.  The Receiver shall use reasonable efforts to issue all tax related forms on behalf of Defendants, including, without limitation, Internal Revenue Service Forms W-2, 1099, and K-1.  The Receiver shall also have the authority to pay taxes which may have been or may be levied against the Collateral;

(iv)     To use reasonable efforts to maintain the Property in at least the same condition as existed at the time the Receiver took possession, excepting reasonable wear and tear and damage by any casualty.  The Receiver may make all repairs, declarations, renewals, replacements, alterations, additions, betterments, and improvements in connection with the Collateral as may seem

the Defendants' other creditors in order of priority, pay outstanding obligations to suppliers who, prior to the entry of this Order, supplied materials, business supplies and/or labor to or for the benefit of the Collateral, and pay any other reasonable expenses incurred by the Receiver as a result of its exercising any of the power and authority granted herein, out of the Collateral, provided sufficient funds are available after reasonable reserves; and

(xiii) To take such other actions as may be reasonably necessary to conserve the Collateral, or as otherwise authorized by the Court.

7.   The liability of the Receiver is and shall be limited to the assets of the receivership, and neither the Receiver nor any person or entity engaged by the Receiver hereunder shall be personally liable for any duly authorized actions properly and lawfully taken pursuant to this Order; notwithstanding the foregoing, the Receiver shall be liable for damages proven to result from its intentional acts and/or omissions.

8.   Notwithstanding anything herein to the contrary, (i) the Receiver is not responsible for and is not obligated to pay any debts of the Property or the Defendants, including but not limited to utility bills, incurred or accrued before its appointment; provided, however, that if the Receiver, in its judgment, believes that paying a bill or debt which arose before its appointment is in the best interest of the Property or residents thereof, the Receiver may pay any such bill or debt without prejudice to the protections afforded by this Order, (ii) the Receiver shall not be personally responsible for any bills during the Receivership, (iii) the Receiver shall not offer to sell, agree to sell or in any way directly or indirectly sell or convey the Property without the written consent of Oxford, and (iv) the Receiver shall provide such information, documents and reports to Oxford as Oxford may request.

9.   The Receiver's compensation shall be on an hourly basis as agreed to by Oxford.  The Receiver's compensation shall be paid (a)

first from the Collateral including all monies or other proceeds derived therefrom, and, next, (b) from secured advances, if any, that Oxford in its sole discretion in accordance with this Order, makes to the Receiver to pay such fees and expenses, but only to the extent that the Collateral is insufficient to pay the Receiver's compensation. The Receiver shall maintain records of its time.

10. The Receiver shall have no obligation to expend funds in excess of the receipts actually collected or received by the Receiver. Oxford shall have no obligation to provide funds to the Receiver. The Receiver is authorized to borrow funds from Oxford at Oxford's sole discretion. Any funds borrowed from Oxford by the Receiver shall be secured by a first, valid and perfected lien and security interest in the Property senior to all other liens and security interests in the Property, which lien shall be valid and perfected without the necessity of recordation, filing, or any other act of Oxford, and the Receiver is authorized, but not required, to issue receivership certificate(s) to evidence and secure any such protective advances by Oxford.

11. Subject to Paragraph No. 3 hereof, within five (5) calendar days from the entry of this Order, and thereafter, forthwith upon request of the Receiver, Defendants and/or their agents shall provide or make available to the Receiver the following, to the extent such items and things exist:

(i)      all Collateral and funds generated by or from the Collateral, whether such funds are held in a Collateral related account or not, including but not limited to: (a) all cash on hand; (b) all cash equivalents and negotiable instruments (such as checks, notes, drafts or other related documents or instruments); and (c) all sums held in accounts in any Financial Institutions, including but not limited to (1) tenant/lessee security deposits, (2) deposits held in escrow for any purpose, such as for payment of real estate taxes

and insurance premiums, (3) proceeds of insurance maintained for, or pertaining to, the Property, (4) rent or prepaid rent, (5) funds designated or intended for capital improvements, repairs, or renovations to, or in connection with, the Property, and (6) all other sums of any kind relating to the use, enjoyment, possession, improvement, or occupancy of all or any portion of the Property;

(ii)     copies of any and all service contracts pertaining to the Collateral;

(iii)    copies of any and all management contracts and/or agreements pertaining to the Collateral;

(iv)    copies of any and all leases, lease abstracts, purchase agreements and the like pertaining to the Collateral;

(v)     all open invoices for services or goods relating to the Collateral;

(vi)    all records evidencing the Defendants' accounts receivable;

(vii)   copies of the 2015 year-end and 2016 year-to-date financial statements (and month by month detail) for each Defendant and on a consolidated basis, in both hard copy and electronic format: balance sheet, income statement, accounts receivable (and receivables/arrearages aging), operating statements, current year budget, sources and uses of cash flow, detailed rent roll, accounts payable, check register, security deposit listing, trial balance, general ledger, contractor statements, lien waivers, sworn owner statements, construction draws, bank reconciliations and bank statements, including any passwords which may be associated with any financial documents or accounts;

(viii)  a complete set of keys (including all masters) and all security and/or access codes and/or cards to the Property and a schedule (including full contact information) identifying each person or entity (including security companies, municipal/governmental

agencies and utility companies), who currently has one or more keys and/or access cards to the Property or who has knowledge of any access codes thereto;

(ix)   any and all records and information Defendants may have concerning the Property, including without limitation all written and electronic books, records, correspondence, and other information (including any computer hardware or software login and password information) related to: (a) any agreements to which the Property is or may be subject; (b) any amounts received from the tenants of the Property, from the time 90 West Street took ownership of the Property to the date of entry of this Order; (c) all liens or other encumbrances on the Property; (d) property taxes, assessments and related appeals; (e) insurance of all types for Defendants and tenants (including but not limited to liability, property, excess liability, auto liability, boiler and machinery, business interruption, professional liability, employee dishonesty, builders risk, construction related insurance and worker's compensation) related to the Property; (f) all maintenance and service contracts; (g) all invoices for services at the Property; (h) all tenant files, including leases, lease abstracts, purchase agreements and sample leases from the time 90 West Street took ownership of the Property to the date of entry of this Order; (i) a current and accurate copy of all electronic information for items related to accounting, including but not limited to tenant escalations/reconciliations from the time 90 West Street took ownership of the Property to the date of entry of this Order; (j) a full and complete rent roll including but not limited to schedules/information related to tenant security deposits, encumbrances, options, escalations, rents and term; (k) all marketing information (in hard copy and electronic format) including but not limited to brochures, photographs (including aerial), maps, and signage; (l) copies of all state and federal tax returns signed and filed

by Defendants for calendar years 2015 and 2016; and, (m) all other aspects of the Property records that are or may be necessary or pertinent to the Receiver's management, maintenance, operation and/or sale of the Property;

    (x)    any and all insurance loss histories and/or claims related to the Collateral; and

    (xi)    all property and all other things of value associated with use, operation and maintenance of the Collateral.

12. Defendants shall at all times after the entry of this Order provide full cooperation to, and shall not in any way interfere with, the Receiver in carrying out its duties hereunder, and shall timely respond to all reasonable requests made by the Receiver. Defendants' obligations pursuant to this Order shall be continuing. Neither 90 West Street nor Woodbriar Health Center nor anyone associated therewith or acting under their authority or control shall in any way directly or indirectly impair the value of the Collateral or interfere with the Receiver in the exercise of its duties pursuant to this Order.

13. The Receiver shall file operating status reports with the Court on January 15, 2018, and every 60 days thereafter. Copies of all such reports, including that required by Paragraph No. 5 hereof, shall be provided to the Defendants via electronic mail upon receipt by the Receiver of their email addresses.

14. The Receiver may at any time may request from the Court that it be exonerated, discharged and released from its appointment as Receiver.  The Receiver shall, during the pendency of this action, have the right to apply to this Court for further instructions or directions.

15. As of the date of this Order, all persons and entities, including but not limited to the Defendants' creditors and their respective officers, agents, representative and all other persons or entities

acting under or in concert with such creditors are hereby placed on notice that all Collateral is in *custodia legis*, and, as such, under the protection of this Court, immune from attachment or other legal process, and subject entirely to control by the Receiver as this Court's appointee.

16. The authority granted to the Receiver is self-executing. The Receiver is authorized to act on behalf of, and in Defendants' (or the Receiver's) name, as the Receiver deems appropriate without further order of this Court and without personal recourse against the Receiver (subject to any recourse described herein).

17. This Order may be modified by Order of the Court after notice to the Receiver, Defendants and Oxford.

18. Nothing in this Order shall impair Oxford of its rights and remedies against the guarantors of the loans at issue in this matter.

Jeffrey T. Karp
Associate Justice, Superior Court
Dated: November 22, 2017

## **Exhibit C**

Mortgage Loan Agreement

(see attached)

# TERM LOAN AND SECURITY AGREEMENT

**By and Among**

**133 SALEM STREET, LLC,**
**a Delaware limited liability company**
**("Borrower")**

**and**

**AP MA FUNDING LLC,**
**a Delaware limited liability company,**
**as a lender, and any other Person that**
**in the future becomes a lender under this Agreement**
**(collectively, "Lenders")**

**and**

**AP MA FUNDING LLC,**
**a Delaware limited liability company**
**("Agent")**

**March 12, 2015**

TABLE OF CONTENTS

Page

| | | | |
|---|---|---|---|
| I. | | DEFINITIONS | 1 |
| | 1.1 | Definitions | 1 |
| | 1.2 | General Terms | 18 |
| II. | | ADVANCES, PAYMENT AND INTEREST | 18 |
| | 2.1 | Term Loan | 18 |
| | 2.2 | Evidence of Term Loan | 18 |
| | 2.3 | Interest Rate; Default Interest Rate; Late Charge | 19 |
| | 2.4 | Payment; Extension of Maturity Date | 21 |
| | 2.5 | Prepayment; Early Termination Fee; Term Extension | 22 |
| | 2.6 | Security | 23 |
| | 2.7 | Collections; Repayment; Springing Lockbox | 23 |
| | 2.8 | Promise to Pay; Manner of Payment | 24 |
| | 2.9 | Grant of Security Interest | 24 |
| | 2.10 | Interest Rate Cap Agreement | 25 |
| | 2.11 | Increased Costs; Capital Adequacy | 27 |
| III. | | FEES AND OTHER CHARGES; RESERVES; CASH MANAGEMENT | 29 |
| | 3.1 | Commitment Fee; Other Fees | 29 |
| | 3.2 | Lawful Limits | 29 |
| | 3.3 | Renovation; Renovation Reserve | 29 |
| | 3.4 | CapEx Obligation | 30 |
| | 3.5 | Tax and Insurance Reserve | 31 |
| | 3.6 | Reserved | 32 |
| | 3.7 | Reserved | 32 |
| | 3.8 | Repair and Remediation Reserve | 32 |
| | 3.9 | Security Interest In Reserves | 33 |
| | 3.10 | Sinking Fund Account | 34 |
| IV. | | CONDITIONS PRECEDENT | 35 |
| | 4.1 | Conditions to Funding of Term Loan and Closing | 35 |
| V. | | REPRESENTATIONS AND WARRANTIES | 38 |
| | 5.1 | Organization and Authority; Investment Company | 38 |
| | 5.2 | Loan Documents | 38 |
| | 5.3 | Subsidiaries, Capitalization and Ownership Interests | 39 |
| | 5.4 | Property Matters | 39 |
| | 5.5 | Other Agreements | 41 |
| | 5.6 | Litigation | 41 |
| | 5.7 | Tax Returns; Governmental Reports | 42 |
| | 5.8 | Financial Statements and Reports | 42 |
| | 5.9 | Compliance with Law | 42 |
| | 5.10 | Intellectual Property | 43 |
| | 5.11 | Burdensome Agreements | 43 |
| | 5.12 | No Default | 43 |
| | 5.13 | Disclosure | 43 |
| | 5.14 | Existing Indebtedness; Investments, Guarantees and Certain Contracts | 44 |

| | 5.15 | Other Agreements | 44 |
|---|---|---|---|
| | 5.16 | Insurance | 44 |
| | 5.17 | Names; Location of Offices, Records and Collateral | 44 |
| | 5.18 | Non-Subordination | 44 |
| | 5.19 | Borrower Bank Accounts | 44 |
| | 5.20 | Healthcare Matters | 45 |
| | 5.21 | First Priority Lien | 46 |
| | 5.22 | Special-Purpose Entity | 47 |
| | 5.23 | Bankruptcy | 47 |
| | 5.24 | Survival; Diligent Inquiry | 47 |
| | 5.25 | Anti-Terrorism; OFAC | 47 |
| | 5.26 | Environmental Matters | 48 |
| VI. | | AFFIRMATIVE COVENANTS | 48 |
| | 6.1 | Financial Statements, Reports and Other Information | 48 |
| | 6.2 | Payment of Obligations | 52 |
| | 6.3 | Conduct of Business and Maintenance of Existence and Assets | 52 |
| | 6.4 | Compliance with Legal and Other Obligations | 52 |
| | 6.5 | Insurance | 53 |
| | 6.6 | True Books | 57 |
| | 6.7 | Inspection; Periodic Audits | 57 |
| | 6.8 | Further Assurances; Post Closing | 58 |
| | 6.9 | Payment of Indebtedness | 59 |
| | 6.10 | Lien Searches | 59 |
| | 6.11 | Use of Proceeds | 59 |
| | 6.12 | Collateral Documents; Security Interest in Collateral | 59 |
| | 6.13 | Taxes and Other Charges | 60 |
| | 6.14 | Payment of Utilities, Assessments, Charges, Etc. | 60 |
| | 6.15 | Waste; Alteration of the Property | 60 |
| | 6.16 | Management | 61 |
| | 6.17 | Rents and Profits | 61 |
| | 6.18 | Hazardous Materials and Environmental Concerns | 61 |
| | 6.19 | Casualty and Condemnation | 65 |
| | 6.20 | Facility Operations | 67 |
| VII. | | NEGATIVE COVENANTS | 68 |
| | 7.1 | Financial Covenants | 68 |
| | 7.2 | Indebtedness | 68 |
| | 7.3 | Liens | 69 |
| | 7.4 | Investments; New Facilities or Collateral; Subsidiaries | 69 |
| | 7.5 | Distributions; Redemptions | 69 |
| | 7.6 | Transactions with Affiliates | 70 |
| | 7.7 | Charter Documents; Fiscal Year; Dissolution; Use of Proceeds | 71 |
| | 7.8 | Truth of Statements | 71 |
| | 7.9 | IRS Form 8821 | 71 |
| | 7.10 | Alienation and Further Encumbrances | 71 |
| | 7.11 | Zoning; Use | 72 |
| | 7.12 | Leases; Facility Lease | 73 |

140860.00412/12485559v.5

|        | 7.13  | Patient Records. ................................................................................................73 |
|        | 7.14  | Easements and Rights-of-Way. .......................................................................73 |
|        | 7.15  | Certain Specific Agreements ..........................................................................73 |
| VIII.  | EVENTS OF DEFAULT ............................................................................................74 |
|        | 8.1   | Events of Default ............................................................................................74 |
|        | 8.2   | Remedies .........................................................................................................77 |
|        | 8.3   | Advances to Protect Property..........................................................................78 |
|        | 8.4   | Rights of Agent to Appoint Receiver .............................................................79 |
|        | 8.5   | Rights and Remedies not Exclusive ...............................................................79 |
|        | 8.6   | Application of Proceeds ..................................................................................79 |
|        | 8.7   | Acceleration; Liquidation ..............................................................................80 |
| IX.    | RIGHT OF FIRST REFUSAL; NON-COMPETE ...................................................82 |
|        | 9.1   | Right of First Refusal .....................................................................................81 |
|        | 9.2   | Non-Compete ..................................................................................................82 |
| X.     | WAIVERS AND JUDICIAL PROCEEDINGS ........................................................82 |
|        | 10.1  | Waivers ...........................................................................................................82 |
|        | 10.2  | Delay; No Waiver of Defaults ........................................................................82 |
|        | 10.3  | Jury Waiver .....................................................................................................83 |
|        | 10.4  | Cooperation in Discovery and Litigation .......................................................83 |
| XI.    | EFFECTIVE DATE AND TERMINATION .............................................................84 |
|        | 11.1  | Effectiveness and Termination .......................................................................84 |
|        | 11.2  | Survival ...........................................................................................................84 |
| XII.   | MISCELLANEOUS .................................................................................................84 |
|        | 12.1  | Governing Law; Jurisdiction; Service of Process; Venue ...............................84 |
|        | 12.2  | Successors and Assigns; Participations; New Lenders ....................................85 |
|        | 12.3  | Application of Payments .................................................................................87 |
|        | 12.4  | Indemnity ........................................................................................................88 |
|        | 12.5  | Notice ..............................................................................................................88 |
|        | 12.6  | Severability; Captions; Counterparts; Facsimile Signatures...........................89 |
|        | 12.7  | Expenses; Periodic Lien Searches ..................................................................89 |
|        | 12.8  | Entire Agreement ............................................................................................90 |
|        | 12.9  | Agent Approvals and Discretion.....................................................................91 |
|        | 12.10 | Publicity and Confidentiality ..........................................................................91 |
|        | 12.11 | Release of Lenders and Agent ........................................................................92 |
|        | 12.12 | Agent ...............................................................................................................92 |
|        | 12.13 | Reserved ..........................................................................................................97 |
|        | 12.14 | Taxes ...............................................................................................................97 |
|        | 12.15 | Agreement Controls ........................................................................................99 |
|        | 12.16 | Loan Party Obligations ...................................................................................99 |
|        | 12.17 | U.S. Patriot Act Notice ...................................................................................99 |
|        | 12.18 | Time of the Essence ......................................................................................100 |

140860.00412/12485559v.5

TERM LOAN AND SECURITY AGREEMENT

**THIS TERM LOAN AND SECURITY AGREEMENT** (this "**Agreement**") dated as of the 12th day of March, 2015, is entered into by and among **133 SALEM STREET, LLC**, a Delaware limited liability company ("**Borrower**"), **AP MA FUNDING LLC**, a Delaware limited liability company ("**AP MA Funding**"), and any other Person that now or hereafter becomes a lender under this Agreement, as co-lenders (collectively, the "**Lenders**" and individually a "**Lender**") and **AP MA FUNDING LLC**, a Delaware limited liability company, in its capacity as administrative, payment and collateral agent for Lenders ("**Agent**").

### RECITALS:

Borrower has requested that Lenders make a loan (the "**Term Loan**") to Borrower in the aggregate original principal amount of Six Million Eight Hundred Fifty Thousand Dollars ($6,850,000) (the "**Loan Amount**"), the proceeds of which shall be used by Borrower to acquire that certain 140 bed skilled nursing facility known as "Annemark Nursing Home", located at 133 Salem Street, Revere, Massachusetts (the "**Facility**"); and

Agent, on behalf of Lenders, is willing to commit to make the Term Loan to Borrower upon the terms and subject to the conditions set forth in this Agreement; and

Agent, on behalf of Lenders, is willing to commit to make the Term Loan to Borrower upon the terms and subject to the conditions set forth in this Agreement. in an amount equal to the commitment amounts set forth in the immediately preceding recital.

### AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Borrower, Lenders and Agent, therefore, agree as follows:

**I.**   **DEFINITIONS**

   1.1   Definitions

      "**Acceleration**" is defined in **Section 8.7(d)**.

      "**Acceptable Counterparty**" is defined in **Section 2.10(a)**.

      "**Acceptance Notice**" is defined in **Section 9.1**.

      "**Account Debtor**" means any Person who is obligated under an Account.

      "**Accounting Change**" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the U.S. Securities and Exchange Commission.

"**Accounts**" means all "accounts" (as defined in the UCC) including without limitation, accounts, accounts receivables, health-care-insurance receivables (as defined in the UCC), monies due or to become due and obligations in any form (whether arising in connection with contracts, contract rights, instruments (as defined in the UCC), general intangibles (as defined in the UCC) or chattel paper (as defined in the UCC)), in each case whether arising out of goods sold or services rendered or from any other transaction and whether or not earned by performance, now or hereafter in existence, and all documents of title or other documents representing any of the foregoing, and all collateral security and guaranties of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

"**ACH**" is defined in **Section 2.7(a)**.

"**Advances**" means any disbursements made by Agent or any Lender above the amount funded to Borrower at Closing.  Any amounts paid by Agent or any Lender on behalf of Borrower or any other Loan Party under any Loan Document shall be an Advance for purposes of this Agreement.

"**Affiliate**" means, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, or (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the Closing Date) of 5% or more of any class of the outstanding voting stock, securities or other equity or ownership interests of such Person.  For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.

"**Agent**" is defined in the introductory paragraph, together with its successors and assigns.

"**Agreement**" means this Term Loan and Security Agreement, as it may be modified from time to time.

"**Amortization Payment**" is defined in **Section 2.4(a)**.

"**Applicable Interest Rate**" is defined in **Section 2.3(a)**.

"**Approving Lenders**" is defined in **Section 12.13(d)**.

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of **Exhibit D** with such amendments or modifications as may be approved by the Agent.

"**Assignment Effective Date**" has the meaning set forth in **Section 12.2(c)**.

- 2 -

"**Block Notice**" is defined in **Section 2.7(a)**.

"**Borrower**" is defined in the introductory paragraph.

"**Borrower's Knowledge**" means the awareness of facts or other information by any officer, director, partner or member of Borrower after all diligent inquiry, including, as necessary, inquiry of each Loan Party and Manager.

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"**CapEx Obligation**" is defined in **Section 3.4(a)**.

"**CapEx Reserve**" is defined in **Section 3.4(a)**.

"**CapEx Reserve Payment**" is defined in **Section 3.4(b)**.

"**Capital Expenditures**" means expenditures incurred by Borrower in connection with the performance of Capital Improvements.

"**Capital Improvements**" means capital improvements, repairs and replacements of every kind and nature to be performed at the Facility.

"**Capital Lease**" means, as to any Person, a lease of any interest in any kind of property or asset by that Person as lessee that is, should be or should have been recorded as a "capital lease" in accordance with GAAP.

"**Capitalized Lease Obligations**" means all obligations of any Person under Capital Leases, in each case, taken at the amount thereof accounted for as a liability in accordance with GAAP.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"**Casualty/Condemnation Event**" is defined in Section 6.19.

"**Change of Control**" means, with respect to any Loan Party, the occurrence of any of the following:  (i) a merger, consolidation, reorganization, recapitalization or share or interest exchange, sale or transfer, (ii) a direct or indirect sale, transfer or other conveyance or disposition, in any single transaction or series of transactions, of all or substantially all of its assets, or (iii) the initial public offering of its securities.

"**Change in Law**" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.11 by any lending office of any Lender or by any Lender's holding company, if any) with any request, guideline or directive

- 3 -

(whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement. For avoidance of doubt: (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof, and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law" for purposes of this Agreement, regardless of the date enacted, adopted, issued or implemented.

"**Charter and Good Standing Documents**" means, for each Loan Party: (i) a copy of the certificate of incorporation or formation (or other charter documents) certified as of a date not more than 45 days before the Closing Date by the applicable Governmental Authority of the jurisdiction of incorporation or organization of such Loan Party and certified by an officer, manager or member of such Loan Party as being unmodified and in full force and effect as of the Closing Date, (ii) a copy of the operating agreement, by-laws or similar organizational documents certified as of a date not more than three Business Days before the Closing Date by the corporate secretary or assistant secretary or by a manager, member or officer of such Loan Party, (iii) an original certificate of good standing as of a date acceptable to Agent issued by the applicable Governmental Authority of the jurisdiction of incorporation or organization of such Loan Party and of every other jurisdiction in which Borrower has an office or conducts business or is otherwise required to be in good standing, and (iv) copies of the resolutions of the members or managers (or other applicable governing body) and, if required, stockholders, members or other equity owners authorizing the execution, delivery and performance of the Loan Documents to which such Loan Party is a party, certified by an authorized officer or manager of such Person as of the Closing Date.

"**Chattel Paper**" means chattel paper as defined in Section 9-102 of the UCC.

"**Clawback Period**" is defined in **Section 12.13(b)(v)**.

"**Closing**" means the satisfaction, or written waiver by Agent, of all of the conditions precedent set forth in this Agreement required to be satisfied prior to the consummation of the transactions contemplated by this Agreement.

"**Closing Date**" means the date the Closing occurs.

"**Collateral**" means the Property together with any other collateral granted to Agent for the benefit of Lenders to secure the Obligations pursuant to any of the Loan Documents.

"**Commitment Fee**" is defined in **Section 3.1(a)**.

"**Competitive Business**" is defined in **Section 9.2(a)**.

"**Contract**" has the meaning ascribed to such term in the Security Instrument.

- 4 -

"**Costs**" means any and all costs, expenses, damages, losses, obligations and liabilities (including, without limitation, reasonable attorneys' fees and disbursements), causes of action, suits, claims, demands and judgments of any nature or description whatsoever which may be imposed upon, incurred by or awarded against Agent or any Lender.

"**Deadlock Notice**" is defined in **Section 12.13(c)**.

"**Debtor Relief Law**" means, collectively, the Bankruptcy Code of the United States of America and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws from time to time in effect affecting the rights of creditors generally, as amended from time to time, whether statutory, common law, case law or otherwise.

"**Decision Period**" is defined in **Section 12.13(d)**.

"**Default**" means any event, fact, circumstance or condition that, with the giving of notice or passage of time or both, could constitute or result in an Event of Default.

"**Defaulting Lender**" means any Lender which for any reason shall fail or refuse to abide by its obligations under the Loan Documents or this Agreement within the time periods specified for performance of such obligation or, if no time frame is specified, if such failure or refusal continues for a period of five Business Days, and shall include any Lender which shall become a Defaulting Lender pursuant to **Section 12.12**.

"**Default Interest Rate**" means the Applicable Interest Rate plus an additional five percent (5%) per annum.

"**Distribution**" means any fee, payment, bonus or other remuneration of any kind, and any repayment of or debt service on loans or other indebtedness to any stockholder, member, partner or other equity owner in such Person's capacity as such, excluding any management fees permitted under this Agreement.

"**Early Termination Fee**" means the product obtained by multiplying (i) the difference between (A) the all-in effective yield (measured as a percentage per annum) earned by Lenders under this Agreement during the three full calendar months immediately preceding the date of termination under this Agreement, minus (B) the latest published (as published in The Wall Street Journal) rate preceding the date of notice of termination (or date of termination if there is no notice of termination) for United States Treasury Notes or Bills (Bills on a discounted basis shall be converted to a bond equivalent) with a maturity date closest to the Scheduled Maturity Date, times (ii) the outstanding principal balance of the Loan Amount as of the date of termination, times (iii) the quotient of (I) the number of months (full or partial) then remaining until the Maturity Date, divided by (II) 12.

"**Environmental Assessment**" means: (a) that certain Phase I Environmental Site Assessment Report dated December 2, 2014, and reissued on March 2, 2015, prepared by EMG Corporation for Alliance Partners LLC and BancAlliance Inc. with respect to Annemark Nursing Home, located at 133 Salem Street, Revere, MA, Project No. 11339.15R-001.111, and (b) that certain Phase II Environmental Site Assessment Report dated December 19, 2014, and reissued

- 5 -

on February 25, 2015, prepared by EMG Corporation for Alliance Partners LLC and BancAlliance Inc. with respect to Annemark Nursing Home, located at 133 Salem Street, Revere, MA, Project No. 11339.15R-001.146.

"**Environmental Indemnity**" means the Environmental Indemnity of even date herewith executed and delivered by Borrower at or prior to Closing.

"**Environmental Laws**" means, collectively and each individually, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Superfund Amendment and Reauthorization Act of 1986, the Resource Conservation and Recovery Act, the Toxic Substances Control Act, the Clean Air Act, the Clean Water Act, any other "Superfund" or "Superlien" law, the Occupational Safety and Health Act and all other federal, state and local and foreign environmental, land use, zoning, health, chemical use, safety and sanitation laws, including common law, statutes, ordinances and codes relating to the protection of health, safety and the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances, in each case, as amended, and the rules, regulations, policies, standards, guidelines, interpretations, decisions, orders and directives of and agreements entered into with Governmental Authorities with respect thereto, all as may hereafter be amended, adopted or enacted.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"**Event of Default**" means the occurrence of any event set forth in Article VIII.

"**Excess Cash Flow**" means, for Borrower, determined on a consolidated basis for any fiscal year, the sum of: (i) EBITDA (as defined in Exhibit C hereto) for such fiscal year, minus (ii) principal and interest with respect to outstanding Indebtedness paid during such fiscal year, minus (iii) Capital Expenditures during such fiscal year, minus (iv) income taxes actually paid or payable during such fiscal year.

"**Extension Fee**" is defined in **Section 3.1(b)**.

"**Facility**" is defined in Recital A.

"**Facility Lease**" means that certain lease agreement dated March __, 2015, between Borrower, as landlord, and Operator, as tenant, pursuant to which the Facility is demised by Borrower to Operator.

"**Fair Valuation**" means the determination of the value of the consolidated assets of a Person on the basis of the amount which may be realized by a willing seller within a reasonable time through collection or sale of such assets at market value on a going concern basis to an interested buyer who is willing to purchase under ordinary selling conditions in an arm's length transaction.

"**First Payment Date**" is defined in Section 2.4(a).

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"**Government Account**" means all Accounts arising out of or with respect to any Government Contract.

"**Governmental Authority**" means any federal, state, municipal, national, local or other governmental department, court, commission, board, bureau, agency or instrumentality or political subdivision thereof, or any entity or officer exercising executive, legislative or judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case or any Medicare/Medicaid Account Debtors, whether of the United States or a state, territory or possession thereof, a foreign sovereign entity or country or jurisdiction or the District of Columbia.

"**Government Contract**" means all contracts with a Governmental Authority, and all amendments thereto.

"**Government Receivables Deposit Account**" means the account at the Lockbox Bank established by Operator to deposit collections of all Medicaid/Medicare Accounts, and collections received by wire transfer or ACH directly from any Medicaid/Medicare Account Debtor, all as more fully set forth in the Government Deposit Account Agreement, as contemplated in **Section 2.7**.

"**Government Receivables Deposit Account Agreement**" means an agreement in form and substance acceptable to Agent, in Agent's discretion, with one or more Lockbox Banks providing for the establishment of Government Receivables Deposit Account with respect to Medicaid/Medicare Accounts, as contemplated in Section 2.7.

"**Guarantor**" means, jointly and severally, Avi Lipschutz (aka Zisha Lipschutz), an individual, and Dov Newmark, an individual.

"**Guaranty**" means, collectively and individually, all guarantees executed by Guarantor in favor of Lenders or Agent for the benefit of Lenders, including without limitation that certain guaranty of even date herewith made by Guarantor in favor of Agent.

"**Hazardous Substances**" means, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, mold, fungus, hazardous materials, hazardous wastes, special wastes, medical or biohazardous wastes, hazardous or toxic substances or related materials as defined in or subject to any applicable Environmental Law.

"**Healthcare Laws**" means all applicable statutes, laws, ordinances, rules and regulations of any Governmental Authority with respect to regulatory matters primarily relating to patient healthcare, healthcare providers and healthcare services (including without limitation

- 7 -

Section 1128B(b) of the Social Security Act, as amended, 42 U.S.C. Section 1320a 7(b) (Criminal Penalties Involving Medicare or State Health Care Programs), commonly referred to as the "Federal Anti-Kickback Statute," and the Social Security Act, as amended, Section 1877, 42 U.S.C. Section 1395nn (Prohibition Against Certain Referrals), commonly referred to as "Stark Statute").

"**HIPAA**" is defined in **Section 5.9**.

"**Improvements**" shall mean all buildings, structures, fixtures and other improvements of every kind and nature situated upon the Land, including without limitation the Facility.

"**Indebtedness**" of any Person means, without duplication, (a) all items which, in accordance with GAAP, would be included in determining total liabilities as shown on the liability side of the balance sheet of such Person as of the date as of which Indebtedness is to be determined, including any lease which, in accordance with GAAP would constitute Indebtedness, (b) all indebtedness secured by any mortgage, pledge, security, Lien or conditional sale or other title retention agreement to which any property or asset owned or held by such Person is subject, whether or not the indebtedness secured shall have been assumed, (c) all indebtedness of others which such Person has directly or indirectly guaranteed, endorsed (otherwise than for collection or deposit in the ordinary course of business), discounted or sold with recourse or agreed (contingently or otherwise) to purchase or repurchase or otherwise acquire, or in respect of which such Person has agreed to supply or advance funds (whether by way of loan, stock, equity or other ownership interest purchase, capital contribution or otherwise) or otherwise to become directly or indirectly liable.

"**Indemnified Persons**" is defined in **Section 12.4**.

"**Insured Event**" is defined in **Section 12.4**.

"**Insurer**" means a Person that insures another Person against any costs, losses, damages, or expenses incurred by such other Person.

"**Intellectual Property**" is defined in **Section 5.10**.

"**Interest Rate Cap Agreement**" is defined in **Section 2.10(a)**.

"**Inventory**" means all "inventory" (as defined in the UCC) of Borrower (or, if referring to another Person, of such other Person), now owned or hereafter acquired, and all documents of title or other documents representing any of the foregoing, and all collateral security and guaranties of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

"**Land**" means collectively the real property more particularly described on **Exhibit A**.

- 8 -

"**Lease(s)**" means any lease or license agreement for occupancy of any portion of the Property, excluding contracts to provide healthcare services to clients of the Facility which include a right of occupancy.

"**Lender(s)**" is defined in the introductory paragraph, together with its successors and assigns.

"**Liability Event**" means any event, fact, condition or circumstance or series thereof (i) in or for which any Loan Party becomes liable or otherwise responsible for any amount owed or owing to any Medicaid or Medicare program by a provider under common ownership with such Loan Party or any provider owned by such Loan Party pursuant to any applicable law, ordinance, rule, decree, order or regulation of any Governmental Authority after the failure of any such provider to pay any such amount when owed or owing, (ii) in which Medicaid or Medicare payments to any Loan Party are lawfully set off against payments to such Loan Party or any other Loan Party to satisfy any liability of or for any amounts owed or owing to any Medicare or Medicaid program by a provider under common ownership with such Loan Party or any provider owned by such Borrower pursuant to any applicable law, ordinance, rule, decree, order or regulation of any Governmental Authority, or (iii) any of the foregoing under clauses (i) or (ii) in each case pursuant to statutory or regulatory provisions that are similar to any applicable law, ordinance, rule, decree, order or regulation of any Governmental Authority referenced in clauses (i) and (ii) above or successor provisions thereto, in each case where the existence of such fact, condition or circumstance could, individually or in the aggregate, reasonably be expected to have or result in a Material Adverse Effect.

"**LIBOR Rate**" means, as of any date of determination, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the rate of interest which is identified and normally published by Bloomberg Professional Service Page BBAM 1 as the offered rate for loans in United States dollars for the period of three (3) months under the caption British Bankers Association LIBOR Rates as of 11:00 a.m. (London time) as adjusted on a monthly basis two (2) Business Days prior to the first day of each such three (3) month period and effective as of the first day of such month.  If the Bloomberg Professional Service (or another nationally recognized rate reporting source acceptable to Agent) no longer reports LIBOR or Agent determines in good faith that the rate so reported no longer accurately reflects the rate available to Agent in the London Interbank Market or if such index no longer exists or if Page BBAM 1 no longer exists or accurately reflects the rate available to Agent in the London Interbank Market, Agent may select a replacement index or replacement page, as the case may be.

"**Licenses**" means all certificates, certifications, permits, licenses and approvals, including, without limitation, certificates of completion and occupancy, required for the legal use, occupancy and operation of the Facility for its intended use.

"**Lien**" means any mortgage, pledge, security interest, encumbrance, restriction, lien or charge of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof), or any other arrangement pursuant to which title to the property is retained by or vested in some other Person for security purposes.

"**Liquidation**" is defined in **Section 8.7(d)**.

"**Loan Amount**" is defined in the Recitals to this Agreement.

"**Loan Document(s)**" means, collectively and each individually, this Agreement, any Note, any Guaranty, any Pledge and Security Agreement, the Security Instruments, the UCC Financing Statements, any Subordination Agreements, and all other agreements, documents, instruments and certificates heretofore or hereafter executed or delivered to Agent in connection with any of the foregoing or the Term Loan, together with any and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements and extensions and modifications of any of the foregoing.

"**Loan Party**" means individually and collectively, Borrower, Guarantor and each Pledging Entity.

"**Lockbox Account**" means the account at the Lockbox Bank established by Operator to deposit collections of all Accounts (other than Medicaid/Medicare Accounts) received in the Lockbox, and collections received by wire transfer or ACH directly from Insurers, all as more fully set forth in the Lockbox Agreement.

"**Lockbox Agreement**" means an agreement in form and substance acceptable to Agent, in Agent's discretion, with one or more Lockbox Banks providing for the establishment of a lockbox account with respect to Accounts (other than Medicaid/Medicare Accounts), as contemplated in **Section 2.7**.

"**Lockbox Bank**" means a bank acceptable to Agent, in Agent's discretion, which is a party to a Lockbox Agreement.

"**Major Action**" is defined in **Section 12.13(a)**.

"**Major Action Notice**" is defined in **Section 12.13(a)**.

"**Major Action Response Notice**" is defined in **Section 12.13(a)**.

"**Major Action Response Period**" is defined in **Section 12.13(a)**.

"**Manager**" means Synergy Health Centers LLC, a New Jersey limited liability company, together, the manager of the Facility pursuant to the Management Agreement, and any subsequent manager approved by Agent in Agent's discretion.

"**Management Agreement**" means the billing and human resources consultant agreement pertaining to the Facility dated as of March __, 2015, between Operator, as the Facility, and Manager, as the Consultant and that certain consulting agreement between Borrower and Operator dated as of March __, 2015.

"**Management Fee Subordination Agreement**" means the Management Fee Subordination Agreement executed in connection herewith, as the same may be modified, amended or supplemented from time to time.

- 10 -

"**Material Adverse Effect**" or "**Material Adverse Change**" means any event, condition or circumstance or set of events, conditions or circumstances or any change(s) which (i) has, had or could reasonably be expected to have any material adverse effect upon or change in the validity, enforceability or priority of any Loan Document, (ii) has been or could reasonably be expected to be material and adverse to the value of any of the Property or of Agent's or Lenders' security interest in or Lien on the Property, (iii) has or could reasonably be expected to have a material adverse effect on the business, operations, prospects, properties, assets, liabilities or financial condition of any Loan Party, either individually or taken as a whole, or the Facility, (iv) has materially impaired or could reasonably be expected to materially impair the ability of Borrower to perform the Obligations, Guarantor to perform the obligations set forth in the Guaranty, or the Pledging Entities to perform the obligations set forth in the Pledge and Security Agreements or (v) has materially impaired or could reasonably be expected to materially impair the ability of Borrower, Operator, or any Pledging Entity to perform its Obligations or to consummate the transactions under the Loan Documents to which it is a party.

"**Maturity Date**" means earlier to occur of (i) the Scheduled Maturity Date, and (ii) the date that Agent accelerates the maturity of the Term Loan after the occurrence of an Event of Default.

"**Medicaid/Medicare Account**" means any Account with a Medicaid/Medicare Account Debtor.

"**Medicaid/Medicare Account Debtor**" means any Account Debtor which is (i) the United States of America acting under the Medicaid or Medicare program established pursuant to the Social Security Act or any other federal healthcare program, including, without limitation, CHAMPUS, (ii) any state, territory or the District of Columbia acting pursuant to a health plan adopted pursuant to Title XIX of the Social Security Act, any successor statute or regulation thereto, or any other state health care program or (iii) any agent, carrier, administrator or intermediary for any of the foregoing.

"**Nominee**" is defined in **Section 8.7(d)**.

"**Note**" is defined in **Section 2.2**.

"**Objecting Lenders**" is defined in **Section 12.13(c)**.

"**O&M Program**" is defined in **Section 6.18(a)**.

"**Obligations**" means all means all present and future obligations, Indebtedness and liabilities of any Loan Party or any other Person under any Loan Documents to Agent, Lenders or otherwise with respect to any Loan or any Bank Products Agreement at any time and from time to time of every kind, nature and description, direct or indirect, secured or unsecured, joint and several, absolute or contingent, due or to become due, matured or unmatured, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, under any of the Loan Documents or otherwise relating to the Term Loan, including, without limitation, all applicable fees, charges and expenses and/or all amounts paid or advanced by Agent and/or Lender on behalf of or for the benefit of any Loan Party for any reason at any time, including in each case obligations of performance as well as obligations of payment and interest that accrue

- 11 -

after the commencement of any proceeding under any Debtor Relief Law by or against any such Person.

"**OFAC**" means the U.S. Department of Treasury's Office of Foreign Asset Control

"**OFAC Prohibited Person**" means, a country, territory, individual or Person (i) listed on, included within or associated with any of the countries, territories, individuals or entities referred to on the List of Specially Designated Nationals and Blocked Persons of The Office of Foreign Assets Control or any other prohibited person lists maintained by governmental authorities, or otherwise included within or associated with any of the countries, territories, individuals or entities referred to in or prohibited by OFAC or any other Anti-Money Laundering Laws, or (ii) which is obligated or has any interest to pay, donate, transfer or otherwise assign any property, money, goods, services, or other benefits from the Mortgaged Property directly or indirectly, to any countries, territories, individuals or entities on or associated with anyone on such list or in such laws.

"**Offer**" is defined in **Section 9.1**.

"**Operator**" means West Revere Health Center, LLC, a Delaware limited liability company, and any successor tenant/operator of the Facility which Agent approves in writing.

"**Option Period**" is defined in Section 9.1.

"**Patriot Act**" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107-56 (signed into law October 26, 2001), as amended.

"**Payment Date**" is defined in Section 2.4.

"**Payment Office**" means the address that may from time to time be designated by notice from Agent to Borrower to be the Payment Office.

"**Permit**" means, collectively, all Licenses, powers, permits, franchise agreements, certificates, authorizations, approvals, certificates of need, provider numbers and other rights necessary or useful for the operation of the Facility for its intended purpose.

"**Permitted Exceptions**" is defined in **Section 5.4(a)**.

"**Permitted Indebtedness**" is defined in **Section 7.2**.

"**Permitted Liens**" means: (i) Liens under the Loan Documents or otherwise arising in favor of Agent for the benefit of Lenders, (ii) Liens imposed by law for taxes, assessments or charges of any Governmental Authority for claims not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained by such Person in accordance with GAAP to the satisfaction of Agent in its discretion, (iii) (A) statutory Liens of landlords (provided that any such landlord has executed a Subordination Agreement in form and substance satisfactory to

- 12 -

Agent) and of carriers, warehousemen, mechanics, and materialmen, and (B) other Liens imposed by law or that arise by operation of law in the ordinary course of business from the date of creation thereof and any Lien of any supplier, laborer or vendor, in each case only for amounts not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained by such Person in accordance with GAAP to the satisfaction of Agent in its discretion, (iv) Liens (A) incurred or deposits made in the ordinary course of business (including, without limitation, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, leases, contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations, or (B) arising as a result of progress payments under government contracts, (v) purchase money Liens (A) securing Indebtedness permitted under clause (iii) above, or (B) in connection with the purchase by such Person of equipment in the normal course of business, provided that such payables shall not exceed any limits on Indebtedness provided for in this Agreement, shall not encumber any of the Collateral other than such Equipment, and shall otherwise be Permitted Indebtedness under this Agreement, (vi) Liens necessary and desirable for the operation of such Person's business, provided Agent has consented to such Liens in writing before their creation and the priority of such Liens and the debt secured t are by their terms expressly subject and subordinate in all respects to the Liens securing the Obligations and all of the rights and remedies of Agent or Lenders, all in form and substance satisfactory to Agent in its discretion; (vii) Liens disclosed on **Schedule 7.3**; and (viii) Permitted Exceptions.

"**Permitted Substances**" means (i) substances used for cleaning and maintenance of the Facility in the ordinary course of business which contain Hazardous Substances and which are purchased and stored in commercially reasonable quantities and used, handled and stored at the Facility in compliance with all Environmental Laws and (ii) medications and other substances, "sharps" and other items utilized in the ordinary course of business of the Facility as a skilled nursing facility which are used, stored, handled and disposed of in compliance with all applicable law, including without limitation, all Environmental Laws.

"**Person**" means an individual, a partnership, a corporation, a limited liability company, a business trust, a joint stock company, a trust, an unincorporated association, a joint venture, a Governmental Authority or any other entity of whatever nature.

"**Pledge and Security Agreement(s)**" means, collectively and each individually, those certain Pledge and Security Agreements made by the Pledging Entities in favor of Agent for the benefit of Lenders.

"**Pledging Entities**" means each interest holder of Borrower and each of the additional Persons, if any, identified as Pledging Entities on **Schedule 5.3C**.

"**Property**" means, collectively, the Real Estate, and all other real and personal property of Borrower.

"**Property Agreements**" is defined in **Section 5.4(h)**.

"**Property Condition Assessment**" means that certain Property Condition Assessment Report for the Facility dated February 5, 2015, reissued as of March 11, 2015, and prepared by EMG Corporation for Alliance Partners LLC and BancAlliance Inc. with respect to Annemark Nursing Home, located at 133 Salem Street. Revere, MA, Project No. 11339.15R-001.137, a copy of which has been provided to, and receipt of which is acknowledged by, Borrower.

"**Rating Agency**" means the rating agency or rating agencies that from time to time rate the securities, certificates or other instruments issued in connection with any Secondary Market Transaction, if any.

"**Real Estate**" means the Land, the Improvements, together with all rights appurtenant thereto.

"**Receipt**" is defined in **Section 12.5**.

"**Register**" is defined in **Section 12.2(c)**.

"**Release(d)**" means any release, spill, deposit, disposal, dispersal, burial, pouring, dumping, injecting, leaking, emptying, emitting, discharging, leaching or migration into the indoor or outdoor environment or into or out of any property.

"**Rents and Profits**" has the meaning ascribed to such term in the Security Instruments.

"**Required Work**" is defined in **Section 3.8**.

"**Reserves**" is defined in **Section 3.9**.

"**Scheduled Maturity Date**" means March 31, 2018, subject to Borrower's right to extend the same pursuant to the terms of Section 2.5(e) to September 30, 2018.

"**Secondary Market Transaction**" means (a) any sale or assignment of the Note, Security Instrument and other Loan Documents to one or more investors as a whole loan, (b) a participation of the Term Loan to one or more Investors, (c) any deposit of the Note, the Security Instrument and the other Loan Documents with a trust or other entity which may sell certificates or other instruments to investors evidencing an ownership interest in the assets of such trust or other entity, or (d) any other sale, assignment or transfer of the Term Loan or any interest therein to one or more investors.

"**Security Documents**" means the Guaranty, the Environmental Indemnity, the Pledge and Security Agreement, the Security Instruments, the Assignments, the UCC Financing Statements and all other documents or instruments necessary to create or perfect the Liens in the Collateral, as such may be modified, amended or supplemented from time to time.

"**Security Instrument(s)**" means individually or collectively, as the context shall require, those certain Mortgages, Security Agreements and Fixture Filings of even date herewith

and those certain Deeds of Trust, Security Agreements and Fixture Filings of even date herewith made by Borrower in favor of Agent.

"**Services**" means medical and health care services provided to a Person, including, but not limited to, medical and health care services which are covered by a policy of insurance issued by an Insurer, physician services, nurse and therapist services, dental services, hospital services, skilled nursing facility services, comprehensive outpatient rehabilitation services, home health care services, residential and out-patient behavioral healthcare services.

"**Sinking Fund Account**" means the account so designated that is provided for in **Section 3.10**.

"**Solvency Certificate**" is defined in **Section 4.1**.

"**Special-Purpose Entity**" means a corporation, limited liability company, or limited partnership which at all times while the Obligations are outstanding complies with the following:

        (i)    <u>Purpose</u>. Such entity was organized solely for the purpose of owning, operating, financing and/or leasing the Facility as and selling such Facility.

        (ii)    <u>No Other Business</u>. Such entity has not and will not engage in any business unrelated to owning, operating, financing or leasing such Facility as a skilled nursing facility and selling the Facility

        (iii)    <u>No Other Assets</u>. Such entity has not and will not have any assets other than those related to its owning, financing or leasing such Facility as a skilled nursing facility and selling such Facility.

        (iv)    <u>No Other Indebtedness</u>.  Such entity has no and will not have indebtedness other than the Obligations and liabilities in the ordinary course of business relating to owning, financing or leasing such Facility as a skilled nursing facility and selling such Facility.

        (v)    <u>Misunderstandings</u>. Such entity has not and will not fail to correct any known misunderstanding regarding the separate identity of such entity.

        (vi)    <u>Separate Accounts</u>. Such entity has maintained and will maintain its accounts, books and records separate from any other person or entity; provided, however, that Borrower's assets and operations may be included in a consolidated financial statement provided that appropriate notation shall be made on such consolidated financial statement to indicate that Borrower is its own separate entity.

        (vii)    <u>Official Records</u>. Such entity has maintained and will maintain its books, records, resolutions and agreements as official records, and will not amend, modify, or alter its articles of organization, certificate of formation, bylaws or other organizational documents without the prior written consent of Agent.

- 15 -

(viii)   Commingling. Such entity has not and will not commingle its funds or assets with those of any other entity, and such entity has held and will hold its assets in its own name.

(ix)   Own Name.   Such entity has conducted and will conduct its business in its own name.

(x)   Separate Records. Such entity has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other person or entity; provided, however, that Borrower's assets and operations may be included in a consolidated financial statement provided that appropriate notation shall be made on such consolidated financial statement to indicate that Borrower is its own separate entity.

(xi)   Own Liabilities. Such entity has paid and will pay its own liabilities out of its own funds and assets; provided, however, that Borrower's entry into this Agreement and payment and performance of the Obligations shall not be deemed a violation of this paragraph.

(xii)   Formalities. Such entity has observed and will observe all partnership, corporate or limited liability company formalities, as applicable.

(xiii)   Guarantees. Such entity has not and will not assume or guarantee or become obligated for the debts of any other entity or hold out its credit as being available to satisfy the obligations of any other entity except for liabilities permitted by Agent to be guaranteed and the Obligations.

(xiv)   Affiliate Securities. Such entity has not and will not acquire obligations or securities of its partners, members or shareholders.

(xv)   Allocations. Such entity has allocated and will allocate fairly and reasonably any overhead for shared office space and uses, invoices and checks.

(xvi)   Pledges. Except as otherwise permitted in this Agreement, such entity has not and will not pledge its assets for the benefit of any other person or entity other than Agent (or Lenders, as the case may be), other than in connection with any loans consented to in writing by Agent, which may be granted or withheld in Agent's discretion and other than pledges and Permitted Liens.

(xvii)   Identification. Such entity has held and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other person or entity.

(xviii)   Loans. Such entity has not made and will not make loans to any person or entity.

(xix)   No Dissolution. Such entity has not and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, asset sale, transfer of membership interest, or amendment of its certificate of formation or operating agreement.

- 16 -

(xx)   Organizational Documents. Its articles of organization, certificate of formation and/or operating agreement, as applicable, shall provide that: (1) the vote of a majority-in-interest of the remaining members is sufficient to continue the life of the limited liability company if a termination event occurs, such as a bankruptcy of any managing member; and (2) if the vote of a majority-in-interest of the remaining members is not obtained to continue the life of the limited liability company upon a termination event, its articles of organization, certificate of formation and/or operating agreement as applicable, provide that the limited liability company may not liquidate collateral without the consent of Agent.

(xxi)   Bankruptcy. Such entity, without the unanimous consent of all of the members, including without limitation any Independent Manager, shall not file or consent to the filing of a bankruptcy or insolvency petition or otherwise institute insolvency proceedings, dissolve, liquidate or amend its organizational documents.

(xxii)   Divisions. Such entity has not and will not identify its members, or any affiliates of either of them as a division or part of it.

(xxiii) Arm's-length Transactions. Such entity has not entered and will not enter into or be a party to, any transaction with its members or its affiliates except in the ordinary course of its business and on terms which are intrinsically fair and are not less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party.

"**Strike Rate**" is defined in **Section 2.10(a)**.

"**Subordination Agreement**" means, collectively and each individually, the Management Fee Subordination Agreement(s), and the Facility Lease subordination agreement(s), and any other subordination agreement(s) executed in connection with the Term Loan.

"**Subsidiary**" means, (i) as to Borrower, any Person in which 50% or more of all equity, membership, partnership or other ownership interests is owned directly or indirectly by Borrower or one or more of its Subsidiaries, and (ii) as to any other Person, any Person in which 50% or more of all equity, membership, partnership or other ownership interests is owned directly or indirectly by such Person or by one or more of such Person's Subsidiaries.

"**Tax and Insurance Reserve**" is defined in Section 3.5(a).

"**Term**" means the period commencing on the Closing Date and ending on the Maturity Date.

"**Term Loan**" is defined in the Recitals.

"**Title Company**" means Madison Title Agency, LLC.

"**Title Insurance Policy**" means an ALTA Lender's Policy (or Policies) of Title Insurance (2006 form deleting all arbitration and co-insurance provisions, or such other form as may be approved by Agent, in its discretion) in favor of Agent for the benefit of Lenders insuring

- 17 -

the first priority lien of the Security Instrument against the Property, together with all endorsements, exceptions, additions and modifications as Agent shall deem appropriate.

"**Transferee**" is defined in **Section 12.2**.

"**Transaction**" is defined in **Section 9.1**.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of this Agreement relating to such perfection, effect of perfection or non-perfection or priority.

1.2     General Terms

All capitalized terms used but not defined in this Agreement shall have meanings provided in Article 9 of the UCC in effect on the Closing Date.  Unless otherwise specified in this Agreement, as used in the Loan Documents, all accounting terms not defined in the Loan Documents shall have the meanings given to such terms in and shall be interpreted in accordance with GAAP.  Wherever used in the Loan Documents, the term "**including**" means "**including without limitation**."

**II.     ADVANCES, PAYMENT AND INTEREST**

2.1     Term Loan

Subject to the terms and conditions set forth in this Agreement, Lenders collectively agree to make the Term Loan to Borrower on the Closing Date.  The Term Loan shall consist of a single advance from each Lender in their respective commitment amounts equal to the Loan Amount, to be disbursed to such account or accounts as Borrower may request in writing.  The Term Loan is not a revolving credit facility, and any repayments of principal may not be re-borrowed.

2.2     Evidence of Term Loan

(a)     Agent shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness to Lenders resulting from the making of the Term Loan, including the amounts of principal and interest payable and paid to the order of Lenders from time to time under this Agreement.

(b)     The entries made in the accounts maintained pursuant to subsection (a) of this **Section 2.2** shall be prima facie evidence of the existence and amounts of the obligations (absent manifest error) therein recorded; provided, however, that the failure of Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of Borrower to repay the Obligations in accordance with their terms.  Agent will provide Borrower with monthly statements which identify charges, loans, advances and other transactions occurring between Lenders and Borrower during that month.

- 18 -

(c)      Borrower agrees that upon notice by Agent to Borrower to the effect that one or more promissory notes or other evidence of indebtedness is reasonably required by Agent to evidence (whether for purposes of pledge, enforcement or otherwise) the Term Loan, Borrower shall promptly execute and deliver to Agent, one or more term notes, payable to the order of Agent in an aggregate principal amount equal to the Loan Amount, in a form substantially similar to the form attached hereto as Exhibit B.  All references to "**Note**" or "**Notes**" in the Loan Documents shall mean the notes, if any, issued (and not returned to Borrower for cancellation) hereunder.

2.3      Interest Rate; Default Interest Rate; Late Charge

(a)      Except as otherwise provided in this Agreement, the principal balance of the Term Loan from day to day outstanding shall bear interest at a fluctuating per annum rate of interest (the "**Applicable Interest Rate**") equal from day to day to the LIBOR Rate plus five percent (5.00%).  Notwithstanding any provision of any Loan Document, for the purpose of calculating interest under this Agreement, the LIBOR Rate shall not be less than one percent (1.00%).

(b)      Interest on the outstanding principal balance of the Term Loan shall be calculated on a three hundred sixty (360) day year and paid for the actual number of days elapsed for any whole or partial month in which interest is being calculated.  In computing the number of days during which interest accrues, the day on which funds are initially advanced shall be included regardless of the time of day such advance is made, and the day on which funds are repaid shall be included unless repayment is credited prior to close of business.  Payments in immediately available federal funds which are received by Agent prior to 2:00 p.m. New York City time at the Payment Office shall be credited prior to close of business on such date.  Any payments made at or after 2:00 p.m. (New York City Time) shall be credited on the next Business Day.

(c)      Each determination of the Applicable Interest Rate by Agent pursuant to any provision of this Agreement shall be conclusive and binding on Borrower absent manifest error.

(d)      Anything in this Agreement to the contrary notwithstanding: (i) if at any time, any applicable Change in Law shall make it unlawful for any Lender to make or maintain the indebtedness evidenced by the Term Loan in eurodollars or (ii) if at the time of or prior to any determination of the Applicable Interest Rate, any Lender determines (which determination shall be conclusive in the absence of manifest error) that by reason of circumstances affecting the London interbank market generally, (A) deposits in United States Dollars in the relevant amounts and of the relevant maturity are not available to any Lender in the London interbank market, (B) the Applicable Interest Rate does not adequately and fairly reflect the cost to such Lender of making or maintaining the Term Loan, due to changes in administrative costs, fees, tariffs and taxes and other matters outside of any Lender's reasonable control (except for the introduction of, or change in the rate of, tax on the overall net income of any Lender or franchise taxes, imposed by the jurisdiction (or any political subdivision or taxing authority thereof) under the laws applicable to any Lender or increased costs resulting from a negative change to any Lender's credit rating) or (C) adequate and fair means do not or will not exist for determining the

- 19 -

Applicable Interest Rate as set forth in this Agreement, then Agent, on behalf of such Lender shall give Borrower and Agent prompt written notice thereof, which notice shall state in reasonable detail the reasons therefor, and the Term Loan shall bear interest, and continue to bear interest until such circumstances no longer pertain, at a substitute index selected by Agent in its reasonable discretion plus a suitable margin to approximate, in Agent's reasonable judgment, the amount needed to compensate such Lender for such increased cost or reduced amount and/or to approximate the Applicable Interest Rate that such Lender would have achieved absent such circumstances.  Such additional amount shall be payable by Borrower to such Lender within thirty (30) days of its receipt of such notice, and such notice shall be conclusive and binding on Borrower.

(e)     Notwithstanding anything contained in this Agreement to the contrary, if:

(i)     the circumstances described in subparagraph (d) above shall occur; or

(ii)     a prepayment of the Term Loan is made on a date other than on a Payment Date, whether such prepayment is optional or mandatory; or

(iii)     Borrower shall default in the payment of interest on the Term Loan; or

(iv)     Borrower fails to make a prepayment of the Term Loan as permitted under this Agreement which Borrower has notified Agent in writing it would make;

and the result is to increase the cost to Lenders of maintaining the Term Loan or to reduce any amount receivable by Agent or Lenders under this Agreement or to cause Lenders to incur any other cost, loss or expense, including, but not limited to, any interest or fees which are payable by Lenders to lenders of funds actually obtained by Lenders, then, in any such case, Borrower shall pay to Agent, on the second Business Day following Agent's demand, any additional amounts necessary to compensate Agent or Lenders for such cost, loss, expense or reduced amount receivable.  If Agent or Lenders become entitled to claim any additional amounts pursuant to this subparagraph (e), Agent shall promptly notify Borrower of the event by reason of which Agent or Lenders have become so entitled and shall certify in reasonable detail any additional amounts so payable.  Such certification submitted by Agent to Borrower shall be conclusive absent manifest error.

(f)     Upon the occurrence of a Default or Event of Default, and whether or not Agent has notified Borrower that a Default or Event of Default has occurred (without implying that Agent has any obligation to notify Borrower that a Default or Event of Default has occurred prior to exercising remedies under this Agreement or under any of the other Loan Documents except as specifically provided therein), or on the failure of Borrower to make a prepayment on the date specified in any Prepayment Notice given pursuant to **Section 2.5**, the Applicable Interest Rate shall be increased to the Default Interest Rate, commencing as of the date of occurrence of such event; provided, however, that if Borrower cures the Default within any applicable grace or notice period or if Agent permits Borrower to cure any Event of Default, then the Applicable Interest Rate shall be calculated without the increase provided in this

- 20 -

**Section 2.3(f)** from and after the date such Default or Event of Default is cured.  Interest accrued at the Default Interest Rate shall be secured by the Security Instrument and other Security Documents.  This clause, however, shall not be construed as an agreement or privilege to extend the due date of any payment due under this Agreement, or as a waiver of any other right or remedy accruing to Agent or any Lender by reason of the occurrence of any Default or Event of Default.

(g)     If any sum payable to Agent for the benefit of Lenders under this Agreement is not paid on or before the date such payment is due (subject to any applicable cure periods provided herein), Borrower shall pay to Agent upon demand an amount equal to the lesser of (i) five percent (5%) of such unpaid sum or (ii) the maximum amount permitted by applicable law, in either case to defray the expenses incurred by Agent in handling and processing such delinquent payment and to compensate Lenders for the loss of the use of such delinquent payment and such late charge shall be secured by the Security Documents.

2.4     Payment; Extension of Maturity Date.

(a)     Borrower unconditionally promises to pay to Agent, for the benefit of Lenders, principal and interest under this Agreement as follows:

(i)     beginning on April 1, 2015 (the "**First Payment Date**"), and on the first day of each calendar month thereafter (each such date, including the First Payment Date, a "**Payment Date**"), all accrued and unpaid interest on the outstanding principal balance of the Loan Amount calculated at the Applicable Interest Rate;

(ii)     on each Payment Date commencing October 1, 2017, in addition to the payment of interest described in **Section 2.4(a)**, a payment (each, an "**Amortization Payment**") in the amount of Ten Thousand Nine Hundred Dollars ($10,900); and

(iii)     on the Maturity Date, the entire outstanding principal balance of the Note, together with accrued and unpaid interest and any other amounts due under the Loan Documents.

Furthermore, upon the occurrence of a Default or Event of Default, Borrower's obligation to make Amortization Payments shall immediately commence at the rate of $9,600 per month during the period between the Closing Date and March 31, 2016, $10,300 per month during the period between April 1, 2016, and March 31, 2017, and $10,900 per month during the period between April 1, 2017, and March 31, 2018.

(b)     Borrower shall have one (1) option (the "**Extension Option**") to extend the Maturity Date for a period of six (6) months (the "**Extension Option Period**") by providing Lender with written notice of its election to exercise the Extension Option not earlier than 5:00 p.m. EST on November 30, 2017, and not later than 5:00 p.m. EST on January 31, 2018; provided that (i) on the date Borrower exercises the Extension Option and all times prior to the commencement of the Extension Option Period, no Default or Event of Default shall exist, and (ii) Borrower pays to Lender simultaneously with the exercise of the Extension Option, the Extension Fee.  If Borrower exercises the Extension Option, Borrower shall pay Lender monthly installments of principal and interest as provided in this **Section 2.4(b)** and on the Maturity Date,

- 21 -

as extended hereby, the entire outstanding principal balance hereof, together with all accrued but unpaid interest thereon, and all sums due under this Agreement and under the Loan Documents shall be due and payable and shall be paid in full.  The Amortization Payment during the Extension Option Period will be Eleven Thousand Three Hundred Dollars ($11,300) per month.

(c)      The monthly installments of principal of the Term Loan provided for in this paragraph may be made to the Sinking Fund Account subject to the terms and conditions of **Section 3.10**.  Payments made into the Sinking Fund Account will not reduce the principal amount of the Term Loan and after a payment into the Sinking Fund Account, interest will continue to accrue on the Loan Amount which was outstanding on the Term Loan immediately prior to such payment into the Sinking Fund Account.

2.5      Prepayment; Early Termination Fee

(a)      (i)      The outstanding principal balance of the Term Loan may not be prepaid, in whole or in part, prior to the first day of the first full calendar month that is eighteen (18) months after the Closing Date (i.e., prior to October 1, 2016) (the "**Lock-Out Expiration Date**").

(ii)      If the Term Loan shall for any reason be prepaid or accelerated prior to the Lock-Out Expiration Date, in addition to paying all other amounts due and payable under this Agreement, Borrower shall pay to Agent for the benefit of Lenders the Early Termination Fee as liquidated damages for such prohibited prepayment.

(b)      Provided no Default has occurred and is continuing and no Event of Default has occurred, the outstanding principal balance of the Term Loan may be prepaid in whole (but not in part), on or after the Lock-Out Expiration Date provided (i) written notice (the "**Prepayment Notice**") of such prepayment specifying the intended date of prepayment is received by Agent not less than 45 days' prior to the date of such prepayment, and (ii) such prepayment is received on a Payment Date and is accompanied by all interest accrued under this Agreement and all other sums due under this Agreement and any other Loan Document.

(c)      No tender of a prepayment of the Term Loan shall be effective unless such prepayment is accompanied by all applicable fees due under the Loan Documents, including the Early Termination Fee.  Provided all of the foregoing and other applicable requirements are satisfied, Borrower shall have the right to prepay the Term Loan on the intended prepayment date set forth in any permitted Prepayment Notice or within 30 days thereafter, provided, if the prepayment is not received by Agent on a Payment Date, in addition to the requirements of clauses (i) through (iii) of **Section 2.5(b)**, Borrower shall additionally pay to Lenders the interest at the Default Interest Rate which would have been payable on the next occurring scheduled Payment Date (or through such earlier date as Borrower revokes the Prepayment Notice), together with a reimbursement of any additional expenses of Agent and/or Lenders, if any, attributable to such prepayment (and for avoidance of doubt, such reimbursement of additional expenses shall specifically exclude any special or punitive damages).  If Borrower does not prepay the Term Loan within 30 days after the intended prepayment date set forth in any permitted Prepayment Notice, then (xi) the Prepayment Notice shall lapse, and Borrower shall thereafter be required to deliver a new Prepayment Notice to prepay the Term Loan in accordance with this Section 2.5 and (xii) Borrower shall pay to each Lender upon demand the

- 22 -

expenses reasonably incurred by such Lender as consideration for each such Lender's continuing to provide the financial accommodations under this Agreement notwithstanding the delivery of a Prepayment Notice together with any expenses of each Lender attributable to Borrower's failure to so make the specified prepayment (including without limitation all internal and external reasonable attorneys' fees).  Partial prepayments of the Term Loan shall not be permitted.

2.6     Security

The Obligations are to be secured by Liens granted under this Agreement and pursuant to the Security Documents, some of which shall be filed or recorded in the real property records of the county in which the Real Estate is located.

2.7     Collections; Repayment; Springing Lockbox

(a)     Borrower shall cause Operator to execute and deliver a Lockbox Agreement with Lockbox Bank, together with such other agreements as Agent may in a commercially reasonable manner require, providing for the establishment and maintenance of a Lockbox Account.  Operator shall (i) notify or cause to be notified each payor (other than individuals making private payments or insurance companies making co-payments for such individuals) that all checks be sent directly to the Lockbox Account and that all wire or automatic clearing house ("**ACH**") transfers be wired or sent directly into the Lockbox Account and (ii) receive in trust for the benefit of Agent and deposit or cause to be deposited into the Lockbox Account, immediately upon receipt, any and all other collections on Accounts received by Operator.  Operator shall have access to the Lockbox Account until a Default or Event of Default occurs.  Operator shall not have any dominion or control over the Lockbox Account or any funds held in the Lockbox Account and Operator disclaims or shall disclaim any right of any nature whatsoever to control or otherwise direct or make any claim against the funds held in the Lockbox Account after a Default or Event of Default occurs and Lockbox Bank receives a written notice from Agent instructing Lockbox Bank to cease honoring Operator's instructions with respect to the Lockbox Account (a "**Block Notice**").  If the Default is cured within any applicable grace or notice period or if Agent permits Borrower to cure any Event of Default, then after the Default or Event of Default no longer exists (i.e., the condition causing the occurrence of such Default or Event of Default has been remedied and Lenders have, in writing, waived the Event of Default), the restriction on Operator's ability to obtain funds from the Lockbox Account shall be lifted.

(b)     Operator shall execute and deliver a Government Receivables Deposit Account Agreement with Lockbox Bank, together with such other agreements as Agent may in good faith require, providing for the establishment and maintenance of the Government Receivables Deposit Account.  Operator shall deliver or cause to be delivered a notice to governmental entities instructing all Medicaid/Medicare Account Debtors that all checks be sent to the Government Receivables Deposit Account and that all wire or ACH transfers from Medicaid/Medicare Account Debtors be wired or sent directly to the Government Receivables Deposit Account.  Agent agrees and confirms that Operator has sole dominion and control over the Government Receivables Deposit Account and all funds held in the Government Receivables Deposit Account.  Agent disclaims any right of any nature whatsoever to control or otherwise

- 23 -

direct or make any claim against the funds held in the Government Receivables Deposit Account.

(c)     Under the terms of the Government Receivables Deposit Account Agreement, Lockbox Bank shall on each Business Day, immediately upon receipt, transfer all available and collected funds deposited into the Government Receivables Deposit Account into the Lockbox Account.

Under the terms of the Lockbox Agreement: (i) until Lockbox Bank receives a Block Notice from Agent, Lockbox Bank shall on each Business Day, immediately upon receipt, transfer all available and collected funds deposited into the Lockbox Account into an account as designated by Operator; and (ii) following the receipt of a Block Notice from Agent, Lockbox Bank shall on each Business Day, immediately upon receipt, transfer all available and collected funds deposited into the Lockbox Account into an account designated by Agent and over which Borrower shall not have any dominion or control.

2.8     Promise to Pay; Manner of Payment

Borrower absolutely and unconditionally promises to pay principal, interest and all other amounts payable under this Agreement, or under any other Loan Document, without any right of rescission and without any deduction whatsoever, including any deduction for any setoff, counterclaim or recoupment, and notwithstanding any damage to, defects in or destruction of the Collateral or any other event, including obsolescence of any property or improvements. All payments made by Borrower shall be made by wire transfer on the date when due, without offset or counterclaim, in U.S. Dollars, in immediately available funds to such account as may be indicated in writing by Lender(s) (or Agent on behalf of Lenders) to Borrower from time to time. Any such payment received after 2:00 p.m. (New York City Time) on the date when due shall be deemed received on the following Business Day.  Whenever any payment under this Agreement shall be stated to be due or shall become due and payable on a day other than a Business Day, the due date thereof shall be extended to, and such payment shall be made on, the next succeeding Business Day, and such extension of time in such case shall be included in the computation of payment of any interest (at the interest rate then in effect during such extension) and/or fees, as the case may be.

2.9     Grant of Security Interest

To secure the payment and performance of the Obligations, Borrower grants to Agent for the benefit of Lenders a continuing security interest in and lien upon, and pledges to Agent for the benefit of Lenders, all of Borrower's real and personal property, including without limitation all of its right, title and interest in and to the following:

(a)     all of Borrower's tangible personal property, including without limitation all present and future Inventory and Equipment (including items of equipment which are or become Fixtures), Fixtures and other Goods, now owned or hereafter acquired, and wherever located;

(b)     all of Borrower's intangible personal property, including without limitation all present and future Accounts, contract rights, General Intangibles, Chattel Paper,

- 24 -

Documents, Instruments, Deposit Accounts, Investment Property, Letter-of-Credit Rights, Supporting Obligations, rights to the payment of money or other forms of consideration of any kind, tax refunds, insurance proceeds, now owned or hereafter acquired, and all intangible and tangible personal property relating to or arising out of any of the foregoing;

    **(c)**    all of Borrower's present and future Government Contracts and rights thereunder and the related Government Accounts and proceeds thereof, now or hereafter owned or acquired by Borrower; provided, however, that Lender(s) or Agent on behalf of Lenders shall not have a security interest in any rights under any Government Contract of Borrower or in the related Government Account where the taking of such security interest is a violation of an express prohibition contained in the Government Contract (for purposes of this limitation, the fact that a Government Contract is subject to, or otherwise refers to, Title 31, § 203 or Title 41, § 15 of the United States Code shall not be deemed an express prohibition against assignment thereof) or is prohibited by applicable law, unless in any case consent is otherwise validly obtained; and

    **(d)**    any and all additions and accessions to any of the foregoing, and any and all replacements, products and proceeds (including insurance proceeds) of any of the foregoing.

Notwithstanding the foregoing provisions of this **Section 2.9**, such grant of a security interest shall not extend to, and the term "**Collateral**" shall not include, any General Intangibles of Borrower to the extent that (i) such General Intangibles are not assignable or capable of being encumbered as a matter of law or under the terms of any license or other agreement applicable thereto (but solely to the extent that any such restriction shall not be rendered ineffective pursuant to the UCC or any other applicable law) without the consent of the licensor thereof or other applicable party thereto, and (ii) such consent has not been obtained; provided, however, that the foregoing grant of a security interest shall extend to, and the term "**Collateral**" when used in this Agreement shall include, each of the following: (a) any General Intangible which is in the nature of an Account or a right to the payment of money or a proceed of, or otherwise related to the enforcement or collection of, any Account or right to the payment of money, or goods which are the subject of any Account or right to the payment of money, (b) any and all proceeds of any General Intangible that is otherwise excluded to the extent that the assignment, pledge or encumbrance of such proceeds is not so restricted, and (c) upon obtaining the consent of any such licensor or other applicable party with respect to any such otherwise excluded General Intangible, such General Intangible as well as any and all proceeds thereof that might theretofore have been excluded from such grant of a security interest and from the term "**Collateral**."

    As additional security for the payment and performance of the Obligations, and as security for Operator's obligations under the Guaranty, Borrower shall cause Operator to grant to Agent for the benefit of Lenders a continuing security interest in and lien upon, all of Operator's real and personal property, including without limitation all of its right, title and interest in and to Collateral of Operator.

- 25 -

2.10    Interest Rate Cap Agreement

(a)    Borrower shall have the right to purchase, at its discretion, and in which case shall thereafter maintain in effect, an interest rate cap agreement (the "**Interest Rate Cap Agreement**") with an Acceptable Counterparty, which shall be coterminous with, or beyond, the Term Loan and have a notional amount which shall not at any time be less than the outstanding principal balance of the Term Loan and which shall at all times have a strike rate less than or equal to a rate agreed to by Borrower and Agent (the "**Strike Rate**").   The Acceptable Counterparty shall be obligated under the Interest Rate Cap Agreement to make monthly payments on the applicable Payment Date equal to the excess of three (3) month LIBOR over the Strike Rate, calculated on the notional amount.   The terms of the Interest Rate Cap Agreement shall be determined prior to Closing and must be acceptable to Lender in Lender's sole discretion.

(b)    Borrower shall collaterally assign to Agent pursuant to an assignment of interest rate cap agreement in form and substance acceptable to Agent, all of its right, title and interest to receive any and all payments under the Interest Rate Cap Agreement (and any related guarantee, if any) and shall deliver to Agent an executed counterpart of such Interest Rate Cap Agreement and notify the Acceptable Counterparty of such collateral assignment (either in such Interest Rate Cap Agreement or by separate instrument).   The Acceptable Counterparty shall agree in writing to make all payments it is required to make under the Interest Rate Cap Agreement directly to Agent.   At such time as the Term Loan is repaid in full, all of Agent's right, title and interest in the Interest Rate Cap Agreement shall terminate and Agent shall promptly execute and deliver at Borrower's sole cost and expense, such documents as may be required to evidence Agent's release of the Interest Rate Cap Agreement and to notify the Acceptable Counterparty of such release.

(c)    Borrower shall comply with all of its obligations under the terms and provisions of the Interest Rate Cap Agreement.   All amounts paid by the Acceptable Counterparty under the Interest Rate Cap Agreement shall be paid to Agent.   Borrower shall take all actions reasonably requested by Agent to enforce Agent's rights under the Interest Rate Cap Agreement in the event of a default by the Acceptable Counterparty and shall not waive, amend or otherwise modify any of its rights thereunder.

(d)    In the event of any downgrade, withdrawal or qualification of the rating of the Acceptable Counterparty below the ratings required in the definition of Applicable Counterparty by the Rating Agency, Borrower shall replace the Interest Rate Cap Agreement with a Replacement Interest Rate Cap Agreement with an Acceptable Counterparty not later than ten (10) Business Days following receipt of notice from Agent of such downgrade, withdrawal or qualification.

(e)    If Borrower fails to purchase and deliver to Agent the Interest Rate Cap Agreement or any Replacement Interest Cap Agreement as and when required under this Agreement, Agent may purchase such Interest Rate Cap Agreement and the cost incurred by Agent in purchasing such Interest Rate Cap Agreement shall be paid by Borrower to Agent with interest thereon at the Default Interest Rate from the date such cost was incurred by Agent until such cost is paid by Borrower to Agent.

- 26 -

(f)     Each Interest Rate Cap Agreement shall contain the following language or its equivalent: "In the event of any downgrade, withdrawal or qualification of the rating of the Counterparty below the ratings required in the definition of Acceptable Counterparty by the Rating Agency, the Counterparty must, within 30 days, either (x) post collateral on terms acceptable to the Rating Agency or (y) find a replacement Acceptable Counterparty, at the Counterparty's sole cost and expense, acceptable to the Rating Agency (notwithstanding the foregoing, if the Counterparty's rating downgraded to "A" or lower, only the option described in clause (y) will be acceptable); provided that, notwithstanding such a downgrade, withdrawal or qualification, unless and until the Counterparty transfers the Interest Rate Cap Agreement to a replacement Acceptable Counterparty pursuant to the foregoing clause (y), the Counterparty will continue to perform its obligations under the Interest Rate Cap Agreement.  Failure to satisfy the foregoing shall constitute an Additional Termination Event as defined by **Section 5(b)(v)** of the ISDA Master Agreement, with the Counterparty as the Affected Party."

(g)     In connection with an Interest Rate Cap Agreement, Borrower shall obtain and deliver to Agent an opinion of counsel from counsel for the Acceptable Counterparty (upon which Agent and its successors and assigns may rely) which shall provide, in relevant part, that:

(i)     the Acceptable Counterparty is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Cap Agreement;

(ii)     the execution and delivery of the Interest Rate Cap Agreement by the Acceptable Counterparty, and any other agreement which the Acceptable Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

(iii)     all consents, authorizations and approvals required for the execution and delivery by the Acceptable Counterparty of the Interest Rate Cap Agreement, and any other agreement which the Acceptable Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

(iv)     the Interest Rate Cap Agreement, and any other agreement which the Acceptable Counterparty has executed and delivered pursuant thereto, has been duly executed and delivered by the Acceptable Counterparty and constitutes the legal, valid and binding obligation of the Acceptable Counterparty, enforceable against the Acceptable Counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

2.11    Increased Costs; Capital Adequacy

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Applicable Interest Rate); or

(ii)    impose on any Lender or the London interbank market any other condition affecting this Agreement or the Term Loan made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining the Term Loan (or of maintaining its obligation to make the Term Loan) or to reduce the amount of any sum received or receivable by any Lender under this Agreement (whether of principal, interest or otherwise), then Borrower will pay to such Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered.

(b)    If Agent (or any Lender) determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Term Loan made by such Lender to a level below that which such Lender or such Lender's holding company, as applicable, could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company, as applicable, with respect to capital adequacy), then from time to time Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender's holding company, as applicable, for any such reduction suffered.

(c)    A certificate of the applicable Lender setting forth the amount or amounts necessary to compensate such Lender or Lender's holding company, as the case may be, as specified in **Sections 2.11(a)** and **(b)**, shall be delivered to Borrower and shall be conclusive absent manifest error. Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    Failure or delay on the part of a Lender to demand compensation pursuant to this **Section 2.11** shall not constitute a waiver of such Lender's right to demand such compensation; provided that Borrower shall not be required to compensate such Lender pursuant to this **Section 2.11** for any increased costs or reductions incurred more than one hundred eighty (180) days prior to the date such Lender (or Agent on behalf of such Lender) notifies Borrower (and Agent) of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)    Notwithstanding anything in this Agreement to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith shall be deemed to be a Change in Law and/or a change in capital adequacy requirements, as applicable, regardless of the date enacted, adopted or issued.

- 28 -

## III.   FEES AND OTHER CHARGES; RESERVES; CASH MANAGEMENT

### 3.1   Commitment Fee; Other Fees

(a)   In partial consideration of each Lender's agreement to make the Term Loan, Borrower shall pay to Agent for the benefit of Lenders at Closing a nonrefundable commitment fee equal to one percent (1.00%) of the Loan Amount (the "**Commitment Fee**"). Borrower acknowledges and agrees that the Commitment Fee shall be deemed earned as of the Closing Date and nonrefundable in all respects.   The Commitment Fee shall be allocated between or among Lenders based on their pro rata shares of the Loan Amount.

(b)   In partial consideration of Agent's agreement to extend the Scheduled Maturity Date pursuant to the provisions of Section 2.5(e), Borrower shall pay to Agent a nonrefundable extension fee equal to 0.5% of the Loan Amount (the "**Extension Fee**"), which Extension Fee shall be deemed fully earned upon receipt.   The Extension Fee shall be allocated between or among Lenders based on their pro rata shares of the Loan Amount.

### 3.2   Lawful Limits

In no contingency or event whatsoever, whether by reason of acceleration or otherwise, shall the interest and other fees and charges paid or agreed to be paid to Agent for the benefit of Lenders for the use, forbearance or detention of money under this Agreement exceed the maximum rate permissible under applicable law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto.   If, due to any circumstance whatsoever, fulfillment of any provision of this Agreement, at the time performance of such provision shall be due, shall exceed any such limit, then, the obligation to be so fulfilled shall be reduced to such lawful limit, and, if any Lender shall have received interest or any other charges of any kind which might be deemed to be interest under applicable law in excess of the maximum lawful rate, then such excess shall be applied first to any unpaid fees and charges under this Agreement (which do not exceed such limit), then to the unpaid principal balance under this Agreement, and if the then remaining excess interest is greater than the unpaid principal balance, such Lender shall promptly refund such excess amount to Borrower and the provisions shall be deemed amended to provide for such permissible rate.   In determining whether or not the interest paid or payable, under any specific contingency, exceeds the highest lawful rate, Borrower and Agent and each Lender shall, to the maximum extent permitted under applicable law, (a) characterize any nonprincipal payment other than specified as interest in this Agreement as an expense, fee, or premium rather than as interest, (b) exclude voluntary prepayments and the effects thereof, and (c) "**spread**" the total amount of interest throughout the entire term of the Term Loan so that the interest rate does not exceed the highest lawful rate of interest.   The terms and provisions of this **Section 3.2** shall control to the extent any other provision of any Loan Document is inconsistent herewith.

### 3.3   **Renovation; Renovation Reserve**

(a)   Within six (6) months of the Closing Date, Borrower shall complete certain renovations to the Property, including, without limitation, the renovation and opening of the first floor short-term unit, the updating of the overall aesthetic appearance of the Property and

- 29 -

the making of other improvements that enhance the overall functionality of the Property, which are approved by Lender in its sole discretion (the "**Renovations**"), at a minimum cost of $400,000 in renovations.  Borrower has provided Lender with a renovation budget/schedule acceptable to Lender with respect to the Renovations.  For avoidance of doubt, any mechanical, ADA compliance and environmental issues noted in the Property Condition Assessment and/or Environmental Assessment are addressed and, as applicable, reserved for separately in this Agreement.  Borrower shall fund and reserve the cost of the Renovations at Closing into a segregated account of Borrower, and Borrower shall only be permitted to utilize the same for the Renovations.

(b)     As additional security for the payment and performance of the Obligations, until the indefeasible payment in full of the Obligations, Borrower shall establish and maintain in effect until indefeasible payment in full of the Obligations a reserve funded by Borrower and held by Agent for payment of costs and expenses associated with the Renovations (the "**Renovation Reserve**").  As of the Closing Date, Borrower has deposited with Agent $150,000 to be held in the Renovation Reserve.  So long as no Default has occurred and is continuing and no Event of Default has occurred (i) all sums in the Renovation Reserve shall be held by Agent in the Renovation Reserve to pay the costs and expenses of completing the Renovations, and (ii) Agent shall, to the extent funds are available for such purpose in the Renovation Reserve, disburse to Borrower the entire Renovation Reserve upon (a) the receipt by Agent of a written request from Borrower for disbursement from the Renovation Reserve which shall include a certification by Borrower that the Renovations has been completed in accordance with the terms of this Agreement, (b) delivery to Agent of invoices, receipts or other evidence satisfactory to Agent verifying the costs of the Renovations paid for by Borrower, (c) delivery to Agent of a certification from an inspecting architect, engineer or other consultant reasonably acceptable to Agent describing the completed work, verifying the completion of the work and the value of the completed work and, if applicable, certifying that the Property is, as a result of such work, in compliance with all applicable laws, ordinances, rules and regulations relating to the Renovations so performed, and (d) delivery to Agent of affidavits, lien waivers or other evidence reasonably satisfactory to Agent showing that all materialmen, laborers, subcontractors and any other parties who might or could claim statutory or common law liens and are furnishing or have furnished materials or labor to the Property have been paid all amounts due for such labor and materials furnished to the Property.  Agent shall not be required to make advances from the Renovation Reserve more frequently than once during the six (6) month term for completion of the Renovations.  In making any payment from the Renovation Reserve, Agent shall be entitled to rely on such request from Borrower without any inquiry into the accuracy, validity or contestability of any such amount.  No interest or other earnings on the funds contained in the Renovation Reserve shall be paid to Borrower and any interest or other earnings on funds deposited into the Renovation Reserve shall be solely for the account of Agent.  In the event that the amounts on deposit or available in the Renovation Reserve are inadequate to pay the costs of the Renovations, Borrower shall pay the amount of such deficiency.

3.4     CapEx Obligation; CapEx Reserve

Beginning twenty-four (24) months from the First Payment Date,  Borrower shall be required to expend for the betterment of the Facility a sum equal to Four Hundred Dollars ($400) per licensed bed per annum (i.e., $56,000) ("**CapEx Obligation**").  As of the

- 30 -

Closing Date, Borrower represents and warrants the aggregate number of licensed beds at the Facility are one hundred forty (140). If the aggregate number of licensed beds shall increase, the CapEx Obligation shall be adjusted accordingly. If at any time Agent notifies Borrower in writing that Agent has reasonable grounds to believe that CapEx Obligation are or are anticipated to be inadequate to cover Capital Improvements reasonably anticipated by Agent to be necessary, the CapEx Obligation shall be increased to the amount specified by Agent in such notice, and Borrower shall increase the amount of the CapEx Obligation accordingly. Borrower shall submit to Agent reports on a calendar quarter basis to document and substantiate compliance with the CapEx Obligation.

3.5     Tax and Insurance Reserve.

(a)     Borrower shall establish and maintain at all times until indefeasible payment in full of the Obligations a reserve (the "**Tax and Insurance Reserve**") with Agent for payment of real estate taxes and assessments and casualty insurance on the Property and as additional security for the Obligations. Borrower shall deposit in the Tax and Insurance Reserve an amount determined by Agent to be sufficient (when added to the monthly deposits described in this Agreement) to pay the next due annual installment of real estate and other taxes and assessments on the Property at least one (1) month prior to the delinquency date thereof (if paid in one installment) and the next due annual casualty insurance premiums with respect to the Property at least one (1) month prior to the due date thereof (if paid in one installment); provided, at all times, the amount on deposit in the Tax and Insurance Reserve shall not be less than the amount determined by Agent. As of the Closing Date, Agent is holding $22,080.00 for purposes of taxes and $1,150.00 for purposes of insurance. Commencing on the First Payment Date, and continuing thereafter on each successive Payment Date, Borrower shall pay to Agent, concurrently with the monthly payments due under this Agreement, deposits in an amount equal to one-twelfth (1/12) of the amount of the annual real estate and other taxes and assessments that will next become due and payable on the Property, plus one-twelfth (1/12) of the amount of the annual premiums that will next become due and payable on casualty insurance policies which Borrower is required to maintain under this Agreement, each as estimated and determined by Agent. No interest on funds contained in the Tax and Insurance Reserve shall be paid by Agent to Borrower and any interest or other earnings on funds deposited in the Tax and Insurance Reserve shall be solely for the account of Agent. Borrower shall pay, on or prior to the respective due date for the payment thereof, all taxes assessments and insurance premiums required to be paid by Borrower under this Agreement, and so long as no Default has occurred and is continuing and no Event of Default has occurred, Agent shall reimburse Borrower for the payment of any such taxes, assessments and casualty insurance premiums within thirty (30) days after the receipt by Agent from Borrower of paid receipts therefor by Agent to the extent of available funds for such purpose in the Tax and Insurance Reserve; provided, at all times, the amount on deposit in the Tax and Insurance Reserve shall not be less than the amount determined by Agent to be sufficient to pay the next due annual installment of real estate taxes and assessments on the Property at least one (1) month prior to the delinquency date thereof (if paid in one installment) and the next due annual casualty insurance premiums with respect to the Property at least one (1) month prior to the due date thereof (if paid in one installment).

(b)     Agent, at any time upon notice to Borrower, may elect (but shall have no obligation) to assume responsibility for payments of real estate taxes and assessments and

- 31 -

insurance premiums from the Tax and Insurance Reserve in accordance with this **Section 3.5**.  In the event Agent makes said election, so long as no Default has occurred and is continuing and no Event of Default has occurred, all sums in the Tax and Insurance Reserve shall be held by Agent in the Tax and Insurance Reserve to pay said taxes, assessments and insurance premiums in one installment before the sums become delinquent.  In the event Agent makes such election, Borrower shall be responsible for ensuring the receipt by Agent, at least forty-five (45) days prior to the respective due date for the payment thereof, of all bills, invoices and statements for all taxes, assessments and insurance premiums to be paid from the Tax and Insurance Reserve, and so long as no Default has occurred and is continuing and no Event of Default has occurred, Agent shall pay the Governmental Authority or other party entitled thereto directly to the extent funds are available for such purpose in the Tax and Insurance Reserve.  In making any payment from the Tax and Insurance Reserve, Agent shall be entitled to rely on any bill, statement or estimate procured from the appropriate public office or insurance company or agent without any inquiry into the accuracy of such bill, statement or estimate and without any inquiry into the accuracy, validity, enforceability or contestability of any tax, assessment, valuation, sale, forfeiture, tax lien or title or claim thereof.  If the total funds in the Tax and Insurance Reserve shall exceed the amount of payments actually applied by Agent for the purposes of the Tax and Insurance Reserve, such excess may be credited by Agent on subsequent payments to be made under this Agreement or, at the option of Agent, refunded to Borrower.  If, however, the Tax and Insurance Reserve shall not contain sufficient funds to pay the sums required when the same shall become due and payable, Borrower shall, within ten (10) days after receipt of written notice thereof, deposit with Agent the full amount of any such deficiency.

(c)      Borrower shall, at all times during the Term, provide Agent with copies of all bills, invoices and statements for all taxes, assessments and insurance premiums promptly after Borrower's receipt thereof, but in no event less than 45 days prior to the respective delinquency date for the payment thereof.

3.6     Reserved

3.7     Reserved

3.8     Repair and Remediation Reserve

Prior to the execution of this Agreement, Agent has caused the Property to be inspected and such inspection has revealed that the Property is in need of certain maintenance, repairs and/or remedial or corrective work.  Contemporaneously with the execution, Borrower has established with Agent a reserve in the amount of One Hundred Thirty Five Thousand Two Hundred Ninety Three and 75/100 Dollars ($135,293.75) (the "**Repair and Remediation Reserve**"), which amount represents 125% of the estimated cost to complete such items of Required Work, by depositing such amount with Agent.  Borrower shall cause each of the items described on **Schedule 3.8** (collectively, the "**Required Work**") to be completed, performed, remediated and corrected to the satisfaction of Agent and as necessary to bring the Property into compliance with all applicable laws, ordinances, rules and regulations on or before six (6) months from the Closing Date, as such time period may be extended by Agent in its discretion.  So long as no Default has occurred and is continuing and no Event of Default has occurred (i) all sums in the Repair and Remediation Reserve shall be held by Agent in the Repair and

- 32 -

Remediation Reserve to pay the costs and expenses of completing the Required Work, and (ii) Agent shall, to the extent funds are available for such purpose in the Repair and Remediation Reserve, disburse to Borrower the amount paid or incurred by Borrower in completing, performing, remediating or correcting the Required Work upon (a) the receipt by Agent of a written request from Borrower for disbursement from the Repair and Remediation Reserve which shall include a certification by Borrower that the applicable item of Required Work has been completed in accordance with the terms of this Agreement, (b) delivery to Agent of invoices, receipts or other evidence satisfactory to Agent verifying the costs of the Required Work to be reimbursed, (c) for any single Required Work item in excess of $20,000 (or for any Required Work item structural in nature) and prior to disbursement of the final $50,000, delivery to Agent of a certification from an inspecting architect, engineer or other consultant reasonably acceptable to Agent describing the completed work, verifying the completion of the work and the value of the completed work and, if applicable, certifying that the Property is, as a result of such work, in compliance with all applicable laws, ordinances, rules and regulations relating to the Required Work so performed, and (d) delivery to Agent of affidavits, lien waivers or other evidence reasonably satisfactory to Agent showing that all materialmen, laborers, subcontractors and any other parties who might or could claim statutory or common law liens and are furnishing or have furnished materials or labor to the Property have been paid all amounts due for such labor and materials furnished to the Property.  Agent shall not be required to make advances from the Repair and Remediation Reserve more frequently than once per month during the six month term for completion of the Required Work.  In making any payment from the Repair and Remediation Reserve, Agent shall be entitled to rely on such request from Borrower without any inquiry into the accuracy, validity or contestability of any such amount.  No interest or other earnings on the funds contained in the Repair and Remediation Reserve shall be paid to Borrower and any interest or other earnings on funds deposited into the Repair and Remediation Reserve shall be solely for the account of Agent.  In the event that the amounts on deposit or available in the Repair and Remediation Reserve are inadequate to pay the costs of the Required Work, Borrower shall pay the amount of such deficiency.

In addition to the Required Work, in the event that Lender determines that the roof requires replacement during the term of the Loan, within ten (10) days of written notice to Borrower of such determination, Borrower shall deposit funds into the Repair and Remediation Reserve equal to 125% of the estimated cost of the roof replacement, which funds shall be disbursed in accordance with this Section 3.8.

3.9     Security Interest In Reserves

As additional security for the payment and performance of the Obligations, Borrower  unconditionally and irrevocably assigns, conveys, pledges, mortgages, transfers, delivers, deposits, sets over and confirms unto Agent for the benefit of each Lender, and  grants to Agent for the benefit of each Lender a security interest in all sums on deposit or due under the Loan Documents including, without limitation, (i) the Renovation Reserve, the Tax and Insurance Reserve, and the Repair and Remediation Reserve (collectively, the "**Reserves**"), (ii) the accounts into which the Reserves have been deposited, (iii) all insurance on said accounts, (iv) all accounts, contract rights and general intangibles or other rights and interests pertaining thereto, (v) all sums now or hereafter therein or represented thereby, (vi) all replacements, substitutions or proceeds thereof, (vii) all instruments and documents now or hereafter

- 33 -

evidencing the Reserves or such accounts, (viii) all powers, options, rights, privileges and immunities pertaining to the Reserves (including the right to make withdrawals therefrom), and (ix) all proceeds of the foregoing. Borrower authorizes and consents to the account into which the Reserves have been deposited being held in Agent's name or the name of any entity servicing the Term Loan for Agent and acknowledges and agrees that Agent, or at Agent's election, such servicing agent, shall have exclusive control over said account. Notice of the assignment and security interest granted to Agent in this Agreement may be delivered by Agent at any time to the financial institution wherein the Reserves have been established, and Agent, or such servicing entity, shall have possession of all passbooks or other evidences of such accounts. Borrower holds Agent harmless with respect to all risk of loss regarding amounts on deposit in the Reserves, except to the extent that any such loss is caused by the gross negligence or intentional misconduct of Agent. Borrower knowingly, voluntarily and intentionally stipulates, acknowledges and agrees that the advancement of the funds from the Reserves as set forth in this Agreement is at Borrower's direction and is not the exercise by Agent of any right of set-off or other remedy upon a Default or Event of Default. Upon the occurrence of an Event of Default, Agent may, without notice or demand on Borrower, at its option: (A) withdraw any or all of the funds (including, without limitation, interest) then remaining in the Reserves and apply the same, after deducting all costs and expenses of safekeeping, collection and delivery (including, but not limited to, reasonable attorneys' fees, costs and expenses) to the Obligations in such manner as Agent shall deem appropriate in its discretion, and the excess, if any, shall be paid to Borrower, (B) exercise any and all rights and remedies of a secured party under any applicable Uniform Commercial Code, or (C) exercise any other remedies available at law or in equity. No such use or application of the funds contained in the Reserves shall be deemed to cure any Default or Event of Default.

The Reserves are solely for the protection of Lenders and entail no responsibility on Agent's part beyond the payment of the respective costs and expenses in accordance with the terms of this Agreement and beyond the allowing of due credit for the sums actually received. Upon assignment of the Security Instrument by Agent, any funds in the Reserves shall be turned over to the assignee and any responsibility of Agent, as assignor, with respect thereto shall terminate. The Reserves shall not, unless otherwise explicitly required by applicable law, be or be deemed to be escrow or trust funds, but, at Agent's option and in Agent's discretion, may either be held in a separate account or be commingled by Agent with the general funds of Agent. Upon full payment of the Obligations in accordance with the terms of this Agreement or at such earlier time as Agent may elect, the balance in the Reserves then in Agent's possession shall be paid over to Borrower and no other party shall have any right or claim thereto. Any amounts received by Agent from Borrower may be invested by Agent (or its servicer) for Agent's benefit, and Agent shall not be obligated to pay, or credit, any interest earned thereon to Borrower except as may be otherwise specifically provided in this Agreement.

3.10    Sinking Fund Account

(a)    Borrower shall establish and maintain a collateral account in the name of the Borrower held by Agent (the "**Sinking Fund Account**"). The Sinking Fund Account shall be held as additional security for the payment and performance of all of the obligations of Borrower under this Agreement and the other Loan Documents, and Borrower hereby pledges and assigns to Agent, and grant to Agent, for the benefit of Lenders, a first lien on and a first

- 34 -

priority security interest in, the Sinking Fund Account, all cash and investments from time to time on deposit in the Sinking Fund Account, and all proceeds of all of the foregoing. All amounts on deposit in the Sinking fund Account shall be released by Agent to Borrower at such time as all of the principal of and interest on the Loan have been paid in full and all of the other obligations to Lender under this Agreement and the other Loan Documents have been fully paid and performed.

(b)     Provided that no Default or Event of Default under this Agreement or any of the other Loan Documents has occurred and is continuing, in lieu of making any monthly payment on the principal of the Notes which is required under this Agreement (other than the payment of principal due on the Stated Maturity Date), Borrower may elect to deposit the amount of such payment in the Sinking Fund Account, and when such deposit has been made, Borrower's obligation to make such payment on the Notes shall be deemed to have been satisfied.

(c)     Amounts on deposit in the Sinking Fund Account shall be held in an interest bearing account at Agent.  Provided that no Default or Event of Default under this Agreement or any of the other Loan Documents has occurred and is continuing, and provided that the amount on deposit is large enough for investment in certificates of deposit as determined by Agent, Borrower shall have the right to invest amounts on deposit in the Sinking fund Account in certificates of deposit issued by Agent.  Earnings on investments of amounts in the Sinking Fund Account shall be added to the Sinking Fund Account.

## IV.     CONDITIONS PRECEDENT

### 4.1     Conditions to Funding of Term Loan and Closing

The obligations of Lenders to consummate the transactions contemplated in this Agreement and to advance their respective commitments with respect to the Loan Amount are subject to the satisfaction, in Agent's discretion, of the following:

(a)     All Loan Documents shall have been duly executed by an authorized signatory of all parties (and notarized, if applicable) and delivered;

(b)     Agent shall have received the following items in form and content satisfactory to Agent: (i) searches of appropriate governmental records for UCC financing statements, tax and judgment lien searches showing no Liens against the Facility or any Loan Party (other than Permitted Liens) and (ii) evidence of the filing, registration or recordation and of the payment of any necessary fee, tax or expense relating thereto as to each document required by any Loan Document or under law or otherwise requested by Agent to be filed, registered or recorded to create in favor of Lender(s) and/or Agent, a perfected first priority lien and security interest against the Property or any part thereof;

(c)     Agent shall have received, all in form and substance satisfactory to Agent, a copy of all organizational documentation of each Loan Party deemed necessary by Agent, certified by an authorized officer, manager or member of such Loan Party as being true, complete and correct, including without limitation (i) charter, incorporation, existence and good standing documents, (ii) incumbency certificate, (iii) as may be required, a certificate executed

- 35 -

by each member of the applicable Loan Party dated as of the Closing Date and certifying that (A) the membership interests in such Loan Party have been transferred to Agent in the books and records of the applicable Loan Party and attaching copies of such Loan Party's books and records evidencing the same and (B) that the operating agreement of such Loan Party does not provide that the membership interests in such Loan Party are subject to Article 8 of the UCC and (C) that such Loan Party has not certificated any interests in such Loan Party at any time between its date of formation and the Closing Date, and (iv) legal opinions of counsel for each Loan Party as may be required by Agent;

(d)     Agent shall have received a certificate of solvency executed by an authorized representative of each Loan Party, in form and substance satisfactory to Agent (each, a "**Solvency Certificate**"), certifying (i) the solvency of such Person after giving effect to the transactions and the Indebtedness contemplated by the Loan Documents and (ii) as to such Person's financial resources and ability to meet its obligations and liabilities as they become due, to the effect that as of the Closing Date and after giving effect to such transactions and Indebtedness; (A) the assets of such Person, at a Fair Valuation, exceed the total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities) of such Person, and (B) such Person has sufficient capital with which to engage in its anticipated business exists with respect to such Person;

(e)     Each Loan Party shall have delivered to Agent, not later than fifteen (15) days prior to Closing, and Agent shall have completed such examinations, the results of which shall be satisfactory in form and substance to Agent, of the Facility, the financial statements, and the books, records, business, obligations, financial condition, operations, and state of each Loan Party and of the operating statements, statements of sources and uses of capital and such other books and records and financial information concerning a Loan Party or the Facility as Agent shall have required, demonstrating to Agent's satisfaction that (i) the operations of each Loan Party comply with all applicable legal requirements, (ii) the operations of each Loan Party are not the subject of any governmental investigation or any remedial action which could result in any expenditure or liability deemed material by Agent, and (iii) no Loan Party has any Indebtedness or other liability (whether contingent or otherwise) that is deemed material by Agent;

(f)     Borrower shall have delivered to Agent all fees, charges and expenses payable to Agent and/or to Lenders on or prior to the Closing Date pursuant to the Loan Documents, including without limitation those amounts payable to Agent pursuant to **Article III**;

(g)     Borrower shall have delivered to Agent, all in form and substance satisfactory to Agent, such consents, approvals and agreements, including, without limitation, any applicable Subordination Agreements from all Loan Parties and third parties as Agent shall determine are necessary or desirable with respect to (i) the Loan Documents and/or the transactions contemplated thereby, and/or (ii) claims against each Loan Party or the Property or any portion thereof;

(h)     Borrower shall have delivered to Agent, not later than fifteen (15) days prior to Closing, evidence to Agent's satisfaction that all insurance requirements under the Loan Documents are satisfied, including without limitation (i) original certificates and/or

- 36 -

endorsements of such insurance policies required under **Section 6.5** of this Agreement confirming that they are in effect and that the premiums due and owing with respect thereto have been paid in full and naming Agent as sole beneficiary, mortgagee, loss payee and/or additional insured, as appropriate; provided, however, if Borrower shall not have delivered such evidence to Agent prior to Closing, Agent may, in Agent's discretion, require Borrower (at Borrower's sole cost and expense) to place insurance with such companies in such amounts as will satisfy the requirements of this Agreement (the "**Placed Insurance**"), which Placed Insurance must remain in place until Borrower otherwise satisfies the requirements of **Section 6.5** of this Agreement. All certificates of insurance required shall be written on ACORD forms (with respect to any property insurance required under this Agreement, on ACORD Form 28 and with respect to any liability insurance, in ACORD Form 25) and shall include a provision that such policies of insurance shall not be cancelled, materially modified or terminated without at least thirty (30) days prior written notice to Agent. Additionally, the words "**endeavor to**" shall be stricken from the "**Cancellation**" section of the ACORD forms;

(i)     all corporate, limited liability company and other proceedings, documents, instruments and other legal matters in connection with the transactions contemplated by the Loan Documents (including, but not limited to, those relating to corporate and capital structures of each Loan Party) shall be satisfactory to Agent;

(j)     Agent shall have received, in form and substance satisfactory to Agent, (i) evidence of the repayment in full and termination of obligations and Liens with respect to all of those Persons set forth in **Schedule 4.1(j)** and all related documents, agreements and instruments and of all Liens, security interests and UCC financing statements relating thereto, and (ii) release and termination of any and all Liens, security interest and/or UCC financing statements in, on, against or with respect to any of the Property (other than Permitted Liens);

(k)     Borrower shall have delivered to Agent the initial deposit required under each of the Reserves;

(l)     Title Company shall have unconditionally committed to issue to Agent for the benefit of Lenders the Title Insurance Policy(ies) and Borrower shall have paid to Title Company all fees and premiums in connection therewith ;

(m)     Each Loan Party shall have executed and delivered to Agent an IRS Form 8821 and shall have delivered evidence satisfactory to Agent that said form has been filed with the appropriate service center of the Internal Revenue Service;

(n)     Agent shall have received and approved, in Agent's discretion, all inspections, investigations, tests, studies, appraisals, environmental studies, structural and mechanical investigations, surveys and other reports, documents, materials and analyses required by Agent;

(o)     Agent shall have received such other documents, certificates, information or legal opinions as Agent may request, all in form and substance satisfactory to Lenders;

(p)     Each of the representations and warranties made by each Loan Party in the Loan Documents shall be accurate in all material respects;

(q)      No Default or Event of Default shall have occurred or be continuing or would exist after giving effect to the funding of the Term Loan; and

(r)      Except as disclosed in the financial statements delivered to Agent pursuant to **Section 4.1(e)**, there shall be no liabilities or obligations with respect to any Loan Party which, either individually or in the aggregate, could reasonably be expected to (i) have a Material Adverse Effect or (ii) cause a Liability Event.

## V.      REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Agent and Lenders as follows:

### 5.1      Organization and Authority; Investment Company

Each Loan Party (i) is duly organized, validly existing and in good standing under the laws of its State of formation, (ii) has all requisite power and authority to own its properties and assets and to carry on its business as now being conducted and as contemplated in the Loan Documents, (iii) is duly qualified to do business in every jurisdiction in which failure so to qualify could reasonably be expected to have a Material Adverse Effect, and (iv) has all requisite power and authority (A) to execute, deliver and perform its obligations under the Loan Documents to which it is a party, (B) to borrow under this Agreement, (C) to consummate the transactions contemplated under the Loan Documents, and (D) to grant the Liens pursuant to the Security Documents.  No Loan Party is an **"investment company"** registered or required to be registered under the Investment Company Act of 1940, as amended, or is controlled by such an **"investment company."**

### 5.2      Loan Documents

The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party, and the consummation of the transactions contemplated thereby, (i) have been duly authorized by all requisite action of each Loan Party and have been duly executed and delivered by or on behalf of each Loan Party; (ii) do not violate any provisions of (A) applicable laws, (B) any order of any Governmental Authority binding on any Loan Party or any of their respective properties, or (C) the applicable governing agreement or document of any Loan Party, or any agreement between any Loan Party and its stockholders, members, partners or equity owners or among any such stockholders, members, partners or equity owners; (iii) are not in conflict with, and do not result in (A) a Default or Event of Default or (B) an event, fact, condition or circumstance which, with notice or passage of time, or both, could constitute or result in a conflict, breach, default or event of default under, any indenture, agreement or other instrument to which any Loan Party is a party, or by which the properties or assets of any Loan Party are bound, the effect of which could reasonably be expected to have a Material Adverse Effect or could reasonably be expected to cause a Liability Event; (iv) except as set forth in the Loan Documents for the benefit of Agent on behalf of Lenders, will not result in the creation or imposition of any Lien of any nature upon any of the properties or assets of any Loan Party, and (v) do not require the consent, approval or authorization of, or filing, registration or qualification with, any Governmental Authority or any other Person except as has been obtained or filed and which is set forth on **Schedule 5.2**.  Each of the Loan Documents to which

- 38 -

each signing Loan Party is a party constitutes the legal, valid and binding obligation of each signing Loan Party, enforceable against each signing Loan Party in accordance with its terms, subject to the effect of bankruptcy, moratorium, insolvency, reorganization or other similar laws affecting the enforceability of creditors' rights generally and to the effect of general principles of equity which may limit the availability of equitable remedies (whether in a proceeding at law or in equity).

5.3     Subsidiaries, Capitalization and Ownership Interests

No Loan Party has any Subsidiaries except as set forth on **Schedule 5.3A**.  The authorized and issued capitalization (or, as applicable, the outstanding membership and economic interests) of each Loan Party, the number and class of equity securities and/or ownership, voting, membership or partnership interests issued and outstanding of each Loan Party and the record and beneficial owners thereof (including options, warrants and other rights to acquire any of the foregoing) are set forth on **Schedule 5.3B**.  The membership or partnership interests of each Loan Party that is a limited partnership or a limited liability company are not certificated, the documents relating to such membership or partnership interests do not expressly state that such interests are governed by Article 8 of the Uniform Commercial Code, and no such membership or partnership interests are held in a securities account.  The outstanding equity securities and/or ownership, voting, membership, economic or partnership interests of each Loan Party have been duly authorized and validly issued and are fully paid and nonassessable, and each Person listed on **Schedule 5.3B** owns beneficially and of record all the equity securities and/or ownership, voting, membership or economic interests it is listed as owning. **Schedule 5.3B** also lists the directors, members, managers and/or partners of each Loan Party. Except as listed on **Schedule 5.3B**, no Loan Party owns an interest or participates or engages in any joint venture, partnership or similar arrangements with any Person.  **Schedule 5.3C** lists (a) each Pledging Entity, each of whom is executing a Pledge and Security Agreement at the Closing, and (b) each other owner of a direct or indirect interest in Borrower.

5.4     Property Matters

(a)     Borrower has good, marketable and indefeasible fee simple title to the Real Estate and marketable title to the balance of the Property, subject only to those matters expressly set forth on the Title Policy (the "**Permitted Exceptions**"), and has full power and lawful authority to grant, bargain, sell, convey, assign, transfer and encumber its interest in the Property in the manner and form done or intended pursuant hereto or to any other Loan Document.  None of the Permitted Exceptions materially interfere with the security intended to be provided by the Security Instrument, the current primary use of the Real Estate or the current ability of the Property to generate income sufficient to service the Term Loan.  Borrower will preserve its interest in and title to the Property and will forever warrant and defend the same to Agent and Lenders against any and all claims whatsoever and will forever warrant and defend the validity and priority of the lien and security interest created in this Agreement against the claims of all persons and parties whomsoever, subject to the Permitted Exceptions.  The foregoing warranty of title shall survive the foreclosure, exercise of any power of sale or other enforcement of the Security Instrument and shall inure to the benefit of and be enforceable by Agent in the event Agent acquires title to the Property pursuant to any foreclosure, exercise of any power of sale or otherwise.

- 39 -

(b)     The Real Estate and the intended use thereof by Borrower comply with all applicable laws. Each parcel of Land constitutes a separate tax parcel for purposes of ad valorem taxation. The Real Estate does not require any rights over, or restrictions against, other property in order to comply with applicable laws or to be used for its intended purpose. The Real Estate is taxed separately without regard to any other real estate and constitutes a legally subdivided lot under all applicable legal requirements (or, if not subdivided, no subdivision or platting of the Real Estate is required under applicable legal requirements), and for all purposes may be mortgaged, conveyed, pledged, hypothecated, assigned or otherwise dealt with as an independent parcel;

(c)     All utility services necessary and sufficient for the full use, occupancy, operation and disposition of the Real Estate for its intended purposes are in place, including water, storm sewer, sanitary sewer, gas, electric, cable and telephone facilities, through public rights-of-way or perpetual private easements reflected in the Title Insurance Policies and approved by Agent;

(d)     All streets, roads, highways, bridges and waterways necessary for access to and full use, occupancy, operation and disposition of the Real Estate have been completed, have been dedicated to and accepted by the appropriate municipal authority and are open and available to the Real Estate without further condition or cost to Borrower;

(e)     As of the Closing Date: (i) the Real Estate is free from delinquent taxes and assessments of every kind, and (ii) no part of the Real Estate has been taken in condemnation, eminent domain or like proceeding nor is any such proceeding pending or to Borrower's Knowledge, threatened or contemplated;

(f)     No improvements on adjoining properties encroach upon the Land. The Facility is structurally sound, in good repair and free of defects in materials and workmanship and have been constructed and installed in substantial compliance with the plans and specifications relating thereto. All major building systems located within the Improvements, including without limitation the heating and air conditioning systems and the electrical and plumbing systems, are in good working order and condition;

(g)     Except for the Facility Lease, there are no leases or subleases affecting any portion of the Property. The Facility Lease complies with all applicable laws. There are no security deposits held or required under the Facility Lease. Rent payments under the Facility Lease are due on a monthly basis and no rent payment under the Facility Lease has been paid more than 30 days in advance. No rents or charges under the Facility Lease have been waived, released, or otherwise discharged or compromised. There are no outstanding options or rights of first offer or refusal to purchase all or any portion of the Property or Borrower's interest therein or any portion thereof;

(h)     No contract (including the Facility Lease), easement, right of way, permit or declaration (collectively, "**Property Agreements**") provides any party with the right to obtain a lien or encumbrance upon all or any portion of the Property. Borrower has delivered to Agent true, correct and complete copies of all Property Agreements and no default exists or would

- 40 -

exist, with the passing of time or the giving of notice, or both, under any Property Agreement which could reasonably be expected to have a Material Adverse Effect;

(i)     To Borrower's Knowledge, no right of offset or recoupment exists respecting continued contributions to be made by any party under any Property Agreement. No material exclusions or restrictions on the utilization, leasing or improvement of the Property (including non-compete agreements) exist in any Property Agreement;

(j)     The Real Estate forms no part of any property owned, used or claimed by any Loan Party as a residence or business homestead and is not exempt from forced sale under the laws of the State in which the Real Estate is located. Borrower disclaims and renounces each and every claim to all or any portion of the Real Estate as a homestead. The Term Loan is made and transacted solely for business, investment, commercial or other similar purposes; and

(k)     The Real Estate is used only for the purpose set forth in the first Recital of this Agreement, and shall not be used for any other purpose whatsoever.

5.5     Other Agreements

No Loan Party is: (i) a party to any judgment, order or decree or any agreement, document or instrument, or subject to any restriction, which would adversely affect its ability to execute and deliver, or perform under, any Loan Document or to pay the Obligations or which could have a Material Adverse Effect, or (ii) in default in the performance, observance or fulfillment of any obligation, covenant or condition contained in any agreement, document or instrument to which it is a party or to which any of its properties or assets are subject, which default, if not remedied within any applicable grace or cure period could reasonably be expected to have a Material Adverse Effect or could reasonably be expected to cause a Liability Event. There is no event, fact, condition or circumstance which, with notice or passage of time or both, could constitute or result in a conflict, breach, default or event of default under, any of the foregoing which, if not remedied within any applicable grace or cure period could reasonably be expected to have a Material Adverse Effect. No Loan Party is a party or subject to any agreement, document or instrument with respect to, or obligation to pay any, service or management fee with respect to, the ownership, operation, leasing or performance of the Facility other than the Facility Lease, nor is there any manager with respect to the Facility (whether or not Borrower is a party to such agreement or arrangement) other than pursuant to the Management Agreement relating to the Facility.

5.6     Litigation

There is no action, suit, proceeding or investigation pending or, to Borrower's Knowledge, any of the foregoing threatened against any Loan Party or pertaining to the Facility except as set forth on **Schedule 5.6**. None of the foregoing (i) questions the validity of any of the Loan Documents or the right of any Loan Party to enter into any Loan Document or to consummate the transactions contemplated thereby, (ii) could reasonably be expected to be or have, either individually or in the aggregate, any Material Adverse Change or Material Adverse Effect or could reasonably be expected to cause a Liability Event, or (iii) could reasonably be expected to result in any Change of Control or other change in the current ownership, control or

management of any Loan Party.  Upon due inquiry of each of the Loan Parties, Borrower is not aware that there is any basis for the foregoing.  No Loan Party is a party or subject to any order, writ, injunction, judgment or decree of any Governmental Authority, and no Loan Party is a party to any of the foregoing where any of the same could reasonably be expected to have or result in a Material Adverse Effect.  There is no action, suit, proceeding or investigation initiated by (i) any Borrower or (ii) with respect to the Facility, Operator, currently pending except as disclosed in **Schedule 5.6**.

>    5.7    Tax Returns; Governmental Reports

No Loan Party: (i) has received any oral or written communication from the Internal Revenue Service with respect to any investigation or assessment relating to such Loan Party directly, or relating to any consolidated tax return which was filed on behalf of such Loan Party; (ii) is aware of any year which remains open pending tax examination or audit by the IRS and (iii) is aware of any information that could give rise to an IRS tax liability or assessment. Each Loan Party has (i) filed all federal, state, foreign (if applicable) and local tax returns and other reports which are required by law to be filed by such Loan Party, and (ii) paid all taxes, assessments, fees and other governmental charges, including, without limitation, payroll and other employment related taxes, that are due and payable.

>    5.8    Financial Statements and Reports

All financial statements and other financial information that have been or may hereafter be delivered to Agent by any Loan Party are accurate and complete and have been prepared in accordance with GAAP, consistently applied with prior periods.  No Loan Party has any material obligations or liabilities of any kind not disclosed in such financial information or statements, and since the date of the most recent financial statements submitted to Agent, there has not occurred any Material Adverse Change or Material Adverse Effect or Liability Event or, to Borrower's Knowledge, any other event or condition that could reasonably be expected to have a Material Adverse Effect or cause or constitute a Liability Event.

>    5.9    Compliance with Law

Each Loan Party: (i) is in compliance with all laws, statutes, rules, regulations, ordinances and tariffs of all Governmental Authorities applicable to such Loan Party and/or such Loan Party's business, assets and operations, including, without limitation, applicable requirements of the Standards for Privacy of Individually Identifiable Health Information which were promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), ERISA and Healthcare Laws, and (ii) is not in violation of any order of any Governmental Authority or other board or tribunal, except where noncompliance or violation could not reasonably be expected to have a Material Adverse Effect.  There is no event, fact, condition or circumstance which, with notice or the passage of time, or both, could constitute or result in any noncompliance with, or any violation of, any of the foregoing, in each case except where noncompliance or violation could not reasonably be expected to have a Material Adverse Effect.  No Loan Party has received any notice that it is not in compliance with any of the requirements of any of the foregoing, except for items which could not reasonably be expected to have or result in a Material Adverse Effect.  No Loan Party has (a)  engaged in any Prohibited

- 42 -

Transactions as defined in **Section 406** of ERISA and Section 4975 of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder, (b) failed to meet any applicable minimum funding requirements under **Section 302** of ERISA in respect of its plans and no funding requirements have been postponed or delayed, (c) knowledge of any amounts due but unpaid to the Pension Benefit Guaranty Corporation, or of any event or occurrence which would cause the Pension Benefit Guaranty Corporation to institute proceedings under Title IV of ERISA to terminate any of the employee benefit plans, (d) fiduciary responsibility under ERISA for investments with respect to any plan existing for the benefit of Persons other than its employees or former employees, or (e) withdrawn, completely or partially, from any multi-employer pension plans so as to incur liability under the Multi-Employer Pension Plan Amendments of 1980, except where noncompliance could not reasonably be expected to have or result in a Material Adverse Effect. There exists no event with respect to any Loan Party described in **Section 4043** of ERISA, excluding Subsections 4043(b)(2) and 4043(b)(3) thereof, for which the thirty (30) day notice period contained in 12 C.F.R. § 2615.3 has not been waived, except where such event could not reasonably be expected to have or result in a Material Adverse Effect.

    5.10    Intellectual Property

        Each Loan Party has full legal right to possess and use any and all patents, patent applications, trademarks, trademark applications, service marks, registered copyrights, copyright applications, copyrights, trade names, trade secrets, and software licenses necessary for the conduct of its business (collectively, the "**Intellectual Property**"). A schedule of all Intellectual Property used in connection with the conduct of the business of each Loan Party is set forth on **Schedule 5.10**. No Loan Party is in violation or noncompliance with any condition or requirement of the right to possess or use any Intellectual Property.

    5.11    Burdensome Agreements

        No Loan Party is a party to or subject to any agreement, instrument or restriction that is so unusual or burdensome that it could reasonably be expected to have a Material Adverse Effect or result in a Liability Event.

    5.12    No Default

        There does not exist any Default or Event of Default.

    5.13    Disclosure

        No Loan Document or any other agreement, document, instrument, affidavit, certificate, or statement or any other data furnished to Agent by or on behalf of any Loan Party in connection with the transactions contemplated by the Loan Documents, or any representation or warranty made by any Loan Party in any Loan Document, contains any untrue statement of material fact or omits to state any fact necessary to make the statements therein not materially misleading. To Borrower's Knowledge, there is no fact known to any Loan Party which has not been disclosed to Agent in writing which could reasonably be expected to have a Material Adverse Effect or result in a Liability Event.

- 43 -

5.14    Existing Indebtedness; Investments, Guarantees and Certain Contracts

Except for Permitted Indebtedness, Borrower has no outstanding Indebtedness, whether secured or unsecured, direct or indirect, contingent, joint, several or otherwise. Borrower has performed all obligations required to be performed in connection with any Permitted Indebtedness and there has occurred no breach, default or event of default under any document evidencing any Permitted Indebtedness, and no fact, circumstance, condition or event has occurred which, with the giving of notice or passage of time or both, could constitute or result in a breach, default or event of default under any Permitted Indebtedness.

5.15    Other Agreements

Except for the Charter and Good Standing Documents of each of the Loan Parties and as otherwise set forth on **Schedule 5.15**, there are no existing or proposed agreements, arrangements, understandings or transactions affecting Borrower, Property or Facility among Borrower and/or any Loan Party and any Loan Party's officers, members, managers, directors, stockholders, partners, other interest holders, employees or Affiliates or any members of their respective immediate families affecting the Property or the Facility.

5.16    Insurance

All insurance policies required pursuant to **Section 6.5** are in full force and effect. All such insurance policies are as listed and described on **Schedule 5.16**.

5.17    Names; Location of Offices, Records and Collateral

During the preceding five years, no Loan Party has conducted business under or used any name (whether corporate, partnership or assumed) other than its current name, except as shown on **Schedule 5.17**. Each Loan Party is the sole owner of its current name and of any names listed on **Schedule 5.17**, and any and all business done and invoices issued in such names are such Loan Party's sales, business and invoices. Each trade name of a Loan Party represents a division or trading style of such Loan Party. Each Loan Party maintains its places of business and chief executive offices only at the locations set forth on **Schedule 5.17**, and all Accounts of each Loan Party arise, originate and are located, and all of the Collateral and all books and records in connection therewith or in any way relating thereto or evidencing the Collateral are located and shall be located only in and at such locations. All of the Collateral is located only in the continental United States.

5.18    Non-Subordination

The Obligations are not subordinated in any way to any other obligations of any Loan Party or to the rights of any other Person.

5.19    Borrower Bank Accounts

**Schedule 5.19** represents all of the bank accounts of Borrower and lists the applicable bank, account number and purpose of such account. Borrower has not pledged any of such bank accounts to any other Person.

- 44 -

5.20   Healthcare Matters

(a)     All Licenses and Permits have been obtained and are in full force and effect.  Borrower and/or Operator owns and/or possesses, and holds free from restrictions or conflicts with the rights of others, all such Licenses and Permits;

(b)     The Facility is duly licensed as a skilled nursing facility as required under the laws of the Commonwealth of Massachusetts.  The licensed bed capacity of the Facility is 140 beds.  Neither of Borrower or Operator has applied to reduce the number of licensed or certified beds or units or to move the right to any and all of the licensed or certified beds to any other location and there are no proceedings pending or contemplated to move or reduce the number of licensed or certified beds or units.

(c)     Borrower and, if applicable, Operator (and, in any event, the operation of the Facility) is/are in compliance with all applicable provisions of the laws, ordinances, statutes, regulations, orders, standards, policies, restrictions or rules of any Governmental Authority having jurisdiction over the operation of the Facility, including, without limitation, (1) health and fire safety codes and (2) Medicare, Medicaid, or other federal, state, local or intermediary laws, rules, regulations or published interpretations or policies relating to the prevention of fraud, abuse, false claims, neglect or mistreatment Borrower and Operator are in compliance with the requirements for participation in the Medicare and Medicaid Programs.  Borrower and Operator, as applicable, are in conformance with all insurance, reimbursement and cost reporting requirements, and has a current provider agreement under Title XVIII and/or XIX of the Social Security Act or any other applicable laws or regulations for reimbursement for the types of care or services provided at the Facility.

(d)     No Loan Party is a target of, participant in, or subject to any action, proceeding, suit, audit, investigation or sanction by any Governmental Authority or any other administrative or investigative body or entity or any other third party or any patient or resident (including, without limitation, whistleblower suits, or suits brought pursuant to federal or state False Claims Acts, and Medicaid/Medicare/State fraud/abuse laws) which may result in the imposition of a fine, penalty, alternative, interim or final sanction, a lower rate certification, recoupment, recovery, suspension or discontinuance of all or part of reimbursement from any Governmental Authority, third-party payor, insurance carrier or private payor, a lower reimbursement rate for services rendered to eligible patients, or any other civil or criminal remedy, or which could have a material adverse effect on any Loan Party or the operation of the Facility, or which could result in the appointment of a receiver or manager, or in the revocation, transfer, surrender, suspension or other impairment of a License or Permit, nor, to Borrower's Knowledge, has any such action, proceeding, suit, investigation proceeding or audit been threatened.

(e)     There are no agreements with residents of the Facility, or with any other persons or organizations which deviate in any adverse respect from, or which conflict with, any legal requirements.  All resident records for the Facility, including patient and/or resident account records, are maintained at the Facility and are true and correct in all respects.

- 45 -

(f)     Neither the execution and delivery of the Loan Documents, nor any Loan Party's performance thereunder, the recordation of any Security Instrument nor the exercise of any remedies by Agent: (i) will adversely affect any Loan Party's right to receive Medicaid, Medicare, insurance company, managed care company, or other third-party insurance payments or reimbursements or to receive private payor payments or reimbursements, (ii) will materially reduce the Medicaid, Medicare, insurance company, managed care company, or other third-party insurance payments or reimbursements or materially reduce private payor payments or reimbursements which such Loan Party is receiving as of the Closing Date, or (iii) will adversely affect the Licenses or Permits.

(g)     No Loan Party is a participant in any federal, state or local program whereby any federal, state or local government or quasi-governmental body, or any intermediary, agency, board or other authority or entity may have the right to recover funds by reason of the advance of federal, state or local funds, including, without limitation, those authorized under the Hill-Burton Act (42 U.S.C. 291 et seq.), other than the Medicare and Medicaid programs.  No Loan Party has received notice of, and no Loan Party is aware of, any violation of applicable antitrust laws.

(h)     Operator's private payor, Medicaid, Medicare, and/or managed care company, insurance company or other third-party insurance accounts receivable are free of any liens.

(i)     No Loan Party is a party to any collective bargaining agreement or other labor contract applicable to persons employed by it and, to Borrower's Knowledge, there are no threatened or pending labor disputes at the Facility. No Loan Party is or has been involved in any labor dispute, strike, walkout or union organization which could reasonably be expected to have a Material Adverse Effect.

(j)     Each Loan Party has maintained in all material respects all records required to be maintained by the Joint Commission, the Food and Drug Administration, Drug Enforcement Agency and State Boards of Pharmacy and the federal and state Medicare and Medicaid programs as required by the Healthcare Laws and there are no presently existing circumstances which could reasonably be expected to result in material violations of the Healthcare Laws, except where any of the foregoing could not reasonably be expected to result in or have a Material Adverse Effect.  No event has occurred which constitutes or could constitute a Liability Event.

5.21    First Priority Lien

Upon the execution, delivery, filing and/or recordation of the Security Instruments, Agent, on behalf of Lenders, will have a good, valid and perfected first priority Lien and security interest in the Property, subject to no transfer or other restrictions or Liens of any kind in favor of any other person except for Permitted Liens and Permitted Exceptions.  No financing statement relating to any of the Collateral is on file in any public office except those on behalf of Agent, for the benefit of Lenders.

- 46 -

5.22    Special-Purpose Entity

Notwithstanding anything to the contrary contained elsewhere in this Agreement, so long as any portion of the Obligations remains outstanding, Borrower shall be a Special-Purpose Entity whose sole asset is the Facility which it owns and the personal property utilized in the ownership or operation thereof.

5.23    Bankruptcy.

No bankruptcy or insolvency proceedings are pending or contemplated by Borrower or any other Loan Party or, to Borrower's Knowledge, Operator.

5.24    Survival; Diligent Inquiry

Borrower makes the representations and warranties contained in this Agreement and the other Loan Documents with the knowledge and intention that Agent and each Lender is relying and will rely thereon, and having made all diligent inquiry of each of the Loan Parties referenced in this Agreement.  All such representations and warranties will survive the execution and delivery of this Agreement and the funding of the Term Loan.

5.25    Anti-Terrorism; OFAC

(a)    No Loan Party, nor any Person controlling or controlled by any Loan Party, nor any Person having a beneficial interest in any Loan Party, nor any Person for whom any Loan Party is acting as agent or nominee in connection with this transaction ("**Transaction Persons**") (i) is a Person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such Person in any manner violative of Section 2 of such executive order, or (iii) is a Person on the list of Specially Designated Nationals and Blocked Persons or is in violation of the limitations or prohibitions under any other OFAC regulation or executive order.

(b)    No part of the proceeds of the Term Loan will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(c)    Each Loan Party acknowledges by executing this Agreement that Agent has notified the Loan Parties that, pursuant to the requirements of the Patriot Act, Agent is required to obtain, verify and record such information as may be necessary to identify the Loan Parties (including, without limitation) the name and address of each Loan Party) in accordance with the Patriot Act.

- 47 -

5.26    Environmental Matters

Except as disclosed in the Environmental Assessment: (i) the Facility, including the operations conducted thereat: (A) is in full compliance with all applicable Environmental Laws, (B) the Facility has, at all times while operated by Borrower or an Affiliate of Borrower has been in compliance with all applicable Environmental Laws, and (C) to Borrower's actual knowledge has at all other times been in full compliance with, all applicable Environmental Laws; (ii) no Hazardous Substances are or have been located on, handled, manufactured, generated, stored, treated, recycled, processed at, or transported to or from, or disposed of on or Released, threatened to be Released, or discharged from the Facility (including soil and groundwater beneath the Facility), except for Permitted Substances (which Permitted Substances have not been disposed of, Released or discharged on or from the Facility); (iii) none of the Facility, Borrower or any person for whose acts or omissions Borrower may be responsible, is subject to any private or governmental lien or judicial, administrative or other notice, action, claim or demand relating to Hazardous Substances or noncompliance with or liability under Environmental Laws, including with respect to off-site waste disposal, nor is Borrower aware of any basis for such lien, notice or action; (iv) except as disclosed in **Schedule 5.26**, there are no underground storage tanks or other underground storage receptacles (whether active or abandoned) on or under the Real Estate; (v) except as disclosed in **Schedule 5.26**, there does not exist any, inquiry, investigation, action, proceeding or claim or demand by any agency, authority or unit of government or by any third party which could result in any liability, penalty, sanction or judgment under any Environmental Laws with respect to any condition, use or operation of or at the Facility, nor does Borrower know of any basis for such inquiry, investigation, action, proceeding or claim; (vi) except as disclosed in **Schedule 5.26**, Borrower has received no notice that, and to Borrower's Knowledge, there has been no claim by any party that, any use, operation or condition of or at the Facility has caused any nuisance, trespass or any other liability or adverse condition on any other property, nor does Borrower know of any basis for such notice or claim; and (vii) there are no present environmental conditions or events or, to Borrower's Knowledge, past environmental conditions or events on or near the Facility that could be reasonably anticipated to have a Material Adverse Effect.

**VI.    AFFIRMATIVE COVENANTS**

Borrower covenants and agrees that, until full performance and indefeasible payment in full in cash of all the Obligations:

6.1    Financial Statements, Reports and Oth**er Information**

(a)    Financial Reports.  Borrower shall furnish or cause to be furnished to Agent (i) as soon as available and in any event within 60 days after the end of each fiscal year of Borrower, unaudited (or if audited, within 90 days after the end of each fiscal year of Borrower) annual consolidated financial statements of Borrower, Manager and Operator including the notes thereto, consisting of a consolidated balance sheet, related consolidated income statement, and an annual census and occupancy report for the Facility by payor type, which financial statements shall be prepared and certified without qualification by an authorized officer of Borrower and (ii) as soon as available and in any event within 45 days after the end of each calendar month, unaudited consolidated financial statements for such period and the year-to-date period with

- 48 -

respect to each of Borrower and the Operator consisting of a balance sheet and income statements and all census and occupancy reports for the Facility by payor type.  In addition, Borrower shall cause Guarantor to furnish to Agent as soon as available and in any event within 90 days after the end of each fiscal year of Guarantor, (x) if Guarantor is an entity, unaudited (or audited, if available) annual consolidated financial statements of Guarantor, including the notes thereto, consisting of a consolidated balance sheet at the end of such completed fiscal year and the related consolidated statements of income and expense for such completed fiscal year, (y) if Guarantor is an individual, personal financial statements of each Guarantor, in form and substance reasonably satisfactory to Agent, and (z) such financial statements and other financial information regarding Manager as Agent shall reasonably request.  All such financial statements shall be prepared in accordance with GAAP consistently applied with prior periods.  With each such financial statement, Borrower shall also deliver (and shall cause Guarantor to deliver) a certificate of its chief financial officer or manager, or other authorized representative as appropriate, in the form attached as **Schedule 6.1** together with such calculations as are necessary to show compliance with the financial covenants in a form satisfactory to Agent.  In addition to the reports required to be delivered in subsections (i) and (ii) above of this **Section 6.1(a)**, Borrower shall deliver immediately upon Agent's request, a report of census and occupancy for the Facility by payor type.   Anything in this section to the contrary notwithstanding, upon the occurrence of a Default or Event of Default, Agent shall have the right to require that Borrower produce to Lender for review audited annual financial statements of Borrower, including the notes thereto, consisting of a balance sheet at the end of such completed fiscal year and the related consolidated statements of income and expense for such completed fiscal year, which financial statements shall be prepared and certified without qualification by an independent certified public accounting firm satisfactory to Agent and accompanied by related management letters, if available.

> (b) <u>Other Materials</u>.  Borrower shall furnish or cause to be furnished to Agent within ten (10) days after Agent's request therefor: (i) copies of such financial statements (other than those required to be delivered pursuant to **Section 6.1(a)**) prepared by, for or on behalf of a Loan Party and any other notes, reports and other materials related thereto, including, without limitation, any pro forma financial statements, (ii) any reports, returns, information, notices and other materials that such Loan Party shall send to its stockholders, members, partners or other equity owners at any time, (iii) all Medicare and Medicaid cost reports and other documents and materials relating to the Facility filed by any Loan Party and any other reports, materials or other information regarding or otherwise relating to Medicaid and Medicare relating to the Facility prepared by, for or on behalf of a Loan Party including without limitation, Medicare and Medicaid provider numbers and agreements relating to the Facility and participating agreements relating to medical plans relating to the Facility, (iv) a report of the status of all payments, denials and appeals of all Medicare and/or Medicaid Accounts relating to the Facility, (v) sales and collection reports and accounts receivable and accounts payable aging schedules for the Facility, including a report of sales, credits issued and collections received, all such reports showing a reconciliation to the amounts reported in the monthly financial statements, and (vi) such additional information, documents, statements, reports and other materials relating to the Facility as Agent may reasonably request from a credit or security perspective or otherwise from time to time. Within thirty (30) days of request of Agent, Borrower shall deliver or cause Operator to deliver to Agent, an inventory of personal property at the Facility.

- 49 -

(c)     Notices.  Borrower shall promptly, and in any event within two (2) days after any Loan Party or any authorized officer, member, manager or employee of such Loan Party obtains knowledge thereof, notify Agent in writing (i) with respect to any Loan Party or the Facility, of any pending or threatened litigation, suit, investigation, arbitration, dispute resolution proceeding or administrative proceeding brought or initiated by any Loan Party or otherwise affecting or involving or relating to any Loan Party or any of its property or assets (including without limitation, the Facility) to the extent (A) the amount in controversy exceeds One Hundred Thousand Dollars ($100,000), or (B) to the extent any of the foregoing seeks injunctive relief, (ii) with respect to any Loan Party, of any of the matters set forth in subparagraph (i) which could reasonably be expected to have or result in a Material Adverse Effect or a Liability Event, (iii) of any Default or Event of Default, which notice shall specify the nature and status thereof, the period of existence thereof and what action is proposed to be taken with respect thereto, (iv) of any other development, event, fact, circumstance or condition that could reasonably be expected to have a Material Adverse Effect or cause a Liability Event, in each case describing the nature and status thereof and the action proposed to be taken with respect thereto, (v) of any notice received by a Loan Party from any payor of a claim, suit or other action such payor has, claims or has filed against any Loan Party where any of the foregoing relate to the Facility or Collateral or could reasonably be expected to have or result in, individually or in the aggregate, a Material Adverse Effect or Liability Event, (vi) of any matter(s) affecting the value, enforceability or collectability of any of the Collateral, including, without limitation, claims or disputes in the amount of One Hundred Thousand Dollars ($100,000) or more, singly or in the aggregate, in existence at any one time, (vii) of any notice given by a Loan Party to any other Agent of Borrower and shall furnish to Agent a copy of such notice, (viii) of receipt of any notice or request from any Governmental Authority or governmental payor regarding any liability or claim of liability, (ix) of receipt of any notice by any Loan Party or Operator regarding termination of any manager of any facility owned by Borrower or any Affiliate or owned or managed by Operator or any Affiliate, the effect of which could reasonably be expected to have a Material Adverse Effect and/or (ix) if any Account relating to the Facility becomes evidenced or secured by an Instrument or Chattel Paper.

(d)     Consents.  Borrower shall obtain and deliver from time to time all required consents, approvals and agreements from such third parties as Agent shall determine are necessary or desirable in its discretion and that are satisfactory to Agent with respect to (i) the Loan Documents and the transactions contemplated and (ii) (A) claims against any Loan Party or the Collateral, and/or (B) any agreements, consents, documents or instruments to which any Loan Party is a party or by which any properties or assets of any Loan Party or any of the Collateral is or are bound or subject, including, without limitation, the Subordination Agreements and the Pledge and Security Agreements.

(e)     Operating Budget.  Borrower shall (and shall cause Operator to) furnish to Agent on or prior to the Closing Date and for each fiscal year of Borrower or Operator thereafter not less than thirty (30) days prior to the commencement of such fiscal year, consolidated projected operating budgets, annual projections, profit and loss statements, and balance sheets of and for the Facility for such upcoming fiscal year, in each case prepared in accordance with GAAP consistently applied with prior periods.

- 50 -

     (f)    <u>Licenses and Provider Agreements</u>.  Borrower shall furnish Agent, (i) as soon as available and in any event within 10 days after the preparation or issuance thereof, updated documentation related to licensure and (ii) within thirty (30) days of the receipt by Borrower or any other Loan Party, with complete copies of the annual Medicaid and Medicare provider agreement(s) and the quarterly Medicaid and the annual Medicare reimbursement rate sheets/letters related to the Facility.

     (g)    <u>Healthcare Surveys and Accreditation Reports.</u>  Borrower shall furnish Agent, within ten (10) days after receipt by Borrower or any other Loan Party, with a complete copy of any Medicare, Medicaid or other licensing or accreditation or ranking agency or entity survey, report, or notice, and any statement of deficiencies, and within the time period required by the particular agency for furnishing a plan of correction also furnish or cause to be furnished to Agent a copy of the plan of correction generated from such survey, report, or notice, and any correspondence related thereto, and correct or cause to be corrected any deficiency, the curing of which is a condition of continued licensure or of full participation in Medicare or Medicaid or a care program offered by an insurance company, managed care company, or other third-party payor by the date required for cure by such agency or entity (plus extensions granted by such agency or entity).  Borrower shall furnish Agent, within five (5) days after receipt by Borrower or any other Loan Party, with a complete copy of any Medicare, Medicaid or other licensing or accreditation or ranking agency or entity warning letter, and within the time period required by the particular agency for furnishing a plan of correction also furnish or cause to be furnished to Agent a copy of the plan of correction generated from such warning letter, and correct or cause to be corrected any deficiency, the curing of which is a condition of continued licensure or of full participation in Medicare or Medicaid or a care program offered by an insurance company, managed care company, or other third-party payor by the date required for cure by such agency or entity (plus extensions granted by such agency or entity).

     (h)    <u>Notices of Non-Compliance</u>.  Borrower shall furnish Agent, within ten (10) days after receipt by Borrower or any other Loan Party with complete copies of any other notices or charges issued relating to the non-compliance by any Loan Party or the Facility with any Governmental Authority, insurance company, managed care company, or other third-party payor laws, regulations, requirements, licenses, permits, certificates, authorizations or approvals and any other reports, materials or other information regarding or otherwise relating to Medicaid or Medicare prepared by, for, or on behalf of Borrower or any other Loan Party or relating to the Facility.

     (i)    <u>Non-Compliance Fee and Special Remedy</u>.  If any of the aforementioned materials are not furnished to Agent within the applicable time periods, Borrower shall pay to Agent a late fee of $250 upon each occurrence for each item not timely delivered.  Further, if any of the aforementioned materials are not furnished to Agent within the applicable time periods, or Agent has objections to the form, manner of preparation or methodology of any of the foregoing, and, in any such events, such matter is not addressed to Agent's reasonable satisfaction within ten (10) Business Days after written notice from Agent to Borrower specifying the objections in reasonable detail, then, in addition to any other rights and remedies of Agent contained in this Agreement, Agent shall have the right, but not the obligation, to obtain the same by means of an audit by an independent certified public accountant selected by Agent, in which event Borrower agrees to pay, or to reimburse Agent for, any expense of such audit and Borrower further agrees

- 51 -

to provide all necessary information to said accountant and to otherwise cooperate in the making of such audit. Borrower agrees that any and all materials furnished under this Agreement may be released and made available to such parties as Agent or Agent's servicer deems appropriate, including any Rating Agency responsible for rating securities issued in any Secondary Market Transaction.

6.2     Payment of Obligations

Borrower shall make full and timely indefeasible payment in cash of the principal of and interest on the Term Loan and of all other Obligations.

6.3     Conduct of Business and Maintenance of Existence and Assets

Borrower shall, and shall cause Operator to: (i) conduct its business and operate the Facility in accordance with good business practices customary to the industry, (ii) operate the Facility substantially as heretofore operated, (iii) collect its Accounts in the ordinary course of business, (iv) maintain all of its material properties, assets and equipment used or useful in its business in good repair, working order and condition (normal wear and tear excepted and except as may be disposed of in the ordinary course of business and in accordance with the terms of the Loan Documents), (v) from time to time make all necessary or desirable repairs, renewals and replacements to the Facility (vi) maintain and keep in full force and effect its existence and all material Permits, Licenses and qualifications to do business and good standing in each jurisdiction in which the ownership or lease of property or the nature of its business makes such Permits, Licenses or qualification necessary and in which failure to maintain such Permits, Licenses or qualification could reasonably be likely to have a Material Adverse Effect or cause a Liability Event; and (vii) remain in good standing and maintain operations in all jurisdictions in which currently located.

6.4     Compliance with Legal and Other Obligations

(a)     Borrower shall, and shall cause each Loan Party to: (i) comply with all laws, statutes, rules, regulations, ordinances and tariffs of all Governmental Authorities applicable to it or its business, assets or operations, including without limitation applicable requirements of all Environmental Laws and the Standards for Privacy of Individually Identifiable Health Information which were promulgated pursuant to HIPAA, (ii) pay all taxes, assessments, fees, governmental charges, claims for labor, supplies, rent and all other obligations or liabilities of any kind, except liabilities being contested in good faith in accordance with applicable law and against which adequate reserves have been established, (iii) perform in accordance with its terms each contract, agreement or other arrangement to which it is a party or by which it or any of the Collateral is bound, except where the failure to comply, pay or perform could not reasonably be expected to have a Material Adverse Effect or cause a Liability Event, (iv) obtain, maintain and comply with all Licenses and Permits necessary to conduct its business and comply with any new or additional requirements that may be imposed on it or its business and (v) properly file all Medicare/Medicaid cost reports.

(b)     Borrower shall take all action necessary to maintain its status as a Special-Purpose Entity. In addition, if Borrower is a limited liability company or a partnership, Borrower

- 52 -

shall cause its managing member or general partner, as the case may be, to be and maintain its status as a Special-Purpose Entity for so long as the Obligations are outstanding.

6.5    Insurance

Borrower shall, at Borrower's sole expense, maintain or cause to be maintained the following insurance coverages with respect to the Property at all times while any portion of the Obligations remains outstanding:

(a)    Insurance against loss or damage to the Property by fire, casualty and other hazards as now or subsequently may be covered by an "all-risk" policy, with coverage for earthquake in amounts and in form satisfactory to Agent, and such endorsements as Agent may from time to time reasonably require and which are customarily required by institutional lenders of similar properties similarly situated, and which coverage shall also meet the following requirements:

(i)    The amount of such property insurance shall be not less than one hundred percent (100%) of the full replacement cost of the Improvements, furniture, furnishings, fixtures, equipment and other items (whether personally or fixtures) included in the Property and owned by Borrower from time to time, without reduction for depreciation.  The determination of the replacement cost amount shall be adjusted annually to comply with the requirements of the Insurer issuing such coverage or, at Agent's election, by reference to such indexes, appraisals or information as Agent determines in its discretion.    Full replacement cost, as used in this Agreement, means, with respect to the Improvements, the cost of replacing the Improvements without regard to deduction for depreciation, exclusive of the cost of excavations, foundations and footings below the lowest basement floor, and means, with respect to such furniture, furnishings, fixtures, equipment and other items, the cost of replacing the same.

(ii)    Each such policy or policies of property insurance shall contain the following provisions, all subject to Agent's approval in form and content:  (i) a replacement cost endorsement;  (ii) either an agreed amount endorsement (to waive the operation of any coinsurance provisions) or a waiver of any co-insurance provisions;  (iii) law and ordinance coverage in an amount satisfactory to Agent; and (iv) coverage for interruption in utility services.

(b)    Business Income including rental value and Extra Expense insurance covering the same perils of loss as are required to be covered by the property insurance required pursuant to **Section 6.5(a)** and meeting the following requirements:

(i)    The amount of such insurance shall be not less than the projected gross revenue from the Facility for a period of one (1) year.  The amount of such insurance shall be determined prior to the Closing Date and at least once each year thereafter based on Borrower's reasonable estimate of the gross revenue from the Facility for the succeeding 36-month period; or, at Agent's election in its discretion, by reference to such indexes, appraisals or information as Agent determines.

(ii)    Each such policy or policies shall contain the following provisions, all subject to Agent's approval in form and content: (i) either an agreed amount endorsement (to waive the operation of any co-insurance provisions) or a waiver of any co-insurance provisions;

- 53 -

(ii) law and ordinance coverage in an amount satisfactory to Agent; (iii) an extended period of indemnity endorsement providing that after the repair of any physical loss to the Property, the continued loss of income will be insured until the earlier of the time that (a) such income returns to the same level as it was at prior to the date on which the physical loss occurred or (b) twelve (12) months from the date that the Property is repaired or replaced and operations are resumed in the manner that such operations were conducted prior to the date of the physical loss to the Property giving rise to such insurance obligation, which payments shall be made notwithstanding the expiration of the policy prior to the end of such period.

(c)     Broad form boiler and machinery insurance covering the major components of the central heating, air conditioning and ventilating systems, boilers, other pressure vessels, high pressure piping and machinery, elevators and escalators, if any, and other similar equipment installed in the Improvements, in an amount equal to one hundred percent (100%) of the full replacement cost of the Improvements.  Such policy or policies shall insure against physical damage to and loss of occupancy and use of the Improvements arising out of an accident or breakdown covered thereunder and shall include all of the following coverage: (A) business interruption including rental value, (B) extra expense, (C) consequential damage and (D) interruption in utility services power supply.

(d)     If the Real Estate or any part thereof is identified by the Secretary of Housing and Urban Development as being situated in an area now or subsequently designated as having special flood hazards (including, without limitation, those areas designated as Zone A or Zone V), flood insurance in an amount equal to one hundred percent (100%) of the lesser of the (A) replacement value of the Improvements or (B) maximum amount of flood insurance available.

(e)     During the period of any construction on the Real Estate or renovation or alteration of the Improvements, a so-called "Builder's All-Risk Completed Value" or "Course of Construction" insurance policy in non-reporting form for any improvements under construction, including, without limitation, for demolition and increased cost of construction or renovation, in an amount equal to one hundred percent (100%) of the estimated replacement cost on the date of completion, including "soft cost" coverage, and Workers' Compensation and Employers Liability insurance covering all persons engaged in such construction, in an amount at least equal to the minimum required by law.  In addition, each contractor and subcontractor shall be required to provide Borrower with a certificate of insurance for (i) workers' compensation and employers liability insurance covering all persons engaged by such contractor or subcontractor in such construction in an amount at least equal to the minimum required by law, and (ii) general liability insurance showing minimum limits of at least $5,000,000, including coverage for premises/operations and products and completed operations.  Each contractor and subcontractor also shall cover Agent, for the benefit of Agent and Lenders, and Borrower as additional insureds under such liability policy and shall defend, indemnify and hold Agent, each Lender and Borrower harmless from and against any and all claims, damages, liabilities, costs and expenses arising out of, relating to or otherwise in connection with the performance by each contractor and subcontractor of such construction.

(f)     Commercial general liability insurance using an "**occurrence**" based form meeting the following requirements:

- 54 -

(i)      The amount of such liability insurance shall be not less than $1,000,000 per occurrence, $3,000,000 per location aggregate or such lesser amount as Agent in Agent's discretion may accept, for bodily injury, personal and advertising injury and property damage.  Agent  retains the right to periodically review the amount of said liability insurance being maintained by Borrower and to require an increase in the amount of said liability insurance should Agent deem an increase to be reasonably prudent under the then existing circumstances.

(ii)      Each such policy or policies of liability insurance shall (i) provide coverage for claims for personal injury, advertising injury, bodily injury, death and property damage liability with respect to the Facility and operations related thereto, whether on or off the Real Estate; (ii) include broad form contractual liability coverage including coverage for the indemnities contained in **Section 12.4**.

(g)      Professional liability and malpractice insurance using an "**occurrence**" based form with limits of at least $1,000,000 per occurrence (claim)/$3,000,000 in the aggregate, and covering acts occurring prior to the date of the Term Loan.  Borrower shall cause, and cause Operator to cause, that each physician or nurse practitioner with clinical privileges at the Facility to carry professional liability and malpractice insurance with limits of not less than $1,000,000 per occurrence (claim)/$3,000,000 in the aggregate.  Agent  retains the right to periodically review the amount of said liability insurance and to require an increase in the amount of the same should Agent deem an increase to be reasonably prudent under the then existing circumstances.

(h)      Motor vehicle (auto) liability coverage for all owned hired and non-owned automobiles, including rented and leased automobiles, containing minimum limits per occurrence of greater of $1,000,000 or at such amounts as are in force as of the Closing Date.

(i)      Workers' compensation and employers liability insurance or other similar insurance which may be required by governmental authorities or applicable legal requirements in an amount at least equal to the minimum required by law.

(j)      With respect to the Property insurance for certified and uncertified acts of terrorism, insurance in such amounts as are requested by Agent.

(k)      Crime coverage providing blanket employee dishonesty insurance with limits of not less than $500,000.

(l)      Such other insurance on the Property or on any replacements, supplements, substitutions thereof or additions thereto as may from time to time be required by Agent against other insurable hazards or casualties which at the time are commonly insured against in the case of property similarly situated, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

All such insurance required pursuant to this **Section 6.5** shall (i) be issued by companies approved by Agent and licensed to do business in the state where the Real Estate is located, with a claims paying ability rating of "A" or better by A.M. Best Company; (ii) contain the complete address of the Real Estate (or a complete legal description), (iii) be for a term of at least one year, (iv) contain deductibles no greater than $10,000 or as otherwise required by Agent, and (v) be subject to the approval of Agent on behalf of Lenders as to insurance

- 55 -

140860.00412/12485559v.5

companies, amounts, content, forms of policies, method by which premiums are paid and expiration dates, and, in addition, Borrower shall comply with, or cause to be complied with, each of the following with respect to the insurance policies required to be maintained pursuant hereto:

(i)      Borrower shall as of the Closing Date deliver to Agent certified copies of such insurance policies or such other evidence of insurance as Agent in its discretion may accept; and evidence satisfactory to Agent in its discretion that said insurance policies have been paid current as of the Closing Date.  Thereafter, Borrower shall deliver to Agent certified copies of any such insurance policies promptly upon request.

(ii)      With respect to insurance policies which require payment of premiums annually, not less than thirty (30) days prior to the expiration dates of the insurance policies obtained pursuant to this Agreement, Borrower shall pay such amount.  Not less than thirty (30) days prior to the expiration dates of the insurance policies obtained pursuant to this Agreement, Borrower shall deliver to Agent certified copies of the renewals of such policies (or other evidence of renewal satisfactory to Agent) bearing notations evidencing the payment of premiums or accompanied by other evidence of payment satisfactory to Agent.  Thereafter, Borrower shall deliver to Agent certified copies of any such insurance policies promptly upon request.

(iii)      No premiums for any policies or policies of insurance required under this Agreement or otherwise held with respect to the Property, whether by Borrower or Operator or otherwise, shall be paid by Borrower, Operator or by any third party through or by means of any financing arrangement with any third party lender.

(iv)      All policies required under this Agreement shall contain:  (a) a provision that such policies shall not be canceled or amended, including without limitation, any amendment that would reduce the scope or limits of coverage or remove any endorsement to such policy or cause the same to no longer be in full force and effect, or failed to be renewed, without at least thirty (30) days prior written notice to Agent in each instance; and (b) a waiver of all rights of subrogation against Agent.

(v)      All policies required or contemplated by **Sections 6.5(a)-(e)** shall name Agent as mortgagee and loss payee, shall provide for all losses to be payable directly to Agent for the benefit of Lenders, and shall contain: a standard noncontributing mortgagee provision or endorsement or its equivalent providing that any loss shall be payable to Agent notwithstanding (a) any negligent or willful acts or omissions of Borrower which might otherwise result in forfeiture of such insurance; (b) occupancy or use of the Facility for purposes more hazardous than those permitted by the terms of such policy; (c) any foreclosure or other action taken by Agent pursuant to the Security Instrument upon the occurrence of an Event of Default; or (d) any change in title or ownership of the Property.

(vi)      All Policies required or contemplated by **Sections 6.5(f)-(h)** shall name Agent for the benefit of Lenders as an additional insured.

- 56 -

(vii)     The delivery to Agent of the insurance policies or other evidence of insurance as provided above shall constitute an assignment of all proceeds payable under such insurance policies arising out of or related to the Facility by Borrower to Agent as further security for the Obligations.   In the event of foreclosure of one or more of the Security Instrument, or other transfer of title to the Property in extinguishment in whole or in part of the Obligations, all right, title and interest of Borrower in and to all proceeds payable under such policies then in force concerning the Property shall thereupon vest in the purchaser at such foreclosure, or in Agent or other transferee in the event of such other transfer of title.

(viii)     Approval of any insurance by Agent shall not be a representation of the solvency of any Insurer or the sufficiency of any amount of insurance.

(ix)     In the event Borrower fails to provide, maintain, keep in force or deliver and furnish to Agent the policies of insurance required by this Agreement or evidence of their renewal as required in this Agreement, Agent may, but shall not be obligated to, procure such insurance and Borrower shall pay all amounts advanced by Agent, together with interest thereon at the Default Interest Rate from and after the date advanced by Agent until actually repaid by Borrower, promptly upon demand by Agent.   Any amounts so advanced by Agent, together with interest thereon, shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the Obligations.   Agent shall not be responsible for nor incur any liability for the insolvency of the Insurer or other failure of the Insurer to perform, even though Agent has caused the insurance to be placed with the Insurer after failure of Borrower to furnish such insurance.

6.6     True Books

Borrower shall, and, with respect to the Facility, shall cause Operator to: (i) keep true, complete and accurate books of record and account in accordance with commercially reasonable business practices in which true and correct entries are made of all of its and their dealings and transactions in all material respects; and (ii) set up and maintain on its books such reserves as may be required by GAAP with respect to doubtful accounts and all taxes, assessments, charges, levies and claims and with respect to its business, and include such reserves in its quarterly as well as year end financial statements.

6.7     Inspection; Periodic Audits

Borrower shall permit and shall cause Operator to permit the agents, employees or representatives of Agent, at the expense of Borrower, from time to time during normal business hours upon reasonable notice, to (i) visit and inspect Borrower's offices or properties or any other place where Collateral is located to inspect the Collateral and/or to examine or audit all of its books of account, records, reports and other papers, (ii) visit and inspect any Loan Party's offices or properties related to or involved in the operation of the Facility and to examine or audit all of its books of account, records, reports and other papers that relate to such Facility or any of the Collateral, (iii) make copies and extracts from any of the books or records referenced at clauses (i) or (ii) above, and (iv) discuss its business, operations, prospects, properties, assets, liabilities, condition and/or Accounts with its officers and independent public accountants (and by this provision such officers and accountants are authorized to discuss the foregoing).

- 57 -

Borrower shall immediately reimburse Agent upon demand and in the manner provided for in **Section 2.8** for all costs and expenses incurred by Agent arising out of or related to any audit conducted by Agent pursuant to this **Section 6.7**, including without limitation all reasonable costs and expenses of any accountant or consultant engaged by Agent for such audit plus all reasonable travel expenses incurred by Agent or any of its accountants, consultants, or representatives in connection with such audit.

    6.8    Further Assurances; Post Closing

    (a)    At Borrower's cost and expense, Borrower shall and shall cause each Loan Party to: (i) within five (5) Business Days after Agent's demand, take such further actions, obtain such consents and approvals and duly execute and deliver such further agreements, assignments, instructions, instruments, certificates, affidavits or documents as Agent may reasonably request with respect to the purposes, terms and conditions of the Loan Documents and the consummation of the transactions contemplated thereby, whether before, at or after the execution of the Loan Documents or the occurrence of a Default or Event of Default, (ii) without limiting and notwithstanding any other provision of any Loan Document, execute and deliver, or cause to be executed and delivered, such agreements and documents, and take or cause to be taken such actions, and otherwise perform, observe and comply with such obligations, as are set forth on **Schedule 6.8**, and (iii) upon the exercise by Agent or any of its Affiliates of any power, right, privilege or remedy pursuant to any Loan Document or under applicable law or at equity which requires any consent, approval, registration, qualification or authorization of any Governmental Authority, execute and deliver, or cause the execution and delivery of, all applications, certificates, instruments and other documents that may be so required for such consent, approval, registration, qualification or authorization. Without limiting the foregoing, upon the exercise by Agent or any of its Affiliates of any right or remedy under any Loan Document which requires any consent, approval or registration with, consent, qualification or authorization by, any Person (including without limitation Operator), Borrower shall execute and deliver, or cause the execution and delivery of, all applications, certificates, instruments and other documents that Agent or its Affiliate may be required to obtain for such consent, approval, registration, qualification or authorization.

    (b)    Without limiting the provisions of **Section 6.8(a)**, if, in connection with any sale or securitization of the Term Loan, any Rating Agency requests an opinion letter as to (i) the enforceability of the provisions of the operating agreement of Borrower or the operating agreement of Borrower's managing member, and/or (ii) whether a federal bankruptcy court would hold that the law of the state of formation of Borrower, and not federal law, would govern the determination of what authority is necessary for Borrower to file a voluntary bankruptcy petition, then Borrower, at its sole cost and expense, shall obtain such opinion letter(s) from a law firm reasonably acceptable to Agent, as required by such Rating Agency and in form and substance reasonably acceptable to Agent.

    (c)    Without limiting the provisions of **Section 6.8(a)**, at any time after the Closing, upon written request from Agent, Borrower shall, at its sole cost and expense, and within thirty (30) days after receipt of Agent's request therefor,  amend and restate its operating agreements such that, following such amendment and restatement, the form of operating agreement for Borrower shall be based on the form of operating agreements customarily used by

- 58 -

limited liability companies domiciled in the State of Delaware whose members are affiliated entities, and shall be approved by Agent in its discretion.

6.9     Payment of Indebtedness

Except as otherwise prescribed in the Loan Documents, Borrower shall (and shall cause Operator) to pay, discharge or otherwise satisfy at or before maturity (subject to applicable grace periods and, in the case of trade payables, to ordinary course payment practices) all of its material obligations and liabilities, except when the amount or validity thereof is being contested in good faith by appropriate proceedings and such reserves as Agent may deem proper and necessary in its discretion shall have been made.  Except as otherwise prescribed in the Loan Documents, Borrower shall cause each Guarantor, Operator and Pledging Entity to comply with the provisions of this **Section 6.9** except to the extent such failure to comply could not reasonably be expected to have or result in a Material Adverse Effect.

6.10    Lien Searches

If Liens other than Permitted Liens exist, Borrower immediately shall take, execute and deliver all actions, documents and instruments necessary to release and terminate such Liens, and shall cause any other Loan Party, to do the same to the extent such Liens affect the Collateral.

6.11    Use of Proceeds

Borrower shall use the proceeds from the Term Loan only for the purpose set forth in the first Recital of this Agreement.

6.12    Collateral Documents; Security Interest in Collateral

Borrower shall and shall cause each Loan Party: (i) to execute, obtain, deliver, file, register and/or record any and all financing statements, continuation statements, stock powers, instruments and other documents, or cause the execution, filing, registration, recording or delivery of any and all of the foregoing, that are necessary or required under law or otherwise or reasonably requested by Agent to be executed, filed, registered, obtained, delivered or recorded to create, maintain, perfect, preserve, validate or otherwise protect the pledge of the Collateral to Agent, and to Agent's and/or Lenders' perfected first priority Lien on the Collateral (and Borrower irrevocably grants Agent (on behalf of Lenders) the right, at Agent's option, to file any or all of the foregoing), (ii) as soon as reasonably practicable upon learning thereof, to report to Agent any reclamation return or repossession of Collateral in excess of Ten Thousand Dollars ($10,000) (individually or in the aggregate), and (iii) defend the Collateral and Agent's and/or Lenders' perfected first priority Lien thereon against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to Lenders, and pay all costs and expenses (including, without limitation, in-house documentation and diligence fees and legal expenses and reasonable attorneys' fees and expenses) in connection with such defense, which may at Lenders' discretion be added to the Obligations.

- 59 -

6.13    Taxes and Other Charges

(a)    Borrower shall promptly and in any event within five (5) Business Days after Borrower or any officer, manager, member or agent thereof obtains knowledge thereof, notify Agent in writing of any oral or written communication from the Internal Revenue Service or any other taxing authority with respect to any (i) tax investigations, relating to any Loan Party or Operator directly, or relating to any consolidated tax return which was filed on behalf of such Loan Party or Operator, (ii) notice of tax assessment or possible tax assessment, (iii) years that are designated open pending tax examination or audit, and (iv) information that could give rise to an IRS tax liability or assessment.

(b)    Borrower shall at all times retain and use (and, with respect to the Facility, shall cause Operator at all times to retain and use), a Person acceptable to Agent to process, manage and pay its payroll taxes and shall cause to be delivered to Agent immediately upon Agent's request, a report detailing its payroll taxes for the immediately preceding calendar month and evidence of payment thereof.

(c)    Borrower shall pay or cause to be paid when due all claims and demands of mechanics, materialmen, laborers and others for any work performed or materials delivered for the Real Estate or the Improvements; provided, however, that Borrower shall have the right to contest in good faith any such claim or demand, so long as it does so diligently, by appropriate proceedings and without prejudice to Lenders and/or Agent and provided that neither the Property nor any interest therein would be in any danger of sale, loss or forfeiture as a result of such proceeding or contest.   In the event Borrower shall contest any such claim or demand, Borrower shall promptly notify Agent of such contest and thereafter shall, upon Agent's request, promptly provide a bond, cash deposit or other security satisfactory to Agent to protect Lenders' interest and security should the contest be unsuccessful.   If Borrower shall fail to immediately discharge or provide security against any such claim or demand as aforesaid, Agent may do so and any and all expenses incurred by Agent, together with interest thereon at the Default Interest Rate from the date incurred by Agent until actually paid by Borrower, shall be immediately paid by Borrower on demand and shall be secured by the Security Instruments and by all of the other Loan Documents securing all or any part of the Obligations.

6.14    Payment of Utilities, Assessments, Charges, Etc.

Borrower shall pay or cause to be paid when due all utility charges which are incurred in connection with the operation of the Property or which may become a charge or lien against any portion of the Property for gas, electricity, water and sewer services and all other assessments or charges of a similar nature, or assessments payable pursuant to any restrictive covenants, whether public or private, affecting the Real Estate or any portion thereof, whether or not such assessments or charges are or may become liens thereon.

6.15    Waste; Alteration of the Property

Borrower shall not commit, suffer or permit any waste on the Real Estate nor take any actions that might invalidate any insurance carried on the Property.  Borrower shall maintain or cause to be maintained the Property in good condition and repair, ordinary wear and tear

- 60 -

excepted, and shall pay or cause to be paid all costs of operating and maintaining the Property. No part of the Improvements may be removed, demolished or materially altered, without the prior written consent of Agent and, if required or necessary, the approval or consent of any Governmental Authorities that have direct or indirect authority or oversight over Borrower, the Property, or the operations conducted at the Real Estate. Without the prior written consent of Agent and, if required or necessary, the approval or consent of any Governmental Authorities that have direct or indirect authority or oversight over Borrower, the Property, or the operations conducted at the Real Estate, Borrower shall not commence or permit any construction of any improvements on the Real Estate other than improvements required for the maintenance or repair of the Property.

6.16   Management

The management of the Property shall be by either: (a) Borrower or an entity affiliated with Borrower approved by Agent; or (b) a professional property management company approved by Agent.  Management by an affiliated entity or a professional property management company shall be pursuant to a written agreement approved by Agent and the Manager must enter into a Management Fee Subordination Agreement with Agent.  In no event shall any manager be removed or replaced or the terms of any management agreement be modified or amended without the prior written consent of Agent.  Upon the occurrence of any Event of Default under this Agreement or of a default under any Management Agreement then in effect, which event under any Management Agreement is not cured within any applicable grace or cure period contained in the Management Agreement, Agent shall have the right to terminate, or to direct Borrower to terminate that Management Agreement upon thirty (30) days' notice and to retain, or to direct Borrower to retain, a new Manager approved by Agent.  Whenever the approval or consent of Agent is required under this **Section 6.16**, the approval or consent may be conditioned, without limitation, on Agent's obtaining evidence in writing from the Rating Agency to the effect that the proposed change in Manager will not result in a re-qualification, reduction, downgrade or withdrawal of any rating initially assigned or to be assigned in a Secondary Market Transaction or, if no such rating has been issued, in Agent's good faith judgment, such change in management shall not have an adverse effect on the level of rating attainable in connection with the Term Loan.

6.17   Rents and Profits.

All Rents and Profits generated by or derived from the Facility shall first be utilized solely for current expenses directly attributable to the ownership and operation of the Facility, including, without limitation, current expenses relating to Borrower's liabilities and obligations with respect to this Agreement and the other Loan Documents, and none of the Rents and Profits generated by or derived from the Property shall be diverted by Borrower and utilized for any other purposes unless all such current expenses attributable to the ownership and operation of the Property have been fully paid and satisfied.

6.18   Hazardous Materials and Environmental Concerns

(a)      Borrower shall keep or cause the Facility to be kept free from Hazardous Substances (other than Permitted Substances), shall not install or use any underground storage

- 61 -

tanks not already installed and in active use as of the Closing Date, shall expressly prohibit and prevent the use, generation, handling, storage, production, processing, treating, recycling, disposal, Release or threatened Release of Hazardous Substances (except Permitted Substances (which Permitted Substances shall not be treated, recycled, disposed Released or threatened to be Released)) by all tenants, invitees and trespassers, and, without limiting the generality of the foregoing, so long as any portion of the Obligations remains outstanding, shall not install in the Improvements or permit to be installed in the Improvements asbestos or any substance containing asbestos.  In no event shall Borrower store any waste materials of any kind at the Facility for such period of time as would require a Permit for such storage.  If required by Agent or if required under any Environmental Law, Borrower shall maintain an Operations and Maintenance Program ("**O&M Program**") for the management of asbestos, lead-based paint, radon, mold or moisture, or any other Hazardous Substances at the Facility.

(b)     Borrower shall promptly notify Agent if Borrower shall become aware of (i) any Release or threatened Release of Hazardous Substances at, on, under, from, or affecting or threatening to affect the Facility or the environment, (ii) any lien or filing of lien, action or notice affecting or threatening to affect the Facility or Borrower resulting from any violation or liability under any of Environmental Law, (iii) any investigation, inquiry or proceeding concerning Borrower or involving the Facility pursuant to any Environmental Law or otherwise relating to Hazardous Substances, or (iv) any occurrence, condition or state of facts which would render any representation or warranty in this **Section 6.18** incorrect in any respect if made at the time of such discovery.  Further, immediately upon receipt of the same, Borrower shall deliver to Agent copies of any and all orders, notices, permits, applications, reports, and other communications, documents and instruments pertaining to the actual, alleged or potential non-compliance with or liability under any Environmental Laws in connection with the Facility including any operations thereat, or presence or existence of any Hazardous Substances at, on, about, under, within, near, from or in connection with the Facility.  Borrower shall, promptly and when and as required, at Borrower's sole cost and expense, take all actions as shall be necessary or, in Agent's view, advisable for compliance with the terms of this **Section 6.18** or for the remediation of any and all portions of the Facility or other affected property, including, without limitation, all investigative, monitoring, removal, containment, remedial and response actions in accordance with all applicable Environmental Laws (and in all events in a manner satisfactory to Agent), and shall further pay or cause to be paid, at no expense to Agent, all remediation, response, administrative and enforcement costs natural resource damage claims or other damage claims including claims for personal injury and property damage of applicable governmental agencies or third parties which may be asserted against Borrower or the Facility.  If Borrower fails to do so (i) Agent may, but shall not be obligated to, undertake remediation at the Facility or other affected property necessary to bring the Facility into compliance with the terms of Environmental Laws, and (ii) Borrower  grants to Agent and its agents and employees access to the Facility and a license to do all things Agent shall deem necessary to bring the Facility into compliance with Environmental Laws.  Any and all costs and expenses reasonably incurred by Agent in connection therewith, together with interest thereon at the Default Interest Rate from the date incurred by Agent until actually paid by Borrower, shall be immediately paid by Borrower on demand and shall be secured by the Security Instrument and by all of the other Loan Documents securing all or any part of the Obligations. BORROWER COVENANTS AND AGREES, AT BORROWER'S SOLE COST AND EXPENSE, TO INDEMNIFY, DEFEND (AT TRIAL AND APPELLATE LEVELS, AND WITH ATTORNEYS, CONSULTANTS AND

- 62 -

EXPERTS ACCEPTABLE TO AGENT), AND HOLD AGENT, EACH LENDER AND THE INDEMNIFIED PERSONS HARMLESS FROM AND AGAINST ANY AND ALL LIENS, DAMAGES, LOSSES, LIABILITIES, OBLIGATIONS, (INCLUDING ANY OBLIGATION TO TAKE ANY REMEDIAL OR CORRECTIVE ACTIONS AT OR WITH RESPECT TO THE FACILITY), SETTLEMENT PAYMENTS, PENALTIES, ASSESSMENTS, CITATIONS, DIRECTIVES, CLAIMS, LITIGATION, DEMANDS, DEFENSES, JUDGMENTS, SUITS, PROCEEDINGS, COSTS, DISBURSEMENTS AND EXPENSES OF ANY KIND OR OF ANY NATURE WHATSOEVER (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS', CONSULTANTS' AND EXPERTS' FEES AND DISBURSEMENTS ACTUALLY INCURRED IN INVESTIGATING, DEFENDING, SETTLING OR PROSECUTING ANY CLAIM, LITIGATION OR PROCEEDING) WHICH MAY AT ANY TIME BE IMPOSED UPON, INCURRED BY OR ASSERTED OR AWARDED AGAINST AGENT, ANY LENDER OR THE FACILITY, AND ARISING DIRECTLY OR INDIRECTLY FROM OR OUT OF:  (I) THE PRESENCE, RELEASE OR THREAT OF RELEASE OF ANY HAZARDOUS SUBSTANCES ON, AT, IN, UNDER, FROM, AFFECTING OR THREATENING TO AFFECT ALL OR ANY PORTION OF THE FACILITY OR ANY SURROUNDING AREAS, REGARDLESS OF WHETHER CAUSED BY OR WITHIN THE CONTROL OF BORROWER; (II) THE VIOLATION OF OR LIABILITY UNDER ANY ENVIRONMENTAL LAWS RELATING TO, AFFECTING OR THREATENING TO AFFECT THE FACILITY, WHETHER OR NOT CAUSED BY OR WITHIN THE CONTROL OF BORROWER; (III) THE FAILURE BY BORROWER TO COMPLY FULLY WITH THE TERMS AND CONDITIONS OF THIS **SECTION 6.18**; (IV) THE BREACH OF ANY REPRESENTATION OR WARRANTY CONTAINED IN THIS **SECTION 6.18**; OR (V) THE ENFORCEMENT OF THIS **SECTION 6.18**, INCLUDING, WITHOUT LIMITATION, THE COST OF ASSESSMENT, CONTAINMENT, REMEDIATION AND/OR REMOVAL OF ANY AND ALL HAZARDOUS SUBSTANCES ON AND/OR FROM ALL OR ANY PORTION OF THE FACILITY OR ANY SURROUNDING AREAS, THE COST OF ANY ACTIONS TAKEN IN RESPONSE TO LITIGATION, ACTIONS TAKEN TO PREVENT OR MINIMIZE ANY RELEASE OR THREAT OF RELEASE SO THAT IT DOES NOT MIGRATE OR OTHERWISE CAUSE OR THREATEN DANGER TO PRESENT OR FUTURE PUBLIC HEALTH, SAFETY, WELFARE OR THE ENVIRONMENT, THE COSTS OF SATISFYING ANY NATURAL RESOURCE DAMAGE CLAIMS, AND COSTS INCURRED TO COMPLY WITH THE ENVIRONMENTAL LAWS IN CONNECTION WITH ALL OR ANY PORTION OF THE FACILITY INCLUDING ANY OPERATIONS THEREAT, OR ANY SURROUNDING AREAS.  THE INDEMNITY SET FORTH IN THIS **SECTION 6.18(B)** SHALL INCLUDE ANY DIMINUTION IN THE VALUE OF THE SECURITY AFFORDED BY THE FACILITY OR ANY FUTURE REDUCTION IN THE SALES PRICE OF THE FACILITY BY REASON OF ANY MATTER SET FORTH IN THIS **SECTION 6.18(B)**, AND ANY AND ALL LIENS, DAMAGES, LOSSES, LIABILITIES, OBLIGATIONS, SETTLEMENT PAYMENTS, PENALTIES, FINES, ASSESSMENTS, CITATIONS, DIRECTIVES, CLAIMS, LITIGATION, DEMANDS, DEFENSES, JUDGMENTS, SUITS, PROCEEDINGS, COSTS, DISBURSEMENTS AND EXPENSES OF ANY KIND OR OF ANY NATURE WHATSOEVER ARISING OUT OF OR RELATING TO INJURY OR DEATH DUE TO EXPOSURE TO HAZARDOUS SUBSTANCES THAT MAY BE PRESENT OR RELEASED AT, ON, UNDER FROM OR TO THE FACILITY.  AGENT'S AND EACH LENDER'S RIGHTS UNDER THIS SECTION ARE IN ADDITION TO ANY

RIGHTS AGENT AND EACH LENDER MAY HAVE UNDER **SECTION 12.4** AND UNDER APPLICABLE LAW AND SHALL SURVIVE PAYMENT IN FULL OF THE OBLIGATIONS AND SHALL BE IN ADDITION TO ALL OTHER RIGHTS OF AGENT (AND EACH LENDER) UNDER THIS SECURITY INSTRUMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS.   THE INDEMNITY CONTAINED IN THIS AGREEMENT SHALL INCLUDE ANY AND ALL CLAIMS ARISING OR ALLEGEDLY ARISING FROM THE NEGLIGENCE OF AGENT OR ANY LENDER OR IN STRICT LIABILITY, BUT SHALL NOT INCLUDE CLAIMS WHICH RESULT SOLELY FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF AGENT OR ANY LENDER.

(c)     Upon Agent's request, at any time after the occurrence of a Default or Event of Default or at such other time as Agent has reasonable grounds to believe that Hazardous Substances are or have been handled, generated, stored, processed, transported to or from, or released or discharged on or from or disposed of on or around the Property or that Borrower, Operator, any tenant or the Property may be in violation of Environmental Laws, Borrower shall provide, at Borrower's sole cost and expense, an environmental site assessment or environmental compliance audit of the Property prepared by a hydrogeologist or environmental engineer or other appropriate consultant approved by Agent to determine whether there has been a Release or threatened Release of Hazardous Substances at, on, or under the Property, or from the Property onto adjoining property and if the Property is in full compliance with Environmental Laws (including asbestos-containing material or lead-based paint).  If Borrower fails to provide such assessment or audit within thirty (30) days after such request, Agent may order the same, and Borrower  grants to Agent and its employees and agents access to the Property and a license to undertake such assessment or audit, including without limitation, a right to conduct intrusive testing of the soils, groundwater and Improvements.  The cost of such assessment or audit, together with interest thereon at the Default Interest Rate from the date incurred by Agent until actually paid by Borrower, shall be immediately paid by Borrower on demand and shall be secured by the Security Instrument and by all of the other Loan Documents securing all or any part of the Obligations.

(d)     Upon reasonable prior notice (except in the event of the occurrence of an Event of Default), without limiting the foregoing, Agent (on behalf of Lenders) and its authorized representatives may, during normal business hours and at its own expense, inspect the Property and Borrower's records related thereto for the purpose of determining compliance with Environmental Laws and the terms and conditions of this **Section 6.18**.

(e)     Borrower shall (i) promptly implement and fully comply with all recommendations set forth in the Environmental Reports listed on **Schedule 5.26**; and (ii) with respect to the Facility on which (A) one or more underground or above ground storage tanks currently exist or (B) one or more above-ground storage tanks are hereafter installed, Borrower shall promptly apply to participate in and thereafter continue to participate in any available federal, state or local storage tank insurance indemnification fund or similar program which may provide financial assistance in the event of a tank system leak, spill or Release, which is now or may hereafter come into existence.  In the event Borrower is not eligible to so participate, it shall take such measures as will enable it to participate.

- 64 -

6.19    Casualty and Condemnation.

(a)    Borrower shall give Agent prompt written notice of the occurrence of any casualty affecting, or the institution of any proceedings for eminent domain or for the condemnation of, the Property or any portion thereof (each, a "**Casualty/Condemnation Event**"). All insurance proceeds on the Property, and all causes of action, claims, compensation, awards and recoveries for any damage, condemnation or taking of all or any part of the Property or for any damage or injury to it for any loss or diminution in value of the Property, are assigned to and shall be paid to Agent for the benefit of Lenders. Agent may participate in any suits or proceedings relating to any such proceeds, causes of action, claims, compensation, awards or recoveries and Agent is authorized, in its own name on behalf of Lenders or in Borrower's name, to adjust any loss covered by insurance or any condemnation claim or cause of action, and to settle or compromise any claim or cause of action in connection therewith, and Borrower shall from time to time deliver to Agent any instruments required to permit such participation; provided, however, that Agent shall not have the right to participate in the adjustment of any loss which is not in excess of the lesser of (i) five percent (5%) of the then outstanding principal balance of the Term Loan, and (ii) $50,000. Provided no Default has occurred and is continuing and no Event of Default has occurred, Agent shall apply any sums received by it under this **Section 6.19** first to the payment of all of its costs and expenses (including, but not limited to, reasonable legal fees and disbursements) incurred in obtaining those sums, and then, as follows:

(b)    If Agent receives insurance proceeds or condemnation awards upon the occurrence of a Casualty/Condemnation Event in an amount not in excess of the lesser of (i) five percent (5%) of the then outstanding principal balance of the Term Loan and (ii) $250,000 (collectively, the "**Threshold Amount**"), Agent shall, to the extent such insurance proceeds or condemnation awards are available for such purpose, disburse to Borrower the amount paid or incurred by Borrower as a result of any such Casualty/Condemnation Event for costs and expenses incurred by Borrower to repair or restore the Property (collectively, the "**Repairs**") pursuant to disbursement provisions as determined by Agent.

If proceeds or awards from a Casualty/Condemnation Event exceed the Threshold Amount, Agent may elect, in Agent's discretion and without regard to the adequacy of Agent's security, to (i) accelerate the maturity date of the Term Loan and declare the Obligations to be immediately due and payable and apply the remainder of such sums received pursuant to this Section to the payment of the Obligations in whatever order Agent directs in its discretion, with any remainder being paid to Borrower, or (ii) make insurance or condemnation proceeds available to Borrower for repair or restoration if Borrower establishes to the satisfaction of Agent, in its discretion, that Borrower otherwise satisfies the requirements of **Section 6.19(c)**. Should Agent make the election described immediately above in item (ii) of this **Section 6.19(b)**, Borrower shall be obligated to undertake restoration and repair of the damaged Improvements consistent with the provisions of this **Section 6.19**.

(c)    If Agent elects to otherwise make the insurance proceeds or condemnation award available to Borrower for repair or restoration pursuant to **Section 6.19(b)**, then if:

(i)    the Property can, in Agent's reasonable judgment, with diligent restoration or repair, be returned to a condition at least equal to the condition thereof that existed

- 65 -

prior to the casualty or partial taking causing the loss or damage by the earlier to occur of the following dates: (A) six (6) months after the receipt of insurance proceeds or condemnation awards by either Borrower or Agent, and (B) six (6) months prior to the Maturity Date, and

(ii)      all necessary governmental approvals can be obtained to allow the rebuilding and reoccupancy of the Property as described in **Section 6.19(c)(i)**, and

(iii)      there are sufficient sums available (through insurance proceeds or condemnation awards and contributions by Borrower, the full amount of which shall at Agent's option have been deposited with Agent) for such restoration or repair (including, without limitation, for any reasonable costs and expenses of Agent to be incurred in administering said restoration or repair) and for payment of principal and interest to become due and payable under this Agreement during such restoration or repair, and

(iv)      the economic feasibility of the Improvements after such restoration or repair will be such that income from their operation is reasonably anticipated to be sufficient to pay operating expenses of the Property and debt service on the Term Loan in full with the same coverage ratio considered by Agent in its determination to make the Term Loan, and

(v)      Borrower shall have delivered to Agent, at Borrower's sole cost and expense, an appraisal report from an appraiser, in form and substance, satisfactory to Agent appraising the value of the Property as proposed to be restored or repaired to be not less than an appraised value of the Property such that the outstanding principal amount of the Term Loan is not greater than 75% of such appraised value,

then, upon satisfaction of each of the foregoing requirements, Agent shall, solely for the purposes of such restoration or repair, advance so much of the remainder of such sums as may be required to facilitate such restoration or repair, and any funds deposited by Borrower therefor, to Borrower in the manner and upon such terms and conditions as would be required by a prudent interim construction lender, including, but not limited to, the prior approval by Agent of plans and specifications, contractors and the form of construction contracts and the furnishing to Agent of permits, bonds, lien waivers, invoices, receipts and affidavits from contractors and subcontractors in form and substance reasonably satisfactory to Agent. Any remaining proceeds shall be applied by Agent for payment of the Obligations in whatever order as Agent directs, or released to Borrower, in its discretion. Borrower shall, in good faith, undertake reasonable efforts to cause the conditions described in this **Section 6.19(c)** to be fully satisfied (e.g., Borrower shall timely make applications for necessary governmental permits, shall order an appropriate appraisal report, etc.). If such conditions are satisfied, Borrower shall be obligated to undertake restoration and repair of the damaged Improvements subject to the terms of this **Section 6.19**.

Any disbursement pursuant to this clause (c) of sums by Agent shall, subject to Borrower's satisfaction of the provisions, be in a manner to promptly facilitate the restoration or repair of the Property. In the event Borrower fails to meet the requirements of this clause (c), then Agent may elect in its discretion and without regard to the adequacy of Agent's or any Lender's security, to accelerate the Maturity Date and declare any and all of the Obligations to be immediately due

and payable and apply the remainder of such sums to the payment of the Obligations in whatever order Agent directs in its discretion, with any remainder being paid to Borrower.

(d)     Any reduction in the Obligations resulting from Agent's application of any sums received by Agent under this Agreement shall take effect only when Agent actually receives such sums and elects to apply such sums to the Obligations and, in any event, the unpaid portion of the Obligations shall remain in full force and effect and Borrower shall not be excused in the payment thereof.  Partial payments received by Agent, as described in the preceding sentence, shall be applied to the payment of the Obligations in whatever order Agent directs in its discretion, with any remainder being paid to Borrower.  If Borrower undertakes to restore or repair the Property after the occurrence of a casualty or partial taking of the Property as provided above, Borrower shall promptly and diligently, at Borrower's sole cost and expense and regardless of whether the insurance proceeds or condemnation award, as appropriate, shall be sufficient for the purpose, restore, repair, replace and rebuild the Property as nearly as possible to their value, condition and character immediately prior to such casualty or partial taking in accordance with the foregoing provisions and Borrower shall pay to Agent all costs and expenses of Agent incurred in administering said rebuilding, restoration or repair, provided that Agent makes such proceeds or award available for such purpose.  Borrower agrees to execute and deliver from time to time such further instruments as may be requested by Agent to confirm the foregoing assignment to Lenders of any award, damage, insurance proceeds, payment or other compensation.  Borrower irrevocably constitutes and appoints Agent the attorney-in-fact of Borrower (which power of attorney shall be irrevocable so long as any of the Obligations are outstanding, shall be deemed coupled with an interest, shall survive the voluntary or involuntary dissolution of Borrower and shall not be affected by any disability or incapacity suffered by Borrower subsequent to the Closing Date), with full power of substitution, subject to the terms of this Section, to settle for, collect and receive any such awards, damages, insurance proceeds, payments or other compensation from the parties or authorities making the same, to appear in and prosecute any proceedings therefor and to give receipts and acquittance therefor.

    6.20    Facility Operations.

        Borrower shall cause the operations conducted or to be conducted at the Facility to be conducted at all times in a manner consistent with or better than the level of operation of such Facility as of the Closing Date, and with the level of operation of other respected facilities in the industry, and, in connection therewith, Borrower shall:

        (a)     maintain or cause to be maintained the standard of care for the residents of such Facility at all times at a level necessary to insure a level of quality care for the residents of such Facility comparable to or better than that existing on the date of Closing;

        (b)     maintain or cause to be maintained a standard of care in the storage, use, transportation and disposal of all medical equipment, medical supplies, medical products or gases, and medical waste, of any kind and in any form, that is in accordance with, that of the highest prudent industry standard and in conformity with all applicable regulations and laws;

        (c)     operate or cause to be operated the Facility in a prudent manner in compliance with applicable laws and regulations relating thereto and cause all Licenses,

- 67 -

reimbursement or care contracts, and any other agreements, and make and file all filings and reports, necessary for the certification, licensure, accreditation or operation of the Facility as may be necessary for participation in the Medicare or Medicaid reimbursement programs, managed care company, insurance company, or other third-party payor reimbursement programs and to cause such operations and participation to remain in effect without reduction in the number of licensed or authorized beds or units for use in Medicare or Medicaid reimbursement programs, managed care company, insurance company, or other third-party payor reimbursement programs;

(d)     take no, nor permit to be taken any, action which will result in a reduction, suspension, or elimination of reimbursement for services from Medicare or Medicaid, or any managed care company, insurance company, or other third-party payor; and

(e)     maintain or cause to be maintained all deposits, including, without limitation, deposits relating to residents or residency agreements.  If such deposits are in cash such deposits are to be deposited and held by Borrower or Operator, as the case may be, in accordance with applicable law, at such commercial or savings bank or banks as may be reasonably satisfactory to Agent.  If such deposits are in any other form, such deposits are to be maintained as Agent may expressly permit.  Any bond or other instrument which Borrower or Operator, as the case may be, is permitted to hold in lieu of cash deposits under any applicable legal requirements shall be maintained in full force and effect unless replaced by cash deposits as described above, shall be issued by an institution reasonably satisfactory to Agent, shall, if permitted pursuant to any legal requirements, name Agent for the benefit of Lenders as payee or Agent thereunder (or at Agent's option, be fully assignable to Agent) and shall, in all respects, comply with any applicable legal requirements and otherwise be reasonably satisfactory to Agent.  Borrower shall, upon request, provide Agent with evidence reasonably satisfactory to Agent of compliance with the foregoing.

## VII.   NEGATIVE COVENANTS

Borrower covenants and agrees that, until full performance and indefeasible payment in full in cash of all the Obligations:

### 7.1     Financial Covenants

Borrower shall not violate or, if applicable, permit Operator to violate, the financial covenants set forth on **Exhibit C** to this Agreement.

### 7.2     Indebtedness

Neither Borrower nor Operator may create, incur, assume or suffer to exist any Indebtedness, except the following (collectively, "**Permitted Indebtedness**"): (i) Indebtedness under the Loan Documents, (ii) any Indebtedness set forth on **Schedule 7.2**, (iii) Capitalized Lease Obligations incurred after the Closing Date and Indebtedness incurred pursuant to purchase money Liens permitted by clause (v) in the definition of Permitted Liens, provided that the aggregate amount thereof outstanding at any time shall not exceed Fifty Thousand Dollars ($50,000), (iv) Indebtedness in connection with advances made by an Affiliate in order to cure any breach of or failure to achieve any of the financial covenants set forth on **Exhibit C**

- 68 -

or to fund any operating deficits of Borrower; provided, however, that such Indebtedness shall be on an unsecured basis, and shall be expressly subordinated by its terms in right of payment and remedies to all of the Obligations and to all of Agent's rights under the Loan Documents; (v) accounts payable to trade creditors and current operating expenses (other than for borrowed money) which are not aged more than ninety (90) days from the billing date or more than thirty (30) days from the due date, in each case incurred in the ordinary course of business and paid within such time period, unless the same are being contested in good faith and by appropriate and lawful proceedings and such reserves, if any, with respect thereto as are required by GAAP and deemed adequate by Borrower's independent accountants shall have been reserved; and (vi) borrowings incurred in the ordinary course of business and not exceeding Ten Thousand Dollars ($10,000) individually or in the aggregate outstanding at any one time; provided, however, that such Indebtedness shall be on an unsecured basis, and expressly subordinated by its terms in right of payment and remedies to all of the Obligations and to all of Agent's and Lenders' rights under the Loan Documents.  Borrower shall not make prepayments on any existing or future Indebtedness to any Person other than to Agent or to the extent specifically permitted by this Agreement or any subsequent agreement between Borrower and Agent.

　　　　7.3　　Liens

　　　　　　Except for Permitted Liens, Borrower shall not (and shall not permit any Loan Party to) create, incur, assume or suffer to exist any Lien upon, in or against, or pledge of, (i) any of the Collateral, or (ii) any of its properties or assets or any of its shares, securities or other equity or ownership or partnership interests, whether now owned or hereafter acquired.  Borrower shall not, and shall not permit any Loan Party to, assign or transfer any interests in any License or Permit, or any reimbursement or care contracts related to the Facility.

　　　　7.4　　Investments; New Facilities or Collateral; Subsidiaries

　　　　　　Borrower, directly or indirectly, shall not (i) purchase, own, hold, invest in or otherwise acquire obligations or stock or securities of, or any other interest in, or all or substantially all of the assets of, any Person or any joint venture, or (ii) make or permit to exist any loans, advances or guarantees to or for the benefit of any Person or assume, guarantee, endorse, contingently agree to purchase or otherwise become liable for or upon or incur any obligation of any Person (other than those created by the Loan Documents and Permitted Indebtedness and other than (A) trade credit extended in the ordinary course of business, (B) advances for business travel and similar temporary advances made in the ordinary course of business to officers, directors and employees, and (C) the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.  Borrower, directly or indirectly, shall not purchase, own, operate, hold, invest in or otherwise acquire any facility, property or assets other than the Property.  Borrower shall have no Subsidiaries, except as listed on **Schedule 5.3A**.

　　　　7.5　　Distributions; Redemptions

　　　　　　Neither Borrower nor Operator shall: (i) declare, pay or make any dividend or Distribution (other than dividends or Distributions payable in its stock, or split-ups or

- 69 -

reclassifications of its stock), (ii) apply any of its funds, property or assets to the acquisition, redemption or other retirement of any Capital Stock or other securities or membership, economic or other interests or of any options to purchase or acquire any of the foregoing (provided, however, that Borrower may redeem its capital stock from terminated employees pursuant to, but only to the extent required under, the terms of the related employment agreements as long as no Default or Event of Default has occurred and is continuing or would be caused by or result therefrom) and (iii) otherwise make any payments or Distributions to any stockholder, member, partner or other equity owner in such Person's capacity as such; provided, however, that after any Payment Date occurring after the six (6) month anniversary of the Term Loan, Borrower and Operator shall have the right to make Distributions, only to the extent of Excess Cash Flow, if any, so long as (i) all amounts due on such Payment Date or otherwise then due under the Loan Documents have been paid; and (ii) no Default has occurred and is continuing or would be caused by or result therefrom and no Event of Default has occurred or would be caused by or result therefrom.  Borrower shall not, and with respect to the ownership or operation of the Facility, shall cause Operator not to, make any payment of any management, service or related or similar fee to any Person or with respect to any facility owned, operated or leased by Borrower or Operator except in the manner permitted under any Management Fee Subordination Agreement, provided that all payments under any Management Agreement or any management agreement related to the Facility shall not exceed five percent (5%) of any Facility's revenues for any calendar year during the Term and that any payments above five percent (5%) shall be considered a Distribution, provided further that Borrower shall not make or suffer to exist any Distribution or payment under any Management Agreement if a Default or Event of Default has occurred and is continuing or would result therefrom.

### 7.6    Transactions with Affiliates

Except as expressly permitted in the Loan Documents, Borrower shall not enter into or consummate any transaction of any kind with any of its Affiliates or any Guarantor other than: (i) salary, bonus, employee stock option and other compensation and employment arrangements with directors or officers in the ordinary course of business, provided, that no payment of any bonus shall be permitted if a Default or Event of Default has occurred and remains in effect or would be caused by or result from such payment, (ii) transactions on overall terms at least as favorable to Borrower as would be the case in an arm's-length transaction between unrelated parties of equal bargaining power; provided that notwithstanding the foregoing Borrower shall not (Y) enter into or consummate any transaction or agreement pursuant to which it becomes a party to any mortgage, note, indenture or guarantee evidencing any Indebtedness of any of its Affiliates or otherwise to become responsible or liable, as a guarantor, surety or otherwise, pursuant to agreement for any Indebtedness of any such Affiliate or (Z) make any payment to any of its Affiliates in excess of $10,000 (other than the management fees due under the Management Agreement and/or payments to ancillary companies for services including, but not limited to, housekeeping and hospice, all as approved by Agent in its reasonable discretion) without the prior written consent of Agent; (iii) transactions with Agent or any Affiliate of Agent, and (iv) the Facility Lease provided that the Facility Lease shall not be amended, modified, changed or terminated without Agent's approval, which approval may be granted or withheld in Agent's discretion.

7.7     Charter Documents; Fiscal Year; Dissolution; Use of Proceeds

Borrower shall not (i) amend, modify, restate or change its articles of incorporation or formation, bylaws, operating agreements or similar charter documents or any Charter Documents in a manner that would be adverse to Agent or Lenders, or that would impair or affect Agent's valid, perfected, first priority security interest in the Property or that would violate this Agreement or any requirements of Borrower's qualification as a Special-Purpose Entity, (ii) shall not allow any of its interests to be certificated, (iii) change its fiscal year unless Borrower demonstrates to Agent's satisfaction compliance with the covenants contained in this Agreement for both the fiscal year in effect prior to any change and the new fiscal year period by delivery to Agent of appropriate interim and annual pro forma, historical and current compliance certificates for such periods and such other information as Agent may reasonably request, (iv) amend, alter or suspend or terminate or make provisional in any material way, any License or Permit without the prior written consent of Agent, which consent shall not be unreasonably withheld, (v) wind up, liquidate or dissolve (voluntarily or involuntarily) or commence or suffer any proceedings seeking or that would result in any of the foregoing, (vi) change its name or jurisdiction of organization without the prior written consent of Agent, or (vii) use any proceeds of the Term Loan for "purchasing" or "carrying" "margin stock" as defined in Regulations U, T or X of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulations T, U or X or any other regulations of such Board of Governors, or for any purpose prohibited by legal requirements or by the terms and conditions of the Loan Documents.

7.8     Truth of Statements

Borrower shall not furnish to Agent or any Lender any certificate or other document, instrument or certificate that contains any untrue statement of a material fact or that omits to state a material fact necessary to make it not misleading in light of the circumstances under which it was furnished.

7.9     IRS Form 8821

Borrower shall not, and shall cause each Loan Party not to, alter, amend, restate or otherwise modify, withdraw, terminate or refile the IRS Form 8821 required to be filed pursuant to **Section 4.1**.

7.10    Alienation and Further Encumbrances

Borrower acknowledges that Agent and Lenders have relied upon the principals of Borrower and the other Loan Parties and their experience in owning and operating properties similar to the Property in connection with the closing of the Term Loan.  Accordingly, in the event that the Property or any part thereof or interest therein shall be sold (including any purchase or sale agreement for all or any portion of the Property), conveyed, disposed of, alienated, hypothecated, leased (except pursuant to the Facility Lease), assigned, pledged, mortgaged, further encumbered or otherwise transferred or Borrower shall be divested of its title to the Property or any interest therein, in any manner or way, whether voluntarily or involuntarily, without the prior written consent of Agent being first obtained, which consent may

- 71 -

be withheld in Agent's discretion, and, if required or necessary, the approval or consent of any Governmental Authorities that have direct or indirect authority or oversight over Borrower, the Property, or the operations conducted on the Property, then, the same shall constitute an Event of Default under this Agreement and Agent shall have the right, at its option, to declare any or all of the Obligations, irrespective of the maturity date specified in this Agreement, immediately due and payable and to otherwise exercise any of its other rights and remedies contained in **Article VIII** or in the Security Instrument or in any of the other Loan Documents.  If such acceleration is during any period when any Early Termination Fee is payable pursuant to the provisions of this Agreement, then, in addition to all of the foregoing, the Early Termination Fee shall also then be immediately due and payable to the same end as though Borrower were prepaying the entire Term Loan on the date of such acceleration.  For the purposes of this Section, the sale, conveyance, transfer, disposition, alienation, hypothecation, pledge or encumbering (whether voluntarily or involuntarily) of all or any portion of the ownership interest in (or, directly or indirectly through constituent parties, any of the ultimate beneficial ownership interest in) Borrower shall be deemed to be a transfer of an interest in the Property.  Furthermore, the sale, conveyance, transfer, disposition, alienation, hypothecation, pledge or encumbering (whether voluntarily or involuntarily) of all or any portion of the ownership interest in (or, directly or indirectly through constituent parties, any of the ultimate beneficial ownership interest in) any Operator, Guarantor or Pledging Entity shall constitute an Event of Default under this Agreement and Agent shall have the right to exercise its various remedies described above.  Borrower shall not consent to any direct or indirect transfer of the Facility Lease, or any ownership interest in Operator.

7.11   Zoning; Use

Without the prior written consent of Agent and, if required or necessary, the approval or consent of any Governmental Authorities that have direct or indirect authority or oversight over Borrower, the Property, or the operations conducted at the Facility, Borrower shall not seek, make, suffer, consent to or acquiesce in any change in the zoning or conditions of use of the Real Estate or the Improvements.  Borrower shall comply with and make all payments required under the provisions of any covenants, conditions or restrictions affecting the Real Estate or the Improvements.  Borrower shall comply with all existing and future requirements of all Governmental Authorities having jurisdiction over the Property or the operations conducted at the Facility.  Borrower shall keep all Licenses and Permits in full force and effect.  Borrower shall operate the Facility as a 140 bed skilled nursing facility for so long as any portion of the Obligations remains outstanding.  If, under applicable zoning provisions, the use of all or any part of the Real Estate or the Improvements is or becomes a nonconforming use, Borrower shall not cause or permit such use to be discontinued or abandoned without the prior written consent of Agent and, if required or necessary, the approval or consent of any Governmental Authorities that have direct or indirect authority or oversight over Borrower, the Property, or the operations conducted at the Facility.  Further, without Agent's prior written consent and, if required or necessary, the approval or consent of any Governmental Authorities that have direct or indirect authority or oversight over Borrower, the Property, or the operations conducted at the Facility, Borrower shall not file or subject any part of the Real Estate or the Improvements to any declaration of condominium or cooperative or convert any part of the Real Estate or the Improvements to a condominium, cooperative or other form of multiple ownership and governance.

7.12    Leases; Facility Lease

Borrower shall not execute any Lease for possession or occupancy of any portion of the Property, except for the Facility Lease, if any, and shall at all times promptly and faithfully perform, or cause to be performed, all of the covenants, conditions and agreements contained in the Facility Lease on the part of the landlord, lessor or licensor thereunder to be kept and performed.  Prior to Closing, Borrower shall have delivered to Agent a copy of the Facility Lease.  Borrower shall not do or suffer to be done any act that might result in a default by the landlord, lessor, licensor or other party under the Facility Lease or allow the tenant thereunder to withhold payment of rent and, shall not further assign the Facility Lease or any such rents or payments.  Borrower, at no cost or expense to Agent, shall enforce, short of termination, the performance and observance of each and every condition and covenant of each of the parties under the Facility Lease.  Borrower shall not, without the prior written consent of Agent, modify the Facility Lease, terminate or accept the surrender of the Facility Lease, or waive or release any other party from the performance or observance of any obligation or condition under the Facility Leases.  Borrower shall not permit the prepayment of any rents under the Facility Lease for more than one (1) month prior to the due date thereof.  Borrower shall diligently enforce all obligations of each lessee or licensee under the Facility Lease.

7.13    Patient Records.

Borrower shall not, and shall not permit Operator to, assign, transfer or remove any records pertaining to the Facility or any patient/resident, including without limitation, resident records, medical and clinical records, except: (a) as required under Applicable Law or by court order, or (B) as directed by the patients or residents who own those records.

7.14    Easements and Rights-of-Way.

Borrower shall not grant any easement or right-of-way with respect to all or any portion of the Real Estate without the prior written consent of Agent.  The purchaser at any foreclosure sale may, in its discretion, disaffirm any easement or right-of-way granted in violation of any of the provisions of any Security Instrument and may take immediate possession of the Property free from, and despite the terms of, such grant of easement or right-of-way.  If Agent consents to the grant of an easement or right-of-way, Agent agrees to grant such consent without charge to Borrower other than reasonable expenses, including, without limitation, reasonable attorneys' fees, incurred by Agent in the review of Borrower's request and, if applicable, in the preparation of documents relating to the subordination of any Security Instrument to such easement or right-of-way.

7.15    Certain Specific Agreements

No Loan Party shall permit any other Transaction Person, to (i) be or become a Person whose property or interests in property are blocked or subject to blocking pursuant to **Section 1** of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engage in any dealings or transactions prohibited by **Section 2** of such executive order, or otherwise be associated with any such Person in any manner violative of

- 73 -

**Section 2** of such executive order, or (iii) otherwise become a Person on the list of Specially Designated Nationals and Blocked Persons in violation of the limitations or prohibitions under any other OFAC regulation or executive order.

## VIII.   EVENTS OF DEFAULT

8.1    Events of Default

The occurrence of any one or more of the following shall constitute an "**Event of Default**" under this Agreement and under the other Loan Documents:

(a)    Borrower shall fail to pay any amount on the Obligations or provided for in any Loan Document within five (5) days after the same becomes due (including a deposit into the Sinking Fund Account in lieu of such payment as permitted in **Section 3.10**) or Borrower's failure to pay the Loan at the Maturity Date, whether by acceleration or otherwise;

(b)    (i) any fact, circumstance, or condition was not as represented or warranted in any material respect in any representation, statement or warranty at the time made or deemed made by any Loan Party in any Loan Document or in any other certificate, document, instrument, report or opinion delivered in conjunction with any Loan Document to which it is a party (whether or not delivered to Agent), regardless of whether such representation or warranty was qualified to the knowledge of the representing or warranting party, or (ii) any fact, circumstance or condition ceases to be as represented or warranted in any material respect after the date of the representation or warranty, or (iii) any representation or warranty of Operator or Property Manager contained in the Management Fees Subordination Agreement, Lease Estoppel and Agreement or other similar document delivered to Agent in connection with the Term Loan shall prove to have been incorrect or untrue in any material respect when made or deemed made;

(c)    any Loan Party or other party thereto other than Agent shall be in violation, breach or default of, or shall fail timely to perform, observe or comply with any covenant, obligation or agreement set forth in, any Loan Document to the extent not otherwise separately identified as an Event of Default; provided only that in the case of the affirmative covenants contained in **Article VI** (other than the covenants contained in **Sections 6.1(a), 6.2, 6.5, 6.7, 6.9** and **6.11**, for which no cure right is provided), Borrower shall have the opportunity to cure any default, breach or failure of performance under **Article VI** within thirty (30) days after the first to occur of (1) Agent's written notice of such default, breach or failure of performance or (2) Borrower's discovery of such default, breach or failure of performance;

(d)    any of the Loan Documents ceases to be in full force and effect, or any Lien created under this Agreement or any Security Document ceases to constitute a valid perfected first priority Lien on the Property in accordance with the terms thereof, or Agent (or Lenders, as the case may be) ceases to have a valid perfected first priority security interest or Lien in any of the Property;

(e)    one or more tax assessments that are not in the ordinary course, judgments or decrees not covered by insurance is rendered against: (i) any Borrower or (ii) Operator with respect to the Facility, in an amount in excess of Ten Thousand Dollars ($10,000) individually or Fifty Thousand Dollars ($50,000) in the aggregate or (iii) Guarantor or Operator or any Pledging

- 74 -

Entity which individually or in the aggregate could reasonably be expected to have or result in a Material Adverse Effect;

(f)   any default occurs (i) in the payment of any Indebtedness (other than the Obligations) of Borrower in excess of $50,000, (ii) in the payment of any Indebtedness of Operator or any Loan Party other than Borrower which could reasonably be anticipated to result in the occurrence of a Material Adverse Effect or (iii) in the performance, observance or fulfillment of any provision contained in any agreement, contract, document or instrument to which Operator or any Loan Party is a party or to which any of their properties or assets are subject or bound where such default could reasonably be expected to have a Material Adverse Effect;

(g)   Borrower, any other Loan Party or Operator shall (i) be unable to pay its debts generally as they become due, (ii) have total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities) that exceed its assets, at a Fair Valuation, (iii) have an unreasonably small capital base with which to engage in its anticipated business, (iv) file a petition under any insolvency statute, (v) make a general assignment for the benefit of its creditors, (vi) commence a proceeding for the appointment of a receiver, trustee, liquidator or conservator of itself or of the whole or any substantial part of its property, or (vii) file a petition seeking reorganization or liquidation or similar relief under any Debtor Relief Law or any other applicable law or statute;

(h)   (i) a court of competent jurisdiction shall (A) enter an order, judgment or decree appointing a custodian, receiver, trustee, liquidator or conservator of any Loan Party or of Operator or the whole or any substantial part of any such Person's properties, which shall continue unstayed and in effect for a period of thirty (30) days, (B) shall approve a petition filed against any Loan Party or Operator seeking reorganization, liquidation or similar relief under any Debtor Relief Law or any other applicable law or statute, which is not dismissed within thirty (30) days or, (C) under the provisions of any Debtor Relief Law or other applicable law or statute, assume custody or control of any Loan Party or Operator or of the whole or any substantial part of any such Person's properties, which is not irrevocably relinquished within thirty (30) days, or (ii) there is commenced against any Loan Party or Operator any proceeding or petition seeking reorganization, liquidation or similar relief under any Debtor Relief Law or any other applicable law or statute, which (A) is not unconditionally dismissed within thirty (30) days after the date of commencement, or (B) with respect to which such Loan Party or Operator takes any action to indicate its approval of or consent to any such proceeding or petition;

(i)   Without limiting the provisions of **Section 7.10**, either (i) any Change of Control occurs or any agreement or commitment to cause or that may result in any such Change of Control is entered into, (ii) any Material Adverse Effect or Material Adverse Change occurs or is reasonably expected to occur, (iii) any Liability Event occurs or is reasonably expected to occur or (iv) any Loan Party or Operator ceases any portion of its business operations as currently conducted or anticipated to be conducted, except if such cessation is with respect to Guarantor and such cessation could not reasonably be expected to result in or have a Material Adverse Effect;

- 75 -

(j)      Agent receives any indication or evidence that any Loan Party or Operator may have directly or indirectly been engaged in any type of activity which, in Agent's reasonable judgment, might result in forfeiture of any property relating to the Facility or the Collateral to any Governmental Authority which shall have continued unremedied for a period of ten (10) days after written notice from Agent;

(k)      a default occurs under any other Loan Document and such default is not cured within any applicable cure period;

(l)      uninsured damage to, or loss, theft or destruction of, any portion of the Property occurs that exceeds One Hundred Thousand Dollars ($100,000) in the aggregate if such portion of the Property is not repaired or replaced within thirty (30) days of such loss, theft or destruction;

(m)      any Loan Party or Operator or any of their respective members, managers, directors or officers is criminally indicted or convicted under any law that could lead to a forfeiture of any Collateral or any Licenses or Permits;

(n)      the issuance of any process for levy, attachment or garnishment or execution upon or prior to any judgment against any property or assets of any Loan Party that, individually or in the aggregate, could be reasonably be expected to have or result in a Material Adverse Effect;

(o)      failure of Borrower to pay to Agent any sum with respect to any of the Reserves within five (5) days after the same becomes due;

(p)      any material default under the Facility Lease is not cured within the applicable cure period by Borrower or Operator, as applicable or any material default occurs under any Management Agreement which is not cured within the applicable cure period thereunder by Borrower or Manager, as applicable, or Borrower does not terminate the Management Agreement and enter into a new management agreement in form and substance and with a new manager acceptable to Agent in Agent's discretion within thirty (30) days of the occurrence of such default;

(q)      any portion of the Term Loan is not used for the purpose for which it was advanced;

(r)      any Loan Party challenges the validity or enforceability of any of the Loan Documents;

(s)      any insurance required under this Agreement is terminated or lapsed;

(t)      any failure to comply with any of the financial covenants set forth on **Exhibit C**;

(u)      any failure of Borrower to comply with the provisions of Section 9.2;

- 76 -

(v)    if Borrower or Operator shall fail to cure or abate any violation of any law, order, ordinance, rule or regulation pertaining to the operation of the Facility that is claimed by any Governmental Authority, or any officer acting on behalf thereof, within the time permitted by such authority for such cure or abatement;

(w)    if any proceedings shall be instituted against any Loan Party by any Governmental Authority which would or are reasonably likely to result in (i) the revocation of any license granted for the operation of the Facility, (ii) if applicable, the decertification of the Facility from participation on the Medicaid or Medicare reimbursement program or (iii) the issuance of a stop placement order with respect to the Facility; or

(x)    any additional Indebtedness incurred by Borrower or Operator without Lender's consent other than trade payables which are incurred and discharged in the ordinary course; provided, however, that Operator shall be permitted to obtain a revolving line of credit upon the following terms and conditions: (i) the revolving amount does not exceed $1,000,000, (ii) the revolving credit loan is secured by certain assets of Operator reasonably acceptable to Lender, and (iii) the revolving credit lender executes and delivers an intercreditor agreement substantially identical to the HUD form of intercreditor agreement, a copy of this is attached hereto as **Schedule 8.1**.

(y)    the entry into any revolving loan arrangement by Operator without Lender's consent.

8.2    Remedies

(a)    Upon the occurrence of any Event of Default, Agent may, without notice or demand, take any or all of the following actions either individually or in conjunction with one another: (i) declare all or any portion of the outstanding principal balance of the Term Loan, all interest thereon and all other Obligations to be due and payable immediately, in each case, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or further notice of any kind, all of which are expressly waived by Borrower, (ii) apply any Reserves held by Agent and any and all sums on deposit in the account designated by Agent pursuant to **Section 2.7(e)** to reduce the Obligations, (iii) foreclose the Liens created under the Security Documents, (iv) realize upon, take possession of and/or sell any collateral or securities pledged (other than collateral consisting of Accounts owed or owing by Medicaid/Medicare Account Debtors absent a court order or compliance with applicable law) with or without judicial process, (v) exercise all rights and powers with respect to the Property as any Borrower, as applicable, might exercise (other than with respect to collateral consisting of Accounts owed or owing by Medicaid/Medicare Account Debtors absent a court order or compliance with applicable law), (vi) collect and send notices regarding the Property (other than with respect to collateral consisting of Accounts owed or owing by Medicaid/Medicare Account Debtors absent a court order or compliance with applicable law), with or without judicial process, (vii) by its own means or with judicial assistance, enter any premises at which the personal property collateral and/or pledged securities are located, or render any of the foregoing unusable or dispose of the personal property collateral and/or pledged securities on such premises without any liability for rent, storage, utilities, or other sums, and no Borrower shall resist or interfere with such action, (viii) at Borrower's expense, require that all or any part of the personal

property collateral be assembled and made available to Agent at any place designated by Agent, (ix) prohibit any action permitted to be taken under this Agreement and (x) exercise any and all other remedies available to Agent under this Agreement, under the Security Documents, under any of the other Loan Documents, under the UCC or otherwise at law or in equity.  Agent may take one or more of the actions set forth in the preceding sentence, the exercise of all or each of which shall not waive any right that Agent may have to exercise any other rights or remedies set forth in this Agreement, in any other Loan Document or available to Agent at law, in equity or under the UCC.

(b)     Borrower agrees that notice received by it at least ten (10) days before the time of any intended public sale, or the time after which any private sale or other disposition of personal property collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition.  If permitted by applicable law, any perishable personal property collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by Agent without prior notice to Borrower.  At any sale or disposition of personal property collateral or securities pledged, Agent or Lenders may (to the extent permitted by applicable law) purchase all or any part thereof free from any right of redemption by any Borrower which right is  waived and released.  Borrower covenants and agrees not to, and not to permit or cause any of its Subsidiaries to, interfere with or impose any obstacle to Agent's or any Lender's exercise of its rights and remedies with respect to the personal property collateral or the Property.  Agent, in dealing with or disposing of the personal property collateral or any part thereof, shall not be required to give priority or preference to any item of collateral or otherwise to marshal assets or to take possession or sell any collateral with judicial process.

8.3     Advances to Protect Property

Without limiting or waiving any other rights and remedies of Agent (or Lenders) under this Agreement, if Agent determines that Borrower is not adequately performing or has failed to perform any of its obligations, covenants or agreements contained in this Agreement or in any of the other Loan Documents and such inadequacy or failure is not cured within any applicable grace or cure period, or if any action or proceeding of any kind (including, but not limited to, any bankruptcy, insolvency, arrangement, reorganization or other debtor relief proceeding) is commenced which might affect Agent's interest in the Property or Agent's right to enforce its security, then Agent on behalf of Lenders may, at its option, with or without notice to Borrower, make any appearances, disburse or advance any sums and take any actions as may be necessary or desirable to protect or enforce the security of the Security Documents or to remedy the failure of Borrower to perform its covenants and agreements (without, however, waiving any Default or Event of Default).  Without limitation of the foregoing, Agent, in its discretion, shall have the right, at any time that Borrower fails to do so, and from time to time, without prior notice (i) to obtain insurance covering any of the Property to the extent insurance is required under this Agreement, (ii) to pay for the performance of any of the Obligations, (iii) to discharge taxes or Liens on any of the Property that are in violation of any Loan Document, and (iv) to pay for the maintenance and preservation of the Property.  Borrower agrees to pay on demand all expenses of Agent reasonably incurred with respect to the foregoing (including, but not limited to, fees and disbursements of counsel), together with interest thereon at the Default Interest Rate from and after the date on which Agent incurs such expenses until reimbursement thereof by Borrower.  Any expenses so incurred by Agent, together with interest thereon as

- 78 -

provided above, shall be additional indebtedness of Borrower secured by the Security Documents and by all of the other Loan Documents securing all or any part of the Obligations. The necessity for any such actions and of the amounts to be paid shall be determined by Agent in its discretion.  Agent is empowered to enter and to authorize others to enter upon the Property or any part thereof for the purpose of performing or observing any such defaulted term, covenant or condition without becoming liable to Borrower or any person in possession holding under Borrower.  Borrower acknowledges and agrees that the remedies set forth in this **Section 8.3** shall be exercisable by Agent, and any and all payments made or costs or expenses incurred by Agent in connection therewith shall be secured by the Security Documents and shall, without demand, be immediately repaid by Borrower with interest thereon at the Default Interest Rate, notwithstanding the fact that such remedies were exercised and such payments made and costs incurred by Agent or Lenders, after the filing by any Loan Party of a voluntary case or the filing against Borrower of an involuntary case pursuant to or within the meaning of the Bankruptcy Reform Act of 1978, as amended (the "**Act**"), Title 11 U.S.C., or after any similar action pursuant to any other Debtor Relief Law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable to any Loan Party, Agent and Lenders, any guarantor or indemnitor, the obligations or any of the Loan Documents.  This indemnity shall survive payment in full of the Obligations.  This **Section 8.3** shall not be construed to require Agent to incur any expenses, make any appearances or take any actions.

8.4     Rights of Agent to Appoint Receiver

Without limiting and in addition to any other rights, options and remedies Agent or any Lender has under the Loan Documents, the UCC, at law or in equity, upon the occurrence and during the continuance of any Event of Default, Agent shall have the right to apply for and have a receiver appointed by a court of competent jurisdiction in any action taken by Agent to enforce its or any Lender's rights and remedies in order to manage, protect and preserve the Property and continue the operation of the business of Borrower and to collect all revenues and profits thereof and apply the same to the payment of all expenses and other charges of such receivership including the compensation of the receiver and to the payments as aforesaid until a sale or other disposition of such Property shall be finally made and consummated.

8.5     Rights and Remedies not Exclusive

Agent shall have the right in its discretion to determine which rights, Liens and/or remedies Agent may at any time pursue, relinquish, subordinate or modify, and such determination will not in any way modify or affect any of Agent's rights, Liens or remedies under any Loan Document, applicable law or equity.  The enumeration of any rights and remedies in any Loan Document is not intended to be exhaustive, and all rights and remedies of Agent described in any Loan Document are cumulative and are not alternative to or exclusive of any other rights or remedies which Agent otherwise may have.  The partial or complete exercise of any right or remedy shall not preclude any other further exercise of such or any other right or remedy.

8.6   Application of Proceeds

In addition to any other rights, options and remedies Lender has under the Loan Documents, the UCC, at law or in equity, all dividends, interest, rents, issues, profits, fees, revenues, income and other proceeds collected or received from collecting, holding, managing, renting, selling, or otherwise disposing of all or any part of the Property or any proceeds thereof upon exercise of its remedies under this Agreement shall be applied in the following order of priority:  (i) first, to the payment of all costs and expenses of such collection, storage, lease, holding, operation, management, sale, disposition or delivery and of conducting Borrower's business and of maintenance, repairs, replacements, alterations, additions and improvements of or to the Property, and to the payment of all sums which Lender may be required or may elect to pay, if any, for taxes, assessments, insurance and other charges upon the Property or any part thereof, and all other payments that Lender may be required or authorized to make under any provision of this Agreement (including, without limitation, in each such case, in-house documentation and diligence fees and legal expenses, search, audit, recording, professional and filing fees and expenses and reasonable attorneys' fees and all expenses, liabilities and advances made or incurred in connection therewith); (ii) second, to the payment of all Obligations as provided in this Agreement; (iii) third, to the satisfaction of Indebtedness secured by any subordinate security interest of record in the Property if written notification of demand therefor is received before distribution of the proceeds is completed, provided, that, if requested by Lender, the holder of a subordinate security interest shall furnish reasonable proof of its interest, and unless it does so, Lender need not address its claims; and (iv) fourth, to the payment of any surplus then remaining to Borrower, unless otherwise provided by law or directed by a court of competent jurisdiction, provided that Borrower shall be liable for any deficiency if such proceeds are insufficient to satisfy the Obligations or any of the other items referred to in this section.

8.7   Acceleration; Liquidation

(a)   **Acceleration**.  Lender may give Agent an Acceleration Notice at any time following the occurrence of an Event of Default.  Unless stayed by the order of a court or operation of law, Agent shall Accelerate the Obligations within a commercially reasonable period of time following Agent's receipt of an Acceleration Notice.

(b)   **Liquidation**.  Unless stayed by the order of a court or operation of law, Agent shall initiate a Liquidation within a commercially reasonable period of time following an Acceleration of the Obligations.  Furthermore, Agent may, in its discretion, establish one or more Nominees to "bid in" or otherwise acquire ownership of the Collateral.  Agent shall manage any Nominee and manage and dispose of the Collateral with a view towards the realization of the economic benefits of the ownership of the Post Foreclosure Assets and in such regard, Agent and/or the Nominee may operate, repair, manage, maintain, develop, and dispose of the Collateral in such manner as Agent determines as appropriate under the circumstances.  Agent may decline to undertake or to continue taking a course of action or to execute an action plan unless indemnified to Agent's satisfaction by Lenders against any and all liability and expense which may be incurred by Agent by reason of taking or continuing to take that course of action or action plan.  Agent and each Lender shall execute all such instruments and documents not inconsistent with the provisions of this Agreement as Agent and/or the Nominee reasonably may

- 80 -

request with respect to the creation and governance of any Nominee, the conduct of Liquidation, and the management and disposition of the Collateral.

      (c)    **Distribution of Liquidation Proceeds**.  Agent may establish one or more reasonably funded reserve accounts into which proceeds of the conduct of any Liquidation may be deposited in anticipation of future expenses which may be incurred by Agent in the exercise of rights as a secured creditor of Borrower and claims which Agent anticipates may need to be paid and having priority over the Obligations.  Agent shall distribute the proceeds of any Liquidation to Agent for distribution in accordance with the relative priorities set forth in Section 8.6.  Each Lender, on the written request of Agent and/or any Nominee, not more frequently than once each month, shall reimburse Agent and/or any Nominee, pro rata on the basis of the amount then outstanding to such Lender, for any cost or expense reasonably incurred by such Person in the conduct of a Liquidation, which amount is not covered out of current proceeds of the Liquidation, which reimbursement shall be paid over to and distributed by Agent.

      (d)    **Definitions**.  For purposes of this Section 8.7: (i) "Acceleration" means the making of demand or declaration that any of the Obligations, not otherwise due and payable, is due and payable; (ii) "Liquidation" means the exercise by Agent of those rights and remedies accorded to Agent under the Loan Documents, on behalf of Lenders, following and on account of an Event of Default (and whether before or after the commencement of a bankruptcy, insolvency or other proceeding) looking towards the realization on the Collateral; and (iii) "Nominee" means a Person formed or established by Agent to own or manage the Collateral.

**IX.**    RIGHT OF FIRST REFUSAL; NON-COMPETE

    9.1    Right of First Refusal

        If at any time Borrower or any Affiliate thereof receives from a third party a bona fide offer, term sheet or commitment or makes a proposal accepted by any third person or entity (each, an "Offer") which provides for any type of financing which is the same or similar to the financing evidenced by this Agreement and is to be secured by all or any part of the Property, Borrower shall notify Agent of the Offer in writing (including all material terms of the Offer) and Agent shall have 30 days after its receipt of such notice (the "Option Period") to provide a binding commitment, which commitment shall be subject to Borrower's satisfaction of the terms and conditions set forth in such commitment, to provide similar financing in the place of such third person or entity upon substantially the same terms and conditions as set forth in the Offer.  Agent shall notify Borrower in writing of Agent's acceptance of the Offer pursuant hereto (the "Acceptance Notice"), in which case Borrower shall obtain such financing from Agent and shall not accept the Offer from such other third person or entity.  If no Acceptance Notice has been received from Agent within the Option Period, Borrower may consummate the Offer with the other third person or entity on the terms and conditions set forth in the Offer (the "Transaction"); provided, however, that none of foregoing or any failure by Agent to issue an Acceptance Notice shall be construed as a waiver of any of the terms, covenants or conditions of any of the Loan Documents.  Nothing in this Section shall serve to waive any requirement for payment of the Early Termination Fee, if applicable, upon closing of the Transaction.  If the Transaction is not consummated on the terms set forth in the Offer or with the third person or entity providing the Offer during the 90 day period following the expiration of the Option Period, Borrower shall not

- 81 -

be permitted to consummate the Transaction without again complying with this <u>Section 9.1</u>. The provisions of this <u>Section 9.1</u> shall survive the payment in full of the indebtedness, liabilities and other obligations arising under this Agreement for a period of three months. For purposes of this <u>Section 9.1</u>, "Agent" shall include AP MA Funding LLC, Alliance Partners LLC, and any of their parents, subsidiaries or affiliates, whether now existing or hereafter created, but shall not include unaffiliated third party assignees. For avoidance of doubt, the parties acknowledge and agree that the foregoing right of first refusal shall NOT apply to any type of financing from any Person under a program sponsored by the United States Department of Housing and Urban Development.

9.2     Non-Compete

(a)     Except for that certain facility currently known as Champion Rehab & Health, located at 2 Beaumont Avenue, Brockton, Massachusetts (the "Existing Competitive Business"), Borrower agrees for the benefit of Agent and Lenders that neither it nor any of its Affiliates shall, either directly, or indirectly, through any ownership interest in any other Person or otherwise, shall acquire or otherwise engage in any business competitive with the business of the Facility (a "Competitive Business") within ten (10) miles from the Facility and that all business opportunities related to a Competitive Business will be pursued exclusively through Borrower.

(b)     Borrower and its Affiliates, without Agent's prior written consent, shall not transfer any patients from the Facility to any Competitive Business unless related to a specific patient need or specific patient request.

(c)     Notwithstanding anything in this Agreement to the contrary, regardless of any involvement in or plans for involvement in any Competitive Business, Borrower and its Affiliates shall: (i) at no time actively encourage, recommend or solicit the transfer of any patients from the Facility unless the same is related to a specific patient need, and (ii) operate the Facility independently of any Competitive Business, including, without limitation, the Existing Competitive Business, so as to maximize occupancy and revenues from the operations at the Facility..

## X.     WAIVERS AND JUDICIAL PROCEEDINGS

10.1     Waivers

Borrower waives setoff, counterclaim, demand, presentment, protest, all defenses with respect to any and all instruments and all notices and demands of any description, and the pleading of any statute of limitations as a defense to any demand under any Loan Document. Borrower  waives any and all defenses and counterclaims it may have or could interpose in any action or proceeding brought by Agent or any Lender to obtain an order of court recognizing the assignment of, or Lien of Agent or any Lender in and to, any Property.  With respect to any action under this Agreement, Agent may conclusively rely upon and shall incur no liability to Borrower in acting upon, any request or other communication that Agent reasonably believes to have been given or made by a person authorized on Borrower's behalf, whether or not such person is listed on the incumbency certificate pursuant to **Section 4.1(c)**.  In each such case,

Borrower waives the right to dispute Agent's action based upon such request or other communication, absent manifest error.

10.2    Delay; No Waiver of Defaults

No course of action or dealing, renewal, release or extension of any provision of any Loan Document, or single or partial exercise of any such provision, or delay, failure or omission on Agent's or any Lender's part in enforcing any such provision shall affect the liability of any Loan Party, or operate as a waiver of such provision or preclude any other or further exercise of such provision.  No waiver by any party to any Loan Document of any one or more defaults by any other party in the performance of any of the provisions of any Loan Document shall operate or be construed as a waiver of any future default, whether of a like or different nature, and each such waiver shall be limited solely to the express terms and provisions of such waiver.  Notwithstanding any other provision of any Loan Document, by completing the Closing under this Agreement and/or by funding the Term Loan, neither Agent nor any Lender waives any breach of any representation or warranty of under any Loan Document, and all of Agent's or any Lender's claims and rights resulting from any such breach or misrepresentation are specifically reserved.

10.3    Jury Waiver

(a)    EACH PARTY  TO THE MAXIMUM EXTENT PERMITTED BY LAW, (i) EXPRESSLY, KNOWINGLY AND VOLUNTARILY  WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, AND (ii) AGREES AND CONSENTS THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES TO THE WAIVER OF THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.

(b)    In the event any such claim or cause of action is brought or filed in any United States federal court sitting in the State of New York or in any state court of the State of New York, and the waiver of jury trial set forth in **Section 10.3(a)** is determined or held to be ineffective or unenforceable, the parties agree that all claims and causes of action shall be resolved by reference to a private judge sitting without a jury, before a mutually acceptable referee or, if the parties cannot agree, a referee selected by the Presiding Judge of the Supreme Court in Manhattan.  Such proceeding shall be conducted in New York, New York, with New York rules of evidence and discovery applicable to such proceeding.  In the event Claims or causes of action are to be resolved by judicial reference, any party may seek from any court having jurisdiction thereover any prejudgment order, writ or other relief and have such prejudgment order, writ or other relief enforced to the fullest extent permitted by law notwithstanding that all claims and causes of action are otherwise subject to resolution by judicial reference.

10.4    Cooperation in Discovery and Litigation

In any litigation, arbitration or other dispute resolution proceeding relating to any Loan Document, Borrower waives any and all defenses, objections and counterclaims it may have or could interpose with respect to (i) any of its directors, officers, employees or agents being deemed to be employees or managing agents of Borrower for purposes of all applicable law or court rules regarding the production of witnesses by notice for testimony (whether in a deposition, at trial or otherwise), (ii) Agent's counsel examining any such individuals as if under cross-examination and using any discovery deposition of any of them as if it were an evidence deposition, and/or (iii) using all commercially reasonable efforts to produce in any such dispute resolution proceeding, at the time and in the manner requested by Agent, all Persons, documents (whether in tangible, electronic or other form) and/or other things under its control and relating to the dispute.

## XI.   EFFECTIVE DATE; TERMINATION; SURVIVAL

11.1    Effectiveness and Termination

Subject to Agent's right to terminate this Agreement upon or after any Event of Default, this Agreement shall continue in full force and effect until the full performance and indefeasible payment in cash of all Obligations.

11.2    Survival

All obligations, covenants, agreements, representations, warranties, waivers and indemnities made by Borrower in any Loan Document shall survive the execution and delivery of the Loan Documents, the Closing, the making of the Term Loan, and any termination of this Agreement until all Obligations are fully performed and indefeasibly paid in full in cash.  The obligations and provisions of **Sections 3.2**, **10.1**, **10.2**, **10.3**, **10.4**, **11.1**, **11.2**, **12.1**, **12.3**, **12.4**, **12.6**, **12.7**, **12.8**, **12.10**, **12.11**, and **12.14** shall survive termination of the Loan Documents and any payment, in full or in part, of the Obligations.

## XII.   MISCELLANEOUS

12.1    Governing Law; Jurisdiction; Service of Process; Venue

**(a)**    PURSUANT TO NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1401, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN THIS AGREEMENT WITHOUT GIVING EFFECT TO ITS CHOICE OF LAW PROVISIONS THAT WOULD RESULT IN APPLICATION OF THE LAWS OF A DIFFERENT JURISDICTION.  TO THE EXTENT THAT AGENT OR ANY LENDER HAS GREATER RIGHTS OR REMEDIES UNDER FEDERAL LAW, WHETHER AS A NATIONAL BANK OR OTHERWISE, THIS PARAGRAPH SHALL NOT BE DEEMED TO DEPRIVE AGENT OR SUCH LENDER OF SUCH RIGHTS AND REMEDIES AS MAY BE AVAILABLE UNDER FEDERAL LAW.

**(b)**    BY EXECUTION AND DELIVERY OF EACH LOAN DOCUMENT TO WHICH IT IS A PARTY, EACH OF THE PARTIES IRREVOCABLY AND

- 84 -

UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST BORROWER OR ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

**(c)** BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN **SECTION 12.1(a)**. EACH OF THE PARTIES IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

**(d)** EACH OF THE PARTIES HERETO WAIVES PERSONAL SERVICE OF PROCESS AND AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN **SECTION 12.5**. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

12.2    Successors and Assigns; Participations; New Lenders

**(a)**    **Successors and Assigns**. The Loan Documents shall inure to the benefit of Agent and Lenders, Transferees and all future holders of the Term Loan, any Note, the Obligations and/or any of the Collateral, and each of their respective successors and assigns. Each Loan Document shall be binding upon the Persons' that are parties thereto and their respective successors and assigns (other than Lenders and Agent), and no such Person may assign, delegate or transfer any Loan Document or any of its rights or obligations thereunder without the prior written consent of Agent. No rights are intended to be created under any Loan Document for the benefit of any third party donee, creditor or incidental beneficiary of any Loan Party. Nothing contained in any Loan Document shall be construed as a delegation to Agent or any Lender of any other Person's duty of performance. BORROWER ACKNOWLEDGES AND AGREES THAT EACH LENDER AT ANY TIME AND FROM TIME TO TIME MAY (I) DIVIDE AND RESTATE THE TERM LOAN OR ANY NOTE, AND/OR (II) SELL,

- 85 -

ASSIGN OR GRANT PARTICIPATING INTERESTS IN OR TRANSFER ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER ANY LOAN DOCUMENT, LOANS, ANY NOTE, THE OBLIGATIONS AND/OR THE COLLATERAL TO OTHER PERSONS (EACH SUCH TRANSFEREE, ASSIGNEE OR PURCHASER, A "**TRANSFEREE**"). Borrower agrees to cooperate with Agent (and each Lender) in connection with any such restatement, division, sale, assignment or transfer.  Each Transferee shall have all of the rights and benefits with respect to the Term Loan, Obligations, any Notes, Collateral and/or Loan Documents held by it as fully as if the original holder thereof, and any Lender or Transferee may be designated as the sole agent to manage the transactions and obligations contemplated therein. Notwithstanding any other provision of any Loan Document, any Lender (or Agent of behalf of such Lender) may disclose to any Transferee all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document.

> **(b)** **Participations; New Lenders**.  Any Lender may assign or pledge all or any portion of the Term Loan or notes held by it to any Federal Reserve Bank or the United States Treasury as collateral security to secure obligations of such Lender, including, without limitation, any assignment or pledge pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any Operating Circular issued by such Federal Reserve Bank, <u>provided</u>, that any payment in respect of such assigned Term Loan or notes made by Borrower to or for the account of the assigning or pledging Lender(s) in accordance with the terms of this Agreement shall satisfy Borrower's obligations under this Agreement in respect to such assigned Term Loan or notes to the extent of such payment.  No such assignment shall release the assigning Lender(s) from its obligations under this Agreement.

> **(c)** **Assignments and Assumptions**.  Assignments and assumptions of an interest in the Term Loan shall be effected by manual execution and delivery to Agent of an Assignment Agreement, and shall be effective as of the date all such requirements are completed unless otherwise agreed to by Agent (the "**Assignment Effective Date**").  In connection with all assignments there shall be delivered to Agent such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be reasonably required to deliver by Agent, together with payment to Agent of a registration and processing fee of $2,500 unless waived by Agent in its sole discretion. Each assignee Lender succeeding to an interest in the Term Loan by assignment and assumption represents and warrants as of the Closing Date or as of the applicable Assignment Effective Date  that (1) it has experience and expertise in the making of or investing in commitments or loans such as the applicable commitment or Term Loan, as the case may be and (2) it will make or invest in, as the case may be, its share of the Term Loan for its own account in the ordinary course of its business and without a view to distribution of such interest in the Term Loan within the meaning of the federal securities laws (it being understood that, subject to the provisions of this Section, the disposition of such Term Loan or any interests therein shall at all times remain within its exclusive control).  Subject to the terms and conditions of this Section, as of the applicable Assignment Effective Date with respect to any assignee and assignor (i) such assignee shall have the rights and obligations of a "Lender" under this Agreement to the extent of its interest in the Term Loan and shall be a party hereto and a "Lender" for all purposes hereof with respect to the interest assigned, in addition to any interests under this Agreement it may theretofore hold as a Lender; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations under this Agreement have been assigned to the assignee, relinquish its rights

- 86 -

(other than any rights which survive the termination hereof) and be released from its obligations under this Agreement (and, in the case of an assignment covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto on the Assignment Effective Date; provided, anything contained in any of the Loan Documents to the contrary notwithstanding, such assigning Lender shall continue to be entitled to the benefit of all indemnities of a Lender under this Agreement as specified in this Agreement with respect to matters arising out of the prior involvement of such assigning Lender as a Lender under this Agreement); (iii) the Term Loan shall be modified to reflect any interest in the Term Loan of such assignee and of such assigning Lender, if any; and (iv) if any such assignment occurs after the issuance of any Note to the assigning Lender, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Note to Agent for cancellation, and thereupon Borrower shall issue and deliver new Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the Term Loan of the assignee and/or the assigning Lender.

       **(d)**    **Reimbursements**.   Borrower will reimburse Agent for all fees and expenses, including reasonable attorneys' fees, in connection with the preparation of this Agreement and the other Loan Documents (including any amendments and assignments hereafter made), and in connection with any modifications thereto and the recording of any of the Loan Documents.  Borrower will bear all other taxes, fees and expenses (other than any taxes measured by the income of a Lender) (including reasonable attorneys' fees and expenses of counsel for Lenders) in connection with the Term Loan.  Without limiting the foregoing, Borrower has undertaken the obligation for payment of, and shall pay, all recording and filing fees, revenue or documentary stamps or taxes, intangibles taxes, and other taxes, expenses and charges payable in connection with this Agreement, any of the Loan Documents, the Obligations, or the filing of any financing statements or other instruments required to effectuate the purposes of this Agreement, and should Borrower fail to do so, Borrower agrees to reimburse Agent for the amounts paid by Agent, together with penalties or interest, if any, incurred by Agent as a result of underpayment or nonpayment.  Such amounts shall constitute a portion of the Obligations, shall be secured by the Mortgage and shall bear interest at the Default Interest Rate from the date advanced until repaid.

       At Agent's option, upon Borrower's failure to do so following the giving of written notice by Agent (except that no notice shall be required if Agent, in its good faith opinion, deems prompt action necessary to protect or preserve the Property or Agent's rights therein), Agent may make any payment or do any act on Borrower's behalf that Borrower or others are required to do to remain in compliance with this Agreement or any of the other Loan Documents, and Borrower agrees to reimburse Agent, on demand, for any payment made or expense incurred by Agent pursuant to the foregoing authorization, including, without limitation, attorneys' fees, and until so repaid any sums advanced by Agent shall constitute a portion of the Obligations, shall be secured by the Mortgage and shall bear interest at the Default Rate from the date advanced until repaid.

12.3    Application of Payments

To the extent that any payment made or received with respect to the Obligations is subsequently invalidated, determined to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other Person under any Debtor Relief Law, common law or equitable cause or any other law, then the Obligations intended to be satisfied by such payment shall be revived and shall continue as if such payment had not been received by Agent. Any payments with respect to the Obligations received shall be credited and applied in such manner and order as Agent shall decide in its sole discretion.

12.4    Indemnity

Each Loan Party jointly and severally shall indemnify Agent, each Lender, its Affiliates and its and their respective managers, members, officers, employees, Affiliates, agents, representatives, successors, assigns, accountants and attorneys (collectively, the "**Indemnified Persons**") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel, allocable costs of in-house counsel, and in-house diligence fees and expenses) which may be imposed on, incurred by or asserted against any Indemnified Person with respect to or arising out of, or in any litigation, proceeding or investigation instituted or conducted by any Person with respect to any aspect of, or any transaction contemplated by or referred to in, or any matter related to, any Loan Document or any agreement, document or transaction contemplated thereby, whether or not such Indemnified Person is a party thereto, except to the extent that any of the foregoing results directly from the gross negligence or willful misconduct of such Indemnified Person as determined by a final non-appealable judgment entered by a court of competent jurisdiction. If any Indemnified Person uses in-house counsel for any purpose for which any Loan Party is responsible to pay or indemnify, each Loan Party expressly agrees that its indemnification obligations include reasonable charges for the costs allocable for such work of such in-house counsel  Agent agrees to give Borrower reasonable notice of any event of which Agent becomes aware for which indemnification may be required under this **Section 12.4**, and Agent may elect (but is not obligated) to direct the defense thereof, provided that the selection of counsel shall be subject to Borrower's consent, which consent shall not be unreasonably withheld or delayed. Any Indemnified Person may, in its reasonable discretion, take such actions as it deems necessary and appropriate to investigate, defend or settle any event or take other remedial or corrective actions with respect thereto as may be necessary for the protection of such Indemnified Person or the Collateral. Notwithstanding the foregoing, if any insurer agrees to undertake the defense of an event (an "**Insured Event**"), Agent agrees not to exercise its right to select counsel to defend the event if that would cause any Loan Party's insurer to deny coverage; provided, however, that Agent along with each Lender, reserves the right to retain counsel to represent any Indemnified Person with respect to an Insured Event at its sole cost and expense. To the extent that any Lender, or Agent, obtains recovery from a third party other than an Indemnified Person of any of the amounts that any Loan Party has paid to such Lender or Agent pursuant to the indemnity set forth in this **Section 12.4**, then such Lender or Agent shall promptly pay to such Loan Party the amount of such recovery.

12.5    Notice

Any notice or request under any Loan Document shall be given to any party to this Agreement at such party's address set forth below, or at such other address as such party may hereafter specify in a notice given in the manner required under this **Section 12.5**. Any notice or request under this Agreement shall be given only by, and shall be deemed to have been received upon (each, a **"Receipt"**):  (i) registered or certified mail, return receipt requested, on the date on which received as indicated in such return receipt, (ii) delivery by a nationally recognized overnight courier, one Business Day after deposit with such courier for next business day delivery, or (iii) electronic mail or facsimile transmission upon sender's receipt of confirmation of proper transmission during normal business hours (provided that a copy is sent out on the next business day by one of the methods set forth in (i) or (ii) above unless waived by Borrower or Agent), as applicable:

|  |  |
|---|---|
| To Borrower: | 133 Salem Street, LLC<br>c/o Synergy Health Centers<br>2363 Lakewood Road, Suite 200<br>Toms River, NJ 08755<br>Attention: Zisha Lipschutz<br>E-Mail: zisha@synergyhs.com |
| With a copy to: | Gutnicki LLP<br>4711 Golf Road, Suite 200<br>Skokie, Illinois 60076<br>Attention: Aaron Rokach, Esquire<br>E-Mail: arokach@gutnicki.com |
| To Agent: | AP MA Funding LLC<br>4445 Willard Avenue, Suite 1100<br>Chevy Chase, MD 20815<br>Attention: John Gray, Managing Director<br>E-Mail: portfolio_management@alliancepartners.com |
| With a copy to: | Blank Rome LLP<br>One Logan Square<br>Philadelphia, Pennsylvania 19103<br>Attention:  Matthew J. Comisky, Esquire<br>E-Mail: comisky@blankrome.com |

12.6    Severability; Captions; Counterparts; Facsimile Signatures

If any provision of any Loan Document is adjudicated to be invalid under applicable laws or regulations, such provision shall be inapplicable to the extent of such invalidity without affecting the validity or enforceability of the remainder of the Loan Documents which shall be given effect so far as possible.  The captions in the Loan Documents are intended for convenience and reference only and shall not affect the meaning or interpretation of the Loan Documents.  The Loan Documents may be executed in one or more counterparts (which taken together, as applicable, shall constitute one and the same instrument) and by facsimile or .pdf (email) transmission, which facsimile or pdf (email) signatures shall be

- 89 -

considered original executed counterparts.  Each party to this Agreement agrees that it will be bound by its own facsimile or pdf (email) signature and that it accepts the facsimile or pdf (email) signature of each other party.

12.7    Expenses; Periodic Lien Searches

(a)    Borrower shall pay, whether or not the Closing occurs, all costs and expenses incurred by Agent and any Lender and/or its Affiliates, including, without limitation, documentation and diligence fees and expenses, all search, audit, appraisal, recording, professional and filing fees and expenses and all other out-of-pocket charges and expenses (including, without limitation, UCC and judgment and tax lien searches and UCC filings and fees for post-Closing UCC and judgment and tax lien searches and wire transfer fees and audit expenses), and reasonable attorneys' fees and expenses, (i) in any effort to enforce, protect or collect payment of any Obligation or to enforce any Loan Document or any related agreement, document or instrument, (ii) in connection with entering into, negotiating, preparing, reviewing and executing the Loan Documents and/or any related agreements, documents or instruments, (iii) arising in any way out of administration of the Obligations, (iv) in connection with instituting, maintaining, preserving, enforcing and/or foreclosing on Agent's and/or Lenders' Liens in any of the Collateral or securities pledged under the Loan Documents, whether through judicial proceedings or otherwise, (v) in defending or prosecuting any actions, claims or proceedings arising out of or relating to Agent's and/or Lenders' transactions with Borrower or any Loan Party, (vi) in seeking, obtaining or receiving any advice with respect to its rights and obligations under any Loan Document and any related agreement, document or instrument, and/or (vii) in connection with any modification, restatement, supplement, amendment, waiver or extension of any Loan Document and/or any related agreement, document or instrument.  All of the foregoing shall be charged to Borrower's account and shall be part of the Obligations.  If Agent, any Lender or any of its Affiliates uses in-house counsel for any purpose under any Loan Document for which Borrower is responsible to pay or indemnify, Borrower expressly agrees that their Obligations include reasonable charges for such work commensurate with the allocable costs of such in-house counsel.

(b)    Without limitation of the foregoing, Agent may conduct title searches and searches of UCC filings and for tax and judgment liens and conduct audits of financial records related to operation of the Property on an annual basis (or more frequently in Agent's discretion), all costs of which shall be paid by Borrower within ten (10) days of delivery by Agent of a statement of account setting forth the amounts due.

12.8    Entire Agreement

This Agreement and the other Loan Documents to which Loan Parties are a party constitute the entire agreement between the Loan Parties and Agent and Lenders with respect to the subject matter of this Agreement and the other Loan Documents, and supersede all prior agreements and understandings, if any, relating to the subject matter of this Agreement and the other Loan Documents.  Any promises, representations, warranties or guarantees not contained in this Agreement or made after the Closing Date shall have no force and effect unless in writing signed by the applicable Loan Party and Agent.  No provision of this Agreement may be changed, modified, amended, restated, waived, supplemented, discharged, canceled or

- 90 -

terminated orally or by any course of dealing or in any other manner other than by an agreement in writing signed by Agent and the applicable Loan Party.  Each party hereto acknowledges that it has been advised by counsel in connection with the negotiation and execution of this Agreement and is not relying upon oral representations or statements inconsistent with the terms and provisions hereof.

12.9    Agent Approvals and Discretion

Unless expressly provided in this Agreement to the contrary, any approval, consent, waiver or satisfaction of Lenders with respect to any matter that is subject of any Loan Document may be granted or withheld by Agent in its sole and absolute discretion.

12.10   Publicity and Confidentiality

(a)    Borrower agrees, and agrees to cause each of its Affiliates: (i) not to transmit or disclose provisions of any Loan Document to any Person (other than to Borrower's advisors and officers on a need-to-know basis or as otherwise may be required by law) without Agent's prior written consent, (ii) to inform all Persons of the confidential nature of the Loan Documents and to direct them not to disclose the same to any other Person and to require each of them to be bound by these provisions.  Borrower agrees to submit to Agent and Agent reserves the right to review and approve all materials that Borrower or any of its Affiliates prepares that contain Agent's  or any Lender's  name or describe or refer to any Loan Document, any of the terms thereof or any of the transactions contemplated thereby.  Borrower shall not, and shall not permit any of its Affiliates to, use Agent's and/or a Lender's name (or the name of any of Lender's Affiliates) in connection with any of its business operations, including without limitation, advertising, marketing or press releases or such other similar purposes, without Agent's prior written consent.  Nothing contained in any Loan Document is intended to permit or authorize Borrower or any of its Affiliates to contract on behalf of Agent.

(b)    Agent shall exercise commercially reasonable efforts to maintain in confidence, in accordance with its customary procedures for handling confidential information, all written non-public information of a Loan Party that any Loan Party furnishes on a confidential basis or that has otherwise been furnished in connection with the origination of the Term Loan ("**Confidential Information**"), other than any such Confidential Information that becomes generally available to the public or becomes available to Agent from a source other than a Loan Party and that is not known to such recipient to be subject to confidentiality obligations; provided, that Agent, each Lender and its Affiliates shall have the right to disclose Confidential Information to:

(i)    any Loan Party or its Affiliates;

(ii)    such Person's Affiliates;

(iii)    such Person's or such Person's Affiliates' lender funding or financing sources;

(iv)     such Person's or such Person's Affiliates' directors, officers, trustees, partners, members, managers, employees, agents, advisors, representatives, attorneys, equity owners, professional consultants, portfolio management services and rating agencies;

(v)     any Person to whom a Lender offers or proposes to offer to sell, assign or transfer the Term Loan or any interest or participation in the Term Loan;

(vi)     any Person that provides statistical analysis and/or information services to a Lender, Agent or their Affiliates;

(vii)     any Governmental Authority to which Lender is subject at the request or pursuant to any requirement of such Governmental Authority, or in connection with an examination of Lender by any such Governmental Authority; and

(viii)     any Person (A) to the extent required by applicable law, (B) in response to any subpoena or other legal process or informal investigative demand, (C) in connection with any litigation, or (D) in connection with the actual or potential exercise or enforcement of any right or remedy under any Loan Document.

**(c)**     Notwithstanding any provision of any Loan Document, Agent, Lender and their respective Affiliates may (i) disclose a general description of transactions arising under the Loan Documents for advertising, marketing or other similar purposes, and (ii) use any Loan Party's name, logo or other indicia germane to such party in connection with such advertising, marketing or other similar purposes.

**(d)**     The obligations of Agent, Lender and their respective Affiliates under this **Section 12.10** shall supersede and replace any other confidentiality obligations agreed to by Agent, Lender or its Affiliates.

12.11   Release of Lenders and Agent

Notwithstanding any other provision of any Loan Document, each Loan Party voluntarily, knowingly, unconditionally and irrevocably, with specific and express intent, for and on behalf of itself,   its managers, members, directors, officers, employees, stockholders, Affiliates, agents, representatives, accountants, attorneys, successors and assigns and their respective Affiliates (collectively, the "**Releasing Parties**"),   fully and completely releases and forever discharges the Indemnified Persons and any other Person or Insurer which may be responsible or liable for the acts or omissions of any of the Indemnified Persons, or who may be liable for the injury or damage resulting therefrom (collectively, with the Indemnified Persons, the "**Released Parties**"), of and from any and all actions, causes of action, damages, claims, obligations, liabilities, costs, expenses and demands of any kind whatsoever, at law or in equity, matured or unmatured, vested or contingent, that any of the Releasing Parties has against any of the Released Parties as of the date of the Closing.   Each Loan Party acknowledges that the foregoing release is a material inducement to Lenders' decision to extend to such Loan Party the financial accommodations under this Agreement and has been relied upon by Lenders in agreeing to make their respective commitments under the Term Loan.

- 92 -

12.12   Agent

(a)   **Appointment**.   Each Lender   (i) irrevocably designates, appoints and authorizes AP MA Funding LLC, a Delaware limited liability company, and its successors and assigns, to act as administrative agent, payment agent and collateral agent for Lenders and their successors and assigns under this Agreement and all other Loan Documents, (ii) irrevocably authorize Agent to take, or to refrain from taking, all actions on its behalf under the provision of this Agreement and all other Loan Documents, and (iii) to exercise all such powers and rights, and to perform all such duties and obligations under this Agreement and the other Loan Documents. Agent, for the benefit of Lenders shall hold all Collateral, payments of principal and interest, fees, charges and collections received pursuant to this Agreement and all other Loan Documents. Borrower acknowledges that Lenders, and their successors and assigns, transfer and assign to Agent the right to act as Lenders' agent to enforce all rights and perform all obligations of Lenders contained in this Agreement and in all of the other Loan Documents. Borrower shall take such further actions, obtain such consents and approvals and duly execute and deliver such further agreements, amendments, assignments, instructions or documents as Agent may request to evidence the appointment and designation of Agent as agent for Lenders and other financial institutions from time to time party hereto and to the other Loan Documents. For all purposes of this Agreement and the Loan Documents, except to the extent expressly set forth in **Section 12.12(b)**, wherever the right of "**Lender**" to approve or consent to a matter is set forth, such right shall be solely vested in Agent and not any other Person or entity for such period as AP MA Funding shall have any right, title or interest as a "**Lender**" under this Agreement.

(b)   **Parameters**.   Agent agrees to act as such on the conditions contained in this **Section 12.12**.  The provisions of this **Section 12.12** are solely for the benefit of Agent and Lenders, and Borrower shall have no rights as third-party beneficiaries of any of the provisions of this **Section 12.12**.  Agent may perform any of its duties under this Agreement, or under the Loan Documents, by or through its agents, employees or sub-agents.  Each Lender agrees and acknowledges that any and all waivers, consents and amendments to the Loan Agreement and any other Loan Documents (and any consent to any departure by Borrower from any provisions thereof) shall be effective so long as each of (i) Agent and (ii) those Lenders having in excess of fifty percent (50%) of the aggregate principal of the Term Loan has consented thereto; provided that to the extent any consent right under this Agreement is vested with Agent, solely the consent of Agent shall be required with respect thereto.

Notwithstanding the foregoing, no amendment, consent or waiver of any of the following (each, a "**Major Action**") shall be effective unless in writing and signed by Lender directly affected thereby: (i) any increase in the principal amount of the Term Loan funded by any particular Lender (subject to the right to make protective advances); (ii) a reduction in the principal amount of the Term Loan owed to such Lender through a forgiveness of debt; (iii) any change in the definition of Applicable Interest Rate which would reduce such rate (provided that Agent may waive or forbear from any charging of the Default Interest Rate without the consent of any Lender); provided that no Defaulting Lender shall have a consent right with respect to item (iii); (iv) change any due dates for the payment of interest or principal other than a one (1) time change relative to the resetting of the monthly payment date, (v) change of the Maturity Date except for an extension thereof for an additional period of up to one (1) year; (vi) release of all or substantially all of the Collateral; (vii) release of Guarantor from its

- 93 -

obligations under the Guaranty; and (vi) modify or amend the Subordination Agreements in a manner which is materially adverse to Lenders.  For purpose of clarity, any amendment, modification, waiver or consent to or under the Loan Agreement or other Loan Documents not requiring the consent of any other Lender pursuant to this **Section 12.12(b)** (or for which Lenders having in excess of fifty percent (50%) of the aggregate principal of the Term Loan have consented to) shall be deemed to be binding on all of Lenders that are a party hereto so long as Agent has executed the same on behalf of all Lenders in its capacity as agent for such Lenders, and any such amendment, modification, waiver or consent shall be binding on all of Lenders in any such circumstance.

(c)     **Nature of Duties**.  In performing its functions and duties under this Agreement, Agent is acting solely on behalf and for the benefit of Lenders, and its duties are administrative in nature, and does not assume and shall not be deemed to have assumed, any obligation toward or relationship of agency or trust with or for Lenders, other than as expressly set forth in this Agreement and in the other Loan Documents, Agent shall have no duties, obligations or responsibilities except those expressly set forth in this Agreement or in the other Loan Documents.  Agent shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender.  Each Lender shall make its own independent investigation of the financial condition and affairs of Borrower in connection with the extension of credit under this Agreement and shall make its own appraisal of the creditworthiness of Borrower.  Except for information, notices, reports and other documents expressly required to be furnished to Agent under this Agreement and the Loan Documents, or given to Agent for the account of or with copies for Lenders, Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the Closing Date or at any time or times thereafter.

(d)     **Rights, Exculpation, Etc.**  Neither Agent nor any of its officers, directors, managers, members, equity owners, employees, attorneys or agents shall be liable to any Lender for any action lawfully taken or omitted by them under this Agreement or under any of the other Loan Documents, or in connection herewith or therewith; provided that the foregoing shall not prevent Agent from being  liable to the extent of its own negligence or willful misconduct as determined by a court of competent jurisdiction on a final and  nonappealable basis. Notwithstanding the foregoing, Agent shall be obligated on the terms set forth in this Agreement for performance of its express duties and obligations under this Agreement.  Agent shall not be liable for any apportionment or distribution of payments made by it in good faith, and if any such apportionment or distribution is subsequently determined to have been made in error, the sole recourse of any Lender to whom payment was due but not made shall be to recover from the other Lenders any payment in excess of the amount to which they are determined to be entitled (and such other Lenders  agree promptly to return to such Lender(s) any such erroneous payments received by them).  In performing its functions and duties under this Agreement, Agent shall exercise the same care which it would in dealing with loans for its own account.  Agent shall not be responsible to any Lender for any recitals, statements, representations or warranties made by the then Lender in this Agreement or for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency of this Agreement or any of the other Loan Documents or the transactions contemplated thereby, or for the financial condition of the then Lender(s).  Agent shall not be required to make any inquiry concerning either the performance or

- 94 -

observance of any of the terms, provisions, or conditions of this Agreement or any of the Loan Documents or the financial condition of the then Lender(s); or the existence or possible existence of any Event of Default.  Agent may at any time request instructions from Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the other Loan Documents Agent is permitted or required to take or to grant, and Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Person for refraining from taking any action or withholding any approval under any of the Loan Documents until it shall have received such instructions from the all Lenders.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of the applicable percentage of Lenders and, notwithstanding the instructions of a Lender, Agent shall have no obligation to take any action if it, in good faith, believes that such action exposes Agent or any of its officers, directors, managers, members, equity owners, employees, attorneys or agents to any personal liability unless Agent receives an indemnification satisfactory to it from such Lender(s) with respect to such action.

(e)     **Indemnification**.  Lenders will reimburse and indemnify Agent for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, attorneys' fees and expenses), advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Person in any way relating to or arising out of this Agreement or any of the Loan Documents or any action taken or omitted by such Person under this Agreement or any of the Loan Documents, in proportion to each Lender's pro rata share on the basis of the amount then outstanding to such Lender, but only to the extent that any of the foregoing is not promptly reimbursed by Borrowers; provided, however, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements resulting from Agent's gross negligence or willful misconduct as determined by a final non-appealable judgment by a court of competent jurisdiction.  If any indemnity furnished to Agent for any purpose shall, in the opinion of such Person, be insufficient or become impaired, such Person may call for additional indemnity and cease, or not commence, to do the acts indemnified against, even if so directed by Lenders or Lenders required under this Agreement, until such additional indemnity is furnished.  The obligations of Lenders under this **Section 12.12(e)** shall survive the payment in full of the Obligations and the termination of this Agreement.

(f)     **AP MA Funding Individually**.  AP MA Funding shall have, and may exercise, the same rights and powers under this Agreement and under the other Loan Documents, and is subject to the same obligations and liabilities, as and to the extent set forth in this Agreement and the other Loan Documents as any other Lender.  The term "Lender" or any similar terms shall, unless the context clearly otherwise indicates, include AP MA Funding in its individual capacity as a Lender.  AP MA Funding: (i) may lend money to, and generally engage in any kind of banking, trust or other business with, any Loan Party or any Subsidiary or Affiliate of any Loan Party as if it were not acting as Agent pursuant hereto, and without any duty to account therefor to Lenders, and (ii) either directly or through strategic affiliations, may accept fees and other consideration from any Loan Party for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

- 95 -

(g)     **Successor Agent**.  Agent may resign from the performance of its agency functions and duties under this Agreement at any time by giving at least 30 Business Days' prior written notice to Borrower and Lenders.  Such resignation shall take effect upon the acceptance by a successor Agent of appointment as provided below.  Upon any resignation or notice of resignation of AP MA Funding as Agent, Lenders shall appoint a "**Successor Agent**".  If no "Successor Agent" has been appointed within thirty (30) days, the resignation shall become effective and Lenders thereafter shall perform all the duties of Agent under this Agreement, until such time, if any, as Lenders appoint a "Successor Agent" as provided above.  Upon the "Successor Agent's" acceptance of any appointment as agent under the Loan Documents, such "Successor Agent" shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring agent and, upon the earlier of such acceptance or the effective date of the retiring agent's resignation, the retiring Agent shall be discharged from its duties and obligations under the Loan Documents, provided that any indemnity rights or other rights in favor of such retiring Agent shall continue after and survive such resignation and succession.  After any retiring agent's resignation as agent under the Loan Documents, the provisions of this **Section 12.12** shall inure to its benefit as to any actions taken or omitted to be taken by it while it was agent under the Loan Documents.

(h)     **Collateral Matters**.  Any action taken by Agent in accordance with the provisions of this section relating to the Collateral, and the exercise by Agent of the powers set forth in this Agreement or in the Collateral, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of Lenders and Agent.  Without limiting the generality of the foregoing, Agent shall have the sole and exclusive right and authority to (i) act as the disbursing and collecting agent for Lenders with respect to all payments and collections arising in connection herewith and with the Loan Documents in connection with the Collateral; (ii) execute and deliver each Loan Document relating to the Collateral and each Subordination Agreement and accept delivery of each such agreement delivered by Borrower or any of their Subsidiaries; (iii) act as collateral agent for Lenders for purposes of the perfection of all security interests and Liens created by such agreements and all other purposes stated therein; (iv) manage, supervise and otherwise deal with the Collateral; (v) take such action as is necessary or desirable to maintain the perfection and priority of the security interests and Liens created or purported to be created by the Loan Documents relating to the Collateral; and (vi) except as may be otherwise specifically restricted by the terms of this Agreement or of any other Loan Document, exercise all right and remedies given to Agent and Lenders with respect to the Collateral under the Loan Documents relating thereto, applicable law or otherwise.

(i)     **Agency for Perfection**.  Each Lender appoints Agent as agent for the purpose of perfecting Lenders' security interest in Collateral which, in accordance with Article 9 of the UCC in any applicable jurisdiction, can be perfected only by possession.  Should any Lender (other than AP MA Funding) obtain possession of any such Collateral, such Lender shall hold such Collateral for purposes of perfecting a security interest therein for the benefit of Lenders, notify Agent thereof and, promptly upon Agent's request therefor, deliver such Collateral to Agent or otherwise act in respect thereof in accordance with AP MA Funding's instructions.

(j)     **Exercise of Remedies**.  Each Lender agrees that it will not have any right individually to enforce or seek to enforce this Agreement or any other Loan Document or to

- 96 -

realize upon any collateral security for the Term Loan, unless instructed to do so by Agent, it being understood and agreed that such rights and remedies may be exercised only by Agent.

(k)     **Protective Advances; Funding and Reimbursement**.  If Agent, in its reasonable judgment, is required to make any Protective Advances with respect to Collateral, Agent shall notify each Lender of the proposed Protective Advance and the proposed amount thereof to be funded by each Lender, and each Lender, subject to the provisions of **Section 12.12(b)**, shall fund its pro rata portion of such proposed Protective Advance to Agent for purposes of making the Protective Advance within two (2) Business Days of such Lender's receipt of written notice from Agent regarding such Protective Advance (such funding by any Lender, the "**PA Funding**").  Subject to **Section 12.13**, if any Lender fails to make a PA Funding as and when required under this Agreement (said failure, an "**Advance Deficiency**"), Agent may (but shall not be obligated to) fund the entire amount of such PA Funding, including any amount of the Advance Deficiency. Any and all of the indebtedness and obligations owing to any Lender which has an Advance Deficiency shall be subordinated in right of payment to the prior payment in full to Agent of any amount of an Advance Deficiency, and any Advance Deficiency shall first be repaid to Agent prior to such Lender receiving any of its pro rata share of any repayment of the Obligations.  Any such Lender shall also be a Defaulting Lender for all purposes of this Agreement.  All amounts paid by Borrower and otherwise due to be applied to the indebtedness and obligations owing to the Defaulting Lender pursuant to the terms of this Agreement shall be distributed by Agent to Lenders in accordance with their respective pro-rata shares of the Term Loan (recalculated for purposes of this Agreement to exclude the Defaulting Lender's pro-rata share of the Term Loan), until all unpaid amounts of the PA Funding have been paid in full.

12.13   Reserved

12.14   Taxes

(a)     Subject to **Section 12.15(f)**, any and all payments by or on account of any obligations of Borrower to Lenders under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or withholding for, any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (including penalties, interest and additions to tax), imposed by any Governmental Authority, excluding, in the case of Lenders: (i) such taxes (including income taxes or franchise taxes) as are imposed on or measured by the net income, overall receipts or total capital of Lenders by the jurisdiction in which any Lender is organized or maintains a lending office or any political subdivision thereof, and (ii) any branch profits taxes imposed by the United States of America (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "**Taxes**").

(b)     In addition, Borrower shall pay to the relevant Governmental Authority any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies which arise from any payment made under this Agreement or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Loan Document ("**Other Taxes**").

**(c)**     Subject to **Section 12.15(f)**, Borrower shall indemnify and hold harmless Agent and Lenders for the full amount of any and all Taxes or Other Taxes (including any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this **Section 12.15**) paid or payable by Agent or Lenders, and any liability (other than any penalties, interest, additions, and expenses that accrue both after the 180th) day after the receipt by such Lender (or Agent) of written notice of the assertion of such Taxes or Other Taxes and before the date that such Lender (or Agent) provides Borrower with a certificate relating thereto pursuant to **Section 12.15(i)**) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted by the relevant Governmental Authority.   Payments under this indemnification shall be made within ten (10) days from the date such Lender (or Agent) makes written demand therefor.

**(d)**     If Borrower shall be required by applicable law to deduct or withhold any Taxes or Other Taxes from or in respect of any sum payable under this Agreement to such Lender or Agent, then, subject to **Section 12.15(f)**:

**(i)**     the sum payable shall be increased to the extent necessary so that after making all required deductions (including deductions applicable to additional sums payable under this **Section 12.15**), such Lender receives an amount equal to the sum it would have received had no such deductions been made;

**(ii)**     Borrower shall make such deductions; and

**(iii)**     Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

**(e)**     Within ten (10) days after the date of any payment by Borrower of Taxes or Other Taxes to a Governmental Authority, Borrower shall furnish to Agent and such Lender the original or a certified copy of a receipt evidencing payment thereof, or other evidence of payment satisfactory to such Lender.

**(f)**     Borrower will not be required to pay any additional amounts in respect of United States Federal income tax pursuant to **Section 12.15(d)** to any Lender to indemnify any Lender pursuant to **Section 12.15(c)** to the extent that  (i) the obligation to withhold amounts with respect to United Stated Federal income tax existed on the date such Lender became a party to this Agreement or, with respect to payments to a lending office newly designated by such Lender (a "**New Lending Office**"), the date such Lender designated such New Lending Office with respect to the Term Loan; provided, however, that this clause (i) shall not apply to the extent the additional amounts such Lender (or any assignee therefrom) through a New Lending Office, would be entitled to receive (without regard to this clause (i)) do not exceed the additional amounts that the Person making the transfer, or such Lender (or such assignee) making the designation of such New Lending Office, would have been entitled to receive in the absence of such transfer or designation; or (ii) the Internal Revenue Service has determined (which determination shall be final and non-appealable) that such Lender is treated as a "**conduit entity**" within the meaning of Treasury Regulation Section 1.881-3 or any successor provision; provided, however, nothing contained in this clause (ii) shall preclude the payment of additional

- 98 -

amounts or indemnity payments by Borrower to the person for whom the "**conduit entity**" is acting.

(g)     If Borrower is required to pay additional amounts to or for the account of any Lender pursuant to this **Section 12.15**, then such Lender shall use its reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonably requested by Borrower or to designate a lending office from a different jurisdiction (if such a lending office exists) so as to eliminate or reduce any such additional payments by Borrower which may accrue in the future if such filing or changes, in the reasonable judgment of such Lender, would not require such Lender to disclose information such Lender deems confidential and is not otherwise disadvantageous to such Lender.

(h)     If any Lender, in its reasonable judgment, receives a refund of any Taxes or Other Taxes as to which it has been indemnified by Borrower or with respect to which Borrower has paid additional amounts pursuant to this **Section 12.15**, it shall promptly pay to Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by Borrower under this **Section 12.15** with respect to the Taxes or Other Taxes giving rise to such refund) and any interest paid by the relevant Governmental Authority with respect to such refund, provided, that Borrower, upon the request of such Lender, shall repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Lender in the event such Lender is required to repay the applicable refund to such Governmental Authority.

(i)     Any Lender, if claiming reimbursement or compensation pursuant to this **Section 12.15**, shall deliver to Borrower a certificate setting forth in reasonable detail the amount payable to such Lender under this Agreement and such certificate shall be conclusive and binding on Borrower in the absence of manifest error.

(j)     The agreements and obligations of Borrower in this **Section 12.15** shall survive the payment of all other Obligations.

12.15   Agreement Controls

In the event of any inconsistency between this Agreement and any other Loan Documents, the terms of this Agreement shall control.

12.16   Loan Party Obligations

Wherever this Agreement contemplates or imposes an obligation on a Loan Party who is not otherwise a party to this Agreement, Borrower covenants and agrees that it shall cause such Loan Party to perform such obligation.

12.17   U.S. Patriot Act Notice

Agent notifies Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow Agent and Lenders to identify each Loan Party in accordance with the Patriot Act.

Borrower shall, promptly following a request by Agent or any Lender, provide all documentation and other information that Agent or any Lender requests in order to comply with its ongoing obligations under applicable "**know your customer**" and anti-money laundering rules and regulations, including the Patriot Act.

    12.18   Time of the Essence

        Time is of the essence in this Agreement with respect to the dates, terms and conditions of this Agreement.

**REMAINDER OF PAGE INTENTIONALLY BLANK.**
**SIGNATURE PAGE(S) FOLLOWS**

.

- 100 -

Executed to be effective as of the date first set forth above.

**BORROWER:**

**133 SALEM STREET, LLC,**
a Delaware limited liability company

By: _____
Name:  Avi Lipschutz
Title:  Manager

**AGENT:**

**AP MA FUNDING LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

**LENDER:**

**AP MA FUNDING LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

Executed to be effective as of the date first set forth above.

**BORROWER:**

**133 SALEM STREET, LLC,**
a Delaware limited liability company

By: _____
Name: Avi Lipschutz
Title: Manager

**AGENT:**

**AP MA FUNDING LLC,**
a Delaware limited liability company

By: _____
Name:
Title:
             **John Gray**
         **Managing Director**

**LENDER:**

**AP MA FUNDING LLC,**
a Delaware limited liability company

By: _____
Name:
Title:
             **John Gray**
         **Managing Director**

Signature Page to Term Loan and Security Agreement

### Appendices, Exhibits and Schedules

| | |
|---|---|
| Exhibit A | Land |
| Exhibit B | Promissory Note |
| Exhibit C | Financial Covenants |
| Exhibit D | Form of Assignment |
| | |
| Schedule 3.8 | Required Work |
| Schedule 4.1(j) | Releasing Lienholders |
| Schedule 5.2 | Government Approvals |
| Schedule 5.3A | Subsidiaries |
| Schedule 5.3B | Equity Holders |
| Schedule 5.3C | Pledging Entity(ies) |
| Schedule 5.6 | Litigation |
| Schedule 5.10 | Intellectual Property |
| Schedule 5.15 | Affiliate Agreements |
| Schedule 5.16 | Insurance |
| Schedule 5.17 | Business Names and Place(s) of Business |
| Schedule 5.19 | Schedule of Borrower's Bank Accounts |
| Schedule 5.26 | Environmental Disclosures |
| Schedule 6.1 | Form of Compliance Certificate |
| Schedule 6.8 | Further Assurances/Post-Closing |
| Schedule 7.2 | Permitted Indebtedness |
| Schedule 7.3 | Liens |
| Schedule 8.1 | HUD Form of Intercreditor Agreement |

EXHIBIT A

LEGAL DESCRIPTION OF PROPERTY

"PARCEL A"

Certain parcels of land situated in Revere, Suffolk County and Commonwealth of Massachusetts, more particularly described as follows:

Parcel 1:

The land with the buildings thereon bounded and described as follows:

| | |
|---|---|
| NORTHWESTERLY | by Salem Street, fifty (50') feet; |
| NORTHEASTERLY | by land formerly of Kidder eighty-two and 50/100 (82.50) feet; |
| SOUTHEASTERLY | by other land of Kidder sixty (60') feet; |
| SOUTHWESTERLY | by a parcel of land used as a highway, in connection with an old land, |

ninety and 02/100 (90.02) feet.

For title reference, see deed from Pell Realty & Maintenance Co., Inc. dated August 31, 1980, recorded with Suffolk County Registry of Deeds in Book 9526, Page 120.

Parcel 2:

A certain parcel of land shown as Lot 25 on a Subdivision Plan of Land drawn by United Surveyors & Engineers, Surveyors, dated May 1977, as modified and approved by the Court, filed in the Land Registration Office as Plan No. 1841-K, a copy of a portion of which is filed with Certificate of Title No. 90342.

For title see Land Court Certificate No. 94834.

Parcel 3:

The land with the buildings thereon shown as Lot C-3 on a Subdivision Plan No. 1841-H drawn by C. B. Humphrey, Surveyor for the Land Court, dated November 11, 1925, filed with Certificate of Title No. 19257.

For title see Land Court Certificate No. 94834.

Parcel 4:

The land with the buildings thereon shown as Lot C-1 on the Subdivision Plan No. 1841-G drawn by C.B. Humphrey, Engineer for the Land Court dated August 1, 1925, as approved by the Court filed with Certificate of Title No. 18865.

For title see Land Court Certificate No. 94834.

Parcel 5:

      The land with buildings thereon shown as Lot 26 on a Subdivision Plan No. 1841-K drawn by United Surveyors & Engineers, Surveyors, dated May 1977 as modified and approved by the Court filed in the Land Registration Office as Plan No. 1841-K.

For title see Land Court Certificate of Title No. 94834.

Parcel 6:

      The land with the buildings thereon shown as Lot 30 on Land Court Subdivision Plan No. 1841-L, drawn by Louis A. Moore, engineer for the Court, dated Nov. 11, 1983, a copy of a portion of which is filed with Certificate of Title No. 98356.

For title see Land Court Certificate of Title No. 94834.

Parcel 7:

      The land with the buildings thereon shown as Lot 31 on Land Court Subdivision Plan No. 1941-L, drawn by Louis A. Moore, engineer for the Court, dated Nov. 11, 1983, a copy of which is filed with Certificate of Title No. 98356.

For title see Land Court Certificate of Title No. 94834.

**PROPERTY ADDRESS:** 133 Salem Street, Revere, MA 02151

<u>"PARCEL B"</u>

Certain parcels of land situated in Revere, Suffolk County, Massachusetts described as follows:

PARCEL I

The land shown as Lot B1 on a subdivision plan drawn by A.F. Sargent, Surveyor, dated July 20, 1909, as approved by the Court, filed in the Land Registration Office as plan No. 1841-C, a copy of a portion of which is filed with Certificate of Title No. 3380.

Said land is subject to a Land Court Order dated July 8, 2005 and recorded as Document Number 706821 on Certificate Number 122463. Said Land is also subject to a Taking, by the Commonwealth of Massachusetts MDC dated July 19, 1946 and recorded as Document Number 706823 on Certificate Number 122463.

PARCEL II

The land shown as Lot 1 on a subdivision plan drawn by A.F. Sargent, Surveyor, dated May 8, 1911, as approved by the Court, filed in the Land Registration Office as plan No. 1841-D, a copy of a portion of which is filed with Certificate of Title No. 3732.

The above-described parcels of land are subject to the restrictions set forth in deed from Charles H. Woodman, Trustee, to James C.F. Waitt, dated April 27, 1914, filed and registered as Document No. 15817.

No residential and/or commercial building or structure used for habitation and/or occupancy shall be constructed or placed upon either Parcel 1 or Parcel II. Parcel I and Parcel II may only be used for parking; no other use of either parcel is permitted. The foregoing restrictions shall be construed as a covenant running with the land and are binding upon future grantees, heirs, executors, administrators, assigns and transferees of said premises or any part or parts thereof. These restrictions cannot be altered by any variance.

**PROPERTY ADDRESS:** Salem Street and Waitt Park, Revere, Massachusetts 02151

Exhibit A – Page 3

EXHIBIT B

**TERM NOTE**

**U.S. $_____**                                    Dated as of : _____, 201__

FOR VALUE RECEIVED, the undersigned, **133 SALEM STREET, LLC**, a Delaware limited liability company ("**Borrower**"), promises to pay to _____, a _____ ("**Lender**"), the unpaid principal amount at any time outstanding, which shall not exceed ____ MILLION _____THOUSAND DOLLARS ($_____) (the "**Term Loan**"), with interest thereon and all other Obligations with respect to the Term Loan under the Term Loan and Security Agreement dated as of even date herewith, among Borrower, AP MA FUNDING LLC, a Delaware limited liability company, in its capacity as administrative, payment and collateral agent for Lender and other lenders, and Lender (as the same may be amended, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), on the Maturity Date or otherwise at the times and in the manner set forth in the Loan Agreement. Capitalized terms used but not defined in this Term Note shall have the meanings given them in the Loan Agreement.

1.      **Interest Payments.** Borrower promises to pay interest on the outstanding principal amount of the Term Loan from the date of funding of the Term Loan until such principal amount is irrevocably paid in full in cash pursuant to and as required by the terms of the Loan Agreement.

2.      **Principal Payment and Maturity.** Unless earlier due and payable or accelerated under the Loan Agreement, this Term Note shall mature, and the outstanding principal balance under this Term Note and other Obligations with respect to the Term Loan, shall become due and payable in full on the Maturity Date. Borrower promises to make all payments of principal as and when required under the Loan Agreement.

3.      **Late Fee; Default Interest Rate.** Notwithstanding any other provision of this Term Note, the Default Interest Rate set forth in the Loan Agreement shall apply to this Term Note as and when provided therein.

4.      **Loan Agreement and Security Agreement.**

(a)      This Term Note is referred to in, made pursuant to, and entitled to the benefits of, the Loan Agreement. The Loan Agreement, among other things, (i) provides for the making of the Term Loan to Borrower in the Dollar amount first mentioned above, (ii) contains provisions for acceleration of the maturity date of this Term Note upon the happening of certain stated events upon the terms and conditions therein specified, and (iii) contains provisions defining an Event of Default and the rights and remedies of Lender and Agent upon the occurrence of an Event of Default.

(b)      This Term Note is a secured note, entitled to the benefits of and security interests granted in, among other things, the Loan Agreement and the other Security Documents.

5.      **Prepayments.**  This Term Note may not be prepaid in whole or in part except as provided in the Loan Agreement.  No payment or prepayment of any amount shall entitle any Person to be subrogated to the rights of Lender under this Term Note or under the Loan Agreement unless and until the Obligations have been performed in full and paid irrevocably in full in cash and the Loan Agreement has been terminated.

6.      **Payments Due on a Day other than a Business Day.**  If any payment to be made on or under this Term Note is stated to be due or becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to, and such payment shall be made on, the next succeeding Business Day, and such extension of time in such case shall be included in the computation of payment of any interest (at the interest rate then in effect during such extension) and/or fees, as the case may be.

7.      **Waivers.**  Borrower waives demand, presentment, protest, notice of dishonor or non-payment, as well as all defenses with respect to this Term Note, the Loan Agreement and/or any Obligation, notice of acceptance of this Term Note, and all other demands and notices of any description, except such as are expressly provided for in this Term Note or in the Loan Agreement.  The pleading of any statute of limitations as a defense to any demand against Borrower under this Term Note is expressly waived by Borrower.  No course of action or dealing, renewal, release or extension of this Term Note or any other Loan Document or any rights under this Term Note or any other Loan Document, release of Borrower or any Guarantor, or delay, failure or omission on Lender's part in enforcing this Term Note or any other Loan Document or in exercising or enforcing any right, remedy, option or power under this Term Note or under any other Loan Document shall affect the liability of Borrower or any Guarantor or operate as a waiver of such or any other right, remedy, power or option or of any default, nor shall any single or partial exercise of any right, remedy, option or power under this Term Note or under any other Loan Document affect the liability of Borrower or any Guarantor or preclude any other or further exercise of such or any other right, remedy, power or option.  No waiver of any one or more defaults in the performance of any of the provisions of this Term Note shall operate or be construed as a waiver of any future default or defaults, whether of a like or different nature.

8.      **Exercise of Rights.**

(a)      Lender shall have the right in its sole discretion to determine which rights, powers, Liens, security interests or remedies Lender may at any time pursue, relinquish, subordinate or modify or to take any other action with respect thereto, and such determination will not in any way modify or affect any of Lender's rights, powers, Liens, security interests or remedies under this Term Note or under any of the Loan Documents, under applicable law or at equity.

(b)      The enumeration of the foregoing rights and remedies is not intended to be exhaustive.  The rights and remedies of Lender described in this Term Note are cumulative and are not alternative to or exclusive of any other rights or remedies which Lender otherwise may have by contract or at law or in equity, and the partial or complete exercise of any right or remedy shall not preclude any other further exercise of such or any other right or remedy.

9.      **Lawful Limits.**  This Term Note is expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration or otherwise, shall the interest and other charges paid or agreed to be paid to Lender for the use, forbearance or detention of money under this Term Note exceed the maximum rate permissible under applicable law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto.  If, due to any circumstance whatsoever, fulfillment of any provision of this Term Note, at the time performance of such provision shall be due, shall exceed any such limit, then, the obligation to be so fulfilled shall be reduced to such lawful limit, and, if Lender shall have received interest or any other charges of any kind which might be deemed to be interest under applicable law in excess of the maximum lawful rate, then such excess shall be applied first to any unpaid fees and charges under this Term Note, then to unpaid principal balance owed by Borrower under this Term Note, and if the then remaining excess interest is greater than the previously unpaid principal balance under this Term Note, Lender shall promptly refund such excess amount to Borrower and the provisions of this Term Note shall be deemed amended to provide for such permissible rate.

10.      **Governing Law.**  PURSUANT TO NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1401 THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN THIS TERM NOTE WITHOUT GIVING EFFECT TO ITS CHOICE OF LAW PROVISIONS THAT WOULD RESULT IN APPLICATION OF THE LAWS OF A DIFFERENT JURISDICTION.   TO THE EXTENT THAT LENDER HAS GREATER RIGHTS OR REMEDIES UNDER FEDERAL LAW, WHETHER AS A NATIONAL BANK OR OTHERWISE, THIS PARAGRAPH SHALL NOT BE DEEMED TO DEPRIVE LENDER OF SUCH RIGHTS AND REMEDIES AS MAY BE AVAILABLE UNDER FEDERAL LAW.

140860.00412/12485559v.5

Borrower has executed this Term Note as of the date first above written,

**BORROWER:**

**133 SALEM STREET, LLC,**
 a Delaware limited liability company


By: _____
Name:
Title:

140860.00412/12485559v.5

# EXHIBIT C

## FINANCIAL COVENANTS

### 1.1   Fixed Charge Coverage Ratio (EBITDA/Fixed Charges)

The Fixed Charge Coverage Ratio for each Test Period, calculated monthly on an annualized trailing six month basis, shall be a minimum of 1.10:1.00 for each Test Period. Notwithstanding the foregoing, with respect to the calculation of the Fixed Charge Coverage Ratio during the first six (6) months of the Term, the Test Period shall be calculated based on the annualized number of months since Closing.

### 1.2   EBITDAR

The EBITDAR of the Facility for each Test Period must be greater than or equal to: (1) $750,000 in months seven through twelve, calculated monthly on an annualized trailing three month basis, (2) $1,000,000 in months thirteen through eighteen, calculated monthly on an annualized trailing six month basis, and (3) $1,200,000 thereafter, calculated monthly on an annualized trailing six month basis.

Notwithstanding anything set forth in this Agreement to the contrary, if any Accounting Change shall occur which results in a change in the method of calculation of financial covenants, then Borrower and Agent shall negotiate in good faith to amend such provisions so as to equitably reflect such Accounting Change to reflect the level of financial covenants and the matters measured thereunder in accordance with the current standards; provided that in all events all such calculations shall continue to be in accordance with GAAP without adversely skewing the calculation of such financial covenants.

For purposes of the covenants set forth in this **Exhibit C**, the terms listed below shall have the following meanings:

"**Capital Expenditures**" means, for any Test Period, the sum (without duplication) of all expenditures (whether paid in cash or accrued as liabilities) during the Test Period, that are or should be treated as capital expenditures under GAAP.

"**Closing Date**" means March 12, 2015.

"**EBITDA**" means, for any Test Period, the sum, without duplication, of the following: Net Income, plus, (a) Interest Expense, (b) taxes on income, whether paid, payable or accrued, (c) depreciation expense, (d) amortization expense, and (e) management fees, payable by the Operator equal to the greater of 5% of the revenue of the Facility or the actual management fees (but excluding fees payable by Operator to Borrower under that certain Consulting Agreement dated as of March 1, 2015 between Borrower and Operator), all of the foregoing determined in accordance with GAAP, minus (a) gains from any sale of assets, other than sales in the ordinary course of business and (b) other extraordinary or non-recurring gains.

Exhibit C-Page 1

"**EBITDAR**" means, for any Test Period, the sum, without duplication, of the following for Operator: Net Income plus, (a) Interest Expense, (b) taxes on income, whether paid, payable or accrued, (c) depreciation expense, (d) amortization expense, (e) the amount of rent paid pursuant to the Facility Lease, and (f) management fees, payable by Operator equal to the greater of 5% of the revenue of the Facility or the actual management fees (but excluding fees payable by Operator to Borrower under that certain Consulting Agreement dated as of March 1, 2015 between Borrower and Operator), all of the foregoing determined in accordance with GAAP, minus (a) gains from any sale of assets, other than sales in the ordinary course of business and (b) other extraordinary or non-recurring gains.

"**Fixed Charge Coverage Ratio**" means, for any applicable Test Period, the ratio of (a) the EBITDA of Borrower, to (b) the Fixed Charges of Borrower.

"**Fixed Charges**" means, the sum of the following:   (a) Total Debt Service, (b) Capital Expenditures (to the extent not already deducted in the calculation of Net Income or paid from amounts on deposit in the Renovation Reserve), (c) income taxes paid in cash or accrued, and (d) dividends or Distributions paid or accrued or declared.

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"**Indebtedness**" of any Person means (without duplication) (a) all items which, in accordance with GAAP, would be included in determining total liabilities as shown on the liability side of the balance sheet of such Person as of the date of such indebtedness, (b) all indebtedness secured by any mortgage, pledge, security, Lien or conditional sale or other title retention agreement to which any property or asset owned or held by such Person is subject, whether or not the indebtedness secured shall have been assumed, (c) all indebtedness of others which such Person has directly or indirectly guaranteed, endorsed (otherwise than for collection or deposit in the ordinary course of business), discounted or sold with recourse or agreed (contingently or otherwise) to purchase or repurchase or otherwise acquire, or in respect of which such Person has agreed to supply or advance funds (whether by way of loan, stock, equity or other ownership interest purchase, capital contribution or otherwise) or otherwise to become directly or indirectly liable.

"**Interest Expense**" means, for any Test Period, total interest expense (including attributable to Capital Leases in accordance with GAAP) fees with respect to all outstanding Indebtedness including capitalized interest but excluding commissions, discounts and other fees owed with respect to letters of credit and bankers' acceptance financing.

"**Net Income**" means the net income (or loss) determined in conformity with GAAP, provided that there shall be excluded (i) the income (or loss) of any Person in which any other Person (other than any Borrower) has a joint interest, except to the extent of the amount of dividends or other distributions actually paid to a Borrower by such Person, (ii) the income (or

Exhibit C-Page 2

140860.00412/12485559v.5

loss) of any Person accrued prior to the date it becomes a Borrower or is merged into or consolidated with a Borrower or that Person's assets are acquired by a Borrower, (iii) the income of any Subsidiary of Borrower to the extent that the declaration or payment of dividends or similar distributions of that income by that Subsidiary is not at the time permitted by operation of the terms of the charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, (iv) compensation expense resulting from the issuance of capital stock, stock options or stock appreciation rights issued to former or current employees, including officers, of a Borrower, or the exercise of such options or rights, in each case to the extent the obligation (if any) associated therewith is not expected to be settled by the payment of cash by a Borrower or any affiliate thereof, and (v) compensation expense resulting from the repurchase of capital stock, options and rights described in clause (iv) of this definition of Net Income.  Further, to the extent not already deducted in the determination of net income, Net Income shall be reduced by the following amounts: (a) with respect to management fees attributable to the Facility, the greater of 5% of the revenue of the Facility or the actual management fees, (b) with respect to replacement costs, at least $400 per bed per annum for the Facility, and (c) real estate taxes for the Land including the Facility.

"**Person**" means an individual, a partnership, a corporation, a limited liability company, a business trust, a joint stock company, a trust, an unincorporated association, a joint venture, a governmental authority or any other entity of whatever nature.

"**Test Period**" means a period ending on the last day of each calendar month and comprised of the six most recent calendar months then ended (taken as one accounting period) unless some other period is specified in this Agreement.

"**Total Debt**" means, at any date of determination, for Borrower individually and collectively on a consolidated and consolidating basis, the total Indebtedness on such date less cash and unrestricted Cash Equivalents held on such date.

"**Total Debt Service**" means the sum of (i) scheduled or other required payments of principal on Indebtedness, and (ii) Interest Expense, in each case for such period.

Exhibit C-Page 3

**EXHIBIT D**

**ASSIGNMENT AGREEMENT**

This Assignment Agreement (this "Assignment") is dated as of the Effective Date set forth below and is entered into by and between _____, a _____ (the "Assignor") and _____ (the "Assignee"). Capitalized terms used but not defined in this Agreement shall have the meanings given to them in the Loan Agreement identified below (as amended, the "Loan Agreement"), receipt of a copy of which is acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 hereto are herby agreed to and incorporated in this Agreement by reference and made a part of this Assignment as if set forth in this Agreement in full.

For an agreed consideration, the Assignor irrevocably sells and assigns to the Assignee, and the Assignee irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Loan Agreement, as of the Effective Date inserted by Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Loan Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including the Swing Line Loans included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether know or unknown, arising under or in connection with the Loan Agreement, any other documents or instruments delivered pursuant thereto or the transactions governed or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to in this Agreement collectively, as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment, without representation and warranty by the Assignor.

Assignor:

Assignee:

Borrower:     133 Salem Street, LLC

Agent: AP MA Funding LLC, as the agent under the Loan Agreement.

Loan Agreement: Loan Agreement dated as of March 12, 2015, between Borrower, the Lenders thereto, and AP MA Funding LLC, as administrative, payment and collateral agent for Lenders

Assigned Interest:

| Assignor | Assignee | Aggregate Amount of Commitments/Loans for All Lenders | Amount of Commitments/ Loans Assigned | Percentage of Assigned Commitments/Loans |
|---|---|---|---|---|
|  |  |  |  |  |

Effective Date: _____, 201__.

The terms set forth in this Assignment are  agreed to:

ASSIGNOR:

a

By: _____

Name:

Title:

ASSIGNEE:

a

By: _____

Name:

Title:

Address/Telephone:

_____

_____

_____

Exhibit D -- Page 2

**CONSENTED TO AND ACCEPTED:**

AP MA FUNDING LLC,
 a Delaware limited liability company


By: _____
Name:
Title:

140860.00412/12485559v.5

## ANNEX 1 to Assignment

## STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT

Representations and Warranties.

Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Loan Agreement or any other Loan Documents, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Credit Parties or their Related Parties or any other person obligated in respect of any Loan Document, or (iv) the performance or observance by the Credit Parties or any other Person of any of their respective obligations under any Loan Document.

Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated  and to become a Lender under the Loan Agreement, (ii) it meets all requirements of an Eligible Assignee under the Loan Agreement (subject to receipt of such consents as may be required under the Loan Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Loan Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, and (iv) it has received a copy of the Loan Agreement, together with copies of the most recent financial statements delivered pursuant to the Loan Agreement, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Agent or any other Lender; and (b) agrees that (i) it will, independently and without reliance on the Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations that by the terms of the Loan Documents are required to be performed by it as a Lender.

Payments.  From and after the Effective Date, the Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts that have accrued to but excluding the Effective Date and to the Assignee for amounts that have accrued from and after the Effective Date.

General Provisions.  This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment.  This Assignment shall be governed by, and construed in accordance with, the law of the State of New York.

Exhibit D -- Page 4

**SCHEDULE 3.8**

**REQUIRED WORK**

| Item | Cost |
|---|---|
| ADA Accessibility: Add van accessible parking space with sign. | $ 4,500.00 |
| Paving, Parking, Sidewalks: Mill, overlay, and stripe asphalt pavement. | $ 9,660.00 |
| Patio, Terrace, and Balcony: Replace wood guardrails on balcony. | $ 1,125.00 |
| HVAC: Replace two rooftop fans and condensing units. | $81,000.00 |
| Elevators: Install wall-mounted cooling unit and replace packing around piston. | $ 6,000.00 |
| Underground Storage Tank: Remove existing UST and replace with above-ground storage tank. | $10,000.00 |
| TOTAL: | $108,235.00 |
| 125% OF TOTAL: | $135,293.75 |

SCHEDULE 4.1(j)

RELEASING LIENHOLDERS

Oppenheimer Multi-family Housing and Healthcare Finance, Inc.

**SCHEDULE 5.2**

**GOVERNMENTAL APPROVALS**

**NONE**

**SCHEDULE 5.3A**

**SUBSIDIARIES**

**NONE**

**SCHEDULE 5.3B**

**EQUITY HOLDERS**

**Borrower:**

| | |
|---|---|
| Avi Lipschutz (aka Zisha Lipschutz): | 35.01% |
| Dov Newmark: | 20.00% |
| Larry H. Lipschutz: | 15.00% |
| MA West Revere Center LLC | 4.99% |
| Massachusetts West Revere Center I LLC | 20.01% |
| The EZL Group LLC | 4.99% |

**Operator:**

| | |
|---|---|
| Avi Lipschutz (aka Zisha Lipschutz): | 50% |
| Dov Newmark: | 50% |

**SCHEDULE 5.3C**

**PLEDGING ENTITY(IES)/PARTIES**

Avi Lipschutz (aka Zisha Lipschutz)

Dov Newmark

Larry H. Lipschutz

MA West Revere Center LLC

Massachusetts West Revere Center I LLC

The EZL Group LLC

**SCHEDULE 5.6**

**LITIGATION**

      1.      Docket Number SUCV2015-00016, DeSimone, et al v. Annemark Nursing Home, Inc. filed January 6, 2015.  Case affects the Property and its prior owner.

**SCHEDULE 5.10**

**INTELLECTUAL PROPERTY**

**NONE**

## SCHEDULE 5.15

## AFFILIATED AGREEMENTS

Billing and Human Resources Consulting Agreement dated March 1, 2015, among Synergy Health Centers LLC, 133 Salem Street, LLC and West Revere Health Center, LLC.

Consulting Agreement dated as of March 1, 2015 between West Revere Health Center, LLC and 133 Salem Street, LLC.

Lease Agreement dated as of March __, 2015 between 133 Salem Street, LLC, a Delaware limited liability company .and West Revere Health Center, LLC, a Delaware limited liability company.

**SCHEDULE 5.16**

**INSURANCE**

**SEE ATTACHED**


**ACORD**®

# CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 3/4/2015 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Oxford Coverage, Inc.<br>2914 Avenue L<br><br>Brooklyn         NY  11210 | PHONE (A/C, No, Ext): (718) 692-0600 | | FAX (A/C, No): (718) 258-8915 |
| | E-MAIL ADDRESS: | | |
| | **INSURER(S) AFFORDING COVERAGE** | | NAIC # |
| | INSURER A : Columbia Casualty Company | | |
| INSURED | INSURER B : American Casualty Company of | | |
| West Revere Health Center<br>133 Salem Street<br><br>Revere          MA  02151 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: CL153416449 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY**<br>X COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS-MADE  X OCCUR<br>PL Limit $1/3M<br><br>GEN'L AGGREGATE LIMIT APPLIES PER:<br>X POLICY ☐ PRO-JECT ☐ LOC | | | 6014711255 | 3/1/2015 | 3/1/2016 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 3,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 3,000,000 |
| | | | | | | | | $ |
| B | **AUTOMOBILE LIABILITY**<br>☐ ANY AUTO<br>☐ ALL OWNED AUTOS  ☐ SCHEDULED AUTOS<br>X HIRED AUTOS  X NON-OWNED AUTOS | | | 6014711224 | 3/01/2015 | 3/01/2016 | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | Liability B&9 | $ 1,000,000 |
| | ☐ UMBRELLA LIAB  ☐ OCCUR<br>☐ EXCESS LIAB  ☐ CLAIMS-MADE<br>☐ DED ☐ RETENTION $ | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | AGGREGATE | $ |
| | | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? ☐ N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | WC STATU-TORY LIMITS ☐ OTH-ER ☐ | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

| DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required) |
|---|
| Certificate Holder is listed as Additional Insured |

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| AP MA FUNDING LLC<br>4445 WILLARD AVENUE<br>SUITE 1100<br>CHEVY CHASE, MD  20815 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE<br><br>Joseph Schwartz/IE |

ACORD 25 (2010/05)

© 1988-2010 ACORD CORPORATION.  All rights reserved.

INS025 (201005).01

The ACORD name and logo are registered marks of ACORD

 **ACORD®** **EVIDENCE OF COMMERCIAL PROPERTY INSURANCE**

| DATE (MM/DD/YYYY) |
| --- |
| 3/4/2015 |

THIS EVIDENCE OF COMMERCIAL PROPERTY INSURANCE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE ADDITIONAL INTEREST NAMED BELOW. THIS EVIDENCE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS EVIDENCE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE ADDITIONAL INTEREST.

| PRODUCER NAME, CONTACT PERSON AND ADDRESS | PHONE (A/C, No, Ext): (718) 692-0600 | COMPANY NAME AND ADDRESS | NAIC NO: |
| --- | --- | --- | --- |
| Oxford Coverage, Inc. 2914 Avenue L Brooklyn          NY   11210 | | CNA Insurance Company 333 S Wabash Chicago           IL  606085 | |
| FAX (A/C, No): (718) 258-8915 | E-MAIL ADDRESS: | IF MULTIPLE COMPANIES, COMPLETE SEPARATE FORM FOR EACH | |
| CODE: | SUB CODE: | POLICY TYPE | |
| AGENCY CUSTOMER ID #: 00003171 | | Commercial Property | |
| NAMED INSURED AND ADDRESS West Revere Health Center 133 Salem Street Revere          MA   02151 | | LOAN NUMBER | POLICY NUMBER 6014711238 |
| | | EFFECTIVE DATE 3/1/2015 | EXPIRATION DATE 3/1/2016 | CONTINUED UNTIL TERMINATED IF CHECKED ☐ |
| ADDITIONAL NAMED INSURED(S) | | THIS REPLACES PRIOR EVIDENCE DATED: | |

**PROPERTY INFORMATION (Use REMARKS on page 2, if more space is required)  ☒ BUILDING  OR ☐ BUSINESS PERSONAL PROPERTY**

| LOCATION/DESCRIPTION |
| --- |
| Loc# 00001, 133 Salem Street Revere, MA  02151 |

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS EVIDENCE OF PROPERTY INSURANCE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES.  LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| COVERAGE INFORMATION | PERILS INSURED | BASIC | BROAD | SPECIAL | X | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| COMMERCIAL PROPERTY COVERAGE AMOUNT OF INSURANCE:  $ | | | | Building $11,939,253 | | DED: $5,000 | | |

| | YES | NO | N/A | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| ☒ BUSINESS INCOME      ☐ RENTAL VALUE | | | | If YES, LIMIT:  3,535,400 | Actual Loss Sustained; # of months: | | |
| BLANKET COVERAGE | X | | | If YES, indicate value(s) reported on property identified above: $ 12,502,053 | | | |
| TERRORISM COVERAGE | X | | | Attach Disclosure Notice / DEC | | | |
|     IS THERE A TERRORISM-SPECIFIC EXCLUSION? | | | X | | | | |
|     IS DOMESTIC TERRORISM EXCLUDED? | | | X | | | | |
| LIMITED FUNGUS COVERAGE | X | | | If YES, LIMIT: | | DED: | |
| FUNGUS EXCLUSION (If "YES", specify organization's form used) | X | | | CNA 62648XX 09-12 | | | |
| REPLACEMENT COST | X | | | | | | |
| AGREED VALUE | | | X | | | | |
| COINSURANCE | | | X | If YES,          % | | | |
| EQUIPMENT BREAKDOWN (If Applicable) | X | | | If YES, LIMIT:      INCLUDED | | DED:   5,000 | |
| ORDINANCE OR LAW   - Coverage for loss to undamaged portion of bldg | X | | | | | | |
|     - Demolition Costs | X | | | If YES, LIMIT:      10,000 | | DED:   5,000 | |
|     - Incr. Cost of Construction | X | | | If YES, LIMIT:      10,000 | | DED:   5,000 | |
| EARTH MOVEMENT (If Applicable) | | X | | If YES, LIMIT: | | DED: | |
| FLOOD (If Applicable) | | X | | If YES, LIMIT: | | DED: | |
| WIND / HAIL (If Subject to Different Provisions) | X | | | If YES, LIMIT: Full Building | | DED:   5,000 | |
| PERMISSION TO WAIVE SUBROGATION IN FAVOR OF MORTGAGE HOLDER PRIOR TO LOSS | | | | | | | |

**CANCELLATION**

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

**ADDITIONAL INTEREST**

| ☐ MORTGAGEE ☐ LENDERS LOSS PAYABLE  X | CONTRACT OF SALE Mortgagee & Loss Payee | LENDER SERVICING AGENT NAME AND ADDRESS |
| --- | --- | --- |
| NAME AND ADDRESS AP MA FUNDING LLC 4445 WILLARD AVENUE CHEVY CHASE  20815 | | |
| | | AUTHORIZED REPRESENTATIVE Joseph Schwartz/IE |

| ACORD 28 (2009/12) | Page 1 of 2 | © 2003-2009 ACORD CORPORATION.  All rights reserved. |
| --- | --- | --- |
| INS028 (200912).04 | | |

The ACORD name and logo are registered marks of ACORD

**SCHEDULE 5.17**

**BUSINESS NAMES AND PLACES OF BUSINESS**

**133 Salem Street, LLC, d/b/a 133 Realty Company:**

c/o Synergy Health Centers
2363 Lakewood Road, Suite 200
Toms River, NJ 08755

and

133 Salem Street
Revere, Massachusetts 02301

**Avi "Zisha" Lipschutz:**

17 Van Winkle Road
Wesley Hills, NY 10952

**Larry H. Lipschutz:**

4775 Collins Avenue, Apartment 901
Miami Beach, Florida  33140

**Dov Newmark:**

1657 Hidden Lane
Lakewood, New Jersey 08701

**MA West Revere Center LLC:**

1415 59th Street
Brooklyn, New York 11219

**Massachusetts West Revere Center I LLC:**

1600 63rd Street
Brooklyn, New York 11204

**THE EZL GROUP LLC:**

1676 50th Street
Brooklyn, New York 11204

**SCHEDULE 5.19**

**SCHEDULE OF BORROWER'S BANK ACCOUNTS**

Borrower's Operating Account:
West Revere Real Estate Account #2423617

Operator's Accounts:

The PrivateBank and Trust Company
Operating Account # 2446518
Private Payor Account #2430939
Government Payor Account # 2443017

Resident Fund Accounts:
TD Bank, N.A.
Trust Account # 0008247286946
Care Cost Account # 0008247286954

**SCHEDULE 5.26**

**ENVIRONMENTAL DISCLOSURES**

1.     Underground storage tank identified in the Environmental Assessment, to be replaced as part of the Required Work.

**SCHEDULE 6.1**

COMPLIANCE CERTIFICATE

_____, ____, 201_

The undersigned, _____, certifies that he or she is the _____ of _____ (individually and collectively, as applicable, the "**Borrower**"), and the undersigned does so deliver this certificate in such capacity and on behalf of Borrower pursuant to that certain Term Loan and Security Agreement dated as of March __, 2015 (as the same may have been amended, modified or supplemented from time to time, the "**Loan Agreement**") by and between Borrower, AP MA Funding LLC, a Delaware limited liability company ("**Agent**") and the "**Lenders**" a party thereto. Capitalized terms used without definition in this Certificate shall have the meaning given such terms in the Loan Agreement.

The undersigned does certify to Agent and Lenders in his capacity and on the date first set forth above and on behalf of Borrower as follows:

1.      The undersigned has reviewed the relevant terms of the Loan Documents and the condition of Borrower.

2.      No Default or Event of Default has occurred or is continuing under the Loan Agreement or any of the Loan Documents.

3.      Each representation and warranty in the Loan Documents is true and correct in all material respects as if made on and as of such date (except where such representation or warranty is otherwise expressly made as of a particular date, in which case it is, was, or will be true and correct on and as of such other date).

4.      Borrower and the Facility are each in compliance with all of the financial covenants set forth in **Exhibit C** to the Loan Agreement.

5.      The amounts, calculations and revisions set forth in this Agreement and on the attached **Schedule 1** are true, complete and correct in all respects and were determined in accordance with the terms of the Loan Agreement.

IN WITNESS WHEREOF, the undersigned has caused this certificate to be executed and delivered as of the date first set forth above on behalf of Borrower and in the capacity first set forth above.

SIGNATURE OF CERTIFYING OFFICER:    SIGNATURE OF BORROWER:

_____    _____

140860.00412/12485559v.5

**SCHEDULE 6.8**

**FURTHER ASSURANCES/POST-CLOSING**

1.   Delivery of evidence that Operator submitted the application for licensure of the Facility within 48 hours of closing on the purchase of the Property as required under Massachusetts law within five (5) days of the Closing Date.

2.   Delivery of a copy of the license from the Office of Health and Human Services for the Commonwealth of Massachusetts licensing West Revere Health Center to operate the Facility on or before the date that is forty (40) days from the Closing Date.

3.   Delivery of fully executed Lockbox Agreements on or before March 19, 2015.

140860.00412/12485559v.5

## SCHEDULE 7.2

## PERMITTED INDEBTEDNESS

## NONE

140860.00412/12485559v.5

**SCHEDULE 7.3**

**LIENS**

**NONE**

140860.00412/12485559v.5

**SCHEDULE 8.1**

**HUD FORM OF INTERCREDITOR**


**See Attached**

140860.00412/12485559v.5

INTERCREDITOR AGREEMENT

This Intercreditor Agreement (this "Agreement") is entered into as of _____, 201__, by and among (i) _____, a _____ ("AR Lender"), (ii) _____, a _____ ("Mortgagee"), (iii) _____, a _____ ("Landlord"), (iv) _____, a _____ ("Licensee") and (v) _____, a _____ ("New Operator").   AR Lender, Mortgagee, Landlord, Licensee and New Operator are referred to in this Agreement individually as a "Party" and collectively as the "Parties".

BACKGROUND

WHEREAS, Licensee leases that certain skilled nursing facility located at _____ _____ (the "Facility") from _____ _____ ("Current Owner").

WHEREAS, Current Owner and Licensee, as sellers, have entered into that certain Asset Purchase Agreement dated [_____] with Landlord pursuant to which the operations of the Facility will be transferred to Landlord and Landlord will enter into a new lease with New Operator to operate the Facility after the Transition Date, as defined below ("New Lease").

WHEREAS, New Operator has entered an Interim Sublease Agreement ("Sublease") and a [Management and] Operations Transfer Agreement with Licensee ("OTA") with Licensee, both dated [_____], 201___], pursuant to which New Operator will manage and operate the Facility on an interim basis on behalf of Licensee until such time as New Operator may obtain its license to operate the Facility from CDPE and the Licensee's Medicare and Medicaid certifications are assigned and transferred to New Operator, at which time the Sublease and OTA will be terminated ("Transition Date"). New Operator will apply for a license to operate the Facility as a skilled nursing facility from the _____ [Department of Health] within fifteen (15) days after the Operations Transfer Date, as defined in the OTA.

WHEREAS, pursuant to the OTA, New Operator will be entitled to receive all revenues from the operation of the Facility, which shall be deposited into Deposit Accounts in the name of the Licensee ("Licensee Accounts") and New Operator will become sole signatory on Licensee's Accounts and New Operator shall pay all costs of operating the Facility from the Licensee Accounts.

WHEREAS, after the Transition Date New Operator will deposit all Accounts directly into new Deposit Accounts in the name of New Operator.

WHEREAS, the New Lease provides that the New Operator grants to Landlord a priority security interest and lien in certain assets of New Operator, which includes the AR Lender Priority Collateral, but this security interest has not been perfected.   New Operator entered into a subordination agreement for the benefit of Mortgagee which grants a security interest in certain collateral of the New Operator which includes the AR Lender Priority Collateral ("New Operator Security Agreement"); and

Page 7

WHEREAS, AR Lender has made, or may in the future make loans and/or extensions of credit to or for the benefit of the New Operator, including pursuant to the AR Loan Agreement which is secured by certain collateral of the New Operator that has been perfected through the filing of a [UCC-1 Financing Statement with the [Delaware] Secretary of State on _____, 201_], which includes the AR Lender Priority Collateral; and

WHEREAS, Mortgagee has made or may in the future make loans and/or extensions of credit to or for the benefit of the Landlord secured by the Facility operated by the New Operator or to or for the benefit of New Operator secured by certain assets of the New Operator; and

WHEREAS, AR Lender and Mortgagee have agreed upon AR Lender's and Mortgagee's respective rights in and to the AR Lender Priority Collateral and Mortgagee's Priority Collateral which agreements and understandings are set forth below.  In the event of a conflict between the terms of this Agreement, and the AR Loan Documents, Mortgage Loan Documents or the Lease Documents, the terms of this document shall govern and control;

NOW, THEREFORE, in consideration of the mutual covenants set forth below, and intending to be legally bound, the Parties hereto hereby agree as follows:

DEFINITIONS

All terms used herein which are not specifically defined shall have the meanings provided in Article 9 of the Uniform Commercial Code as in effect in the State of _____ from time to time (the "UCC"). In addition to the terms defined elsewhere in this Agreement, the following terms shall have the following meanings when used in this Agreement.

      **I.**      "Accounts" shall mean all right, title and interest of New Operator  in and to the following, in each case arising from New Operator's operation of the Facility in the ordinary course of New Operator's business, pursuant to the OTA prior to the Transition Date, or after the Transition Date: (a) all rights to payment of a monetary obligation, whether or not earned by performance, including, but not limited to, accounts receivable, health-care insurance receivables, Medicaid and Medicare receivables, Veterans Administration receivables, or other governmental receivables, private patient receivables, and HMO receivables, (b) payment intangibles, (c) guaranties, letter-of-credit rights and other supporting obligations relating to the property described in clauses (a) and (b); and (d) all of the proceeds of the property described in clauses (a), (b) and (c).  Notwithstanding the foregoing, "Accounts" do not include insurance proceeds, commercial tort claims, or accounts arising from the sale of New Operator's equipment, inventory or other goods, other than accounts arising from the sale of New Operator's inventory in the ordinary course of New Operator's business; provided that "Accounts" shall include any Approved Business Interruption Insurance Proceeds. For purposes herein, "Approved Business Interruption Insurance Proceeds" include the proceeds of business interruption payable to New Operator to the extent such proceeds support continued funding of the AR Loan, provided however, that "Approved Business Interruption Insurance Proceeds" shall not include rent coverage loss payable to the Mortgagee.

      **II.**      "Advances" shall mean advances under the revolving loan facility provided for in the AR Loan Documents.

**III.**   "AR Lender Priority Collateral" shall mean all right, title and interest of New Operator in and to the following:  (a) all Accounts arising from the delivery of goods and rendering of services by New Operator prior to the Cut-Off Time and the proceeds thereof; (b) all Deposit Accounts and the proceeds thereof; and (c) all Accounts arising after the Cut-Off Time and the proceeds thereof solely to the extent of (and in the amount of) Protective Advances made after the Cut-Off Time in accordance with the terms of this Agreement provided that the collateral should be prioritized in accordance with Section 2.1.

**IV.**   "AR Loan" shall mean a revolving loan (including any amounts contemplated as letter of credit obligations) made by AR Lender to New Operator pursuant to the AR Loan Agreement. Notwithstanding anything else in the AR Loan Documents, unless otherwise specifically approved in writing by Mortgagee, the AR Loan shall exclude any term loan facility, equipment loan facility and any indebtedness, liability or obligations arising under a guarantee, except to the extent that the obligations guaranteed consist solely of AR Loan Obligations and such guarantors waive subrogation an similar rights until the Mortgage Loan is paid in full. Mortgagee acknowledges that New Operator will guaranty the payment and performance of loan facilities other than the AR Loan; *provided, however,* any such guaranties of New Operator shall be unsecured.

**V.**   "AR Loan Agreement" shall mean that certain Loan and Security Agreement, dated as of [_____, 201_], by and among AR Lender, as lender, and New Operator as borrower, as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

**VI.**   "AR Loan Documents" shall mean any and all promissory notes, security agreements and any and all other documents evidencing or securing the AR Loan as identified on Schedule 1 attached hereto, in each case, as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement, provided that, for purposes of this Agreement, this Agreement shall not be considered an AR Loan Document.

**VII.**   "AR Loan Obligations" shall mean the AR Loan and all other indebtedness, liabilities and obligations owing to AR Lender under the AR Loan Documents (including without limitation any Over-line Advances and/or Allowable Over-Advances, as permitted pursuant to Section 2.7, and Protective Advances), provided, however, that notwithstanding anything to the contrary set forth in the AR Loan Documents, "AR Loan Obligations" shall exclude any and all indebtedness, liabilities and obligations that are not directly related to the benefit of the Facility or the Other Facilities, or the financing thereof.   Notwithstanding anything to the contrary in the AR Loan Documents or this Agreement, this Agreement shall not be deemed an "AR Loan Obligation."

**VIII.**   "Availability" means "Revolving Loan Availability" as defined in the AR Loan Agreement.

**IX.**   "Business Day" shall mean any day other than a Saturday, a Sunday, or any day that banks in Colorado are required or permitted by law to close.

**X.**   "Ceased Funding" means, with respect to the Cut-Off Time, either of the following events: (i) AR Lender has received a request for an Advance under the AR Loan Agreement for which there is sufficient Availability and a period of thirty (30) calendar days has elapsed since the date of such request, during which time such Advance is not made or (ii) AR Lender has notified New

Operator and/or Mortgagee in writing that it has determined to permanently cease making further Advances (at least with respect to the Facility) under the AR Loan Agreement.

      **XI.**    "Cut-Off Time" shall mean, unless subsequently extended in writing by Mortgagee, such time indicated in the written notice ("Cut-Off Time Notice") that may be given by the Mortgagee to the AR Lender following the occurrence of an Loan Triggering Event or an AR Loan Triggering Event, which Cut-Off Time Notice must be:  (a) in the form set forth in Exhibit A and designating the Facility as to which the Cut-Off Time applies and (b) given pursuant to Section 4.5. Unless the AR Lender has Ceased Funding, the Cut-Off Time shall be no earlier than thirty (30) calendar days after the Cut-Off Time Notice has been given (as set forth in Section 4.5) by Mortgagee to AR Lender.  If the AR Lender has Ceased Funding, the Cut-Off Time may be concurrent with the date on which Ceased Funding occurred, even if the Cut-Off Time Notice is delivered thereafter.

      **XII.**    "Deposit Accounts" shall mean any deposit account (a) holding proceeds of any Accounts, (b) holding any cash of the New Operator, (c) into which Advances are funded (d) for which a deposit account control agreement in favor of the A/R Lender, has been entered into, or (e) to the extent permitted by applicable law, for which a deposit account services and instructions agreement or similar agreement has been entered into.

      **XIII.**    "Facility" shall have the meaning set forth above.

      **XIV.**    "Lease" shall mean the New Lease and the Sublease with respect to the Facility.

      **XV.**    "Lease Documents" shall mean the New Lease and the Sublease or any other lease of the Facility as amended, restated, supplemented or otherwise modified from time to time.

      **XVI.**    "Lease Obligations" shall mean the New Lease and the Sublease and all other obligations owing to Landlord under the Lease Documents.

      **XVII.** "Mortgagee Priority Collateral" shall mean any and all property (whether real, personal or mixed, tangible or intangible) in which Mortgagee is granted liens, encumbrances, security interests and other rights pursuant to any of the Mortgage Loan Documents, except for the AR Lender Priority Collateral, it being understood that Mortgagee has an "all assets" security interest on the assets of New Operator including but not limited to (i) the skilled nursing facility licenses and any other healthcare or long term care licenses for the Facility, (ii) all Medicare and Medicaid/state/county provider agreements for the Facility, (iii) the certificates of need for the Facility, (iv) the New Lease and (v) New Operator's furniture, fixtures, equipment, software and inventory directly related to such Facility.

      **XVIII.** "Mortgage Loan(s)" shall mean the mortgage loan(s) made by Mortgagee with respect to the Facility.

      **XIX.**    "Mortgage Loan Documents" shall mean, with respect to the Mortgage Loan, any and all promissory notes, deeds of trust, mortgages, security agreements and any and all other documents required by Mortgagee as identified on Schedule 2 attached hereto in connection with such Mortgage Loan, in each case, as amended, restated, supplemented or otherwise modified from time to time, provided that this Agreement shall not be considered a Mortgage Loan Document for purposes of this Agreement.

**XX.** "Mortgage Loan Obligations" shall mean the Mortgage Loan and all other indebtedness, liabilities and obligations owing to Mortgagee under the Mortgage Loan Documents.

**XXI.** (Intentionally Omitted).

**XXII.** "Maximum Commitment Amount" shall mean $[     ].

**XXIII.** "Paid in Full" shall mean the final indefeasible payment in full of all AR Loan Obligations or Mortgage Loan Obligations, as applicable, and the termination of the AR Loan Documents and the Mortgage Documents, as applicable; provided, however, that a reduction in the outstanding balance due under the AR Loan Documents to zero shall not mean that the AR Loan Obligations have been "Paid in Full" unless and until, all commitments of the AR Lender to lend under the AR Loan Documents have been terminated. With respect to any AR Loan Obligations under the AR Loan Documents, final payment is considered the setting apart of cash sufficient to discharge such AR Loan Obligations in an account for the exclusive benefit of AR Lender.

**XXIV.** "Possession Date" shall mean, with respect to the Facility, the earlier of the date upon which (a) Mortgagee, or its nominee, has taken actual physical possession and control of the Facility, whether by foreclosure, deed in lieu of foreclosure, appointment of a receiver or other legal process, or (b) Mortgagee, or its nominee, has begun the operation and management of the Facility.

**XXV.** "Protective Advances" shall mean amounts advanced by AR Lender following the Cut-Off Time and prior to the Possession Date that the AR Lender deems reasonably necessary to preserve and protect the AR Lender Priority Collateral and written notice of which is given to Mortgagee within five (5) Business Days after the subject advance is made, provided, however, that failure to provide such notice within five Business Days shall not affect the inclusion of Accounts arising after the Cut-Off Time as AR Lender Priority Collateral, as described more fully in the definition of AR Lender Priority Collateral.

**XXVI.** "Triggering Event" shall mean a Lease Triggering Event or an AR Loan Triggering Event. An "Mortgage Loan Triggering Event" shall mean any of (i) a payment default under the Mortgage Loan Documents, (ii) acceleration by Mortgagee of the sums due under the Mortgage Loan Documents, (iii) an Event of Default (as defined in any of the Mortgage Documents) has occurred, or (iv) an Event of Default (as defined under the Lease Documents) has occurred. An "AR Loan Triggering Event" shall mean any event which results in AR Lender having Ceased Funding or accelerating the AR Loan Obligations (provided, however, that any acceleration that occurs automatically pursuant to the terms of the AR Loan Agreement shall not be an AR Loan Triggering Event if such acceleration is timely waived, cured, unwound or otherwise disregarded by the AR Lender who continues to fund).

PRIORITIES

**I.**     AR Lender Priority.

1.1     AR Lender and Mortgagee agree that, as between AR Lender and Mortgagee, subject to Section 2.1(b), at all times, whether before, during or after the pendency of any bankruptcy, reorganization or other insolvency proceeding, and notwithstanding the taking of possession of, or other exercise of rights in respect of the Mortgagee Priority Collateral (or any portion thereof) or the priorities that ordinarily would result under the Uniform Commercial Code as enacted in each and every applicable

jurisdiction, and as amended from time to time, and other applicable law for the order of granting or perfecting of any security interests referred to herein, AR Lender shall have a first and prior security interest in, upon and to the AR Lender Priority Collateral to secure the AR Loan Obligations; and Mortgagee hereby subordinates to AR Lender's security interest in the AR Lender Priority Collateral. Mortgagee shall abide by the standstill provisions set forth below in Section 2.3(a). Mortgagee, Landlord, Licensee and New Operator agree, that, in the event AR Lender seeks to enforce any of its remedies under the AR Loan Documents, AR Lender may have reasonable access to the Facility for any inspection and copying of the books and records of Licensee or New Operator relating to the AR Lender Priority Collateral and the Mortgagee Priority Collateral, provided that AR Lender shall promptly repair any damage to the Facility caused by AR Lender or its agents resulting from such inspection and copying. AR Lender agrees that, notwithstanding anything in the AR Loan Documents to the contrary: (i) AR Lender may not require Licensee or New Operator to deliver the books and records of New Operator to AR Lender; and (ii) AR Lender's rights to inspect and copy Licensee or New Operator's books and records shall be limited to those rights set forth in the preceding sentence.

      1.2    Without limiting the foregoing, following the occurrence of a Triggering Event, Mortgagee may deliver to AR Lender a Cut-Off Time Notice. Notwithstanding the occurrence of a Cut-Off Time, the AR Lender shall have a first and prior security interest in the AR Lender Priority Collateral, and Mortgagee shall have a subordinate lien in the AR Lender Priority Collateral, until the AR Loan Obligations are Paid in Full. Any Accounts arising from the delivery of goods and rendering of services by New Operator at the Facility after the Cut-Off Time Notice, but prior to the Cut-Off Time, shall be AR Lender Priority Collateral notwithstanding the collection of the same after the Cut-Off Time. For the avoidance of doubt, Mortgagee shall have a first and prior security interest in any Accounts arising from the delivery of goods and rendering of services by New Operator at the Facility on or after the Cut-Off Time with respect to the Facility (except to the extent AR Lender makes Protective Advances), and such Accounts shall be considered Mortgagee Priority Collateral and not AR Lender Priority Collateral. From and after the Cut-Off Time, all amounts received by AR Lender on account of the AR Lender Priority Collateral shall be applied solely to the AR Loan Obligations. Nothing herein shall prevent AR Lender from collecting the full amount of the AR Loan Obligations from any guarantors thereof and/or from collateral other than the AR Lender Priority Collateral and/or the Mortgagee's Priority Collateral.

      1.3    If AR Lender's security interest (as now or in the future existing) in the AR Lender Priority Collateral becomes, in whole or in part, for any reason, unperfected or is judicially or administratively determined to be unenforceable, in whole or in part, or is voided, in whole or in part, and as a result thereof, a creditor subordinate to AR Lender would have or would be entitled to claim, priority over the Mortgagee in the AR Lender Priority Collateral, nothing in this Agreement is intended or shall be construed as a subordination by Mortgagee to such other creditor.

      1.4    Notwithstanding anything else in this Agreement AR Loan Obligations shall not include indemnity obligations relating to any breach of this Agreement or relating to any dispute between AR Lender and Mortgagee.

      1.5    AR Lender agrees to exercise any rights of setoff against funds on deposit in Deposit Accounts maintained with AR Lender for application to AR Loan Obligations consistently with the priorities and provisions established under this Agreement.

      **II.**    <u>Mortgagee Priority</u>.

(a)      AR Lender and Mortgagee agree that, as between AR Lender and Mortgagee, subject to Section 2.2(b), at all times, whether before, during or after the pendency of any bankruptcy, reorganization or other insolvency proceeding, and notwithstanding the taking of possession of, or other exercise of rights in respect of, the AR Lender Priority Collateral (or any portion thereof) or the priorities that ordinarily would result under the Uniform Commercial Code as enacted in each and every applicable jurisdiction, and as amended from time to time, and other applicable law for the order of granting or perfecting of any security interests referred to herein, Mortgagee shall have a first and prior security interest in, upon and to the Mortgagee Priority Collateral; and AR Lender hereby subordinates to Mortgagee AR Lender's security interest, if any, in the Mortgagee Priority Collateral to secure the Loan. AR Lender shall abide by the standstill provisions set forth below in Section 2.3(b).  Promptly upon execution of this Agreement, AR Lender agrees to cause itself to be removed from any insurance policy and insurance certificate that has any designation of AR Lender as (a) loss payee or lender's loss payee on any insurance with respect to any Mortgagee Priority Collateral upon which AR Lender does not have a subordinate lien as permitted by this Agreement and (b) primary loss payee or primary lender's loss payee on any insurance with respect to any Mortgagee Priority Collateral upon which AR Lender has a subordinate lien permitted under this Agreement.

(b)      If Mortgagee's security interest (as now or in the future existing) in the Mortgagee Priority Collateral becomes, in whole or in part, for any reason, unperfected or is judicially or administratively determined to be unenforceable, in whole or in part, or is voided, in whole or in part, and as a result thereof, a creditor subordinate to Mortgagee would have or would be entitled to claim, priority over AR Lender in the Mortgagee Priority Collateral, nothing in this Agreement is intended or shall be construed as a subordination by AR Lender to such other creditor.  Notwithstanding the foregoing, Mortgagee shall have a first priority security interest in the Mortgagee's Priority Collateral applicable to the corresponding Facility, provided however, AR Lender shall have the ability to utilize the Mortgagee's Priority Collateral solely to the extent necessary to exercise any of AR Lender's rights and/or remedies (including without limitation billing and collecting the New Operator's accounts receivable and other assets comprising AR Lender Priority Collateral) under the AR Loan Documents.

## III.    Standstill; Possession Date.

3.1      Until the AR Loan Obligations have been Paid in Full, Mortgagee, Landlord or Licensee shall not exercise any remedies with regard to the AR Lender Priority Collateral (including without limitation pursuant of any remedies in conflict with section 2.9(c) below which includes, without limitation, notifying account debtors to redirect payment for such AR Lender Priority Collateral, changing or attempting to change any direction of payment or remittance instructions to account debtors for such AR Lender Priority Collateral to any deposit accounts other than those accounts into which Accounts have been paid historically, or any combination of the foregoing); *provided however*, that after a Triggering Event, the foregoing shall not prohibit the Mortgagee from (i) taking any action against the New Operator with respect to any Mortgagee's Priority Collateral (so long as such action does not compromise the AR Lender's ability to bill and/or collect the AR Lender Priority Collateral), (ii) terminating the New Lease, (iii) commencing an action for possession or for collection of rent or other monetary amounts due under the Lease Documents or for specific enforcement of an New Operator's covenants under such Lease Documents, so long as such actions do not comprise the exercise of a remedy with regard to AR Lender Priority Collateral, or (iv) pursuing the remedies specified in the definition of "Possession Date," (v) taking steps to appoint a receiver or (vi) contacting the necessary authorities, which may include account debtors, to begin the process of transferring the license and/or any other

necessary permits or approvals, and the assignment of the provider agreements from the incumbent New Operator to a new operator of the Facility.

3.2     Until the Mortgage Loan Obligations have been Paid in Full, subject to AR Lender's right to access the Mortgagee's Priority Collateral set forth in Section 2.1 above, AR Lender shall not affirmatively exercise any remedies with regard to the Mortgagee Priority Collateral.

3.3     Without limiting the foregoing, Mortgagee shall deliver to AR Lender ten (10) Business Days' prior written notice of the commencement of any action or undertaking to take physical possession, control or management of the Facility (the "Possession Date Notice"). If a Cut-Off Time Notice has previously been issued, the Possession Date Notice shall have no effect on the Cut-Off Time. If no previous Cut-Off Time Notice has been issued, the Possession Date Notice shall serve as a Cut-Off Time Notice. If a Possession Date Notice is serving as Cut-Off Time Notice, notwithstanding the fact that Mortgagee or its designee may take physical possession, control or management of a Facility upon providing ten (10) Business Days' notice to AR Lender, AR Lender shall have rights to and be entitled to the collections of all Accounts arising from the delivery of goods or rendering of services at the Facility for the period beginning on the date of the Possession Date Notice and continuing until the thirtieth (30th) day following a Possession Date Notice, without regard to whether such Accounts were generated in the name of New Operator or in the name of any temporary or permanent replacement operator, manager or receiver.

3.4     Without limiting any of its rights hereunder or under the AR Loan Documents, at any time after receiving a Cut-Off Time Notice or a Possession Date Notice, AR Lender shall have the right to cease making Advances.  Irrespective of whether or not AR Lender makes any Advances (including Protective Advances) after receiving the Cut-Off Time Notice, it shall retain a first priority lien on all AR Lender Priority Collateral.

3.5     Except as may be expressly set forth herein, including but not limited to in Section 2.6(b) hereof, Mortgagee Landlord, Licensee, and New Operator hereby agree that any AR Lender Priority Collateral and proceeds thereof, which may come into the possession of Mortgagee, Landlord or Licensee or New Operator will be held in trust for AR Lender, and Mortgagee, Landlord and Licensee shall turn over any AR Lender Priority Collateral and/or proceeds thereof to AR Lender, in the same form as received with any necessary endorsements, promptly upon receipt, until all of the AR Loan Obligations have been Paid in Full. Any replacement operator or receiver who commences operating the Facility shall agree in writing to abide by the provisions of this Section 2.3(e) to the extent it, or its new lender, if any, comes into possession of any AR Lender Priority Collateral, provided, however, failure to secure such written agreement shall not subject Mortgagee to any liability nor affect the subordination and lien priorities set forth in this Agreement.

3.6     Any Mortgagee Priority Collateral that may come into the possession of AR Lender, Landlord, New Operator or Licensee will be held in trust by AR Lender, New Operator, Landlord or Licensee (as applicable), for Mortgagee, and such recipient shall turn over any Mortgagee Priority Collateral so received to Mortgagee in the same form as received, with any necessary endorsements, promptly upon receipt, until the Loan Obligations have been Paid in Full in accordance with the terms of this Agreement. Any replacement operator or receiver who commences operating the Facility shall agree in writing to abide by the provisions of this Section 2.3(f) to the extent it, or its new lender, if any, comes into possession of any Mortgagee Priority Collateral.

140860.00412/12485559v.5

IV.     No Contest.

4.1     Mortgagee agrees that it will not make any assertion or claim in any action, suit or proceeding of any nature whatsoever in any way challenging the priority, validity or effectiveness of the liens and security interests granted to AR Lender with respect to the AR Lender Priority Collateral *provided that*, nothing in this Section 2.4(a) shall prevent Mortgagee from taking all appropriate steps to protect and preserve its priority in the circumstances contemplated in Section 2.1(b).  Mortgagee further agrees that, subject to Section 2.2(b),  AR Lender's lien and security interest in the AR Lender Priority Collateral shall at all times, while any indebtedness or obligations under the AR Loan Documents are owing from New Operator to AR Lender, be superior and prior to the liens and security interests granted to the Mortgagee in such AR Lender Priority Collateral, irrespective of the time, order or method of attachment or perfection of AR Lender's and the Mortgagee's liens and security interests, or the filing of financing statements, or the taking of possession of the Mortgagee's Priority Collateral, or any portion thereof.

4.2     AR Lender agrees that it will not make any assertion or claim in any action, suit or proceeding of any nature whatsoever in any way challenging the priority, validity or effectiveness of the liens and security interests granted to Mortgagee with respect to the Mortgagee's Priority Collateral; *provided that*, nothing in this Section 2.4(b) shall prevent AR Lender from taking all appropriate steps to protect and preserve its priority in the circumstances contemplated in Section 2.2(b).  AR Lender further agrees that Mortgagee's lien and security interest in the Mortgagee's Priority Collateral shall at all times while any indebtedness or obligations under the Lease Documents are owing from the New Operator to the Mortgagee, be superior and prior to the liens and security interests granted to AR Lender in such Mortgagee's Priority Collateral, irrespective of the time, order or method of attachment or perfection of the  Mortgagee's liens and security interests, or the filing of financing statements or the taking of possession of the AR Lender Priority Collateral, or any portion thereof.

(c)     AR Lender waives, in respect of Mortgagee, any and all rights under any theory of marshalling or ordering of the disposition of collateral and accordingly, AR Lender agrees that Mortgagee may (i) proceed directly against any collateral in which Mortgagee has a lien or security interest (subject to the terms of this Agreement) and/or any guarantor of the Mortgage Loan Obligations in any particular order and (ii) release, surrender, substitute or exchange any collateral and/or any guarantor at any time without affecting the agreements set forth in this Agreement.  Mortgagee waives, in respect of AR Lender, any and all rights under any theory of marshalling or ordering of the disposition of collateral and accordingly, Mortgagee agrees that AR Lender may (A) proceed directly against any collateral in which AR Lender has a lien or security interest (subject to the terms of this Agreement) and/or any guarantor of the AR Loan Obligations in any particular order and (B) release, surrender, substitute or exchange any collateral and/or any guarantor at any time without affecting the agreements set forth in this Agreement.

V.      Releases; Bailee for Perfection.

5.1     Notwithstanding anything to the contrary contained herein or in any of the Mortgage Loan Documents, Lease Documents or New Operator Security Agreement, but subject to Section 2.5(b) below, Mortgagee agrees that in the event any AR Lender Priority Collateral (but not the AR Loan) is sold, transferred or conveyed or otherwise disposed of in conjunction with the exercise of AR Lender's remedies against New Operator under the AR Loan Documents, the Mortgagee shall release all of its rights to and interests in such AR Lender Priority Collateral. Nothing in this Section 2.5(a) shall

require any release of the Mortgagee Priority Collateral. Mortgagee shall execute such release documents as AR Lender may reasonably request to effectuate the terms of this Section 2.5(a). Notwithstanding anything to the contrary contained herein or in any of the AR Loan Documents, but subject to Section 2.5(b), AR Lender agrees that in the event any Mortgagee Priority Collateral (but not the Loan) is sold, transferred or conveyed or otherwise disposed of in conjunction with the exercise of Mortgagee's remedies under the Mortgage Loan Documents, AR Lender shall release all of its rights to and interests in (if any) such Mortgagee Priority Collateral and such property shall be transferred free and clear of all liens and security interests in favor of AR Lender. Nothing in this Section 2.5(a) shall require any release of the AR Lender Priority Collateral. AR Lender shall execute such release documents as Mortgagee may reasonably request to effectuate the terms of this Section 2.5(a).

5.2     Notwithstanding the foregoing, to the extent that the proceeds of any sale of AR Lender Priority Collateral exceed the amount necessary to pay and satisfy in full the AR Loan Obligations, such excess shall be delivered to Mortgagee (to the extent that Mortgagee is otherwise entitled thereto in accordance with the Mortgage Loan Documents and/or applicable law) for application by Mortgagee pursuant to the Mortgage Loan Documents. To the extent that the proceeds of any sale of Mortgagee Priority Collateral exceed the amount necessary to pay and satisfy the Lease Obligations in full, such excess shall be delivered to AR Lender (to the extent that AR Lender has a security interest in the Mortgagee Priority Collateral and is otherwise entitled thereto in accordance with the AR Loan Documents and/or applicable law) for application by AR Lender pursuant to the AR Loan Documents.

5.3     In the event Mortgagee or its nominee purchases any AR Lender Priority Collateral (which it shall have no obligation to purchase), AR Lender agrees that upon receipt of the purchase price (i) all such AR Lender Priority Collateral so sold, and all liens or security interests therein, and all proceeds thereof, shall be deemed to be held by AR Lender as agent for the purchaser until effectively transferred to such purchaser's ownership and control, (ii) AR Lender shall continue to receive such AR Lender Priority Collateral and proceeds thereof in existing lockbox or controlled deposit accounts until such purchaser has made alternative collection and deposit arrangements (which it shall arrange within thirty (30) days), and (iii) AR Lender shall remit all collections of such purchased AR Lender Priority Collateral in the same manner as provided in Section 2.6.

5.4     With respect to any AR Lender Priority Collateral and/or Mortgagee Priority Collateral that Mortgagee cannot perfect a security interest in by filing a financing statement, and with respect to which AR Lender has perfected a security interest, AR Lender shall be deemed to be holding such AR Lender Priority Collateral and/or Mortgagee Priority Collateral as representative and bailee for Mortgagee for the purposes of perfection of Mortgagee's liens thereon or therein under the Uniform Commercial Code as in effect in each applicable jurisdiction, and as amended from time to time; provided, however, that the failure of AR Lender to hold any such collateral shall not subject such AR Lender to any liability nor affect the subordination and lien priorities set forth in this Agreement.

**VI.**     Return of Payments

6.1     AR Lender agrees that, upon the AR Loan Obligations being Paid in Full, any AR Lender Priority Collateral and the proceeds thereof which may come into AR Lender's possession will be held by it in trust for Mortgagee and it shall turn over any such AR Lender Priority Collateral and/or proceeds thereof to Mortgagee, in the same form as received with any necessary endorsements or in an amount equal to the proceeds received, promptly upon receipt.

140860.00412/12485559v.5

6.2     Mortgagee agrees that upon the Mortgage Loan Obligations being Paid in Full, any Mortgagee Priority Collateral securing the AR Loan Obligations and proceeds thereof, which may come into Mortgagee's possession, will be held by it in trust for AR Lender and it shall turn over any such Mortgagee Priority Collateral and/or proceeds thereof to AR Lender, in the same form as received with any necessary endorsements or in an amount equal to the proceeds received, promptly upon receipt.

**VII.     AR Loan Documents; Over-line Advances; Allowable Over-Advances.**

7.1     AR Lender represents and warrants that as of the date hereof <u>Schedule 1</u> sets forth a list of the material documents evidencing or securing the AR Loan(s) and that true, correct and complete copies of the documents listed thereon have been provided to Mortgagee and its counsel.

7.2     Notwithstanding anything else in this Agreement or the AR Loan Documents, AR Lender shall not make Over-line Advances without prior written consent of Mortgagee (provided that Mortgagee may be deemed to have given consent as set forth below in this section 2.7(b)), except for Protective Advances. "Over-line Advance" means an Advance in excess of the Maximum Commitment Amount. Upon the written request by AR Lender to Mortgagee to make an Over-line Advance, Mortgagee shall promptly (within one (1) Business Day) make such request of Mortgagee and Mortgagee will make commercially reasonable efforts to respond within ten (10) Business Days to any written request for consent to an Over-line Advance if such request is sent to Mortgagee and supported by a documented collateral analysis showing sufficient eligible collateral so as to not exceed the borrowing base formula set forth in the AR Loan Documents; provided, however, that if Mortgagee fails to respond within ten (10) Business Days of receiving such request, such failure to respond shall be deemed to be a consent to the making of such Over-line Advance.

7.3     Notwithstanding anything else in this Agreement or the AR Loan Documents, AR Lender shall not make any Over-Advance, other than Allowable Over-Advances, without prior written consent of Mortgagee.

(i)     "Over-Advance" means any Advances made by AR Lender pursuant to the AR Loan Documents in excess of the borrowing base formula provisions set forth in the AR Loan Documents.

(ii)     "Allowable Over-Advances" shall mean one or more Over-Advances which: (1) are advanced by AR Lender solely to be used by New Operator for working capital purposes and/or to pay for costs and expenses incurred by the New Operator relating to the operation of the Facility or Other Facilities (including, but not limited to payroll and related expenses, food and other dietary goods, pharmaceuticals, debt service on Mortgage Loan Documents, rent due pursuant to the Lease Documents and/or Mortgage Loan Documents), (2) are due within 180 days; and (3) are accompanied by documentation (which documentation may include an amendment to the AR Loan Documents or letter to the New Operator) dictating the amount and duration/due date of such Over-Advance and documentation (which may be from the New Operator) indicating why such Over-Advance is necessary, provided that AR Lender gives notice pursuant to <u>Section 4.5</u> of this Agreement to Mortgagee within five (5) Business Days of such Over-Advance and any extension of such Over-Advance; and provided further that failure by AR Lender to provide notice (or any required accompanying documentation) to Mortgagee within 5 Business Days shall not subject AR Lender to any liability hereunder nor affect the subordination and lien priorities set forth in this Agreement, and shall not cause any Over-

140860.00412/12485559v.5

Advance to not constitute an "Allowable Over-Advance" hereunder.  In no event shall the due date for an Allowable Over-Advance be extended beyond 180 days from the making of the Over-Advance without prior written consent from Mortgagee.

7.4     Until the AR Loan Obligations are Paid in Full, without the prior written consent of Mortgagee, AR Lender shall not amend, restate, supplement or otherwise modify the AR Loan Documents in any way which, and AR Lender shall not take any action which, (i) results in the creation of any lien, security interest or other encumbrance in any collateral related to the Facility other than the security interests and liens in existence as of the date of this Agreement pursuant to the AR Loan Documents listed on Schedule 1, (ii) conflicts in any way with this Agreement, (iii) adds a term loan facility, equipment loan facility, or any additional credit facility other than the revolving loan facility set forth in the AR Loan Documents in existence as of the date of this Agreement, (iv) amends the definition of "Obligations" set forth in the AR Loan Agreement on the date hereof, or (v) materially and adversely affects the rights or interests of Mortgagee.

7.5     (Intentionally Omitted)

7.6     AR Lender agrees to provide Mortgagee with true, correct and complete copies of any AR Loan Documents, including any amendments thereto, upon written request from Mortgagee. New Operator shall provide copies of any and all amendments to the AR Loan Documents to Mortgagee prior to the effective date of any amendment.  Nothing in this paragraph shall limit any New Operator obligations to receive any necessary consents pursuant to the Mortgage Loan Documents.

**VIII.**     Mortgage Loan Documents.  Mortgagee represents and warrants that as of the date hereof, Schedule 2 sets forth a list of certain material documents evidencing or securing the Mortgage Loan and that true, correct and complete copies of the documents listed thereon have been provided to AR Lender and its counsel.  Mortgagee agrees to provide AR Lender with true, correct and complete copies of any Mortgage Loan Documents, including any amendments thereto, upon written request from AR Lender.

**IX.**     Deposit Account Control Agreements; Lien Releases.

9.1     Any deposit accounts into which the proceeds of Accounts are deposited, shall be subject to deposit account control agreements and/or deposit account instructions and services agreements, with each depository bank maintaining such deposit accounts (each, a "Depository Bank") on terms approved by the Mortgagee.

9.2     Upon the AR Loan Obligations being Paid in Full, AR Lender agrees to promptly notify the Mortgagee of such event, and AR Lender further agrees that it will execute any and all such termination statements or releases as may be necessary to release any lien on the New Operator's assets, including but not limited to the termination of (or, if Mortgagee and AR Lender are both a party to the same such agreement, release of AR Lender from) any deposit account control agreement, provider account agreement, blocked account agreement or lockbox agreement with any depository bank of New Operator which holds or receives New Operator's Accounts.   In the event any Party to this Agreement that has been Paid in Full fails to file any required releases and/or termination statements within ten (10) Business Days of the other Party's timely demand therefor, the requesting Party hereby is authorized to file a copy of this Agreement in any appropriate UCC financing office as conclusive evidence of such (non-complying) Party's release of its security interest in the AR Lender Priority Collateral, and any third

Party shall be entitled to rely upon the filing of this Agreement as a full and complete release of such Party's security interest.

9.3     Until the AR Loan Obligations are Paid in Full, AR Lender will have the exclusive authority to exercise control (unless prohibited by law) over the Deposit Accounts and to provide appropriate instructions to the applicable Depository Bank.  At such time that the AR Loan Obligations are Paid in Full, Mortgagee will have the exclusive authority to exercise control (unless prohibited by law) over the Deposit Accounts and to provide appropriate instructions to the applicable Depository Bank, and AR Lender will take all necessary steps to effectuate the foregoing, including, but not limited to, providing appropriate instructions to the applicable Depository Bank or terminating any deposit account control agreement, provider account agreement, blocked account agreement or lockbox agreement with any depository bank of New Operator which holds or receives New Operator's Accounts. After a Cut-Off Time, the parties agree to coordinate the timing of instructions given to residents and third-party payors that identify new deposit accounts into which payments should be made.  Without limiting anything set forth in Section 2.3(a), each of the parties to this Agreement hereby agrees to cooperate and work in good faith with each other in order to effectively and efficiently bill, invoice and collect all Accounts due from New Operator's account debtors and to promptly turn over any proceeds of Accounts to the party entitled to such proceeds.

REPRESENTATIONS; COVENANTS

**I.**     New Operator operates the Facility.  New Operator has granted or will grant a security interest in its Accounts and certain other assets pursuant to the Operator Security Agreement in connection with one or more loans provided to Landlord by Mortgagee (the "Mortgage Loan").

**II.**     AR Lender consents to the Operator Security Agreement and the liens granted in favor of the Mortgagee notwithstanding any contrary provisions of the AR Loan Documents.  This Intercreditor Agreement sets forth the relative priorities of AR Lender and the Mortgagee in and to the assets of New Operator.

**III.**     Subject to the provisions of <u>Section 3.4</u> below, the Parties acknowledge that funds received by New Operator from AR Lender ("AR Loan Advances") shall be utilized (i) first, to pay current debt service obligations of New Operator to AR Lender with respect to the Facility, (ii) second, to pay New Operator's costs of operations with respect to the Facility including, but not limited to, rent and all other payment obligations due under the Lease Documents, payroll and payroll taxes, ordinary maintenance and repairs and management fees ("Current Operating Costs") and (iii) after the payment of Current Operating Costs, subject to applicable restrictions, if any, in the AR Loan Documents and the Lease Documents, AR Loan Advances may be distributed to New Operator's shareholders, partners, members or owners, as the case may be.  AR Lender makes no representations or covenants with respect to New Operator's compliance with the terms of this <u>Section 3.3</u>.

**IV.**     Except as set forth herein, New Operator certifies that there are no proposed agreements, arrangements, understandings or transactions (side deals) outside of the AR Loan Documents that utilize the Accounts of New Operator as security for any other obligations.  New Operator agrees that New Operator shall not be a guarantor or party to any other accounts receivable financing agreement without the consent of Mortgagee.

140860.00412/12485559v.5

**V.** Except as set forth herein, New Operator certifies that there are no proposed agreements, arrangements, understandings or transactions (side deals) outside of the AR Loan Documents that utilize the Accounts of New Operator as security for any other obligations. New Operator agrees that New Operator shall not be a guarantor or party to any other accounts receivable financing agreement without the consent of Mortgagee.

**VI.** Except as set forth herein or as otherwise disclosed to and approved by Mortgagee in writing, (a) AR Lender and New Operator certify and agree that there are no existing or proposed agreements, arrangements, understandings or transactions that involve the Facility (side deals) between (i) New Operator (or any of New Operator's officers, members, managers, directors, stockholders, partners, or other interest holders, employees or affiliates, or any member of their respective immediate families, and/or its parent entity), and (ii) AR Lender; (b) Mortgagee and New Operator certify and agree that there are no existing or proposed agreements, arrangements, understandings or transactions that involve the Facility (side deals) between (i) New Operator (or any of New Operator's officers, members, managers, directors, stockholders, partners, or other interest holders, employees or affiliates, or any member of their respective immediate families, and/or its parent entity), and (ii) Mortgagee; and (c) AR Lender and New Operator certify that, notwithstanding anything else in the AR Loan Documents, neither the AR Lender Priority Collateral nor the Mortgagee Priority Collateral shall secure any obligations to the AR Lender, or any of its affiliates (including any lender under the AR Lender Documents), relating to projects other than the Facility. AR Lender and New Operator certify and agree that any and all cross-default provisions have been disclosed to and approved in writing by Mortgagee.

MISCELLANEOUS

**I.** <u>Beneficiaries</u>. This Agreement is entered into solely for the benefit of AR Lender, Mortgagee, and their respective successors and assigns, and neither New Operator, Licensee nor any other persons or entities whatsoever, including but not limited to any third party donee, investor, incidental beneficiary or any creditor of New Operator or Mortgagee, shall have any right, benefit, priority or interest under or because of the existence of this Agreement.

**II.** <u>Amendment</u>. This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof, and shall not be modified, amended or terminated orally but only in writing signed by AR Lender, Mortgagee, Landlord, Licensee and New Operator.

**III.** <u>Bankruptcy Financing</u>. In the event of the commencement of a bankruptcy, insolvency or similar type of proceeding filed by or against the New Operator ("Proceeding"), AR Lender shall have the non-exclusive option (in its sole and absolute discretion) to continue to provide financing (on terms acceptable to AR Lender) to the trustee, other fiduciary or to the New Operator as a debtor-in-possession, if AR Lender deems such financing to be in its best interests. The subordination and lien priority provisions of this Agreement shall continue to apply to all AR Lender Priority Collateral arising upon the commencement and during the pendency of such Proceeding without regard as to whether a Cut-Off Time has occurred prior to the commencement of such Proceeding, so that AR Lender shall have a prior lien on all AR Lender Priority Collateral, created before and during such Proceeding (to the extent AR Lender provides such financing during the Proceeding or to the extent New Operator is granted the right to use, sell, or otherwise dispose of cash collateral during any such Proceeding), to secure the AR Loans, whether advanced before or during such Proceeding.

140860.00412/12485559v.5

**IV.**   Relative Rights; Cure Rights; Certain Notice Obligations of Mortgagee and AR Lender.

4.1   This Agreement is entered into solely for the purposes set forth herein, and except as expressly provided herein, neither AR Lender nor Mortgagee assumes any other duties or responsibilities to the other regarding the financial condition of New Operator, Licensee or any other party, or regarding any of New Operator's property, or regarding any other circumstance bearing upon the risk of nonpayment of the obligations of New Operator or Licensee under any of the agreements referred to herein. Each of AR Lender and Mortgagee shall be responsible for managing its financial relationships with New Operator, and neither shall be deemed to be the agent of the other for any purpose.

4.2   AR Lender and the Mortgagee agree to notify the other of any notice of a "Notice Event" given to their respective borrower under any of the AR Loan Documents or any of the Mortgage Loan Documents as applicable; provided, that the failure to provide such notice shall not subject such Party to any liability nor affect the subordination and lien priorities set forth in this Agreement. AR Lender and the Mortgagee shall have the right (but not the obligation) to cure any payment default under the other Party's documents within ten (10) days after notice thereof. A "Notice Event" for purposes of this Section shall mean (i) with regard to Mortgagee and the Mortgage Loan Documents, an acceleration of the Mortgage Loan, a foreclosure, or an action for the appointment of a receiver or similar remedy, including any Mortgage Loan Triggering Event; (ii) with regard to AR Lender and AR Loan Documents, any event which results in AR Lender having Ceased Funding or accelerating the AR Loan Obligations or the AR Loan Obligations accelerating automatically in accordance with the terms of the AR Loan Documents, including any AR Loan Triggering Event; or (iii) with regard to AR Lender and the AR Loan Documents, if there is insufficient Availability to fund the Current Impositions (as defined above in Section 3.4), at least with respect to the Facility.

**V.**   Notices.   Any notice or service of process given, or required to be given, pursuant hereto and in connection herewith, including without limitation any notice of any Cut-Off Time, shall be in writing and shall be deemed to be properly given:  (a) when personally delivered; (b) the first or second Business Day after the notice is deposited with a nationally recognized overnight courier service with arrangements made for payment of charges for next or second Business Day delivery, respectively; or (c) two Business Days after the date sent by certified mail return receipt requested, in each case addressed to the Party for whom it is intended at its address hereinafter set forth or such address as subsequently provided to all Parties in writing.

If to AR Lender to:

                                        Attn:
                                          Telephone: (___) _____
                                          Facsimile: (___) _____

With copies to:

                                          Attn:
                                          Telephone: (___) _____
                                          Facsimile: (___) _____

If to Landlord to:

                                          Attn:
                                          Telephone: (___) _____
                                          Facsimile: (___) _____

With copies to:

                                          Attn:
                                          Telephone: (___) _____
                                          Facsimile: (___) _____

If to New Operator to:

                                          Attn:
                                          Telephone: (___) _____
                                          Facsimile: (___) _____

With copies to:

                                          Attn:
                                          Telephone: (___) _____
                                          Facsimile: (___) _____

140860.00412/12485559v.5

If to Mortgagee to:

                    Attn:
                    Telephone: (___) _____
                    Facsimile: (___) _____

With copies to:

                    Attn:
                    Telephone: (___) _____
                    Facsimile: (___) _____

**VI.**    Counterparts; Facsimile Signatures. **This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together constitute one and the same agreement.  Signature transmitted by facsimile or other electronic means shall bind the Parties hereto.**

**VII.**    Authorization. **Each individual signatory hereto represents and warrants that he or she is duly authorized to execute this Agreement on behalf of his or her principal and that he or she executes the Agreement in such capacity and not as a Party.**

**VIII.**    Successors and Assigns. **This Agreement shall be binding upon the Parties hereto and their legal representatives, successors and assigns, provided, however, that each of the parties hereto further agrees to provide the other party with written notice of any such assignment of the AR Loan and/or the Mortgage Loan Documents, respectively.  Each of the parties hereto agrees not to assign their rights to the AR Loan and/or the Mortgage Loan Documents to New Operator or any affiliate of New Operator.**

**IX.**    Governing Law. **This Agreement and all matters arising out of or related to this Agreement shall be deemed to have been made under, and shall be governed and construed in all respects by, the substantive laws of the State of _____ without regard to principles of conflicts of laws.**

**X.**    Jurisdiction and Venue. **Mortgage and AR Lender hereby irrevocably consent to the nonexclusive jurisdiction of the State and Federal Courts located in the State of _____ in any and all actions and proceedings arising under or in connection with this Agreement.**

**XI.**    WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION COMMENCED BY OR AGAINST ANY OTHER PARTY(IES) WITH RESPECT TO THE RIGHTS AND OBLIGATIONS SET FORTH HEREIN.

**XII.**    Severability. **If a court of competent jurisdiction in a final determination deems any provision of this Agreement invalid, prohibited or unenforceable, such invalidity,**

140860.00412/12485559v.5

prohibition or unenforceability shall apply only to such provision and only to the extent of such invalidity, prohibition or unenforceability, and shall not render this Agreement or any other provision of this Agreement wholly or partially invalid, prohibited or unenforceable.

XIII.   <u>Headings</u>.   The paragraph headings used in this Agreement are for convenience only and shall not affect the interpretation of any of the previous hereof. The statements set forth in the Recital paragraphs are incorporated herein by reference.

XIV.   <u>Entire Agreement</u>.  This Agreement is the entire agreement among the Parties regarding the subject matter of this Agreement.

140860.00412/12485559v.5

IN WITNESS WHEREOF, the undersigned have executed this Agreement the day and year first above written.

**AR LENDER:**


By:_____


**MORTGAGEE:**


By:_____
Name:_____
Title:_____


**LANDLORD:**


By:_____


**NEW OPERATOR:**


By:_____


**LICENSEE:**


By:_____

140860.00412/12485559v.5

**Schedule 1**

**AR LOAN DOCUMENTS**

**Schedule 2**
**Mortgage Loan Documents**

140860.00412/12485559v.5

**Exhibit A**
**Form of Cut-Off Time Notice**

_____                    _____, 20 __

_____

Attn: _____


Re:    Intercreditor Agreement Dated as of _____, 20__ by and among _____ ("AR
       Lender"), _____ ("Mortgagee and _____ ("New Operator") (the
       "Intercreditor Agreement")

Ladies and Gentlemen:


This letter constitutes the Cut-Off Time Notice described in the Intercreditor Agreement.  All capitalized terms used, and not otherwise defined, herein shall have the meanings provided for in the Intercreditor Agreement.


Please be advised that:

☐    an   Lease   Triggering   Event   has   occurred   as   a   result   of
_____,
and notice of such Lease Triggering Event [is provided by this notice] **OR**  [has been provided on
_____].


☐    an   AR   Loan   Triggering   Event   has   occurred   as   a   result   of
_____,
and notice of such AR Loan Triggering Event was received on _____.


☐    Ceased Funding has occurred as of _____.


This Cut-Off Time Notice applies to the following Facility(ies) Loan Nos.:

_____.

In accordance with Section [1.11] of the Intercreditor Agreement the Cut-Off Time shall be deemed to occur as of _____ [a.m./p.m.], _____ time, on _____, 20__, unless extended [*which date and time may be immediately after Ceased Funding (even if this notice results in retroactive designation of such Cut-Off Time), but no sooner than 30 days after notice of an AR Loan Triggering Event*].

      All provisions of the Intercreditor Agreement applicable after the Cut-Off Time shall govern the future relationship of AR Lender, and New Operator under the Intercreditor Agreement with respect to the Facility(ies) identified in this Cut-Off Time Notice.  Please contact the undersigned at _____ if you have any questions.

Sincerely,

_____

By:     _____

cc: _____     Name: _____

Title: _____

## **Exhibit D**

Mortgage

(see attached)



2015 00019177
Bk: 54172 Pg: 93   Page: 1 of 20
Recorded: 03/13/2015 02:04 PM
ATTEST:Francis M. Roache, Register
Suffolk County Registry of Deeds



THIS INSTRUMENT PREPARED BY AND
WHEN RECORDED, RETURN TO:

Matthew J. Comisky, Esquire
Blank Rome LLP
One Logan Square
Philadelphia, Pennsylvania 19103-6998



2015 00841128
Cert#: 122501   Bk: 808 Pg: 101
Doc: MTG   03/13/2015 01:26 PM   SF
ATTEST:Francis M. Roache, Register
Suffolk County Registry of Deeds

## MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE
## FINANCING STATEMENT
### County of Suffolk, Commonwealth of Massachusetts

This MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FINANCING STATEMENT (this "**Instrument**") is made as of this 12ᵗʰ day of March, 2015, by **133 SALEM STREET, LLC**, a Delaware limited liability company, whose organizational identification number is 47-2609831 ("**Borrower**"), whose address is c/o Synergy Health Centers, 2363 Lakewood Road, Suite 200, Toms River, New Jersey 08755, in favor of **AP MA FUNDING LLC**, a Delaware limited liability company, as administrative, payment and collateral agent for lenders ("**Agent**"), whose mailing address is 4445 Willard Avenue, Suite 1100, Chevy Chase, Maryland 20815.

### RECITALS

A.    Agent and Lender have agreed, subject to the terms and conditions of that certain Term Loan and Security Agreement, dated of even date herewith (as amended, restated, renewed, replaced or otherwise modified from time to time, the "**Loan Agreement**"), executed by and among Borrower, the other financial institutions who are or hereafter become parties to the Loan Agreement (collectively or individually, as the context may require, "**Lender**") and Agent, to make a loan (the "**Loan**") in the aggregate original principal amount of Six Million Eight Hundred Fifty Thousand Dollars ($6,850,000) to Borrower.   The Loan Agreement provides for monthly payments, with the balance thereof, due and payable on March 31, 2018 (said date, any later date to which the maturity date may be extended in accordance with the Loan Agreement, or any earlier date on which the entire unpaid principal amount shall be paid or required to be paid in full, whether by prepayment, acceleration or

140860.00412/12486481v.2

otherwise is hereinafter called the "**Maturity Date**"). The terms and provisions of the Loan Agreement are hereby incorporated by reference in this Instrument. Capitalized terms used but not defined herein shall have the meaning provided in the Loan Agreement.

B.     Lender and Agent wish to secure: (i) the payment of the Loan, together with all interest, premiums, fees, costs and expenses and other amounts, if any, due in accordance with the terms of the Loan Agreement and the Note, as well as the payment of any additional indebtedness accruing to Lender or Agent on account of any future payments, advances or expenditures made by Lender or Agent pursuant to the Note, the Loan Agreement or this Instrument or any of the other Loan Documents (as hereinafter defined); (ii) the performance of each and every covenant, condition, and agreement contained in the Note, the Loan Agreement, this Instrument, this Mortgage, and any other documents evidencing or securing the Loan or executed in connection therewith (as amended, restated, renewed, replaced or otherwise modified from time to time, collectively, the "**Loan Documents**"); and (iii) the payment and performance of any and all other debts, claims, obligations, demands, monies, liabilities and indebtedness of any kind or nature now or hereafter owing, arising, due or payable from Borrower to Lender or Agent in connection with the Loan. All payment obligations of Borrower or any principal to Lender or Agent with respect to the Loan or under any of the Loan Documents are hereinafter sometimes collectively referred to as the "**Indebtedness**," and all other obligations of Borrower or any principal to Agent with respect to the Loan or under any of the Loan Documents are hereinafter sometimes collectively referred to as the "**Obligations**."

NOW, THEREFORE, TO SECURE the repayment of the Indebtedness, all renewals, extensions and modifications of the Indebtedness, and the performance of the Obligations, Borrower has executed this Instrument and does hereby mortgage, convey, assign, warrant, transfer, pledge and grant to Agent WITH MORTGAGE COVENANTS, UPON THE STATUTORY CONDITION AND THE STATUTORY POWER OF SALE, for the benefit of Agent and Lender, and does hereby grant to Agent, for the benefit of Agent and Lender, a security interest in, all right, title and interest of Borrower in and to the following described Property (as defined below), including the Land, and all proceeds thereof (which property is hereinafter sometimes collectively referred to as the "**Property**":

A.     The real estate described on <u>Exhibit A</u> attached hereto (the "**Land**");

B.     All of the following (collectively, the "**Improvements**"):   all buildings, improvements and fixtures now or in the future located or to be constructed on the Land; to the extent not owned by tenants of the Property, all machinery, appliances, equipment, furniture, fixtures and all other personal property of every kind or nature located in or on, or attached to, or used or to be used in connection with the Land, buildings, improvements or fixtures; all building materials and goods procured for use or in connection with the foregoing; and all additions, substitutions and replacements to any of the foregoing;

C.     To the extent assignable by Borrower, all plans, specifications, architectural renderings, drawings, soil test reports, other reports of examination or analysis of the Land or the Improvements;

D.     All easements, rights-of-way, water courses, mineral rights, water rights, air rights and appurtenances in any way belonging, relating or appertaining to any of the Land or Improvements, or which hereafter shall in any way belong, relate or be appurtenant thereto (collectively, "**Appurtenances**");

E.     All leases, master leases, subleases, licenses and other agreements with regard to the use or occupancy of all or any portion of the Land and/or the Improvements, including without

- 2 -

limitation, service agreements that include an occupancy agreement and all guaranties, amendments, extensions and renewals of any such lease, license or agreement, now or hereafter entered into (collectively, the "**Leases**") and all rents, incomes, receipts, prepayments, security deposits, termination payments, royalties, profits, issues and revenues, prepayment of the same including without limitation, lease termination, cancellation or similar fees, and all other amounts of any nature now due or which may become due or to which Borrower may now or shall hereafter become entitled or which it may demand or claim and arising or accruing directly or indirectly from the Leases or from the Land and/or Improvements from time to time (collectively, the "**Rents**");

        F.     To the extent assignable by Borrower, all claims, demands, judgments, insurance proceeds, refunds, reserves, deposits, rights of action, awards of damages, compensation, settlements and other rights to the payment of money hereafter made resulting from or relating to (i) the taking of the Land or the Improvements or any part thereof under the power of eminent domain, (ii) any damage (whether caused by such taking, by casualty or otherwise) to the Land, Improvements, Appurtenances or other Property or any part thereof, or (iii) the ownership or operation of the Property;

        G.     To the extent assignable by Borrower, all management contracts, permits, certificates, licenses, approvals, contracts, purchase and sale agreements, purchase options, entitlements, development rights and authorizations, however characterized, issued or in any way furnished for the acquisition, construction, development, operation and use of the Land, Improvements and/or Leases, including building permits, environmental certificates, licenses, certificates of operation, warranties and guaranties;

        H.     All of the following types of collateral, as defined in the Uniform Commercial Code as in effect from time to time in the State of New York (the "**UCC**"): accounts, contract rights, general intangibles, chattel paper, documents, instruments, inventory, goods, equipment, investment property, deposit accounts, letter of credit rights, commercial tort claims, health-care-insurance receivables and all books and records relating to the foregoing; provided that Borrower will cooperate with Agent in obtaining "control" as defined in the UCC, with respect to collateral consisting of deposit accounts, investment property, letter of credit rights and electronic chattel paper;

        I.     Any monies on deposit with or for the benefit of Agent, including deposits for the payment of real estate taxes, insurance premiums and any cash collateral account;

        J.     All proceeds, products, replacements, additions, substitutions, renewals and accessions of and to the Land, Improvements, Appurtenances or any other property of the types described in the preceding granting clauses; and

        K.     Any and all after-acquired right, title or interest of Borrower in and to any property of the types described in the preceding granting clauses.

    TO HAVE AND TO HOLD the Property and all parts thereof together with the rents, issues, profits and proceeds thereof, unto Agent to its own proper use, benefit, and advantage forever, subject, however, to the terms, covenants, and conditions herein.

    Borrower covenants and agrees with Agent as follows:

    1.     **Payment of Indebtedness; Performance of Obligations**.  Borrower shall promptly pay when due the Indebtedness and shall promptly perform all Obligations.

140860.00412/12486481v.2

2.      **Taxes and Other Obligations; Insurance and Condemnation Proceeds.**

(a)      Borrower shall pay or cause to be paid, when due, and before any interest, collection fees or penalties shall accrue, all Taxes in accordance with Section 7.3 of the Loan Agreement.

(b)      Should Borrower fail to make any of such payments subject to any notice and cure period expressly provided in the Loan Agreement, Agent may, at its option and at the expense of Borrower, pay the amounts due for the account of Borrower. Upon the request of Agent, Borrower shall immediately furnish to Agent copies of all notices of amounts due and receipts evidencing payment. Borrower shall promptly notify Agent of any lien on all or any part of the Property and shall promptly discharge any unpermitted lien or encumbrance.

(c)      Insurance and condemnation proceeds shall be paid and applied in accordance with Section 2.4 of the Loan Agreement.

3.      **Preservation and Maintenance of Property.**

(a)      Borrower warrants and represents that Borrower is lawfully seized of the Property and has the right, power and authority to mortgage, grant, convey and assign the Property, and that the Property is unencumbered, except as shown on the schedule of exceptions to coverage in the title policy issued to and accepted by Agent contemporaneously with the execution and recordation of this Instrument and insuring Agent's interest in the Property (the "**Schedule of Title Exceptions**"). Borrower covenants that Borrower will warrant and defend generally the title to the Property against all claims and demands, subject to any easements and restrictions listed in the Schedule of Title Exceptions.

(b)      Borrower shall: (i) not commit waste or permit impairment or deterioration of the Property; (ii) not abandon the Property; (iii) keep the Property (or cause the Property to be kept) in good repair and restore or repair promptly, in a good and workmanlike manner, all or any part of the Property to the equivalent of its original condition as of the date of this Instrument, or such other condition as Agent may approve in writing, upon any damage or loss thereto; (iv) comply (or cause compliance) in all material respects with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property; (v) give notice in writing to Agent of and, unless otherwise directed in writing by Agent, appear in and defend any action or proceeding purporting to affect the Property, the security granted by the Loan Documents or the rights or powers of Agent; and (vi) provide for management of the Property by a Qualified Manager pursuant to a contract in form and substance reasonably satisfactory to Agent. Neither Borrower nor any tenant or other person shall remove, demolish or alter any Improvement on the Land except when incident to the replacement of fixtures, equipment, machinery and appliances with items of like kind.

4.      **Protection of Agent's and/or Lender's Security.** If, after expiration of any applicable cure or grace periods set forth in the Loan Documents, (a) Borrower fails to pay the Indebtedness or to perform the Obligations, or (b) any action or proceeding is commenced which affects or could affect the Property or Agent's or Lender's interest therein, including any loss, damage, cost, expense or liability incurred by Agent or Lender with respect to (i) any environmental matters relating to the Property or (ii) the preparation of the commencement or defense of any action or proceeding or any threatened action or proceeding affecting the Loan Documents or the Property, then Agent, at Agent's option, may make such appearances, disburse such sums and take such action as Agent deems necessary, in its sole discretion, to protect the Property or Agent's or Lender's interest therein, including entry upon the Property to take such actions Agent determines appropriate to preserve, protect or restore the Property. Any amounts disbursed by Agent or Lender pursuant to this <u>Section 4</u> (including reasonable attorneys' fees, costs and expenses), together with interest thereon at the "Default Rate" (as set forth in <u>Section 2.9(c)</u> of the Loan

- 4 -

Agreement) from the date of disbursement, shall become additional Indebtedness of Borrower secured by the lien of this Instrument and the other Loan Documents and shall be due and payable on demand. Nothing contained in this <u>Section 4</u> shall require Agent or Lender to incur any expense or take any action hereunder.

     5.    <u>Actions</u>.  Except as disclosed in the Schedule of Title Exceptions, Borrower shall warrant title and appear in and defend any claim or any action or other proceeding purporting to affect title or other interests relating to any part of the Property, the security of this Instrument or the rights of Agent or Lender, and give Agent prompt written notice of any such claim, action or proceeding.  Agent may, at the expense of Borrower, appear in and defend any such claim, action or proceeding and any claim, action or other proceeding asserted or brought against Agent or Lender in connection with or relating to any part of the Property or this Instrument or involving the priority, validity or enforceability of any Loan Document.

     6.    <u>Assignment of Rents</u>.

     (a)    To secure payment and performance of the Indebtedness and Obligations, in addition to, and not in contravention of, the assignment of the Leases and Rents in the preceding granting clauses of this Instrument, Borrower absolutely and unconditionally assigns and transfers to Agent, for the benefit of Agent and Lender, all of Borrower's right, title and interest in and to (i) the Leases, (ii) the Rents and the immediate and continuing right to collect and receive all of the Rents, and (iii) any and all rights and claims of any kind that Borrower may have now or in the future against any present or future tenant, subtenant or occupant of the Property (a "**Tenant**").  In furtherance of this assignment, and not in lieu thereof, promptly upon request by Agent, Borrower agrees to execute and deliver such further assignments as Agent may from time to time require.

     (b)    All of the Rents and all proceeds payable under any policy of insurance covering loss of rents resulting from untenantability caused by damage to any part of the Property, together with any and all rights that Borrower may have against any Tenant under the Leases or any subtenants or occupants of any part of the Property and any award made hereafter to Borrower in any court proceedings involving any of the Tenants or in any bankruptcy, insolvency, or reorganization proceedings in any state or federal court, and all payments by Tenants in lieu of Rent, are hereby absolutely and unconditionally assigned to Agent, for the benefit of Agent and Lender, to be applied by Agent in accordance with the terms of the Loan Agreement.  It is understood and agreed by the parties that this assignment of the Leases and Rents is intended to be and is a present, absolute, and unconditional assignment from Borrower to Agent, and not merely the passing of a security interest, and shall, immediately upon execution, give Agent the right to collect the Rents and to apply them in payment of the Indebtedness. Such assignment and grant shall continue in effect until the Indebtedness is paid in full.

     (c)    Borrower hereby irrevocably appoints Agent its true and lawful attorney-in-fact, with full power of substitution and with full power for Agent in its own name and capacity or in the name and capacity of Borrower to demand and collect any and all Rents and, after an Event of Default, to file any claim or take any other action or proceeding and make any settlement regarding the Leases.  All Tenants are hereby expressly authorized and directed to pay to Agent, or to such nominee as Agent may designate in a writing delivered to such Tenants, all amounts due Borrower pursuant to the Leases.  All Tenants are expressly relieved of all duty, liability or obligation to Borrower in respect of all payments so made to Agent or such nominee.

     (d)    After an Event of Default, Agent may, at any time without notice, either in person, by Agent or by a receiver appointed by a court, and without regard to the adequacy of any security for the Indebtedness and the Obligations and without regard to solvency of Borrower:

- 5 -

140860.00412/12486481v.2

(i)      Enter upon, take possession of and manage the Property, or any part thereof, for the purpose of collecting the Rents in its own name, sue for or otherwise collect the Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees, upon the Indebtedness and in such order as Agent may so determine;

(ii)      Dispossess by the usual summary proceedings any Tenant defaulting in the payment thereof to Borrower, lease the Property or any part thereof, repair, restore, and improve the Property;

(iii)      Apply the Rent after payment of Property expenses as determined by Agent to the Indebtedness in accordance with the terms of the Loan Agreement; and

(iv)      Apply to any court of competent jurisdiction for specific performance of this Instrument, an injunction against the violation hereof and/or the appointment of a receiver.

(e)      The collection of Rents, or the entering upon and taking possession of the Property, or the application thereof as aforesaid, shall not cure or waive any Event of Default or notice of an Event of Default hereunder or invalidate any act done in response to such Event of Default or pursuant to such notice of an Event of Default. In the event Borrower, as lessor under the Leases, shall fail to perform and fulfill in any material respect any material term, covenant, condition, or provision in the Leases, on its part to be performed or fulfilled, at the time and in the manner in the Leases provided, or if the Borrower shall suffer or permit to occur any breach or default by lessor under the provisions of the Leases, or any of them, and such default shall give the Tenant thereunder the right to terminate its Lease or otherwise shall continue for a period of thirty (30) days following the giving of written notice of such default to Borrower, or such longer period (not to exceed 60 days) as may be permitted for cure under the applicable Lease, provided that Borrower has diligently commenced corrective measures, then and in any such event, such breach or default shall constitute an Event of Default.

(f)      In the event Borrower fails to perform any Lease covenant, Agent may, at its option, upon ten (10) days prior notice to Borrower (except in the event of an emergency) perform any Lease covenant for and on behalf of Borrower, and all monies expended in so doing shall be chargeable to Borrower and added to the Indebtedness and shall be immediately due and payable.

(g)      Borrower hereby covenants and agrees as follows:

(i)      This Instrument transfers to Agent all of Borrower's right, title, and interest in any security deposits held by Borrower. Agent shall have no obligation to any Tenant with respect to its security deposit unless and until Agent comes into possession of the deposit.

(ii)      Agent may assign its right, title and interest in the Leases, Rents and other Property, and any subsequent assignee shall have all of the rights and powers provided to Agent by this Instrument.

(iii)      Borrower shall not without the prior written consent of Agent: (a) perform any act or execute any other instrument which might interfere with the exercise of Agent's or Lender's rights hereunder; (b) execute any assignment, pledge or hypothecation of Rents or any of the Leases; or (c) suffer or permit any of the Leases to become subordinate to any lien other than the lien of this Instrument or Permitted Liens but only to the extent as may be provided under the Loan Documents.

- 6 -

(h)     This Instrument shall not be deemed to impose upon Agent or Lender any of the obligations or duties of the landlord or Borrower provided in any Lease.  Borrower hereby acknowledges and agrees: (i) Borrower is and will remain liable under the Leases to the same extent as though this Instrument had not been made; and (ii) Agent has not by this Instrument assumed any of the obligations of Borrower under the Leases, except as to such obligations which arise after such time as Agent shall have assumed actual ownership or control of the Property.  This Instrument shall not make Agent responsible for the control, care, management, or repair of the Property or any personal property or for the carrying out of any of the terms of the Leases unless and until Agent takes possession or actual control of the Property.  Agent and Lender shall not be liable in any way for any injury or damage to person or property sustained by any person or persons, firm, or corporation in or about the Property absent gross negligence or willful misconduct by such Person.

(i)     In the event any Tenant should be the subject of any proceeding under the Federal Bankruptcy Code or any other federal, state, or local statute which provides for the possible termination or rejection of any Lease, Borrower covenants and agrees no settlement for damages shall be made without the prior written consent of Agent, which consent shall not be unreasonably withheld or delayed, and any check in payment of damages for rejection of any Lease will be made payable both to Borrower and Agent.  Borrower hereby assigns any such payment to Agent and further covenants and agrees that it will duly endorse to the order of Agent any such check.

(j)     After an Event of Default, then, without notice to, or the consent of, Borrower, Agent shall be entitled to exercise all of the rights and remedies contained in this Instrument or in any other Loan Document or otherwise available at law or in equity including, without limitation, the right to do any one or more of the following:

(i)     To enter upon, take possession of and manage the Property for the purpose of collecting the Rents;

(ii)     Dispossess by the usual summary proceedings any Tenant defaulting in the payment thereof to Borrower;

(iii)     Lease the Property or any part thereof;

(iv)     Repair, restore, and improve the Property;

(v)     Apply the Rents after payment of Property expenses as determined by Agent to the Indebtedness and the Obligations in such order as Agent may determine; and

(vi)     Apply to any court of competent jurisdiction for specific performance of this Instrument, an injunction against the violation hereof and/or the appointment of a receiver.

(k)     Borrower hereby agrees to indemnify Agent and Lender and to hold Agent and Lender harmless from any liability, loss or damages including, without limitation, reasonable attorney's fees, costs and expenses which may or might be incurred by Agent under the Leases or by reason of this Instrument, and from any and all claims and demands which may be asserted against Agent or Lender by reason of any term, covenant or agreement contained in any of the Leases, except for any such liability, loss or damage resulting solely from Agent's or Lender's gross negligence or willful misconduct.

(l)     The assignment of Leases and Rents set forth in this Section 6 and the granting clauses of this Instrument shall run with the land and be good and valid against Borrower or those claiming by, under or through Borrower, from the date hereof and such assignment shall continue to be

- 7 -

operative during the foreclosure or any other proceeding taken to enforce this Instrument. In the event of a sale or foreclosure which shall result in a deficiency, such assignment shall stand as security during the redemption period of the payment of such deficiency. Agent shall be permitted, at its sole option, to exercise remedies under such assignment separately from remedies exercised against other portions of the Property.

7.     **Statements by Borrower**. Borrower shall within ten (10) days after Agent's request, furnish Agent with a written statement, duly acknowledged, setting forth the sums, according to Borrower's books and records, secured by the Loan Documents and any right of set-off, counterclaim or other defense which exists against such sums and the Obligations.

8.     **No Additional Liens, Encumbrances or Indebtedness**. Except as expressly permitted in Article 8 of the Loan Agreement, Borrower covenants not to execute any mortgage, deed of trust, security agreement, assignment of leases and rents or other agreement granting a lien (except the liens granted to Agent by the Loan Documents) against or encumbrance on the Property or take or fail to take any other action which would result in a lien against the Property or the interest of Borrower (or any Principal) in the Property without the prior written consent of Agent; provided, however, Borrower may in good faith, by appropriate proceeding, contest the validity or amount of any asserted lien in accordance with the terms of the Loan Agreement and pending such contest, Borrower shall not be deemed to be in default hereunder.

9.     **Borrower and Lien Not Released**. Without affecting the liability of Borrower for any of the Indebtedness or the Obligations, or any other person liable for the payment of the Indebtedness or the performance of any Obligations, and without affecting the lien or charge of this Instrument as security for the payment of the Indebtedness, Agent may, from time to time and without notice to any junior lien holder or holder of any right or other interest in and to the Property: (a) release any person liable for payment of all or any portion of the Indebtedness or performance of the Obligations; (b) waive or modify any provision of this Instrument or the other Loan Documents or grant other indulgences; (c) release all or any part of the Property; (d) take additional security for any obligation herein mentioned; (e) subordinate the lien or charge of this Instrument; (f) consent to the granting of any easement; or (g) consent to any map, plat or plan of the Property.

10.     **Uniform Commercial Code Security Agreement**.

(a)     This Instrument shall cover, and the Property shall include, all property now or hereafter affixed or attached to the Land, which to the fullest extent permitted by law, shall be deemed fixtures and a part of the Land. In addition, this Instrument shall constitute a security agreement pursuant to the UCC for any portion of the Property which, under applicable law, may be subject to a security interest pursuant to the UCC (such portion of the Property is hereinafter called the **"Personal Property"**) and Borrower hereby grants to Agent, for the benefit of Agent and Lender, a security interest in the Personal Property. Agent shall have all of the rights and remedies of a secured party under the UCC as well as all other rights and remedies available at law or in equity.

(b)     Borrower hereby authorizes Agent to file any financing statements, as well as extensions, renewals and amendments thereof, and reproductions of this Instrument, all in such form as Agent may require to perfect a security interest with respect to the Personal Property. Borrower hereby authorizes and empowers Agent and irrevocably appoints Agent its agent and attorney-in-fact to execute and file, on Borrower's behalf, all financing statements and refilings and continuations thereof as Agent deems necessary or advisable to create, preserve and protect such lien. Borrower shall pay all costs of filing such financing statements and any extensions, renewals, amendments and releases thereof, and shall

- 8 -

pay all reasonable costs and expenses of any record searches for financing statements as Agent may reasonably require.

(c)     Borrower shall not, without the prior written consent of Agent, sell, assign, transfer, encumber, remove or permit to be removed from the Property any of the Personal Property. So long as no Event of Default exists, Borrower may sell or otherwise dispose of the Personal Property when obsolete, worn out, inadequate, unserviceable or unnecessary for use in the operation of the Property, but only upon replacing the same with other Personal Property at least equal in value and utility to the disposed Personal Property. Any replacement or substituted Personal Property shall be subject to the security interest granted herein.

(d)     To the extent permitted by law, Borrower, Lender and Agent agree that with respect to all items of Personal Property which are or will become fixtures on the Land, this Instrument, upon recording or registration in the real estate records of the proper office, shall constitute a "fixture filing" within the meaning of the UCC. For purposes of this <u>Section 10(d)</u>, (i) Borrower shall be deemed the "Debtor" with the address set forth for Borrower in the first paragraph of this Instrument which Borrower certifies as accurate; (ii) Agent shall be deemed to be the "Secured Party" with the address set forth for Agent in the first paragraph of this Instrument and shall have all of the rights of a secured party under the UCC; (iii) this Instrument covers all items of Personal Property which are or will become fixtures on the Land; (iv) Borrower is the record owner of the Land and the address of the record owner is as provided in the preamble to this Instrument; (v) the organizational identification number of Borrower is as identified in the preamble to this Instrument; (vi) Borrower is the type of entity as identified in the preamble to this Instrument organized under the laws of the State as identified in the preamble to this Instrument; and (vii) the exact legal name of Borrower is as identified in the preamble to this Instrument.

(e)     After an Event of Default, Agent may exercise in respect of the Personal Property, in addition to all other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Personal Property) and also may: (i) require Borrower to, and Borrower hereby agrees that it will, at its expense and upon request of Agent, forthwith assemble all or part of the Personal Property as directed by Agent and make it available to Agent at any reasonable place or places designated by Agent; and (ii) without notice except as specified below, sell, lease or otherwise dispose of the Personal Property or any part thereof in one or more parcels at public or private sale, and without the necessity of gathering at the place of sale of the property to be sold, at any of Agent's offices or elsewhere, at such time or times, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as Agent may deem commercially reasonable.

(f)     Borrower agrees that, to the extent notice of sale shall be required by law, a reasonable authenticated notification of disposition shall be a notification given at least ten (10) days prior to any such sale and such notice shall (i) describe Agent and Borrower, (ii) describe the Personal Property that is the subject of the intended disposition, (iii) state the method of intended disposition, (iv) state that Borrower is entitled to an accounting of the Indebtedness and stating the charge, if any, for an accounting, and (v) state the time and place of any public disposition or the time after which any private sale is to be made. Notwithstanding the foregoing, to the contrary, no notification need be given to Borrower if it has authenticated after default a statement renouncing or modifying any right to notification of sale or other intended disposition. At any sale of the Personal Property, if permitted by law, Agent may bid (which bid may be, in whole or in part, in the form of cancellation of indebtedness) for the purchase, lease, license or other disposition of the Personal Property or any portion thereof for the account of Agent. Agent shall not be obligated to make any sale of Personal Property regardless of notice of sale having been given. Agent may disclaim any warranties that might arise in connection with the sale, lease, license or other disposition of the Personal Property and have no obligation to provide any warranties at such time. Agent

-9-

may adjourn any public or private sale from time to time by announcement at the time and place fixed therefore, and such sale may, without further notice, be made at the time and place to which it was so adjourned. To the extent permitted by law, Borrower hereby specifically waives all rights of redemption, stay or appraisal which it has or may have under any applicable law now existing or hereafter enacted.

(g)   After an Event of Default, Agent or its agents or attorneys shall have the right without further notice or demand or legal process (unless the same shall be required by applicable law), personally, or by its agents or attorneys, (i) to enter upon, occupy and use any premises owned or leased by Borrower or where the Personal Property is located (or is believed to be located) for so long as such entry, occupancy and use is necessary, without any obligation to pay rent to Borrower, to render the Personal Property useable or saleable and to remove the Personal Property or any part thereof therefrom to the premises of Agent or any agent of Agent for such time as Agent may desire in order to effectively collect or liquidate the Personal Property and use in connection with such removal and any and all services, supplies and other facilities of Borrower; (ii) to make copies of and have access to Borrower's original books and records, to obtain access to Borrower's data processing equipment, computer hardware and software relating to the Personal Property and to use all of the foregoing and the information contained therein in any manner Agent deems appropriate; and (iii) to notify postal authorities to change the address for delivery of Borrower's mail to an address designated by Agent and to receive, open and dispose of all mail addressed to Borrower.

11.   **Events of Default; Acceleration of Indebtedness**.  The occurrence of any one or more of the following events shall constitute an **"Event of Default"** under this Instrument:

(a)   failure of Borrower to pay any of the Indebtedness, including any payment due under the Loan Agreement or Note within five (5) days of when due, or Borrower's failure to pay the Loan at the Maturity Date, whether by acceleration or otherwise; or

(b)   failure of Borrower to strictly comply with Section 8 (no additional liens) and 6(g)(iii) (no interference with Agent's liens on Leases and Rents) of this Instrument; or

(c)   failure of Borrower to satisfy each and every Obligation not set forth in subsection (a) or (b) above, and the continuance of such failure for ten (10) days after notice by Agent to Borrowers; provided, however, Borrowers shall have an additional thirty (30) days to cure such failure if (a) such Obligation cannot by its nature reasonably be cured within ten (10) days; (b) such failure does not involve the failure to make payments on a monetary obligation; (c) if Borrower commences to cure such failure promptly after written notice thereof and thereafter diligently pursues the curing thereof, and (d) Borrower provides Agent with security reasonably satisfactory to Agent against any interruption of payment or impairment of collateral as a result of such continuing failure, Borrower shall not be in default hereunder during such additional thirty (30) day period of diligent curing;

(d)   Borrower changes the state of its formation or its name without providing Agent thirty (30) days prior written notice; or

(e)   the occurrence of an Event of Default (as such term is defined in the applicable Loan Document) under any other Loan Document.

12.   **Remedies; Entry; Foreclosure**.  All references in this Instrument to "foreclosure sale," "judicial foreclosure," "non-judicial foreclosure" and words of similar import shall be deemed to include strict foreclosure or foreclosure by sale.  Upon the occurrence of an Event of Default, at the option of Agent, the Indebtedness shall become immediately due and payable without further demand or notice to Borrower and Agent shall have the STATUTORY POWER OF SALE and be entitled to all of the rights

140860.00412/12486481v.2

and remedies provided in the Loan Documents or at law or in equity including all other remedies permitted by applicable law.  Borrower acknowledges that the power of sale granted in this Instrument may be exercised by Agent without prior judicial hearing.  Each remedy provided in the Loan Documents is distinct and cumulative to all other rights or remedies under the Loan Documents or afforded by law or equity, and may be exercised concurrently, independently, or successively, in any order whatsoever.

If Agent invokes the STATUTORY POWER OF SALE, Agent shall mail a copy of a notice of sale to Borrower in the manner provided by applicable law.  Agent shall publish the notice of sale and the Property shall be sold in the manner prescribed by the laws of Massachusetts.  Agent may, at Agent's option, sell the Property in one or more parcels and in such order as Agent may determine.  Agent or Agent's designee may purchase the Property at any sale.  The proceeds of the sale shall be applied in the following order:  (a) to all costs and expenses of the sale, including reasonable attorneys' fees and costs of title evidence; (b) to the Indebtedness in such order as Lender, in Lender's discretion, directs; and (c) the excess, if any, to the person or persons legally entitled to it.

This Instrument is upon the STATUTORY CONDITION and upon the further condition that all covenants and agreements of Borrower contained in this Instrument shall be kept and fully performed, and upon any breach of such covenants and agreements or if an Event of Default shall exist under this Instrument, Lender shall have, as to the Property, the STATUTORY POWER OF SALE, and as to the UCC Collateral, all remedies of a secured party under the Uniform Commercial Code.

Upon the occurrence of an Event of Default, Borrower, upon demand of Agent, shall forthwith surrender to Agent the actual possession of the Property, or to the extent permitted by law, Agent or a receiver appointed by a court of competent jurisdiction, may enter and take possession of all or any part of the Property, and may exclude Borrower and its agents and employees wholly therefrom, and may have joint access with Borrower to the books, papers and accounts of Borrower.  If Borrower shall for any reason fail to surrender or deliver the Property or any part thereof after such demand by Agent, Agent or such receiver may obtain a judgment or decree conferring on Agent or such receiver, the right to immediate possession of the Property or requiring the delivery of the Property to Agent or such receiver, and Borrower specifically consents to the entry of such judgment or decree.  Upon every such entering upon or taking of possession, Agent or such receiver may hold, store, use, operate, manage and control the Property and conduct the business thereof, and Agent or such receiver may take any action required by applicable law or which Agent or such receiver believes necessary to enforce compliance with the environmental provisions contained herein or in the other Loan Documents, and negotiate with governmental authorities with respect to the Property's environmental compliance and remedial measures in connection therewith.  Agent and such receiver and their representatives shall have no liability for any loss, damage, injury, cost or expense resulting from any action or omission which was taken or omitted in good faith.

When the Indebtedness or any part thereof shall become due, whether by acceleration or otherwise, Agent may, either with or without entry or taking possession as herein provided or otherwise, proceed by suit or suits at law or in equity or by any other appropriate proceeding or remedy to:  (a) enforce payment of the Loan or the performance of any term, covenant, condition or agreement of Borrower under any of the Loan Documents; (b) foreclose the lien hereof for the Indebtedness or part thereof and sell the Property as an entirety or otherwise, as Agent may determine; (c) exercise its rights under Section 10 with respect to all or any portion of the Personal Property in accordance with the provisions of the UCC; provided Agent shall have no obligation to clean up or otherwise prepare such Personal Property for sale nor marshal any Personal Property in favor of Borrower or any other secured party; and/or (d) pursue any other right or remedy available to it under or by the law and decisions of the State in which the Land is located.  Agent may comply with any applicable state or federal law requirements in connection with a disposition of the Personal Property and compliance will not be

- 11 -

considered adversely to affect the commercial reasonableness of any sale of the Personal Property. Notwithstanding any statute or rule of law to the contrary, the failure to join any tenant or tenants of the Property as party defendant or defendants in any foreclosure action or the failure of any such order or judgment to foreclose their rights shall not be asserted by Borrower as a defense in any civil action instituted to collect (a) the Indebtedness, or any part thereof or (b) any deficiency remaining unpaid after foreclosure and sale of the Property.

Upon any foreclosure sale, Agent may bid for and purchase the Property and shall be entitled to apply all or any part of the Indebtedness as a credit to the purchase price.

13.   **Appointment of Receiver or Mortgagee in Possession**.   If an Event of Default is continuing or if Agent shall have accelerated the Indebtedness, Agent, upon application to a court of competent jurisdiction, shall be entitled as a matter of strict right, without notice, and without regard to the occupancy or value of any security for the Indebtedness or the insolvency of any party bound for its payment, to the appointment, at its option, of itself as mortgagee in possession, or of a receiver to take possession of and to operate the Property, and to collect and apply the Rents to the extent permitted by applicable law.

14.   **Expenditures and Expenses**.   In any action to foreclose the lien hereof or otherwise enforce Agent's or Lender's rights and remedies hereunder, there shall be allowed and included as additional Indebtedness all costs and expenses which may be paid or incurred by or on behalf of Agent or Lender, including without limitation, the costs of collection, enforcement, retaining, holding, preparing for disposition, processing and disposing of the Personal Property, appraiser's fees, outlays for documentary and expert evidence, stenographic changes, publication costs and costs (which may be estimated as the items to be expended after the entry of the decree) of procuring all such abstracts of title, title searches and examination, UCC record searches, title insurance policies, and similar data and assurance with respect to title as Agent may deem to be reasonably necessary either to prosecute any foreclosure action or to evidence to the bidder at any sale pursuant thereto the true condition of the title to or the value of the Property. All such costs and expenses, together with such other reasonable costs and expenses as may be incurred by Agent or Lender in the protection of the Property, maintenance of the lien of this Instrument or in any workout or restructuring of the Loan, including reasonable attorneys' fees and costs in any negotiation, litigation or other proceeding affecting this Instrument, the Note, the other Loan Documents, the Property or the Personal Property, including probate, appellate, and bankruptcy proceedings and any post-judgment proceedings to collect or enforce any judgment or order relating to this Instrument or the other Loan Documents or in preparation for the commencement or defense of any action or proceeding or threatened action or proceeding, shall be immediately due and payable to Agent, with interest thereon at the Default Rate, and shall be secured by this Instrument.

15.   **Application of Proceeds of Foreclosure Sale**.   The proceeds of any foreclosure sale of the Property shall be distributed and applied in the order of priority set forth in the Loan Agreement with the excess, if any, being applied to any party entitled thereto as their rights may appear. With respect to the Personal Property and only to the extent required by law, including the UCC, need Agent account for any surplus to the Borrower. To the extent permitted by applicable law, Borrower waives all claims, damages, and demands against Agent or Lender arising out of the disposition, repossession or retention of the Property.

16.   **Future Advances**.   This Instrument is given to secure not only the existing Indebtedness and Obligations, but also future advances (whether such advances are obligatory or are made at the option of Lender or Agent, or otherwise) made by Agent or Lender under the Loan Agreement, the Note, this Instrument or any of the other Loan Documents, to the same extent as if such future advances were made on the date of the execution of this Instrument.   It is the intent hereof to secure payment of the

- 12 -

Indebtedness whether the entire amount shall have been advanced to Borrower at the date hereof, or at a later date, and to secure any other amount or amounts that may be added to the Indebtedness or Obligations. The total amount of the Indebtedness and Obligations secured hereby may decrease or increase from time to time, but the total unpaid balance so secured at any one time shall not exceed Six Million Eight Hundred Fifty Thousand Dollars ($6,850,000) in principal, plus interest thereon and any disbursements made for the payment of taxes, levies, or insurance on the Property with interest thereon. This Instrument shall secure any and all additional or further monies which may be advanced by Lender or Agent to Borrower after the date hereof, which future advances of money, if made, may be evidenced by a note or notes executed by Borrower to Lender and Agent bearing such rate of interest and with such maturities as shall be determined from time to time. Nothing herein contained shall be deemed an obligation on the part of Lender or Agent to make any future advances.

17.   **Waiver of Statute of Limitations**.   Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien created by any of the Loan Documents or to any action brought to enforce the Loan Agreement, the Note or any other obligation secured by any of the Loan Documents.

18.   **Waiver of Homestead and Redemption**.   Borrower hereby waives all right of homestead exemption in the Property. Borrower hereby waives all right of redemption on behalf of Borrower and on behalf of all other persons acquiring any interest or title in the Property subsequent to the date of this Instrument, except decree or judgment creditors of Borrower.

19.   **Governing Law; Severability**.   This Instrument shall be governed by and construed in accordance with the internal laws of the State of New York except that the provisions of the laws of the jurisdiction in which the Land is located shall be applicable to the creation, perfection and enforcement of the lien created by this Instrument and as may be required by applicable law to enforce the remedies of Agent provided herein. The invalidity, illegality or unenforceability of any provision of this Instrument shall not affect or impair the validity, legality or enforceability of the remainder of this Instrument, and to this end, the provisions of this Instrument are declared to be severable.

20.   **Notice**.   Notices shall be given under this Instrument in conformity with the terms and conditions of the Loan Agreement and in conformity with applicable law.

21.   **Successors and Assigns Bound; Joint and Several Liability; Agents; Captions**.   The covenants and agreements contained in the Loan Documents shall bind, and the rights thereunder shall inure to, the respective successors and assigns of Agent, Lender and Borrower, subject to the transfer restrictions set forth in the Loan Agreement. In exercising any rights under the Loan Documents or taking any actions provided for therein, Agent may act through its employees, agents or independent contractors as authorized by Agent. The captions and headings of the paragraphs of this Instrument are for convenience only and are not to be used to interpret or define the provisions hereof.

22.   **Release**.   Upon payment in full of all Indebtedness and the performance of all Obligations, Agent shall release this Instrument. In such event, Agent shall, at the request of Borrower, deliver to Borrower in recordable form, all such documents as shall be necessary to release the Property from the liens, security interests, conveyances, and assignments created or evidenced by this Instrument. The recitals in such reconveyance of any matters or facts shall be conclusive as to the accuracy thereof. The grantee in such reconveyance may be described as "the person or persons legally entitled thereto." Borrower shall pay Agent's reasonable costs incurred in releasing or assigning this Instrument and in preparing and filing any terminations or assignments of financing statements related thereto, as a condition to Agent's obligation to deliver the same.

- 13 -

23. **Loss of Note**. Upon notice from Agent of the loss, theft, or destruction of the Note (or any of them) and upon receipt of an affidavit of lost note and an indemnity reasonably satisfactory to Borrower from Agent, or in the case of mutilation of the Note (or any of them), upon surrender of the mutilated Note, Borrower shall make and deliver a new note of like tenor in lieu of the then to be superseded Note (or any of them). Any one or more of the financial institutions which are or become a party to the Loan Agreement as Lenders may from time to time be replaced and, accordingly, one or more of the Notes may from time to time be replaced, provided that the terms of the Notes following such replacement, including the principal amount evidenced thereby, shall remain the same. As the indebtedness secured by this Instrument shall remain the same, such replacement of the Notes shall not be construed as a novation and shall not affect, diminish or abrogate Borrower's liability under this Instrument or the priority of this Instrument.

24. **Further Assurances**. Borrower agrees to execute any further documents, and to take any further actions reasonably requested by Agent to evidence or perfect the security interests granted herein, to maintain the first priority of the security interests, and to effectuate the rights specifically granted to Agent and Lender hereunder.

25. **Subrogation**. Agent is hereby subrogated (a) to the lien(s) of each and every mortgage, deed of trust, lien or other encumbrance on all or any part of the Property which is fully or partially paid or satisfied out of the proceeds of the Indebtedness, and (b) to the rights of the owner(s) and holder(s) of any such mortgage, deed of trust, lien or other encumbrance. The respective rights under and priorities of all such mortgages, deeds of trust, liens or other encumbrances shall be preserved and shall pass to and be held by Agent as additional security for the Indebtedness, to the same extent as if such rights and priorities had been duly assigned by separate instrument of assignment and notwithstanding that the same may have been cancelled and satisfied of record. Notwithstanding the foregoing, Agent agrees that only the terms and provisions set forth in this Instrument and the other Loan Documents shall govern and control Borrower's rights and obligations hereunder and thereunder.

26. **Time of Essence**. Time is of the essence of this Instrument and the performance of each of the covenants and agreement contained herein.

27. **Venue**. BORROWER HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE CITY, COUNTY OR STATE OF NEW YORK AND THE STATE WHERE THE PROPERTY IS LOCATED AND IRREVOCABLY AGREES THAT, SUBJECT TO AGENT'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS MORTGAGE SHALL BE LITIGATED IN SUCH COURTS. BORROWER EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS. BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON BORROWER BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWER, AT THE ADDRESS SET FORTH IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.

28. **Jury Trial Waiver**. BORROWER, AND AGENT AND LENDER BY THEIR ACCEPTANCE OF THIS MORTGAGE, HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS MORTGAGE AND THE BUSINESS RELATIONSHIP THAT IS BEING ESTABLISHED. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY BORROWER, LENDER AND AGENT, AND BORROWER ACKNOWLEDGES THAT NEITHER AGENT NOR LENDER, NOR ANY PERSON ACTING ON

- 14 -

BEHALF OF AGENT OR LENDER, HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR HAS TAKEN ANY ACTIONS WHICH IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.  BORROWER, LENDER AND AGENT ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH OF THEM HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS MORTGAGE AND THAT EACH OF THEM WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS.  BORROWER, LENDER AND AGENT FURTHER ACKNOWLEDGE THAT THEY HAVE BEEN REPRESENTED (OR HAVE HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS MORTGAGE AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL.

29.    **TRUE AND CORRECT COPY.  BORROWER HEREBY DECLARES THAT BORROWER HAS READ THIS INTRUMENT, HAS RECEIVED A COMPLETELY FILLED-IN COPY OF IT WITHOUT CHARGE THEREFOR, AND HAS SIGNED THIS INSTRUMENT AS OF THE DATE AT THE TOP OF THE FIRST PAGE.**

140860.00412/12486481v.2

IN WITNESS WHEREOF, Borrower has executed this Instrument or has caused the same to be executed as an instrument under seal by its duly authorized representatives as of the date first above written.

**BORROWER:**

**133 SALEM STREET, LLC,**
a Delaware limited liability company

By: _____
Name:  Avi Lipschutz
Title:  Manager

COMMONWEALTH OF MASSACHUSETTS

STATE OF _New York_              )
                                 ) ss.
COUNTY OF _Rockland_             )

On this _6_ day of _March_ , 2015, before me, the undersigned notary public, personally appeared Avi Lipschutz, proved to me through satisfactory evidence of identification, being (check whichever applies): ☑ driver's license or other state or federal governmental document bearing a photographic image, ☐ oath or affirmation of a credible witness known to me who knows the above signatory, or ☑ my own personal knowledge of the identity of the signatory, to be the person whose name is signed above, and acknowledged the foregoing to be signed by him/her voluntarily for its stated purpose, as the duly authorized manager of 133 SALEM STREET, LLC, a Delaware limited liability company.

Notary Public
My commission expires: ____5/22/18____
Print Notary Public's Name: _Avraham Obermeister_

[Notary Seal]

AVRAHAM Y OBERMEISTER
NOTARY
NO. 01OB6146516
QUALIFIED IN
ROCKLAND COUNTY
COMM. EXP.
05/22/2018
PUBLIC
STATE OF NEW YORK

Signature & Acknowledgment page to Mortgage

**EXHIBIT A**

**LEGAL DESCRIPTION**

"PARCEL A"

Certain parcels of land situated in Revere, Suffolk County and Commonwealth of Massachusetts, more particularly described as follows:

Parcel 1:

     The land with the buildings thereon bounded and described as follows:

| | |
|---|---|
| NORTHWESTERLY | by Salem Street, fifty (50') feet; |
| NORTHEASTERLY | by land formerly of Kidder eighty-two and 50/100 (82.50) feet; |
| SOUTHEASTERLY | by other land of Kidder sixty (60') feet; |
| SOUTHWESTERLY | by a parcel of land used as a highway, in connection with an old land, |

ninety and 02/100 (90.02) feet.

For title reference, see deed from Pell Realty & Maintenance Co., Inc. dated August 31, 1980, recorded with Suffolk County Registry of Deeds in Book 9526, Page 120.

Parcel 2:

     A certain parcel of land shown as Lot 25 on a Subdivision Plan of Land drawn by United Surveyors & Engineers, Surveyors, dated May 1977, as modified and approved by the Court, filed in the Land Registration Office as Plan No. 1841-K, a copy of a portion of which is filed with Certificate of Title No. 90342.

For title see Land Court Certificate No. 94834.

Parcel 3:

     The land with the buildings thereon shown as Lot C-3 on a Subdivision Plan No. 1841-H drawn by C. B. Humphrey, Surveyor for the Land Court, dated November 11, 1925, filed with Certificate of Title No. 19257.

For title see Land Court Certificate No. 94834.

Parcel 4:

     The land with the buildings thereon shown as Lot C-1 on the Subdivision Plan No. 1841-G drawn by C.B. Humphrey, Engineer for the Land Court dated August 1, 1925, as approved by the Court filed with Certificate of Title No. 18865.

For title see Land Court Certificate No. 94834.

Parcel 5:

      The land with buildings thereon shown as Lot 26 on a Subdivision Plan No. 1841-K drawn by United Surveyors & Engineers, Surveyors, dated May 1977 as modified and approved by the Court filed in the Land Registration Office as Plan No. 1841-K.

For title see Land Court Certificate of Title No. 94834.

Parcel 6:

      The land with the buildings thereon shown as Lot 30 on Land Court Subdivision Plan No. 1841-L, drawn by Louis A. Moore, engineer for the Court, dated Nov. 11, 1983, a copy of a portion of which is filed with Certificate of Title No. 98356.

For title see Land Court Certificate of Title No. 94834.

Parcel 7:

      The land with the buildings thereon shown as Lot 31 on Land Court Subdivision Plan No. 1941-L, drawn by Louis A. Moore, engineer for the Court, dated Nov. 11, 1983, a copy of which is filed with Certificate of Title No. 98356.

For title see Land Court Certificate of Title No. 94834.

**PROPERTY ADDRESS:** 133 Salem Street, Revere, MA 02151

"PARCEL B"

Certain parcels of land situated in Revere, Suffolk County, Massachusetts described as follows:

PARCEL I

The land shown as Lot B1 on a subdivision plan drawn by A.F. Sargent, Surveyor, dated July 20, 1909, as approved by the Court, filed in the Land Registration Office as plan No. 1841-C, a copy of a portion of which is filed with Certificate of Title No. 3380.

Said land is subject to a Land Court Order dated July 8, 2005 and recorded as Document Number 706821 on Certificate Number 122463. Said Land is also subject to a Taking, by the Commonwealth of Massachusetts MDC dated July 19, 1946 and recorded as Document Number 706823 on Certificate Number 122463.

PARCEL II

The land shown as Lot 1 on a subdivision plan drawn by A.F. Sargent, Surveyor, dated May 8, 1911, as approved by the Court, filed in the Land Registration Office as plan No. 1841-D, a copy of a portion of which is filed with Certificate of Title No. 3732.

The above-described parcels of land are subject to the restrictions set forth in deed from Charles H. Woodman, Trustee, to James C.F. Waitt, dated April 27, 1914, filed and registered as Document No. 15817.

Exhibit A – Page 2

140860.00412/12486481v.2

No residential and/or commercial building or structure used for habitation and/or occupancy shall be constructed or placed upon either Parcel 1 or Parcel II. Parcel I and Parcel II may only be used for parking; no other use of either parcel is permitted. The foregoing restrictions shall be construed as a covenant running with the land and are binding upon future grantees, heirs, executors, administrators, assigns and transferees of said premises or any part or parts thereof. These restrictions cannot be altered by any variance.

**PROPERTY ADDRESS:** Salem Street and Waitt Park, Revere, Massachusetts 02151

Exhibit A – Page 3

# THIS

# PAGE

# LEFT

# BLANK

# INTENTIONALLY

## Exhibit E

Financing Statements filed against Owner Defendant by Agent:

(a) financing statement against 133 Salem Street, LLC with the Delaware Secretary of State on March 13, 2015, file no. 2015 1067981.

Financing Statement filed against Operator Defendant by Agent:

(a) financing statement against West Revere Health Center, LLC with the Delaware Secretary of State on March 18, 2015, file nos. 2015 1067981 and 2015 1146843; and

(b) financing statement against West Revere Health Center, LLC with the Delaware Secretary of State on March 13, 2015, file no. 2015 1068104.

**Exhibit F**

Account Control Agreements

(see attached)

DEPOSIT ACCOUNT CONTROL AGREEMENT
(PLEDGED ACCOUNT WITH ACTIVATION)

This Agreement (the "Agreement"), among **THE PRIVATEBANK AND TRUST COMPANY** ("Bank"), **133 SALEM STREET, LLC**, a Delaware limited liability company ("Borrower") and **AP MA FUNDING LLC**, a Delaware limited liability company, as Agent ("Agent") for the lenders ("Lenders") under the Loan Agreement (defined herein) pursuant to the Term Loan and Security Agreement dated as of March 12, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), is dated as of March 12, 2015, and shall serve as instructions regarding the accounts that have been established by Borrower at Bank and identified in Exhibit A attached hereto (each, an "Account" and collectively, the "Accounts").

1.      Lien.  Borrower has granted to Agent a continuing lien on and security interest in the Accounts and all amounts from time to time on deposit therein.  The parties hereto agree that this Agreement constitutes an "authenticated record" for purposes of Section 9-104(a)(2) of the Illinois Uniform Commercial Code (the "UCC") and is being entered into to give Agent control of the Accounts as contemplated by Section 9-104 (a)(2) of the UCC.

2.      Duties.  Bank agrees to take such action with respect to the Accounts as shall from time to time be specified in any writing received by Bank purportedly from Borrower or Agent as provided herein.  Borrower and Agent agree that: (a) Bank has no duty to monitor the balance of the Accounts; (b) until Bank receives written notice purportedly from Agent instructing Bank to cease honoring Borrower's instructions with respect to the Accounts (the "Block Notice"), Borrower shall have full rights to instruct Bank with respect to the Accounts and take any and all actions with respect to the Accounts in accordance with any deposit, cash management or other agreements between Borrower and Bank governing the Accounts or relating to products or services provided for such Accounts (including, without limitation, making withdrawals therefrom (using checks, electronic funds transfers or otherwise)); (c) following Bank's receipt of a Block Notice, Bank may, without further inquiry, rely on and act in accordance with any instructions Bank receives which purport to be originated by Agent directing the disposition of funds in the Accounts without further consent from Borrower and notwithstanding any conflicting or contrary instructions Bank receives from Borrower, and Bank shall have no liability to Agent, Borrower or any other person in relying on and acting in accordance with any such instructions; (d) Bank shall have no responsibility to inquire as to the form, execution, sufficiency or validity of any notice or instructions delivered to it pursuant hereto, nor to inquire as to the identity, authority or rights of the person or persons executing or delivering the same; and (e) following Bank's receipt of a Block Notice, Bank shall have a reasonable period of time within which to act in accordance with such Block Notice and other notices or instructions thereafter received by Bank from Agent with respect to the Accounts (not to exceed three (3) Business Days (as defined below) if received by 1:00 p.m. (Central time) on a Business Day, or four (4) Business Days if received after such time).  Notwithstanding the preceding terms of this Section 2, it is expressly understood and agreed that any direction or request by Agent directing the disposition of funds on deposit in the Accounts will apply only to

available funds on deposit in the Accounts and Agent shall make withdrawals from the Accounts only via fedwire or other electronic funds transfer.

Each Business Day after Bank has received and had a reasonable time to act on a Block Notice, Bank will wire transfer to Agent the balance of available funds on deposit in the Accounts to the account identified in the Block Notice or as otherwise instructed by Agent after delivery of a Block Notice. For purposes of this Agreement, the term "Business Day" shall mean Monday through Friday, excluding holidays observed by Bank and other days on which Bank is required or permitted to close.

Notwithstanding anything to the contrary contained in this Agreement, Bank shall immediately cease all transfers of funds pursuant to this Agreement upon its knowledge of the commencement of any bankruptcy, receivership, insolvency, reorganization, dissolution or liquidation proceedings by or against Borrower (a "Bankruptcy Filing"'), provided, however that such suspension shall in no way effect the rights of Bank to debit the Accounts for amounts due under this Agreement. From and after the date on which Bank receives notice of such Bankruptcy Filing, Bank shall hold all funds deposited in the Accounts. Upon receipt by Bank of an appropriate order from a court of competent jurisdiction, Bank shall thereafter resume any transfer of funds pursuant to this Agreement.

3.    Deposit of Items.  Borrower and Agent irrevocably direct and authorize Bank, and Bank agrees, to process items deposited to the Account in accordance with the terms of the Business Deposit Account Agreement for the Account and, to the extent applicable, the Treasury Management Services Agreement or any other cash management agreements between Borrower and Bank.

4.    Information.  Bank shall provide Agent, at Borrower's expense, with such information with respect to the Accounts and all items (and proceeds thereof) deposited to the Accounts as Agent may from time to time reasonably request, and Borrower hereby consents to such information being provided to Agent.

5.    Exculpation; Indemnity.  Bank undertakes to perform only such duties as are expressly set forth herein. Notwithstanding any other provisions of this Agreement, the parties hereby agree that Bank shall not be liable for any action taken by it in accordance with this Agreement, including, without limitation, any action so taken at Agent's request, except direct damages attributable to Bank's gross negligence or willful misconduct. In no event shall Bank be liable for any (i) losses or delays resulting from acts of God, war, computer malfunction, interruption of communication facilities, labor difficulties or other causes beyond Bank's reasonable control or (ii) other damages, including without limitation, indirect, special, punitive or consequential damages. Borrower agrees to indemnify and hold Bank harmless from and against any and all costs, damages, claims, judgments, reasonable attorneys' fees, expenses, obligations and liabilities of every kind and nature (collectively, "Losses") which Bank may incur, sustain or be required to pay (other than those attributable to Bank's gross negligence or willful misconduct) in connection with or arising out of this Agreement, the Accounts, the Block Notice or any instruction provided by Agent pursuant to Section 2 (including without limitation, the amount of any overdraft created in any of the Accounts resulting from a Chargeback being charged to the related Account or from debiting any of the Accounts for Charges (defined below) owed to Bank), and to pay to Bank on demand the amount of all such Losses. Nothing in this

2

Agreement, and no indemnification of Bank under this Section, shall affect in any way the indemnification obligations of Borrower to Agent under the Loan Agreement or otherwise. After Agent sends the Block Notice, Agent agrees, jointly and severally with Borrower, to indemnify and hold Bank harmless from and against any and all Losses (other than those attributable to Bank's gross negligence or willful misconduct) in connection with or arising out of this Agreement, the Accounts, the Block Notice or any instruction provided by Agent pursuant to Section 2 (including without limitation, the amount of any overdraft created in any of the Accounts resulting from a Chargeback being charged to the related Account or from debiting any of the Accounts for Charges owed to Bank), and to pay to Bank on demand the amount of all such Losses. The provisions of this Section 5 shall survive termination of this Agreement.

6.    Chargebacks. All items deposited in, and electronic funds transfers credited to, the Accounts and then returned unpaid or returned (or not finally settled) for any reason (collectively, "Chargebacks") will be handled in the following manner: (a) any item which is returned because of insufficient or uncollected funds or otherwise dishonored for any reason will be charged back to the Account in which it was originally deposited, and (b) any returns, reversals or Chargebacks relating to electronic funds transfers or deposits into an Account, or merchant card, debit card or credit card transactions involving such Account will be charged back to such Account.

In the event there are insufficient funds in the Accounts to cover such Chargebacks, upon receipt of notice from Bank of the occurrence of such Chargebacks and the failure of Borrower to pay Bank the amount of such Chargebacks, Agent agrees to pay such amount to Bank, in immediately available funds, within five (5) Business Days after receipt of such notice, provided that (a) Agent shall have no obligation to pay the amount of any Chargeback occurring prior to the date Agent sends the Block Notice and (b) any such liability of Agent to Bank shall in no way release Borrower from liability to Agent and shall not impair Agent's rights and remedies against Borrower, by way of subrogation or otherwise, to collect all such Chargebacks.

7.    Charges. In consideration of the services of Bank in establishing, maintaining and conducting transactions through the Accounts, Bank has established, and Borrower hereby agrees to pay, the fees and other charges for the Accounts and services related thereto as in effect from time to time, together with any and all other expenses incurred by Bank in connection with this Agreement or the Accounts and related services, including without limitation amounts paid or incurred by Bank in enforcing its rights and remedies under this Agreement, or in connection with defending any claim made against Bank in connection with this Agreement, the Accounts, the Block Notice or any instruction provided by Agent pursuant to Section 2 (collectively, the "Charges").

In connection with the payment of the Charges in any month, Bank will debit the Accounts or any other account Borrower maintains at Bank. In the event the Accounts or such other accounts with Bank do not contain sufficient available funds to pay the Charges or Borrower maintains no other accounts with Bank, Bank will bill Borrower directly, and Borrower agrees to pay Bank, via wire transfer or other immediately available funds, the amount of such Charges. If Borrower fails to pay the amount of the Charges within five (5) Business Days of receipt of a billing statement detailing such Charges, Agent agrees to pay Bank, via wire transfer or other immediately available funds, the amount of such Charges within five (5) Business Days after receipt of a billing statement detailing such Charges, provided, however, that

3

(a) Agent shall not be obligated to pay any Charges incurred prior to the date of the Block Notice, and (b) any such liability of Agent to Bank shall in no way release Borrower from liability to Agent and shall in no way impair Agent's rights and remedies against Borrower, by way of subrogation or otherwise, to collect all such fees and expenses, and all such amounts paid by Agent shall constitute a part of the "Obligations" under the Loan Agreement.

8.    Irrevocable Agreement.  Borrower acknowledges the agreements made by it and the authorizations granted by it herein are irrevocable and the authorizations granted herein are powers coupled with an interest.

9.    Set-off.  Bank waives all of its existing and future rights of set-off and banker's liens against the Accounts and all items (and proceeds thereof) that come into possession of Bank in connection with the Accounts, except for (a) those rights of set-off and banker's liens arising in connection with (a) any charges, fees, expenses, payments and other amounts for which the Borrower and/or Agent is responsible to Bank (including, without limitation, any of the foregoing with respect to cash management services provided by Bank to Borrower, including, but not limited to, funds transfer (origination or receipt), trade, lockbox, commercial card, investment, disbursement, reconcilement, stop payment, positive pay, automatic investment, imaging, and information services), (b) Chargebacks, (c) Charges and (d) other amounts owed to Bank pursuant to Section 5 hereof.

10.    Miscellaneous.  This Agreement is binding upon the parties hereto and their respective successors and assigns (including any trustee of Borrower appointed or elected in any action under the Bankruptcy Code) and shall inure to their benefit.  Neither Borrower nor Agent shall be entitled to assign or delegate any of its rights or duties hereunder without first obtaining the express prior written consent of Bank.  Neither this Agreement nor any provision hereof may be changed, amended, modified or waived, except by an instrument in writing signed by the parties hereto.  Any provision of this Agreement that may prove unenforceable under any law or regulation shall not affect the validity of any other provision hereof.  This Agreement may be executed in any number of counterparts which together shall constitute one and the same instrument.

11.    Governing Law, Jurisdiction, and Venue.  Bank agrees that for the purpose of Section 9-304 of the UCC, its jurisdiction is the State of Illinois.  This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Illinois without regard to conflict of laws provisions.  Any action in connection with this Agreement shall be brought in the courts of the State of Illinois, located in Cook County, or the courts of the United States of America for the Northern District of Illinois.  Each party hereto irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds, irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of said courts.  Each party hereto intentionally, knowingly and voluntarily irrevocably waives any right to trial by jury in any proceeding related to this Agreement.

12.    Termination and Resignation.  This Agreement may be terminated by Agent upon written notice to Bank.  Bank may, at any time upon thirty (30) days' prior written notice to Agent and Borrower, terminate this Agreement and close the Accounts; provided, however, that Bank may terminate this Agreement immediately upon written notice to Agent and Borrower in the event of a material breach of this Agreement (including non-payment of any charges or other

4

obligations under this Agreement) by either Borrower or Agent.  Upon termination of this Agreement, any funds in the Accounts shall be subject to the direction of Agent (if after Bank's receipt of a Block Notice) or Borrower (if prior to Bank's receipt of a Block Notice), as applicable.

13.   Notices.  Unless otherwise specifically provided herein, any notice or other communication required or permitted to be given shall be in writing addressed to the respective party as set forth below and may be personally served, sent by electronic mail or sent by overnight courier service and shall be deemed to have been given:  (a) if delivered in person, when delivered; (b) if delivered by electronic mail, on the date of transmission if transmitted on a Business Day before 4:00 P.M. (Central time), or, if not, on the next succeeding Business Day; or (c) if delivered by reputable overnight courier, the Business Day on which such delivery is made by such courier.  Notices shall be addressed as follows:

Agent:  AP MA FUNDING LLC
4445 Willard Avenue, Suite 1100
Chevy Chase, MD  20815
Attn:  John Gray, Managing Director
Email: portfolio_management@alliancepartners.com

Borrower:  133 Salem Street, LLC
c/o Synergy Health Centers
2363 Lakewood Road, Suite 200
Toms River, New Jersey 08755
Attn:  Avi Lipschutz
Email:  zisha@synergyhs.com

Bank:  The Private Bank and Trust Company
120 South LaSalle Street
Chicago, Illinois 60603
Attention:  Matt Tyler
Email:  mtyler@theprivatebank.com

With a copy to:  The PrivateBank and Trust Company
70 West Madison Street
Chicago, IL 60602
Attention:  Internal Client Services
Email:  clientservices@theprivatebank.com

or in any case, to such other address as the party addressed shall have previously designated by written notice to the serving party, given in accordance with this Section.

[Signature page follows]

5

This Agreement has been executed and delivered by each of the parties hereto by a duly authorized officer of each such party on the date first set forth above.

**133 SALEM STREET, LLC,**
a Delaware limited liability company

By: _____
Name:  Avi Lipschutz
Title:  Manager

Duly Authorized

AP MA FUNDING LLC,
a Delaware limited liability company, as Agent

By: _____
Name:
Title:

ACCEPTED AND AGREED TO
as of March ___, 2015

THE PRIVATE BANK AND TRUST COMPANY

By: _____
Name:
Title:

Duly Authorized

This Agreement has been executed and delivered by each of the parties hereto by a duly authorized officer of each such party on the date first set forth above.

**133 SALEM STREET, LLC,**
a Delaware limited liability company


By: _____
Name:  Avi Lipschutz
Title:  Manager

Duly Authorized

**AP MA FUNDING LLC,**
a Delaware limited liability company, as Agent

By: _____
Name:                **John Gray**
Title:          **Managing Director**

ACCEPTED AND AGREED TO
as of March ____, 2015

THE PRIVATE BANK AND TRUST COMPANY


By: _____
Name:
Title:

Duly Authorized

This Agreement has been executed and delivered by each of the parties hereto by a duly authorized officer of each such party on the date first set forth above.

**133 SALEM STREET, LLC,**
a Delaware limited liability company

By: _____
Name:  Avi Lipschutz
Title:  Manager

Duly Authorized

**AP MA FUNDING LLC,**
a Delaware limited liability company, as Agent

By: _____
Name:
Title:

ACCEPTED AND AGREED TO
as of March ___, 2015

THE PRIVATE BANK AND TRUST COMPANY

By: _____
Name:
Title:

Duly Authorized

**EXHIBIT A**

| <u>Account Name</u> | <u>Account Number</u> | <u>Tax Identification Number</u> |
|---|---|---|
| Operating Account | 2423617 | ████9831 |
| | | |
| | | |
| | | |

Deposit Account Control Agreement<br/>(Pledged Account with Activation)

DEPOSIT ACCOUNT CONTROL AGREEMENT
(PLEDGED ACCOUNT WITH ACTIVATION)

This Agreement (the "Agreement"), among **THE PRIVATEBANK AND TRUST COMPANY** ("Bank"), **WEST REVERE HEALTH CENTER, LLC**, a Delaware limited liability company ("Operator") and **AP MA FUNDING LLC**, a Delaware limited liability company, as Agent ("Agent") for the lenders ("Lenders") under the Loan Agreement (defined herein) pursuant to the Term Loan and Security Agreement dated as of March 12, 2015 between 133 Salem Street, LLC ("Borrower"), Agent, and the Lenders (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), is dated as of March 12, 2015, and shall serve as instructions regarding the accounts that have been established by Operator at Bank and identified in Exhibit A attached hereto (each, an "Account" and collectively, the "Accounts").

1.    Lien. Operator has granted to Borrower a continuing lien on and security interest in the Accounts and all amounts from time to time on deposit therein, which lien is evidenced by a financing statement that has been assigned to Agent. The parties hereto agree that this Agreement constitutes an "authenticated record" for purposes of Section 9-104(a)(2) of the Illinois Uniform Commercial Code (the "UCC") and is being entered into to give Agent control of the Accounts as contemplated by Section 9-104 (a)(2) of the UCC.

2.    Duties. Bank agrees to take such action with respect to the Accounts as shall from time to time be specified in any writing received by Bank purportedly from Operator or Agent as provided herein. Operator and Agent agree that: (a) Bank has no duty to monitor the balance of the Accounts; (b) until Bank receives written notice purportedly from Agent instructing Bank to cease honoring Operator's instructions with respect to the Accounts (the "Block Notice"), Operator shall have full rights to instruct Bank with respect to the Accounts and take any and all actions with respect to the Accounts in accordance with any deposit, cash management or other agreements between Operator and Bank governing the Accounts or relating to products or services provided for such Accounts (including, without limitation, making withdrawals therefrom (using checks, electronic funds transfers or otherwise)); (c) following Bank's receipt of a Block Notice, Bank may, without further inquiry, rely on and act in accordance with any instructions Bank receives which purport to be originated by Agent directing the disposition of funds in the Accounts without further consent from Operator and notwithstanding any conflicting or contrary instructions Bank receives from Operator, and Bank shall have no liability to Agent, Operator or any other person in relying on and acting in accordance with any such instructions; (d) Bank shall have no responsibility to inquire as to the form, execution, sufficiency or validity of any notice or instructions delivered to it pursuant hereto, nor to inquire as to the identity, authority or rights of the person or persons executing or delivering the same; and (e) following Bank's receipt of a Block Notice, Bank shall have a reasonable period of time within which to act in accordance with such Block Notice and other notices or instructions thereafter received by Bank from Agent with respect to the Accounts (not to exceed three (3) Business Days (as defined below) if received by 1:00 p.m. (Central time) on a Business Day, or four (4) Business Days if received after such time). Notwithstanding the preceding terms of this Section 2, it is expressly understood and agreed that any direction or

140860.00412/100007442v.2

request by Agent directing the disposition of funds on deposit in the Accounts will apply only to available funds on deposit in the Accounts and Agent shall make withdrawals from the Accounts only via fedwire or other electronic funds transfer.

Each Business Day after Bank has received and had a reasonable time to act on a Block Notice, Bank will wire transfer to Agent the balance of available funds on deposit in the Accounts to the account identified in the Block Notice or as otherwise instructed by Agent after delivery of a Block Notice. For purposes of this Agreement, the term "Business Day" shall mean Monday through Friday, excluding holidays observed by Bank and other days on which Bank is required or permitted to close.

Notwithstanding anything to the contrary contained in this Agreement, Bank shall immediately cease all transfers of funds pursuant to this Agreement upon its knowledge of the commencement of any bankruptcy, receivership, insolvency, reorganization, dissolution or liquidation proceedings by or against Operator (a "Bankruptcy Filing"), provided, however that such suspension shall in no way effect the rights of Bank to debit the Accounts for amounts due under this Agreement. From and after the date on which Bank receives notice of such Bankruptcy Filing, Bank shall hold all funds deposited in the Accounts. Upon receipt by Bank of an appropriate order from a court of competent jurisdiction, Bank shall thereafter resume any transfer of funds pursuant to this Agreement.

3.    Deposit of Items. Operator and Agent irrevocably direct and authorize Bank, and Bank agrees, to process items deposited to the Account in accordance with the terms of the Business Deposit Account Agreement for the Account and, to the extent applicable, the Treasury Management Services Agreement or any other cash management agreements between Operator and Bank.

4.    Information. Bank shall provide Agent, at Operator's expense, with such information with respect to the Accounts and all items (and proceeds thereof) deposited to the Accounts as Agent may from time to time reasonably request, and Operator hereby consents to such information being provided to Agent.

5.    Exculpation; Indemnity. Bank undertakes to perform only such duties as are expressly set forth herein. Notwithstanding any other provisions of this Agreement, the parties hereby agree that Bank shall not be liable for any action taken by it in accordance with this Agreement, including, without limitation, any action so taken at Agent's request, except direct damages attributable to Bank's gross negligence or willful misconduct. In no event shall Bank be liable for any (i) losses or delays resulting from acts of God, war, computer malfunction, interruption of communication facilities, labor difficulties or other causes beyond Bank's reasonable control or (ii) other damages, including without limitation, indirect, special, punitive or consequential damages. Operator agrees to indemnify and hold Bank harmless from and against any and all costs, damages, claims, judgments, reasonable attorneys' fees, expenses, obligations and liabilities of every kind and nature (collectively, "Losses") which Bank may incur, sustain or be required to pay (other than those attributable to Bank's gross negligence or willful misconduct) in connection with or arising out of this Agreement, the Accounts, the Block Notice or any instruction provided by Agent pursuant to Section 2 (including without limitation, the amount of any overdraft created in any of the Accounts resulting from a Chargeback being charged to the related Account or from debiting any of the Accounts for Charges (defined below)

2

owed to Bank), and to pay to Bank on demand the amount of all such Losses.  Nothing in this Agreement, and no indemnification of Bank under this Section, shall affect in any way the indemnification obligations of Borrower or Operator, as applicable, to Agent under the Loan Agreement or otherwise.  After Agent sends the Block Notice, Agent agrees, jointly and severally with Operator, to indemnify and hold Bank harmless from and against any and all Losses (other than those attributable to Bank's gross negligence or willful misconduct) in connection with or arising out of this Agreement, the Accounts, the Block Notice or any instruction provided by Agent pursuant to Section 2 (including without limitation, the amount of any overdraft created in any of the Accounts resulting from a Chargeback being charged to the related Account or from debiting any of the Accounts for Charges owed to Bank), and to pay to Bank on demand the amount of all such Losses.  The provisions of this Section 5 shall survive termination of this Agreement.

6.     Chargebacks.  All items deposited in, and electronic funds transfers credited to, the Accounts and then returned unpaid or returned (or not finally settled) for any reason (collectively, "Chargebacks") will be handled in the following manner:  (a) any item which is returned because of insufficient or uncollected funds or otherwise dishonored for any reason will be charged back to the Account in which it was originally deposited, and (b) any returns, reversals or Chargebacks relating to electronic funds transfers or deposits into an Account, or merchant card, debit card or credit card transactions involving such Account will be charged back to such Account.

In the event there are insufficient funds in the Accounts to cover such Chargebacks, upon receipt of notice from Bank of the occurrence of such Chargebacks and the failure of Operator to pay Bank the amount of such Chargebacks, Agent agrees to pay such amount to Bank, in immediately available funds, within five (5) Business Days after receipt of such notice, provided that (a) Agent shall have no obligation to pay the amount of any Chargeback occurring prior to the date Agent sends the Block Notice and (b) any such liability of Agent to Bank shall in no way release Borrower or Operator, as applicable, from liability to Agent and shall not impair Agent's rights and remedies against Borrower or Operator, by way of subrogation or otherwise, to collect all such Chargebacks.

7.     Charges.  In consideration of the services of Bank in establishing, maintaining and conducting transactions through the Accounts, Bank has established, and Operator hereby agrees to pay, the fees and other charges for the Accounts and services related thereto as in effect from time to time, together with any and all other expenses incurred by Bank in connection with this Agreement or the Accounts and related services, including without limitation amounts paid or incurred by Bank in enforcing its rights and remedies under this Agreement, or in connection with defending any claim made against Bank in connection with this Agreement, the Accounts, the Block Notice or any instruction provided by Agent pursuant to Section 2 (collectively, the "Charges").

In connection with the payment of the Charges in any month, Bank will debit the Accounts or any other account Operator maintains at Bank.  In the event the Accounts or such other accounts with Bank do not contain sufficient available funds to pay the Charges or Operator maintains no other accounts with Bank, Bank will bill Operator directly, and Operator agrees to pay Bank, via wire transfer or other immediately available funds, the amount of such Charges.  If Operator fails to pay the amount of the Charges within five (5) Business Days of

3

receipt of a billing statement detailing such Charges, Agent agrees to pay Bank, via wire transfer or other immediately available funds, the amount of such Charges within five (5) Business Days after receipt of a billing statement detailing such Charges, provided, however, that (a) Agent shall not be obligated to pay any Charges incurred prior to the date of the Block Notice, and (b) any such liability of Agent to Bank shall in no way release Borrower or Operator, as applicable, from liability to Agent and shall in no way impair Agent's rights and remedies against Borrower or Operator, by way of subrogation or otherwise, to collect all such fees and expenses, and all such amounts paid by Agent shall constitute a part of the "Obligations" under the Loan Agreement.

8.      Irrevocable Agreement.   Operator acknowledges the agreements made by it and the authorizations granted by it herein are irrevocable and the authorizations granted herein are powers coupled with an interest.

9.      Set-off.   Bank waives all of its existing and future rights of set-off and banker's liens against the Accounts and all items (and proceeds thereof) that come into possession of Bank in connection with the Accounts, except for (a) those rights of set-off and banker's liens arising in connection with (a) any charges, fees, expenses, payments and other amounts for which the Operator and/or Agent is responsible to Bank (including, without limitation, any of the foregoing with respect to cash management services provided by Bank to Operator, including, but not limited to, funds transfer (origination or receipt), trade, lockbox, commercial card, investment, disbursement, reconcilement, stop payment, positive pay, automatic investment, imaging, and information services), (b) Chargebacks, (c) Charges and (d) other amounts owed to Bank pursuant to Section 5 hereof.

10.      Miscellaneous.   This Agreement is binding upon the parties hereto and their respective successors and assigns (including any trustee of Operator appointed or elected in any action under the Bankruptcy Code) and shall inure to their benefit.  Neither Operator nor Agent shall be entitled to assign or delegate any of its rights or duties hereunder without first obtaining the express prior written consent of Bank.  Neither this Agreement nor any provision hereof may be changed, amended, modified or waived, except by an instrument in writing signed by the parties hereto.  Any provision of this Agreement that may prove unenforceable under any law or regulation shall not affect the validity of any other provision hereof.  This Agreement may be executed in any number of counterparts which together shall constitute one and the same instrument.

11.      Governing Law, Jurisdiction, and Venue.   Bank agrees that for the purpose of Section 9-304 of the UCC, its jurisdiction is the State of Illinois.  This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Illinois without regard to conflict of laws provisions.  Any action in connection with this Agreement shall be brought in the courts of the State of Illinois, located in Cook County, or the courts of the United States of America for the Northern District of Illinois.  Each party hereto irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds, irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of said courts.  Each party hereto intentionally, knowingly and voluntarily irrevocably waives any right to trial by jury in any proceeding related to this Agreement.

140860.00412/100007442v.2

12.   Termination and Resignation.  This Agreement may be terminated by Agent upon written notice to Bank.  Bank may, at any time upon thirty (30) days' prior written notice to Agent and Operator, terminate this Agreement and close the Accounts; provided, however, that Bank may terminate this Agreement immediately upon written notice to Agent and Operator in the event of a material breach of this Agreement (including non-payment of any charges or other obligations under this Agreement) by either Operator or Agent.  Upon termination of this Agreement, any funds in the Accounts shall be subject to the direction of Agent (if after Bank's receipt of a Block Notice) or Operator (if prior to Bank's receipt of a Block Notice), as applicable.

13.   Notices.  Unless otherwise specifically provided herein, any notice or other communication required or permitted to be given shall be in writing addressed to the respective party as set forth below and may be personally served, sent by electronic mail or sent by overnight courier service and shall be deemed to have been given:  (a) if delivered in person, when delivered; (b) if delivered by electronic mail, on the date of transmission if transmitted on a Business Day before 4:00 P.M. (Central time), or, if not, on the next succeeding Business Day; or (c) if delivered by reputable overnight courier, the Business Day on which such delivery is made by such courier.  Notices shall be addressed as follows:

|  |  |
|---|---|
| Agent: | AP MA FUNDING LLC |
|  | 4445 Willard Avenue, Suite 1100 |
|  | Chevy Chase, MD  20815 |
|  | Attn:  John Gray, Managing Director |
|  | Email: portfolio_management@alliancepartners.com |
|  |  |
| Operator: | West Revere Health Center, LLC |
|  | c/o Synergy Health Centers |
|  | 2363 Lakewood Road, Suite 200 |
|  | Toms River, New Jersey 08755 |
|  | Attn:  Avi Lipschutz |
|  | Email:  zisha@synergyhs.com |
|  |  |
| Bank: | The Private Bank and Trust Company |
|  | 120 South LaSalle Street |
|  | Chicago, Illinois 60603 |
|  | Attention:  Matt Tyler |
|  | Email:  mtyler@theprivatebank.com |
|  |  |
| With a copy to: | The PrivateBank and Trust Company |
|  | 70 West Madison Street |
|  | Chicago, IL 60602 |
|  | Attention:  Internal Client Services |
|  | Email:  clientservices@theprivatebank.com |

or in any case, to such other address as the party addressed shall have previously designated by written notice to the serving party, given in accordance with this Section.

[Signature page follows]

5

140860.00412/100007442v.2

This Agreement has been executed and delivered by each of the parties hereto by a duly authorized officer of each such party on the date first set forth above.

**WEST REVERE HEALTH CENTER, LLC,**
a Delaware limited liability company

By: _____
Name:  Avi Lipschutz
Title:    Manager
            Duly Authorized

**AP MA FUNDING LLC,**
a Delaware limited liability company, as Agent

By: _____
Name:
Title:

ACCEPTED AND AGREED TO
as of March ___, 2015

THE PRIVATE BANK AND TRUST COMPANY

By: _____
Name:  Matthew Tyler
Title:    Managing Director
Duly Authorized

This Agreement has been executed and delivered by each of the parties hereto by a duly authorized officer of each such party on the date first set forth above.

WEST REVERE HEALTH CENTER,
LLC, a Delaware limited liability company

By: _____
Name: Avi Lipschutz
Title: Manager

Duly Authorized

AP MA FUNDING LLC,
a Delaware limited liability company, as Agent

By: _____
Name:
Title:
      **John Gray**
      **Managing Director**

ACCEPTED AND AGREED TO
as of March ___, 2015

THE PRIVATE BANK AND TRUST COMPANY

By: _____
Name:
Title:

Duly Authorized

This Agreement has been executed and delivered by each of the parties hereto by a duly authorized officer of each such party on the date first set forth above.

**WEST REVERE HEALTH CENTER, LLC,**
a Delaware limited liability company

By: _____
Name:  Avi Lipschutz
Title:  Manager

Duly Authorized

**AP MA FUNDING LLC,**
a Delaware limited liability company, as Agent

By: _____
Name:
Title:

ACCEPTED AND AGREED TO
as of March ___, 2015

THE PRIVATE BANK AND TRUST COMPANY

By: _____
Name:
Title:

Duly Authorized

**EXHIBIT A**

| Account Name | Account Number | Tax Identification Number |
|---|---|---|
| Operating Account | 2446518 | ████4861 |
| | | |
| | | |
| | | |

## DEPOSITORY AGREEMENT
### (Commercial Depository Accounts)

**THIS DEPOSITORY AGREEMENT** (this "Agreement") is made and entered into as of the 12th day of March, 2015, by and among **THE PRIVATEBANK AND TRUST COMPANY**, an Illinois State-Chartered bank ("Bank"), **WEST REVERE HEALTH CENTER, LLC,** a Delaware limited liability company (the "Company"), and **AP MA FUNDING LLC,** a Delaware limited liability company, for itself and as agent for the Lenders (in such capacity, together with any successors and assigns, "Agent"). All capital terms used herein, but not otherwise defined, shall have the meaning given to them in the Loan Agreement (as defined below).

### RECITALS

**WHEREAS,** pursuant to that certain Term Loan and Security Agreement dated as March 12, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement") among Agent, the other financial institutions from time to time party thereto (the "Lenders") and 133 Salem Street, LLC (the "Borrower"), Agent and Lenders have agreed to make a certain loan and extend certain financial accommodations to Borrower (the "Loan");

**WHEREAS,** the Company and Borrower are affiliates and have entered into that certain Lease Agreement dated as of March 1, 2015 (the "Lease");

**WHEREAS,** as a condition precedent to the making of the Loan by Agent and Lenders to Borrower, the Company has agreed that all remittances made by account debtors in payment of accounts receivable of the Company be made to a controlled deposit account;

**WHEREAS,** the Company has established one or more deposit accounts through which cash, checks, money orders, electronic funds transfers (including wires and ACH) and other items of value (the "Items") of the Company are processed by Bank for deposit (collectively, the "Commercial Depository Account") which accounts are identified on Exhibit A attached hereto and incorporated herein by reference;

**WHEREAS,** the Company has further established an account with Bank for the deposit of all remittances made by Governmental Account Debtors in payment of accounts receivable of the Company made to such account ("Government Depository Account"); and

**WHEREAS,** the parties hereto desire to enter into this Agreement in order to set forth their relative rights and duties with respect to the Commercial Depository Account and all funds on deposit therein from time to time.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto agree as follows:

140860.00412/12486924v.2

## AGREEMENT

1.   **Effectiveness.**  This Agreement shall take effect immediately upon its execution by all parties hereto and shall supersede any blocked account or similar agreement in effect with respect to the Commercial Depository Account.

2.   **Security Interest; Agency.**  As collateral security for the Company's obligations to Agent and the Lenders under the Loan Agreement and the other Loan Documents described therein, Bank acknowledges that the Company has granted to Agent, for its benefit and the benefit of Lenders, a present and continuing security interest in, among other things, (a) the Commercial Depository Account, (b) all contract rights, claims and privileges in respect of the Commercial Depository Account, and (c) all cash, checks, money orders, drafts, notes, collection remittances and other items of value of the Company including those received via automated clearinghouse ("ACH") or wire transfer now or hereafter paid, deposited, credited, held (whether for collection, provisionally or otherwise) or otherwise in the possession or under the control of, or in transit to, Bank or any agent, bailee or custodian thereof (collectively, "Receipts"), and all proceeds of the foregoing.  Bank acknowledges that this Agreement constitutes notice, in accordance with the Uniform Commercial Code of Illinois (the "UCC"), of Agent's security interest in such collateral and does hereby consent thereto.  The Company hereby agrees that Bank, on behalf of Agent, shall be entitled to exercise, upon the written instructions of Agent, any and all rights which Agent may have under the Loan Agreement, the other Loan Documents described therein or under applicable law with respect to the Commercial Depository Account, all Receipts and all other collateral described in this Paragraph 2.

3.   **Control of Commercial Depository Account.**  All parties agree that the Commercial Depository Account is a "deposit account" within the meaning of Article 9 of the UCC.  In order to give Agent control over the Commercial Depository Account, as "control" is defined in the Uniform Commercial Code, Bank hereby agrees to comply with any and all instructions from time to time issued by Agent directing disposition of funds in any and all Commercial Depository Account and all other Receipts, without further consent by Company.  The Commercial Depository Account shall be under the sole dominion and control of Agent and shall be maintained by Bank in the names set forth on Exhibit A attached hereto and incorporated herein by reference.  Notwithstanding anything set forth herein to the contrary, neither the Company nor any other person or entity, through or under the Company, shall have any control over the use of, or any right to withdraw any amount from, the Commercial Depository Account.

4.   **Representations, Warranties and Covenants.**

    (a)   Each party hereto represents and warrants to the other parties hereto that such party has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and that such execution, delivery and performance shall not constitute or cause a breach of or default under such party's organizational documents or any material contract to which such party is bound.

    (b)   Each party hereto represents and warrants to the other parties hereto that this Agreement is legally valid and binding on such party, enforceable against such party in

2

accordance with its terms, except as limited by bankruptcy or other comparable laws affecting creditors' rights generally, and except as limited by the availability of equitable remedies.

(c)     Bank hereby represents and warrants to Agent that except for this Agreement, it has not entered into any agreement with any person or entity pursuant to which it is obligated to comply with instructions as to the disposition of funds from the Commercial Depository Account. Bank hereby covenants and agrees that it shall not, without the prior written consent of Agent, enter into any agreement with any other person or entity pursuant to which Bank is obligated to comply with instructions as to the disposition of funds from the Commercial Depository Account.

(d)     The Company represents and warrants that it has the legal authority to accept for deposit and otherwise negotiate Receipts in the form of Items payable to payees different from the Company's legal name as such name is designated on the Company's charter documents. The Company agrees that Bank may debit the Commercial Depository Account for the amount of any Item deposited and processed but not payable to the Company.

5.     **Procedures for Commercial Depository Account**. Bank shall follow the following procedures with respect to the Commercial Depository Account:

(a)     Bank shall have exclusive and unrestricted access to and shall have complete and exclusive authority to receive, pickup and open all regular, registered, certified or insured mail addressed to the Company (the "Mail") for deposit in the Commercial Depository Account.

(b)     On each business day of Bank, Bank shall pursuant to Bank's procedures then in place (i) open all Mail addressed to the Company and remove and inspect the enclosures, (ii) apply and credit for deposit to the Commercial Depository Account all Receipts consisting of checks, money orders, drafts, collection remittances and other instruments or items of value from time to time tendered by or on behalf of the Company for deposit (collectively, "Checks") in the Commercial Depository Account, and (iii) apply and credit to the Commercial Depository Account all Receipts tendered by or on behalf of the Company for deposit therein, including without limitation all ACH or wire transfers and other payments directed to the Commercial Depository Account. Upon the request of Bank, the Company shall provide any endorsement deemed necessary by Bank for the deposit of such Checks. The Company represents and warrants to Bank that all Checks deposited into the Commercial Depository Account bear the valid and legally binding endorsement of the payee named therein.

(c)     The Company hereby irrevocably authorizes Bank (and all persons designated by Bank for such purpose) to endorse the Company's name on all Checks payable to the name set forth on Exhibit A. Bank's appointment as agent to endorse such Checks is for the specific, limited and restricted purpose of endorsement for deposit as described above and at no time shall be interpreted as authorizing Bank as such agent to commit the Company or Agent to acceptance of any legend of any kind, nature or description appearing on such Checks.

(d)     The Company, Agent and Bank agree that, on a daily basis on each business day of Bank, Bank shall determine the balance of all available funds on deposit in the

3

Commercial Depository Account and shall automatically initiate a federal funds wire transfer in immediately available funds of all such funds not later than 2:00 p.m. (New York Time) on each such business day to the account designated below, or to such other account as may be designated in writing from time to time by Agent (the "Collection Account"):

| | |
|---|---|
| Bank: | The PrivateBank and Trust Company |
| | 120 S. LaSalle Street, Chicago, Illinois 60603 |
| ABA No.: | 071006486 |
| Account Name: | West Revere Health Center LLC, |
| | Operating account |
| Account No.: | 2446518 |

Each of Bank, Agent and the Company agrees that Bank will comply with these instructions and any other instructions originated by Agent directing disposition of the funds in the Commercial Depository Account without further consent by the Company.

6.   **Statements and Other Information**.  Bank shall send to Company and to Agent, copies of all returned and dishonored Checks promptly upon Bank's receipt thereof.   The Company authorizes Bank to provide Agent, monthly, with copies of all Commercial Depository Account statements.  In addition, the Company authorizes Bank to provide Agent with such other information relating to the Commercial Depository Account as shall reasonably be requested by Agent.  Bank shall also deliver to Agent a copy of all notices and statements required to be sent to the Company pursuant to any agreement governing or related to the Commercial Depository Account.  The Company agrees to pay any charges incurred by Bank associated with sending statements and other information to Agent.

7.   **Fees**.  The Company agrees to pay on demand all usual and customary service charges, transfer fees and account maintenance fees (collectively, "Fees") of Bank in connection with the Commercial Depository Account.  In the event the Company fails to make a payment to Bank of any Fees on a timely basis, Bank may offset and charge any account of the Company held by Bank other than the Commercial Depository Account or Government Depository Account for the amount of such Fees only.  In the event that the Company does not pay such Fees within five (5) business days after demand by Bank, and there are insufficient sums in any account of the Company held by Bank other than the Commercial Depository Account or Government Depository Account to pay such Fees as described in the preceding sentence, then, commencing five (5) business days after Bank both (a) made demand for the applicable Fee and (b) advised Agent in writing that such Fee has not been paid, the Company agrees that Bank shall be entitled to debit the Commercial Depository Account to pay such Fees.   Under no circumstances shall Agent have any responsibility or liability for the payment of any Fees.

4

8. **Uncollected Funds**. Bank shall demand reimbursement and may immediately set off against the Commercial Account for (a) returned or charged-back items, including without limitation, returned electronic funds transfers, checks or items returned for a claimed violation of a UCC endorsement warranty, (b) reversals or cancellations of payment orders and other electronic fund transfers, and (c) overdrafts resulting from adjustments or corrections of previous credits or other postings in the Commercial Depository Account (collectively "Uncollected Funds") from the Company directly. In the event the Company shall have failed to reimburse Bank or there were inadequate funds in the Commercial Account to reimburse Bank for such Uncollected Funds within a reasonable period, not to exceed two (2) business days, following Bank's request for reimbursement or set-off, Bank may offset and charge any other account of the Company held by Bank other than the Government Depository Account to reimburse Bank for the Uncollected Funds only. If there are insufficient funds in the Commercial Depository Account (or such other accounts as described above) to reimburse Bank for such Uncollected Funds, then Agent shall pay the amount of such Uncollected Funds, to the extent Agent received value for such items, within two (2) business days of receipt of written demand for such payment, provided that such demand is received within ninety (90) days of such item having been credited to the Collection Account.

9. **Set-off**. Bank hereby agrees that during the term of this Agreement, Bank will not exercise or claim any right of set-off or banker's lien against the Commercial Depository Account or any Receipts on deposit therein, and Bank hereby further waives until such date any such right or lien which it may have against any Receipts deposited in the Commercial Depository Account, except to the extent expressly set forth in or for amounts owed to Bank pursuant to Paragraphs 7, 8 and 10 herein.

10. **Exculpation of Bank; Indemnification by the Company**. The Company and Agent agree that Bank shall have no liability to either of them for any loss or damage that either or both may claim to have suffered or incurred, either directly or indirectly, by reason of this Agreement or any transaction or service contemplated by the provisions hereof, unless occasioned by the gross negligence or willful misconduct of Bank. In no event shall Bank be liable for losses or delays resulting from computer malfunction, interruption of communication facilities, labor difficulties or other causes beyond Bank's reasonable control or for indirect, punitive, incidental, special or consequential damages or lost profits, even if the Bank has been advised of the possibility of such losses or damages. The Company agrees to indemnify and hold each of Bank and Agent harmless from and against any and all claims, other than those ultimately determined to be founded on gross negligence or willful misconduct of Bank, and from and against any damages, penalties, judgments, liabilities, losses or expenses (including reasonable attorney's fees and disbursements) (collectively, "Losses") incurred as a result of the assertion of any claim, by any person or entity, arising out of, or otherwise related to, any transaction conducted or service provided by Bank through the use of any account at Bank pursuant to the procedures provided for or contemplated by this Agreement and pay to Bank on demand the amount of all such Losses. Agent hereby agrees to indemnify and hold Bank harmless from and against any and all Losses arising out of or related to Bank acting in accordance with and pursuant to instructions reasonably believed by Bank to be provided by Agent under the terms of this Agreement, and to pay Bank on demand the amount of all such Losses other than Losses resulting from Bank's gross negligence or willful misconduct.

5

11.  **Termination**.

(a)     This Agreement may be terminated by Agent at any time, with or without cause, upon its delivery of written notice thereof to each of the Company and Bank. This Agreement may be terminated by Bank at any time on not less than thirty (30) days prior written notice delivered to each of the Company and Agent; provided that this Agreement may be terminated on lesser notice as reasonably deemed appropriate by Bank (on written notice to Agent) if Bank reasonably believes that the Commercial Depository Account is being used in connection with any unlawful activity which has a reasonable likelihood of subjecting Bank to criminal or civil liability or upon notice by Bank in the event of a default (including failure of any party to pay any obligation owed to Bank hereunder) by any party hereto. Termination of this Agreement shall not affect any obligation incurred under this Agreement before the effective date of such termination; provided that in no event shall Agent have any obligation hereunder in respect of the Commercial Depository Account or otherwise after the effective date of termination of this Agreement except as expressly set forth herein and unless such obligation, if any, arises from or relates to any period prior to the effective date of such termination.

(b)     Upon receipt of such notice of termination to or by Bank, Bank will: (i) for a period of thirty (30) days after Bank's notice of termination immediately transmit to the Collection Account (A) all funds, if any, then on deposit in, or otherwise to the credit of, the Commercial Depository Account, and (B) upon receipt, all Receipts (other than Checks) received after such notice for deposit in, or otherwise to the credit of, the Commercial Depository Account; and (ii) unless such termination is due to a default as a result of Company's failure to pay any obligation owed to Bank under Sections 7 and 8 hereof, for a period of thirty (30) days after Bank's notice of termination, deliver directly to Agent all Checks, whether then in the possession of Bank or received by Bank after such notice, without depositing such Checks in the Commercial Depository Account or any other account. For purposes of this paragraph, the power of attorney granted by the Company in favor of Bank pursuant to Paragraph 5(c) shall survive for the duration of Bank's obligations hereunder

(c)     The provisions of Paragraphs 2, 3 and 9 shall survive termination of this Agreement unless and until specifically released by Agent in writing. All rights of Bank under Paragraphs 7, 8 and 10 shall survive any termination of this Agreement.

12.  **Irrevocable Agreements**. The Company acknowledges that the agreements made by it and the authorizations granted by it in Paragraphs 2, 3, and 5 hereof are irrevocable and that the authorizations granted in Paragraphs 2, 3 and 5 hereof are powers coupled with an interest.

13.  **Customer Agreement**. This Agreement supplements rather than replaces Bank's account agreement, terms and conditions and other standard documentation in effect from time to time with respect to the Commercial Depository Account or services provided in connection with the Commercial Depository Account. In the event of a conflict between this Agreement and any other agreement between Bank and the Company, the terms of this Agreement will prevail; provided, however, that this Agreement shall not alter or affect any mandatory arbitration provision currently in effect between Bank and the Company pursuant to a separate agreement.

6

14.   **Tax Reporting**.  All reports with respect to the Commercial Depository Account required of Bank under the Internal Revenue Code or any applicable state taxation laws, rules or regulations shall be made under the name and taxpayer identification number of the Company.

15.   **Court Orders**.  Bank shall disregard any and all notices, orders or instructions received from any source, except only (a) such notices, orders or instructions as are allowed by the terms of this Agreement and (b) orders or process (including, without limitation, any judgment, decree, injunction, garnishment, tax levy or writ of seizure) of a court of competent jurisdiction or of any federal, state or local government entity (each an "Order").  If, from time to time, the Commercial Depository Account becomes subject to an Order, Bank may comply with any such Order in good faith without liability to any person, even though such Order may thereafter be annulled, reversed, modified or vacated.  In addition, upon receipt of an Order or upon receipt of conflicting claims to the Commercial Depository Account or the proceeds of the Commercial Depository Account and upon Bank's good faith determination that such action is necessary to protect its interests, Bank may interplead the Commercial Depository Account proceeds into an appropriate court of competent jurisdiction and seek a determination of its rights and obligations with respect to the Commercial Depository Account.

16.   **Notices**.  All notices, requests or other communications given to the Company, Agent or Bank shall be given in writing (including by electronic mail) at the address specified below:

| | |
|---|---|
| Agent: | AP MA Funding LLC<br>4445 Willard Avenue, Suite 1100<br>Chevy Chase, MD  20815<br>Attn:  John Gray, Managing Director<br>Email: portfolio_management@alliancepartners.com |
| Bank: | The PrivateBank and Trust Company<br>120 S. LaSalle Street<br>Chicago, IL 60603<br>Attn:  Matthew Tyler, Managing Director<br>Email:  mtyler@theprivatebank.com and<br>clientservices@theprivatebank.com |
| Company: | 133 Salem Street, LLC<br>c/o Synergy Health Centers<br>2363 Lakewood Road, Suite 200<br>Toms River, NJ 08755<br>Attention: Zisha Lipschutz<br>E-Mail: zisha@synergyhs.com |

Any party may change its address for notices hereunder by notice to each other party hereunder given in accordance with this Paragraph 16.  Each notice, request or other communication shall be effective (a) if given by electronic mail, when such electronic mail is transmitted to the email specified in this Paragraph 16 and confirmation of receipt is made by the appropriate party, or (b) if given by overnight courier, twenty-four (24) hours after such

7

communication is deposited with the overnight courier for delivery, addressed as aforesaid, or (c) if given by any other means, when delivered at the address specified in this Paragraph 16.

17.     **Miscellaneous.**

(a)     Bank may rely, and Bank shall be protected in acting or refraining from acting, upon any notice (including but not limited to electronically confirmed facsimiles of such notice) reasonably believed by Bank to be genuine and to have been given by the proper party or parties.

(b)     This Agreement may be amended only by a written instrument executed by Agent, Bank, and the Company acting by their respective duly authorized representatives. No waiver of any rights hereunder shall be binding on any party hereto unless such waiver is in writing and signed by the party against whom enforcement is sought.

(c)     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, but the Company shall not be entitled to assign or delegate any of its rights or duties hereunder without first obtaining the express prior written consent of Agent.

(d)     This Agreement may be executed in any number of several counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Signatures by facsimile or by electronic mail delivery of an electronic version of any executed signature page shall bind the parties hereto.

(e)     THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO ANY OTHERWISE APPLICABLE CONFLICTS OF LAW PRINCIPLES THEREOF. THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY.

(f)     If any term or provision set forth in this Agreement shall be invalid or unenforceable, the remainder of this Agreement, other than those provisions held invalid or unenforceable, shall be construed in all respects as if such invalid or unenforceable term or provision were omitted.

(g)     The Company and Agent, as the case may be, are responsible for, and Bank may rely upon, the contents of any notice or instruction that Bank believes in good faith to be from the Company or Agent, as the case may be, without any independent investigation. Bank shall have no duty to inquire into the authority of the person in giving such notice or instruction. In the event that Bank receives conflicting notices or instructions, Bank may refuse to act.

(h)     Bank shall not be deemed to have any knowledge (imputed or otherwise) of: (a) any of the terms or conditions of the Loan Agreement or any document referred to therein or relating to any financing arrangement between the Company and Agent, or any breach thereof, or (b) any occurrence or existence of a default. Bank has no obligation to inform any person of such breach or to take any action in connection with any of the foregoing, except such actions

8

regarding the Commercial Depository Account as are specified in this Agreement. Bank is not responsible for the enforceability or validity of the security interest in the items and the Commercial Depository Account.

(i)     Neither the Company, Agent nor Bank will be liable for any failure to perform its obligations when the failure arises out of causes beyond its control, including, without limitation, an act of a governmental regulatory/authority, an act of God, accident, equipment failure, labor disputes or system failure, provided it has exercised such diligence as the circumstances require.

(j)     Nothing in this Agreement, unless otherwise agreed in writing, or any course of dealing among the Company, Agent or Bank commits or obligates Bank to extend any overdraft or other credit to the Company or Agent.

*(Signature Pages Follow)*

9

*Signature Page to Depository Agreement*
*(Commercial Depository Accounts)*

**IN WITNESS WHEREOF,** each of the parties has duly executed and delivered this Agreement as of the day and year first above set forth.

**BANK:**

**THE PRIVATEBANK AND TRUST COMPANY,** an Illinois State-Chartered bank

By: _____
Name:
Title:

<u>Signature Page to Depository Agreement</u>
<u>(Commercial Depository Accounts)</u>

**COMPANY:**

**WEST REVERE HEALTH CENTER, LLC,**
a Delaware limited liability company

By: _____

Name:    Avi Lipschutz
Title:    Manager
Duly Authorized

*Signature Page to Depository Agreement*
*(Commercial Depository Accounts)*

AGENT:

AP MA FUNDING LLC,
a Delaware limited liability company, as Agent

By: _____
Name:
Title:

**John Gray**
**Managing Director**

**EXHIBIT A**

**LIST OF ALL DEPOSITORY ACCOUNTS**

| Name | FEIN | Account Number |
|------|------|----------------|
| West Revere Health Center, LLC | ████4861 | 2430939 |

Exhibit A – Page 1

## DEPOSITORY AGREEMENT
### (Government Depository Accounts)

**THIS DEPOSITORY AGREEMENT** (this "<u>Agreement</u>") is made and entered into as of the 12th day of March, 2015, by and among **THE PRIVATEBANK AND TRUST COMPANY**, an Illinois State-Chartered bank ("<u>Bank</u>"), **WEST REVERE HEALTH CENTER, LLC**, a Delaware limited liability company (the "<u>Company</u>"), and **AP MA FUNDING LLC**, a Delaware limited liability company, for itself and as agent for the Lenders (in such capacity, together with any successors and assigns, "<u>Agent</u>"). All capital terms used herein, but not otherwise defined, shall have the meaning given to them in the Loan Agreement (as defined below).

### RECITALS

**WHEREAS**, pursuant to that certain Term Loan and Security Agreement dated as March 12, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Loan Agreement</u>") among Agent, the other financial institutions from time to time party thereto (the "<u>Lenders</u>") and 133 Salem Street, LLC (the "<u>Borrower</u>"), Agent and Lenders have agreed to make a certain loan and extend certain financial accommodations to Borrower (the "<u>Loan</u>");

**WHEREAS,** the Company and Borrower are affiliates and have entered into that certain Lease Agreement dated as of March 1, 2015 (the "<u>Lease</u>");

**WHEREAS**, as a condition precedent to the making of the Loan by Agent and Lenders to Borrower, the Company has agreed that all remittances made by Governmental Account Debtors in payment of accounts receivable of the Company be made to a controlled deposit account;

**WHEREAS**, the Company has established one or more deposit accounts with Bank through which cash, checks, money orders, electronic funds transfers (including wires and ACH) and other items of value ("<u>Items</u>") of the Company are processed by Bank for deposit (collectively, the "<u>Government Depository Account</u>"), which accounts are identified on <u>Exhibit A</u> attached hereto and incorporated herein by reference; and

**WHEREAS**, the Company has further established an account with Bank for the deposit of all remittances made by other account debtors in payment of accounts receivable of the Company made to such account ("<u>General Depository Account</u>"); and

**WHEREAS**, the parties hereto desire to enter into this Agreement to set forth their relative rights and duties with respect to the Government Depository Account and all funds on deposit therein from time to time.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto agree as follows:

<u>AGREEMENTS</u>

1.      **Effectiveness**.  This Agreement shall take effect immediately upon its execution by all parties hereto and shall supersede any blocked account or other similar agreement in effect with respect to the Government Depository Account.

2.      **Security Interest; Agency**.  As collateral security for the Company's obligations to Agent and Lenders under the Loan Agreement and the other Loan Documents described therein, Bank acknowledges that the Company has granted to Agent, for its benefit and the benefit of Lenders, a present and continuing security interest in, among other things, (a) the Government Depository Account, (b) all contract rights, claims and privileges in respect of the Government Depository Account, and (c) all cash, checks, money orders, drafts, notes, collection remittances and other items of value of the Company including those received via automated clearinghouse ("<u>ACH</u>") or wire transfer now or hereafter paid, deposited, credited, held (whether for collection, provisionally or otherwise) or otherwise in the possession or under the control of, or in transit to, Bank or any agent, bailee or custodian thereof (collectively, "<u>Receipts</u>"), and all proceeds of the foregoing.  Bank acknowledges that this Agreement constitutes notice, in accordance with the Uniform Commercial Code of Illinois (the "<u>UCC</u>"), of Agent's security interest in such collateral and does hereby consent thereto.  The Company hereby agrees that Bank, on behalf of Agent, shall be entitled to exercise, upon the written instructions of Agent, any and all rights which Agent may have under the Loan Agreement, the other Loan Documents described therein or under applicable law with respect to the Government Depository Account, all Receipts and all other collateral described in this Paragraph 2.

3.      **Control of Government Depository Account**.    All parties agree that the Government Depository Account is a "deposit account" within the meaning of Article 9 of the UCC. The Government Depository Account shall be under the sole dominion and control of the Company and shall be maintained by Bank in the name set forth on Exhibit A attached hereto and incorporated herein by reference.  Bank agrees that it shall not enter into a control agreement regarding the Government Depository Account with any other person or entity.

4.      **Representations, Warranties and Covenants**.

(a)      Each party hereto represents and warrants to the other parties hereto that such party has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and that such execution, delivery and performance shall not constitute or cause a breach of or default under such party's organizational documents or any material contract to which such party is bound.

(b)      Each party hereto represents and warrants to the other parties hereto that this Agreement is legally valid and binding on such party, enforceable against such party in accordance with its terms, except as limited by bankruptcy or other comparable laws affecting creditors' rights generally, and except as limited by the availability of equitable remedies.

140860.00412/12486921v.2

(c)     Bank hereby represents and warrants to Agent that except for this Agreement, it has not entered into any agreement with any person or entity pursuant to which it is obligated to comply with instructions as to the disposition of funds from the Government Depository Account. Bank hereby covenants and agrees that it shall not, without the prior written consent of Agent, enter into any agreement with any other person or entity pursuant to which Bank is obligated to comply with instructions as to the disposition of funds from the Government Depository Account.

(d)     Company represents and warrants that it has the legal authority to accept for deposit and otherwise negotiate Receipts in the form of Items payable to payees different from the Company's legal name as such name is designated on Company's charter documents. The Company agrees that Bank may debit the Government Depository Account for the amount of any Item deposited and processed but not payable to the Company.

5.     **Procedures for Government Depository Account.**  Bank shall follow the following procedures with respect to the Government Depository Account:

(a)     Bank shall have exclusive and unrestricted access to and shall have complete and exclusive authority to receive, pickup and open all regular, registered, certified or insured mail addressed to the Company (the "Mail") for deposit in the Government Depository Account.

(b)     On each business day of Bank, Bank shall pursuant to Bank's procedures then in place (i) open all Mail addressed to the Company and remove and inspect the enclosures, (ii) apply and credit for deposit to the Government Depository Account all Receipts consisting of checks, money orders, drafts, collection remittances and other instruments or items of value from time to time tendered by or on behalf of the Company for deposit (collectively, "Checks") in the Government Depository Account, and (iii) apply and credit to the Government Depository Account all Receipts tendered by or on behalf of the Company for deposit therein, including without limitation all ACH or wire transfers and other payments directed to the Government Depository Account. Upon the request of Bank, the Company shall provide any endorsement deemed necessary by Bank for the deposit of such Checks. The Company represents and warrants to Bank that all Checks deposited into the Government Depository Account bear the valid and legally binding endorsement of the payee named therein.

(c)     Company hereby irrevocably authorizes Bank (and all persons designated by Bank for such purpose) to endorse the Company's name on all Checks payable to the name set forth on Exhibit A and other acceptable payees pursuant to the terms of this Agreement. Bank's appointment as agent to endorse such Checks is for the specific, limited and restricted purpose of endorsement for deposit as described above and at no time shall be interpreted as authorizing Bank as such agent to commit the Company or Agent to acceptance of any legend of any kind, nature or description appearing on such Checks.

(d)     Company, Agent and Bank agree that, on a daily basis on each business day of Bank, Bank shall determine the balance of all available funds on deposit in the Government Depository Account and shall automatically initiate a federal funds wire transfer or other form of electronic funds transfer in immediately available funds of all such funds not later

3

than 2:00 p.m. (New York Time) on each such business day to the account designated below, or to such other account as may be designated in writing from time to time by Agent (the "Concentration Account"):

| | |
|---|---|
| Bank Name: | The PrivateBank and Trust Company |
| Bank Address: | 120 S. LaSalle Street, Chicago, Illinois 60603 |
| Account Name: | West Revere Health Center, LLC<br>Operating Account |
| ABA #: | 071006486 |
| Account No.: | 2446518 |

The Company may modify these directions by written notice to Bank, provided that such modification shall not become effective until ten (10) business days after Bank has delivered to Agent a copy of such written notice from the Company by facsimile or overnight delivery service to Agent's address shown in Paragraph 16 below.

6.     **Statements and Other Information**.  Bank shall send to Company and Agent, copies of all returned and dishonored Receipts promptly upon Bank's receipt thereof.   The Company authorizes Bank to provide Agent, monthly, with copies of all Government Depository Account statements.  In addition, the Company authorizes Bank to provide Agent with such other information relating to the Government Depository Account as shall reasonably be requested by Agent.  Bank shall also deliver to Agent a copy of all notices and statements required to be sent to the Company pursuant to any agreement governing or related to the Government Depository Account.  The Company agrees to pay any charges incurred by Bank associated with sending statements and other information to Agent.

7.     **Fees**.  The Company agrees to pay on demand all usual and customary service charges, transfer fees and account maintenance fees (collectively, "Fees") of Bank in connection with the Government Depository Account. In the event the Company fails to make a payment to Bank of any Fees on a timely basis, Bank may offset and charge any account of the Company held by Bank other than the Government Depository Account for the amount of such Fees only. In the event that the Company does not pay such Fees within five (5) business days after demand by Bank, and there are insufficient sums in any account of the Company held by Bank other than the Government Depository Account or the Concentration Account to pay such Fees as described in the preceding sentence, then, commencing five (5) business days after Bank both (a) made demand for the applicable Fee and (b) advised Agent in writing that such Fee has not been paid, Company agrees that Bank shall be entitled to debit the Government Depository Account to pay such Fees.  Under no circumstances shall Agent have any responsibility or liability for the payment of any Fees.

4

8.    **Uncollected Funds**.  Bank shall demand reimbursement and may immediately set off against the Government Depository Account for (a) returned or charged-back items, including without limitation, returned electronic funds transfers, checks or items returned for a claimed violation of a UCC endorsement warranty, (b) reversals or cancellations of payment orders and other electronic fund transfers, and (c) overdrafts resulting from adjustments or corrections of previous credits or other postings in the Government Depository Account (collectively "Uncollected Funds") from the Company directly.  In the event the Company shall have failed to reimburse Bank or there were inadequate funds in the Governmental Depository Account to reimburse Bank for such Uncollected Funds within a reasonable period, not to exceed two (2) business days, following Bank's request for reimbursement or set-off, Bank may offset and charge the Government Depository Account (or any other account of the Company held by Bank other than the Concentration Account) to reimburse Bank for the Uncollected Funds only. If there are insufficient funds in the Government Depository Account (or such other accounts as described above) to reimburse Bank for such Uncollected Funds, then Agent shall pay the amount of such Uncollected Funds, to the extent Agent received value for such items, within two (2) business days of receipt of written demand for such payment, provided that such demand is received within ninety (90) days of such item having been credited to the Concentration Account.

9.    **Set-off**.  Bank hereby agrees that during the term of this Agreement, Bank will not exercise or claim any right of set-off or banker's lien against the Government Depository Account or any Receipts on deposit therein, and Bank hereby further waives until such date any such right or lien which it may have against any Receipts deposited in the Government Depository Account, except to the extent expressly set forth in or for amounts owed to Bank pursuant to Paragraphs 7, 8 and 10 herein.

10.    **Exculpation of Bank; Indemnification by the Company**.  Company and Agent agree that Bank shall have no liability to either of them for any loss or damage that either or both may claim to have suffered or incurred, either directly or indirectly, by reason of this Agreement or any transaction or service contemplated by the provisions hereof, unless occasioned by the gross negligence or willful misconduct of Bank.  In no event shall Bank be liable for losses or delays resulting from computer malfunction, interruption of communication facilities, labor difficulties or other causes beyond Bank's reasonable control or for indirect, punitive, incidental, special or consequential damages or lost profits, even if the Bank has been advised of the possibility of such losses or damages.  The Company agrees to indemnify and hold each of Bank and Agent harmless from and against any and all claims, other than those ultimately determined to be founded on gross negligence or willful misconduct of Bank, and from and against any damages, penalties, judgments, liabilities, losses or expenses (including reasonable attorney's fees and disbursements) (collectively, "Losses") incurred as a result of the assertion of any claim, by any person or entity, arising out of, or otherwise related to, any transaction conducted or service provided by Bank through the use of any account at Bank pursuant to the procedures provided for or contemplated by this Agreement and to pay to Bank on demand the amount of all such Losses.  Agent hereby agrees to indemnify and hold Bank harmless from and against any and all Losses arising out of or related to Bank acting in accordance with and pursuant to instructions reasonably believed by Bank to be provided by Agent under the terms of this Agreement, and to pay to Bank on demand the amount of all such Losses other than Losses resulting from Bank's gross negligence or willful misconduct.

5

11.   **Termination**.

(a)     This Agreement may be terminated by Agent at any time, with or without cause, upon its delivery of written notice thereof to the Company and Bank.  This Agreement may be terminated by Bank at any time on not less than thirty (30) days prior written notice delivered to the Company and Agent; provided that this Agreement may be terminated on lesser notice as reasonably deemed appropriate by Bank (on written notice to Agent) if Bank reasonably believes that the Government Depository Account is being used in connection with any unlawful activity which has a reasonable likelihood of subjecting Bank to criminal or civil liability or upon notice by Bank in the event of a default (including failure of any party to pay any obligation owed to Bank hereunder) by any party hereto.  Termination of this Agreement shall not affect any obligation incurred under this Agreement before the effective date of such termination; provided that in no event shall Agent have any obligation hereunder in respect of the Government Depository Account or otherwise after the effective date of termination of this Agreement except as expressly set forth herein and unless such obligation, if any, arises from or relates to any period prior to the effective date of such termination.

(b)     Upon receipt of such notice of termination to or by Bank, Bank will: (i) for a period of thirty (30) days after Bank's notice of termination, immediately transmit to the Concentration Account (A) all funds, if any, then on deposit in, or otherwise to the credit of, the Government Depository Account, and (B) upon receipt, all Receipts (other than Checks) received after such notice for deposit in, or otherwise to the credit of, the Government Depository Account; and (ii) unless such termination is due to a default as a result of Company's failure to pay any obligation owed to Bank under Sections 7 and 8 hereof, for a period of thirty (30) days after Bank's notice of termination, deliver directly to Agent all Checks, whether then in the possession of Bank or received by Bank after such notice, without depositing such Checks in the Government Depository Account or any other account.  The Company may modify the directions in subpart (ii) of the preceding sentence by written notice to Bank, provided that such modification shall not become effective until ten (10) business days after Bank has delivered to Agent a copy of such written notice from the Company by facsimile or overnight delivery service to Agent's address shown in Paragraph 16 below.  For purposes of this paragraph, the power of attorney granted by the Company in favor of Bank pursuant to Paragraph 5(c) shall survive for the duration of Bank's obligations hereunder.

(c)     The provisions of Paragraphs 2, 3 and 9 shall survive termination of this Agreement unless and until specifically released by Agent in writing.  All rights of Bank under Paragraphs 7, 8 and 10 shall survive any termination of this Agreement.

12.   **Irrevocable Agreements**.  Company acknowledges that the agreements made by it and the authorizations granted by it in Paragraphs 2, 3, and 5 hereof are irrevocable, subject to the rights of Company provided therein, and that the authorizations granted in Paragraphs 2, 3 and 5 hereof are powers coupled with an interest.

13.   **Customer Agreement**.  This Agreement supplements rather than replaces Bank's account agreement, terms and conditions and other standard documentation in effect from time to time with respect to the Government Depository Account or services provided in connection with the Government Depository Account.  In the event of a conflict between this Agreement

6

and any other agreement between Bank and the Company, the terms of this Agreement will prevail; provided, however, that this Agreement shall not alter or affect any mandatory arbitration provision currently in effect between Bank and the Company pursuant to a separate agreement.

14.     **Tax Reporting**.  All reports with respect to the Government Depository Account required of Bank under the Internal Revenue Code or any applicable state taxation laws, rules or regulations shall be made under the name and taxpayer identification number of the Company.

15.     **Court Orders**.  Bank shall disregard any and all notices, orders or instructions received from any source, except only (a) such notices, orders or instructions as are allowed by the terms of this Agreement and (b) orders or process (including, without limitation, any judgment, decree, injunction, garnishment, tax levy or writ of seizure) of a court of competent jurisdiction or of any federal, state or local government entity (each an "Order").  If, from time to time, the Government Depository Account becomes subject to an Order, Bank may comply with any such Order in good faith without liability to any person, even though such Order may thereafter be annulled, reversed, modified or vacated.  In addition, upon receipt of an Order or upon receipt of conflicting claims to the Government Depository Account or the proceeds of the Government Depository Account and upon Bank's good faith determination that such action is necessary to protect its interests, Bank may interplead the Government Depository Account proceeds into an appropriate court of competent jurisdiction and seek a determination of its rights and obligations with respect to the Government Depository Account.

16.     **Notices**.  All notices, requests or other communications given to the Company, Agent or Bank shall be given in writing (including by electronic mail) at the address specified below:

|  |  |
|---|---|
| Agent: | AP MA Funding LLC<br>4445 Willard Avenue, Suite 1100<br>Chevy Chase, MD  20815<br>Attn: John Gray, Managing Director<br>Email: portfolio_management@alliancepartners.com |
| Bank: | The PrivateBank and Trust Company<br>120 S. LaSalle Street<br>Chicago, IL 60603<br>Attn:  Matthew Tyler, Managing Director<br>Email: mtyler@theprivatebank.com and<br>clientservices@theprivatebank.com |
| Company: | 133 Salem Street, LLC<br>c/o Synergy Health Centers<br>2363 Lakewood Road, Suite 2A<br>Toms River, New Jersey 06723<br>Attention: Zisha Lipschutz<br>Email: zisha@synergyhs.com |

7

Any party may change its address for notices hereunder by notice to each other party hereunder given in accordance with this Paragraph 16. Each notice, request or other communication shall be effective (a) if given by electronic mail, when such electronic mail is transmitted to the email address specified in this Paragraph 16 and confirmation of receipt is made by the appropriate party, or (b) if given by overnight courier, twenty-four (24) hours after such communication is deposited with the overnight courier for delivery, addressed as aforesaid, or (c) if given by any other means, when delivered at the address specified in this Paragraph 16.

17.   **Miscellaneous**.

(a)   Bank may rely, and Bank shall be protected in acting or refraining from acting, upon any notice (including but not limited to electronically confirmed facsimiles of such notice) reasonably believed by Bank to be genuine and to have been given by the proper party or parties.

(b)   This Agreement may be amended only by a written instrument executed by Agent, Bank, and the Company acting by their respective duly authorized representatives. No waiver of any rights hereunder shall be binding on any party hereto unless such waiver is in writing and signed by the party against whom enforcement is sought.

(c)   This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, but the Company shall not be entitled to assign or delegate any of its rights or duties hereunder without first obtaining the express prior written consent of Agent.

(d)   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Signatures by facsimile or by electronic mail delivery of an electronic version of any executed signature page shall bind the parties hereto.

(e)   THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO ANY OTHERWISE APPLICABLE CONFLICTS OF LAW PRINCIPLES. THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY.

(f)   If any term or provision set forth in this Agreement shall be invalid or unenforceable, the remainder of this Agreement, other than those provisions held invalid or unenforceable, shall be construed in all respects as if such invalid or unenforceable term or provision were omitted.

(g)   The Company and Agent, as the case may be, are responsible for, and Bank may rely upon, the contents of any notice or instruction that Bank believes in good faith to be from the Company or Agent, as the case may be, without any independent investigation. Bank shall have no duty to inquire into the authority of the person in giving such notice or instruction. In the event that Bank receives conflicting notices or instructions, Bank may refuse to act.

8

(h)     Bank shall not be deemed to have any knowledge (imputed or otherwise) of:  (a) any of the terms or conditions of the Loan Agreement or any document referred to therein or relating to any financing arrangement between the Company and Agent, or any breach thereof, or (b) any occurrence or existence of a default.  Bank has no obligation to inform any person of such breach or to take any action in connection with any of the foregoing, except such actions regarding the Government Depository Account as are specified in this Agreement.  Bank is not responsible for the enforceability or validity of the security interest in the items and the Government Depository Account.

(i)     Neither the Company, Agent, nor Bank will be liable for any failure to perform its obligations when the failure arises out of causes beyond its control, including, without limitation, an act of a governmental regulatory/authority, an act of God, accident, equipment failure, labor disputes or system failure, provided it has exercised such diligence as the circumstances require.

(j)     Nothing in this Agreement, unless otherwise agreed in writing, or any course of dealing among the Company, Agent or Bank commits or obligates Bank to extend any overdraft or other credit to the Company or Agent.

*(Signature Pages Follow)*

9

*Signature Page to Depository Agreement*
*(Government Depository Accounts)*

**IN WITNESS WHEREOF**, each of the parties has duly executed and delivered this Agreement as of the day and year first above set forth.

**BANK:**                                      **THE PRIVATEBANK AND TRUST COMPANY**, an Illinois State-Chartered bank

By: _____

Name: _____

Title: _____

*Signature Page to Depository Agreement*
*(Government Depository Accounts)*

**COMPANY:**

**WEST REVERE HEALTH CENTER, LLC,**
a Delaware limited liability company

By: _____
Name:  Avi Lipschutz
Title:  Manager
Duly Authorized

*Signature Page to Depository Agreement*
*(Government Depository Accounts)*

**COMPANY:**

AP MA FUNDING LLC,
a Delaware limited liability company

By: _____

Name:

Title: **John Gray**
**Managing Director**

Duly Authorized

## EXHIBIT A

## LIST OF ALL GOVERNMENT DEPOSITORY ACCOUNTS

| Name of Owner of Account | FEIN | Account Number | Description of Account |
|---|---|---|---|
| West Revere Health Center, LLC | ████4861 | 2443017 | Government Depository Account |

140860.00412/12486921v.2

## **Exhibit G**

Forbearance Agreement

(see attached)

## FORBEARANCE AGREEMENT

This Forbearance Agreement (this "Forbearance Agreement") is made as of this 30th day of December 2016 by and among 133 SALEM STREET, LLC, a Delaware limited liability company ("Borrower"); AP MA FUNDING LLC, a Delaware limited liability company, as agent for Lenders ("Agent") and as a Lender; BANCALLIANCE, INC., a Maryland corporation, as a Lender; AVI "ZISHA" LIPSCHUTZ, an adult individual ("Zisha"), DOV NEWMARK, an adult individual ("Dov" and together with Zisha and with their successors and assigns, each a "Guarantor" and collectively, jointly and severally, the "Guarantor").

## RECITALS

WHEREAS, pursuant to that certain Term Loan and Security Agreement dated as of March 12, 2015, by and among Borrower, Agent and Lender (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), Agent and Lender agreed to make a loan available to Borrower. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Loan Agreement.

WHEREAS, the Obligations under the Loan Documents are secured by, inter alia, a first priority mortgage on the Property.

WHEREAS, pursuant to that certain Guaranty dated as of March 12, 2015, Guarantor guaranteed the payment of certain indebtedness and the performance of Borrower's Obligations to Lender under the Loan Documents on the terms set forth therein.

WHEREAS, the Events of Default set forth on Schedule 1 hereto have occurred under the Loan Documents and have not been waived or cured (the "Existing Defaults").

WHEREAS, notwithstanding the Existing Defaults, Borrower has asked Agent and Lender to forbear from exercising their rights and remedies under the Loan Documents and applicable law.

WHEREAS, subject to the terms and conditions of this Forbearance Agreement, Agent and Lender agree to forbear from exercising any and all of their rights and remedies under the Loan Documents and/or applicable law as a result of the Existing Defaults, in each case without constituting a waiver of any of the Existing Defaults and on the express terms and subject to the conditions set forth herein.

## AGREEMENTS

NOW, THEREFORE, in consideration of the premises and of the mutual promises, covenants and agreements herein contained, and for other valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  Defined Terms; Interpretive Provisions.

     1.1.   Certain Defined Terms.   As used herein, the following terms have the corresponding meanings set forth below:

        1.1.1.   "Effective Date" means the date on which all of the conditions specified in Section 7 of this Forbearance Agreement are satisfied.

        1.1.2.   "Forbearance Default" means Borrower's or Guarantor's breach of any representation, warranty or acknowledgement of this Forbearance Agreement, or failure in any way to completely perform any term, condition, obligation or covenant of this Forbearance Agreement within the time required therefor, if any.

        1.1.3.   "Forbearance Expiration Date" means December 30, 2017.

        1.1.4.   "Forbearance Fees" means all reasonable costs of Agent, Lender and Borrower associated with this Forbearance Agreement and the transactions and documents related thereto, including, but not limited to, out-of-pocket expenses associated with the transaction, professional fees, recording fees, search fees and filing fees.

        1.1.5.   "Forbearance Period" means the period from the Effective Date until the Forbearance Termination Date.

        1.1.6.   "Forbearance Termination Date" means the earlier to occur of (a) the Forbearance Expiration Date and (b) the date of the occurrence of a Forbearance Termination Event, subject to the applicable cure period set forth in Section 6.2 below.

        1.1.7.   "Forbearance Termination Event" means the occurrence of any of the following: (a) a Forbearance Default; (b) any default under any of the Loan Documents other than the Existing Defaults; (c) any Material Adverse Change; (d) any of the Loan Documents shall for any reason cease to be in full force and effect in accordance with their terms, or their validity or enforceability shall be contested by any party thereto; (e) a judgment in an amount of $250,000 or less adverse to Borrower or Guarantor is entered in any legal proceeding and which is not satisfied or otherwise resolved by written agreement within thirty (30) days of its entry; (f) a judgment in an amount exceeding $250,000 adverse to Borrower or Guarantor is entered in any legal proceeding; (g) any property belonging to any Borrower or Guarantor, or any material part thereof, is taken by execution, levy, attachment, forfeiture, sequestration or other process of law (other than in the nature of eminent domain); (h) any Borrower or Guarantor (i) execute an assignment for the benefit of creditors, or (ii) become or be adjudicated a bankrupt, debtor or insolvent under any bankruptcy or insolvency law, (iii) admit in writing its/his inability to pay its/his debts generally as they become due, (iv) apply for or agree by consent to the appointment of a conservator, receiver, trustee or liquidator of it/him or of all or a substantial part of its/his assets, (v) file a voluntary petition seeking relief under the provisions of title 11, United States Code, (vi) be the subject of an involuntary bankruptcy case commenced under 11 U.S.C. section 303, which case is not dismissed within thirty (30) days of its filing, (vii) file an answer admitting the material allegations of or consenting to, or default in, a petition filed against it/him in any proceeding under any debtor relief laws, or (viii) institute a voluntary bankruptcy case or

2

be or become a party to any other judicial proceedings intended to effect a discharge of its/his debts, in whole or in part, or a postponement of the maturity or the collection thereof, or a suspension of any of the rights of Agent and Lender granted in the Loan Documents or this Forbearance Agreement; (i) termination of Next Step as manager of the Facility without cause and without the prior written consent of Agent; (j) failure of Borrower or Operator to follow the Public Relations Plan in any material respect; (k) failure of Operator to provide the Post-Effective Date Transfer Notes; (l) failure of Borrower to pledge any Post-Effective Date Transfer Notes to Agent; (m) the entry of any civil judgment with respect to the ERISA Investigation in an amount of $250,000 or less and which is not satisfied or otherwise resolved by written agreement within thirty (30) days of its entry; (n) the entry of any civil judgment with respect to the ERISA Investigation in an amount exceeding $250,000; and/or (o) the filing of any criminal complaint or the issuance of an indictment by any Governmental Authority in connection with the ERISA Investigation.

　　　　1.1.8. "Material Adverse Change" means any event, change, circumstance or effect that has a material adverse effect on the business or financial condition of the Facilities, taken as a whole and measured from and after the date of this Forbearance Agreement; provided, however, that none of the following, either alone or in combination, will constitute, or be considered in determining whether there has been, a Material Adverse Change: any event, change, circumstance or effect resulting from or related to (i) any outbreak or escalation of war or major hostilities or any act of terrorism, (ii) changes in laws, regulations, GAAP or the enforcement or interpretation thereof, (iii) any action taken in accordance with this Forbearance Agreement or at the request of, or consented to in writing by, the Agent or Lender, or (iv) the execution or delivery of this Forbearance Agreement, the consummation of the transactions contemplated by this Forbearance Agreement or the public announcement or other publicity with respect to any of the foregoing set forth in this subsection (iv).

　　　　1.1.9. "Next Step" means Next Step Healthcare, LLC.

　　　　1.1.10. "Parties" means Borrower, Guarantor, Agent and Lender.

　　　　1.1.11. "Synergy" means Synergy Health Centers LLC.

　　　　1.1.12. "Synergy Facilities" means each of Synergy's facilities, including: Braemoor Health Center; Merrimack Valley Health Center; Waban Health Center; Watertown Health Center; Worcester Health Center; West Revere Health Center; New England Health Center; Park Avenue Health Center; Woodbriar Health Center; and Grosvenor Health Center.

　　　　1.1.13. "Synergy Services Termination Date" means the date Synergy stops providing back-office services for Manager pursuant to the Management Agreement, which in no event shall be later than nine (9) months after the Effective Date.

　　1.2.　　Interpretive Provisions. The meaning of defined terms shall be equally applicable to the singular and plural forms of the defined terms. The words "hereof," "herein," "hereunder" and words of similar import when used in this Forbearance Agreement shall refer to this Forbearance Agreement as a whole and not to any particular provision of this Forbearance Agreement. The captions and headings of this Forbearance Agreement are for convenience of

reference only and shall not affect the interpretation of this Forbearance Agreement. The term "including" is not limiting and means "including without limitation." Whenever any performance obligation hereunder (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a business day, such performance shall be made or satisfied on the next succeeding business day. In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding," and the word "through" means "to and including."

2.   Acknowledgements Concerning Loan and Defaults.

2.1.   Truth of Recitals.  Borrower and Guarantor acknowledge that, to the best of their knowledge, the above Recitals are true and accurate in all material respects, and incorporated within this Forbearance Agreement as if fully rewritten.  As a condition to the signing of this Forbearance Agreement, all parties are relying on the truth, completeness and correctness of the statements and representations made herein, including the Recitals, and all parties represent for themselves that this Forbearance Agreement contains no known material misrepresentations or omissions by any Party to this Forbearance Agreement.

2.2.   Liability for Obligations. Borrower and Guarantor acknowledge and agree that (a) Borrower is indebted to Lender for repayment of the sums due under the Loan Agreement and for payment and performance under the Loan Documents to which it is a party, and (b) Guarantor is liable to Lender for payment and performance under the Guaranty, subject to the terms thereof.

2.3.   Status of Indebtedness.

2.3.1.   Borrower and Guarantor acknowledge and agree that, as of December 30, 2016, the outstanding principal balance under the Loan Agreement is $6,856,659.72.  Interest in the amount of $33,108.33 has accrued as of December 30, 2016 and remains unpaid.

2.3.2.   Borrower and Guarantor further hereby ratify all of the Loan Documents to which they are a party and reaffirm all of their obligations with respect to the Obligations, as set forth in the applicable Loan Documents.  Borrower and Guarantor each hereby acknowledge, reaffirm and agree that the Loan Documents, as modified by this Forbearance Agreement, represent valid, binding obligations of Borrower and Guarantor to Agent and Lender enforceable according to the terms hereof.  Borrower unconditionally owes to Lender the full amount of the outstanding indebtedness secured by the Collateral, including unpaid principal, accrued interest and other fees and charges provided for in the Loan Documents.  Subject to the terms of this Agreement, Borrower and Guarantor promise to perform all obligations under the Loan Documents to which they are a party in accordance with the terms thereof; provided, however, that the foregoing shall not obligate Borrower or Guarantor to cure any of the Existing Defaults except as otherwise expressly provided herein.

2.3.3.   Borrower and Guarantor acknowledge and agree that there are no existing defenses, claims, counter-claims, counter demands, or rights of setoff or recoupment whatsoever with respect to the Obligations or the Loan Documents, or, if Borrower and Guarantor believe

4

that there are, Borrower and Guarantor are waiving and releasing same pursuant to <u>Section 8</u> herein.   Borrower and Guarantor agree that each shall not assert or seek to assert any claim, set-off, defense or counterclaim of any kind or nature whatsoever with respect to the Obligations or the Loan Documents.

     2.4.   <u>Acknowledgement and Preservation of Existing Defaults</u>.   Borrower and Guarantor acknowledge, admit and agree that (a) the Existing Defaults are preserved and shall continue in existence, (b) this Forbearance Agreement does not constitute and shall not be construed as a waiver of the Existing Defaults, and (c) nothing in this Forbearance Agreement shall be construed as a waiver by Agent or any Lender of Agent's and Lender's right to assert and enforce the Existing Defaults upon the Forbearance Termination Date.

     2.5.   <u>No Obligation to Forbear</u>.   Borrower and Guarantor each acknowledge that (a) Agent and Lender have no obligation to modify, extend, or otherwise amend the terms and conditions of the Loan Documents or to negotiate with Borrower or Guarantor or any other person or entity concerning any of the foregoing, and (b) except as set forth herein, Agent's and Lender's execution of this Forbearance Agreement does not create any such obligation.

3.   <u>Representations and Warranties of Borrower</u>.   Borrower and Guarantor each certifies, represents, warrants and acknowledges that, to the best of its/his knowledge, as the case may be, each of the following is true as to itself or himself, as the case may be:

     3.1.   <u>No Litigation</u>.   There is no litigation, prosecution, investigation or proceeding of any nature whatsoever now pending or, to the best of its/his knowledge, threatened against it/him that would materially and adversely affect performance of any obligations under this Forbearance Agreement or the other Loan Documents.

     3.2.   <u>Due Organization</u>.   Borrower is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of Delaware.   Since first execution of the Loan Agreement, there has been no change in the ownership or control of Borrower and the operating agreements, articles or by-laws, as the case may be, have not been modified or amended in any respect.

     3.3.   <u>Residence</u>.   Zisha is a resident of the state of New York.

     3.4.   <u>Authority</u>.   Borrower and Guarantor each have the full power and authority and have been authorized to execute, deliver, and perform this Forbearance Agreement. The execution, delivery and performance of this Forbearance Agreement and the transactions contemplated herein have not resulted and will not result in a breach or violation of any provision of (a) Borrower's organizational documents, (b) any statute, law, rule or regulation applicable to Borrower or Guarantor, (c) any judgment, injunction, order, decree, writ or determination applicable to Borrower or Guarantor, or (d) any contract, agreement or other instrument by which Borrower or Guarantor may be bound or to which any of the assets of Borrower or Guarantor are subject.

3.5.   No Breach.   To the best of Borrower's knowledge, except for the Exiting Defaults, Borrower is not in breach of or in default under any Loan Document to which it is a party, and no Forbearance Default has occurred.

3.6.   Truth of Loan Documents.   To the best of Borrower's knowledge, all representations and warranties set forth in the Loan Documents are true and correct in all material respects as of the date hereof, except as qualified or limited by this Forbearance Agreement.

3.7.   Good faith.   As of the date of this Forbearance Agreement, Agent and Lender and their respective agents have acted at all times in a fair and reasonable manner, and in good faith, in connection with their administration and enforcement of the Loan Documents, their dealings with Borrower and Guarantor with respect to the Loan Documents, and their negotiations in connection with this Forbearance Agreement and any other transactions related to the Loan Documents and/or this Forbearance Agreement.  The execution and delivery of this Forbearance Agreement by Borrower and Guarantor was and is its free and voluntary act and deed, without any misapprehension as to the effect thereof, and without any coercion, duress, overreaching or any other misconduct by Agent or Lender or any agent of Agent or Lender.

3.8.   Legal Counsel.   Borrower and Guarantor have had the benefit of, or the opportunity to obtain, legal counsel throughout its dealings with Agent and Lender in connection with the administration and enforcement of the Loan Documents by Agent and Lender and the execution and delivery of this Forbearance Agreement and the Loan Documents.

4.   Amendments to Loan Documents.

4.1.   Loan Agreement.   The Parties hereby agree, that as of the Effective Date, the Loan Agreement shall be immediately deemed amended as follows:

4.1.1.   Additional Definitions.  Section 1.1 of the Loan Agreement is amended to add the following definitions in the proper alphabetical order:

"Cash Collateral Reserve" is defined in the Forbearance Agreement.

"Debt Service Reserve" is defined in the Forbearance Agreement.

"Effective Date" is defined in the Forbearance Agreement.

"Forbearance Agreement" means that certain Forbearance Agreement entered into by and between Borrower, Agent, Guarantor and Lender on December 30, 2016.

"Forbearance Termination Date" is defined in the Forbearance Agreement.

"Forbearance Termination Event" is defined in the Forbearance Agreement.

"Forbearance Period" is defined in the Forbearance Agreement.

6

"Next Step Subordination and Collateral Assignment Agreement" means that certain Subordination and Collateral Assignment Agreement dated as of the Forbearance Agreement Effective Date by and between, Operator, Manager, Borrower and Agent.

"Replacement Reserve" is defined in the Forbearance Agreement.

4.1.2.   Loan Documents.  The definition of "Loan Documents" in Section 1.1 of the Loan Agreement is amended to include: "the Forbearance Agreement and the Next Step Subordination and Collateral Assignment Agreement."

4.1.3.   Manager.   The definition of "Manager" in Section 1.1 of the Loan Agreement is deleted and replaced with the following: "**Manager**" means the manager(s) of the Facility pursuant to the Management Agreement, and any subsequent manager(s) approved by Agent in Agent's reasonable discretion.

4.1.4.   Management Agreement.  The definition of "Management Agreement" in Section 1.1 of the Loan Agreement is deleted and replaced with the following: "**Management Agreement**" means the Next Step Management Agreement provided for in the Forbearance Agreement or any other agreement for the management of the Facility approved by Agent.

4.1.5.   Management Fee Subordination Agreement.   The definition of "Management Fee Subordination Agreement" is amended to include the Next Step Subordination and Collateral Assignment Agreement.

4.1.6.   Maturity Date.  The definition of "Maturity Date" in Section 1.1 of the Loan Agreement is deleted and replaced with the following: "**Maturity Date**" means the Forbearance Termination Date."

4.1.7.   Extension Options.  Section 2.4(b) of the Loan Agreement is deleted and replaced with "Reserved."

4.1.8.   Payments.  Section 2.4(a)(ii) of the Loan Agreement is amended by adding the following at the beginning of the subsection: "except during the Forbearance Period,"

4.1.9.   EBITDAR Testing.

4.1.9.1.        Section 1.1 of Exhibit C of the Loan Agreement is amended by deleting the last sentence of the section and replacing it with: "Notwithstanding the foregoing, with respect to the calculation of the Fixed Charge Coverage Ratio: (i) during the first six (6) months of the Term, the Test Period shall be calculated based on the annualized number of months since Closing; and (ii) the Test Period shall be a period ending on the last day of each calendar month and comprised of the three most recent calendar months then ended (taken as one accounting period) and the first Test Period following the Effective Date shall end on February 28, 2017.

7

          4.1.9.2.       Section 1.2 of Exhibit C of the Loan Agreement is amended by deleting the first paragraph of the section and replacing it with: "EBITDAR of the Facility for each Test Period, beginning with the full first six-month period following the Effective Date, shall be greater than or equal to:

| | | |
|---|---|---|
| T-6 annualized | 3/31/2017 | $156,000 |
| T-6 annualized | 4/30/2017 | $228,000 |
| T-6 annualized | 5/31/2017 | $301,000 |
| T-6 annualized | 6/30/2017 | $386,000 |
| T-6 annualized | 7/31/2017 | $412,000 |
| T-6 annualized | 8/31/2017 | $455,000 |
| T-6 annualized | 9/30/2017 | $459,000 |
| T-6 annualized | 10/31/2017 | $481,000 |
| T-6 annualized | 11/30/2017 | $500,000 |
| T-6 annualized | 12/31/2017 | $569,000" |

          4.1.10. EBITDAR Definition. The definition of EBITDAR in Section 1.2 of Exhibit C of the Loan Agreement is deleted and replaced with the following: "**EBITDAR**" means, for any Test Period, the sum, without duplication, of the following for Operator: Net Income plus, (a) Interest Expense, (b) taxes on income, whether paid, payable or accrued, (c) depreciation expense, (d) amortization expense, (e) the amount of rent paid pursuant to the Facility Lease, (f) the management fees payable by Operator under the Management Agreement in excess of five percent (5%) of the Facility's revenue, (g) Forbearance Fees incurred prior to the Forbearance Agreement Effective Date, (h) Forbearance Fees incurred following the Forbearance Agreement Effective Date and/or (i) the fees, costs, and expenses (including legal fees and expenses) incurred by Borrower in connection with the negotiation, documentation and execution of the Forbearance Agreement, all of the foregoing determined in accordance with GAAP, minus (a) gains from any sale of assets, other than sales in the ordinary course of business and (b) other extraordinary or non-recurring gains.

          4.1.11. Tax and Insurance Reserve. Section 3.5 of the Loan Agreement shall be deleted and replaced with the following:

     3.5    Tax and Insurance Reserve.

     (a) Borrower shall establish and maintain at all times until indefeasible payment in full of the Obligations a reserve (the "**Tax and Insurance Reserve**") with Agent for payment of real estate taxes and assessments and casualty insurance on the Property, as additional security for the Obligations. Following the Effective Date, Borrower shall deposit in the Tax and Insurance Reserve the amount of $16,206.45 to pay the next due annual installment of real estate and other taxes and assessments on the Property at least one (1) month prior to the delinquency date thereof (if paid in one installment) and the next due annual casualty insurance premiums with respect to the Property at least one (1) month prior to the due date thereof (if paid in one installment). Commencing on December 1, 2016, and continuing thereafter on each successive Payment Date, Borrower shall pay to Agent, concurrently with the monthly payments due under this Agreement, deposits in an amount equal to one-twelfth (1/12) of the amount of the annual

8

real estate and other taxes and assessments that will next become due and payable on the Property, plus one-twelfth (1/12) of the amount of the annual premiums that will next become due and payable on casualty insurance policies which Borrower is required to maintain under this Agreement, each as estimated and determined by Agent.  No interest on funds contained in the Tax and Insurance Reserve shall be paid by Agent to Borrower and any interest or other earnings on funds deposited in the Tax and Insurance Reserve shall be solely for the account of Agent.

(b) Agent assumes responsibility for payments of real estate taxes and assessments and insurance premiums from the Tax and Insurance Reserve in accordance with this **Section 3.5**.  Borrower is responsible for ensuring the receipt by Agent, at least forty-five (45) days prior to the respective due date for the payment thereof, of all bills, invoices and statements for all taxes, assessments and insurance premiums to be paid from the Tax and Insurance Reserve.  Following receipt of such bills, invoices and statements and, so long as, no Default has occurred and is continuing and no Event of Default has occurred, Agent shall pay the Governmental Authority or other party entitled thereto directly to the extent funds are available for such purpose in the Tax and Insurance Reserve.  In making any payment from the Tax and Insurance Reserve, Agent shall be entitled to rely on any bill, statement or estimate procured from the appropriate public office or insurance company or agent without any inquiry into the accuracy of such bill, statement or estimate and without any inquiry into the accuracy, validity, enforceability or contestability of any tax, assessment, valuation, sale, forfeiture, tax lien or title or claim thereof.  If the Tax and Insurance Reserve does not, at any time, contain sufficient funds to pay the sums required when the same shall become due and payable, Borrower shall, within ten (10) days after receipt of written notice thereof, deposit with Agent the full amount of any such deficiency, unless payment of such amount is being contested in good faith by Borrower.

(c) Borrower shall, at all times during the Term, provide Agent with copies of all bills, invoices and statements for all taxes, assessments and insurance premiums promptly after Borrower's receipt thereof, but in no event less than 45 days prior to the respective delinquency date for the payment thereof;  provided that the failure to timely provide the same shall not constitute an Event of Default.

4.1.12. <u>Replacement Reserve</u>.  Section 3.6 of the Loan Agreement is amended by deleting the word "Reserved" and replacing it with:

3.6     Replacement Reserve.  Borrower shall establish and maintain at all times until indefeasible payment in full of the Obligations a reserve (the "**Replacement Reserve**") with Agent for payment of repairs and replacements.  On the Effective Date, Agent shall transfer $200,000 of the $285,000 in the Renovation and Replacement Reserve to the Replacement Reserve.  During the Forbearance Period, Borrower may request disbursement of funds from the Replacement Reserve for reasonable repairs and replacements in increments of $10,000 upon Agent's receipt of estimates evidencing the repairs and replacements, after which Agent shall promptly release to Borrower the amount(s) so requested.  No interest on funds contained in the Replacement Reserve shall be paid by Agent to Borrower and any interest or other earnings on funds deposited in the Replacement Reserve shall be solely for the account of Agent.

9

4.1.13. <u>Debt Service and Cash Collateral Reserves</u>.   Section 3.7 of the Loan Agreement is amended by deleting the word "Reserved" and replacing it with:

3.7     Debt Service and Cash Collateral Reserves.

(a)     Borrower shall establish and maintain at all times until indefeasible payment in full of the Obligations a reserve (the "**Debt Service Reserve**") with Agent for payment of the Obligations.  On the Effective Date, Agent shall transfer $85,000 of the $285,000 in the Renovation and Replacement Reserve to the Debt Service Reserve.  Borrower is prohibited from requesting disbursements from the Debt Service Reserve during the Forbearance Period.  The Debt Service Reserve shall be Collateral.  No interest on funds contained in the Debt Service Reserve shall be paid by Agent to Borrower and any interest or other earnings on funds deposited in the Debt Service Reserve shall be solely for the account of Agent.  The Debt Service Reserve shall be released and applied against and in reduction of the outstanding principal balance of the Loan at the Forbearance Expiration Date without offset or deduction of any kind or nature.

(b)     Borrower shall establish and maintain at all times until indefeasible payment in full of the Obligations a reserve (the "**Cash Collateral Reserve**") with Agent for payment  of the Obligations.  Prior to the Effective Date, Borrower invested $137,500 in the Facility (the "<u>Initial Investment</u>").  Prior to the Effective Date, Borrower shall provide Agent with proof of the making of the Initial Investment.  On the Effective Date, Borrower shall make an additional cash payment of $262,500 to the Cash Collateral Reserve.  During the Forbearance Period, Borrower may request that Agent apply funds from the Cash Collateral Reserve against the Obligations and Agent shall promptly comply with any such request(s).  No interest on funds contained in the Cash Collateral Reserve shall be paid by Agent to Borrower and any interest or other earnings on funds deposited in the Cash Collateral Reserve shall be solely for the account of Agent.

4.1.14. <u>Reserve</u>.   The definition of "Reserves" in Section 3.9 of the Loan Agreement is amended to include the Replacement Reserve, the Debt Service Reserve and the Cash Collateral Reserve.

4.1.15. Section 8.1 of the Loan Agreement is amended to add a new subsection (z):

(z)     the occurrence of a Forbearance Termination Event.

4.2.     <u>Guaranty</u>.  The Parties hereby agree that, as of the Effective Date, the Guaranty shall be deemed immediately amended to release Dov from his obligations under the Guaranty. Agent shall execute such documents that may be reasonably requested by Dov to reflect, and which are consistent with, the foregoing.

5.     <u>Borrower's and Guarantor's Covenants and Agreements</u>.   As of the Effective Date, Borrower agrees to the following covenants and agreements:

5.1.     <u>Management</u>.

10

5.1.1.   Prior to or on the Effective Date, Operator shall replace (or cause to be replaced) Manager with Next Step for the purpose of providing operational and clinical management services to Operator (the "Next Step Engagement") pursuant to a new management agreement by and between Operator, Synergy and Next Step and reasonably acceptable in form and substance to Agent (the "Next Step Management Agreement").  For informational purposes, as of the Effective Date, Agent and Lender have no objection to Next Step serving as Manager.

5.1.2.   Borrower, Operator, Manager and Next Step shall execute an agreement to assign the Next Step Management Agreement and subordinate payments under and enforcement actions with respect to the Next Step Management Agreement in favor of Agent, in form and substance acceptable to Agent and Lender in their sole discretion (the "Next Step Subordination and Collateral Assignment Agreement").

5.1.3.   Synergy shall continue to provide Manager's back-office services to Operator through the Synergy Services Termination Date and such services shall be set forth in the Next Step Management Agreement.  At least one (1) month prior to the Synergy Services Termination Date, Operator, Next Step, and Synergy shall propose a new back-office provider to Agent and Lender.  The choice of a new back-office provider is subject to the written approval of Agent, Lender and Next Step, which approval shall not be unreasonably withheld, conditioned or delayed.

5.1.4.   Following the Synergy Services Termination Date, if requested by Next Step, Synergy shall provide supplemental services until the earlier of the retention of a new provider or 3 additional months under a transition services agreement, which agreement shall include customary terms and conditions, including compensation-related provisions, acceptable in form and substance to Agent, Lender, and Synergy, to facilitate the onboarding of the new back-office provider.

5.1.5.   From the Effective Date through the earliest to occur of (a) the Synergy Services Termination Date and (b) the Forbearance Termination Date, Next Step, and Synergy shall be compensated for the management services each provides by a management fee equal to 5.75% of the gross revenue of the Facility per month (the "Management Fee").   The Management Fee shall be shared by Synergy and Next Step in portions agreed upon by Synergy and Next Step, provided, Synergy shall receive no more than 40% of the Management Fee.  The Management Fee shall be provided for in the Next Step Management Agreement.

5.1.6.   As of the Effective Date, Borrower and Operator shall not engage, or continue to engage, Synergy for any services other than the permitted back-office services.

5.1.7.   During the Forbearance Period, Agent and Lender may, at their discretion, freely correspond with, enter into discussions with and have contact with Next Step and its agents and employees.

5.1.8.   Borrower and Operator shall deliver to Agent any and all notices of termination of the Next Step Management Agreement that Operator sends to Manager within 24 hours of Operator sending any such notice to Manager, provided that the failure of Operator to

timely provide such notice to Agent shall not constitute a Forbearance Default if Agent otherwise receives such notice within the applicable 24 hour period.

5.1.9.  Borrower and Operator shall deliver to Agent any and all requests by Manager to assign its rights and obligations under the Next Step Management Agreement within 24 hours of Operator's receipt of any such request, provided that the failure of Operator to timely provide such notice to Agent shall not constitute a Forbearance Default if Agent otherwise receives such notice within the applicable 24 hour period.

5.1.10. Borrower shall provide Agent and Lender a copy of their plan to manage public relations in connection with the appointment of Next Step as manager (the "Public Relations Plan") prior to Borrower's commencement of the Public Relations Plan.  The Public Relations Plan shall be reasonably acceptable to Agent and Lender.

5.1.11. Borrower, Operator and Synergy shall deliver to Agent copies of any notice received by any or all of them from Manager of a Proposed Acquisition, as defined in the Management Agreement within 24 hours of Borrower's, Operator's or Synergy's first receipt of such notice.

5.1.12. If Borrower, Operator or Synergy exercises its right to terminate the Management Agreement pursuant to Section 7.2 of the Management Agreement, prior to the expiration of the ninety (90) calendar days' notice set forth in Section 7.2, Operator shall replace Manager with a new manager, acceptable to Agent and Lender in their sole discretion, pursuant to a new management agreement, acceptable to Agent and Lender in their sole discretion.

5.2.  Equity Infusion for Cash Collateral Reserve.  On the Effective Date, Borrower shall make a single cash payment of $262,500 to Agent to fund the Cash Collateral Reserve (the "Equity Infusion for Cash Collateral Reserve").

5.3.  Distributions.  Borrower and Operator shall not make any distributions to equity holders during the Forbearance Period; provided, however, that distributions may be made to equity holders for tax purposes only and the Management Fee shall not be considered a distribution.

5.4.  Financial Reporting.  In addition to all financial reports required to be delivered by Borrower, Operator and Guarantor under the Loan Agreement, during the Forbearance Period, Borrower shall deliver to Agent, a current census report for each Facility every two weeks, within four (4) days after the end of each two week period on a rolling basis.

5.5.  Fees.  All Forbearance Fees shall be paid by Borrower.  Agent may submit a statement of Forbearance Fees of Agent and Lender to Borrower prior to the Effective Date, which such fees shall be paid by Borrower to Agent and Lender on the Effective Date. Thereafter, Agent and Lender shall submit any of their remaining Forbearance Fees to Borrower for payment and such fees shall be paid by Borrower to Agent and Lender within ten (10) business days thereafter.  Borrower may submit a statement of Forbearance Fees of Borrower to Agent prior to the Effective Date, which fees Borrower may pay on the Effective Date.

5.6.    Transfers Between Borrower and Operator.

5.6.1.  Pre-Effective Date Transfers.

5.6.1.1.    On the Effective Date, Operator shall execute a promissory note in favor of Borrower for all transfers of cash from Borrower to Operator prior to the Effective Date that remain outstanding on the books and records of Borrower as of the Effective Date, secured by Operator's accounts receivable (the "Pre-Effective Date Transfer Note").

5.6.1.2.    On the Effective Date, Borrower shall (a) deliver a copy of the Pre-Effective Date Transfer Note to Agent and (b) execute a pledge of the Pre-Effective Date Transfer Note to Agent for the benefit of Lender.

5.6.2.  Post-Effective Date Transfers.

5.6.2.1.    As of the Effective Date and at all times thereafter, all transfers of cash between Borrower and Operator shall be made in increments equal to or greater than $25,000, and prior to any such transfer, each transfer shall be documented by a promissory note(s) in favor of Borrower secured by Operator's accounts receivable (the "Post-Effective Date Transfer Notes").

5.6.2.2.    Simultaneous with the issuance of each and every Post-Effective Date Transfer Note, such note shall be pledge to Agent for benefit of Lender.

6.    Forbearance; Remedies Upon Forbearance Termination Event.

6.1.    Provided that no Forbearance Termination Event occurs, Agent and Lender shall refrain and forbear during the Forbearance Period from exercising any and all of Agent's and/or Lender's rights and remedies under the Loan Documents and/or applicable law, including with respect to the Existing Defaults; provided, however, that in no event shall the foregoing be deemed to limit, modify, amend, waive or otherwise affect Agent's or any Lender's rights and remedies that exist by reason of the Existing Defaults, all of which are expressly preserved and may be enforced by Agent and Lender in the event the Obligations remain outstanding following the Forbearance Termination Date, except Agent and Lender agree (a) not to charge default interest on the Obligations during the Forbearance Period unless a Forbearance Termination Event, other than the occurrence of the Forbearance Expiration Date, occurs, and (b) not to charge any exit, payoff, prepayment, make whole premium or similar fee if the Obligations are repaid in full on the Forbearance Termination Date.

6.2.    Immediately upon the occurrence of a Forbearance Termination Event and without notice to or demand on Loan Parties, except with respect to a Forbearance Termination Event that can be cured by the payment of money, in which case Borrower shall have the opportunity to cure such breach for the five (5) days after receipt of written notice of the breach from Agent (the "Monetary Cure Breach Option"): (a) the Obligations shall be immediately due and payable in full; (b) Agent shall be entitled, at its sole option and without further notice to or demand on any Borrower or Guarantor to seek any and all legal recourse against Borrower and Guarantor and pursue and enforce, either successively or concurrently, all rights and remedies

13

set forth in the Loan Documents and the Guaranty and such other rights in law or in equity as may be available to Agent and Lender.   Notwithstanding anything herein to the contrary, Borrower may only exercise the Monetary Breach Cure Option a total of two (2) times during the Forbearance Period.

7.    Conditions Precedent to this Forbearance Agreement.  It shall be a condition precedent to all obligations of Agent and Lender hereunder that all of the following conditions precedent shall have been and shall continue to be satisfied:

7.1.   Next Step shall have been engaged as Manager of the Facility pursuant to the Next Step Management Agreement.

7.2.   Next Step shall have been engaged as manager of the Synergy Facilities.

7.3.   Agent shall have received payment of the Equity Infusion for Cash Collateral Reserve, in full, and proof of the Initial Investment.

7.4.   Agent shall have received payment of any and all Forbearance Fees of Agent or Lender submitted to Borrower for payment prior to the Effective Date.

7.5.   No Forbearance Termination Event shall have occurred.

7.6.   One hundred percent (100%) of Dov's membership interests in Borrower shall have been forfeited or distributed to one or more existing or new members of Borrower, including Next Step.

7.7.   Agent and Lender shall have received all of the following in form and substance satisfactory to Agent and Lender: (a) an original of this Forbearance Agreement fully executed by Borrower and Guarantor; (b) a fully executed Next Step Management Agreement and any other agreements for the engagement of Next Step at the Facility; (c) a fully executed Next Step Subordination and Collateral Assignment Agreement; (d) evidence of Dov's forfeiture or distribution of 100% of his membership interest in Borrower and the resulting equity ownership of Borrower, delineated by owner and percentage; (e) the pledge of any Pre-Effective Date Transfer Notes and copies of any Pre-Effective Date Transfer Notes; (f) the Public Relations Plan; (g) a side letter setting forth each Guarantor's address; and (h) such other documents, instruments and agreements as Agent may reasonably require and which are consistent with this Forbearance Agreement.

8.    General Release; Waiver.

8.1.   For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of Borrower and Guarantor, for themselves and their respective predecessors, heirs, successors and assigns, do hereby waive, release, acquit and forever discharge Agent, each Lender and all of Agent's and each Lender's past, present, and future directors, officers, employees, agents, attorneys, principals, shareholders, partners, representatives, joint venture partners, affiliates, parent and affiliated companies, subsidiaries, sureties and insurers, predecessors, successors, heirs, executors, administrators and assigns

14

(collectively, the "Lender's Related Persons"), and each of them, of and from any and all claims, demands, obligations, liabilities, indebtedness, breaches of contract, breaches of duty or any relationship, acts, omissions, misfeasance, malfeasance, cause or causes of action, debts, sums of money, accounts, compensation, contracts, controversies, promises, damages, costs, losses and expenses of every type, kind, nature, description, or character, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, that any or all of Borrower and Guarantor has or asserts or may hereafter have or assert against Agent or any Lender or any of the Lender's Related Persons that in any way arise out of, are connected with or related to the Obligations, the Loan Documents, the Guaranty or any of the transactions contemplated herein and therein or any earlier or other agreement or document referred to therein or any other action, claim, cause of action, demand, damage or cost of whatever nature as of the date of this Forbearance Agreement (collectively, the "Released Claims"); provided, however, that nothing herein shall discharge, waive, release or otherwise affect any claims that Borrower and/or Guarantor may have against any of Lender's Related Persons for any breach of its/their obligations hereunder.

8.2.    The agreements of Borrower and Guarantor set forth in this Section 8 shall inure to the benefit of the successors, assigns, insurers, administrators, officers, agents, employees, attorneys, and representatives of Agent, Lender and the Lender's Related Persons.  To the extent that the releases as set forth above run to the favor of persons or entities not signatories hereto, this Forbearance Agreement is hereby declared to be made in and for their respective benefits and uses.

8.3.    Without limiting the generality of Section 8.1, the each of Borrower and Guarantor hereby represent and warrant to Agent and Lender that they have read the foregoing releases and waivers, have obtained the advice of counsel regarding the releases and waivers, have agreed to the provisions of this Section 8 with full knowledge and understanding of the significance, extent, effect and consequences of the various releases and waivers granted pursuant to this Section 8 and of the importance to Agent and Lender of these waivers and releases, and are making the agreements, releases and waivers herein of their own volition and without any coercion or duress.

8.4.    The releases contained in this Section 8 are not to be construed and do not constitute an admission of liability on the part of Agent or any Lender. This release shall constitute an absolute bar to any Released Claim of any kind, whether such claim is based on contract, tort, warranty, mistake or any other theory, whether legal, statutory or equitable. Each of Borrower and Guarantor specifically agree that any attempt to assert a claim barred hereby shall subject each of them to the provisions of applicable law setting forth the remedies for the bringing of groundless, frivolous or baseless claims or causes of action.

8.5.    The releases contained in this Section 8 are not intended to, and shall not extend to, or in any way release, acquit, or discharge any of the rights, duties, or obligations arising from, created by, or maintained by this Forbearance Agreement.

8.6.    Each of Borrower and Guarantor represent and warrant to Agent and Lender that each of Borrower and Guarantor alone are the owners of the Released Claims and that they have not heretofore hypothecated, pledged, encumbered, assigned or transferred, nor purported to hypothecate, pledge, encumber, assign or transfer, to any person or entity any of the Released

Claims.  Each of Borrower and Guarantor further agree to indemnify, protect, defend and hold Agent and Lender harmless from and against any and all claims, demands, losses, liabilities, damages, costs and expenses (including attorneys' fees and court costs) incurred by Agent and/or any Lender as the result of any person or entity asserting any such hypothecation, pledge, encumbering, assignment or transfer of any of the Released Claims.

9.    Miscellaneous.

9.1.    Integration; Modifications.    This Forbearance Agreement contains the entire agreement between Borrower, Guarantor, Agent and Lender with respect to the subject matter hereof and, except to the extent that it modifies and amends the Loan Documents, supersedes all prior agreements and understandings with respect thereto.  This Forbearance Agreement may not be changed, modified, or supplemented except by a writing signed by the Party against whom enforcement of such change, modification or supplement is sought.

9.2.    Counterparts.    This Forbearance Agreement may be executed in one or more counterparts, each of which shall be deemed an original (including copies sent by facsimile transmission or electronically), but all of which together shall constitute but one and the same instrument.

9.3.    Full Force and Effect of Loan Documents; Conflicts.  Except as specifically set forth herein, the Loan Documents are not amended or modified in any respect, and each of them remains in full force and effect.  In the event of any conflict or inconsistency between the terms and conditions of this Forbearance Agreement and the other Loan Documents, the terms and conditions of this Forbearance Agreement shall prevail.

9.4.    Attorneys' Fees.  In any legal action, arbitration, or other proceeding brought to enforce or interpret the terms of this Forbearance Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and any other costs incurred in that proceeding in addition to any other relief to which it is entitled (including bankruptcy and appellate proceedings).  The provisions of this Section 9.4 constitute a distinct and severable agreement from the contractual rights created by this Forbearance Agreement. In the event of a judgment against one party concerning any aspect of this Forbearance Agreement, the right to recover post-judgment attorneys' fees incurred in enforcing the judgment shall not be merged into and extinguished by any money judgment.

9.5.    Severability. If any provision of this Forbearance Agreement is found invalid, illegal or unenforceable, such provision shall be severed from this Forbearance Agreement, and the validity, legality and enforceability of the remaining provisions shall not be impaired or affected thereby.

9.6.    Time of the Essence.  Time is of the essence in the performance of each provision and satisfaction of each condition hereof.

9.7.    No Waiver.  No failure or delay on the part of Agent or any Lender in the exercise of any power, right or remedy, and no course of dealing between Borrower and/or Guarantor and Agent or any Lender shall operate as a waiver of such power, right or remedy, nor shall any

single or partial exercise of any power, right or remedy preclude other or further exercise thereof or the exercise of any other power, right or remedy. Without limiting the generality of the foregoing, Agent's and each Lender's forbearance hereunder shall not constitute a waiver of any succeeding breach or default by Borrower or Guarantor.

9.8.    Governing Law.  This Forbearance Agreement shall be governed by and interpreted in accordance with the laws of the State of New York without regard to rules concerning conflicts of laws, except to the extent federal law is applicable to Agent.

9.9.    Further Assurances.   Borrower and Guarantor will, upon Agent's request, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, to the Agent any and all documents, instruments and agreements and shall perform such acts as may be reasonably necessary to effectuate the intent and purpose of this Forbearance Agreement and the other Loan Documents.

9.10.   Binding Effect.  This Forbearance Agreement shall be binding on and shall inure to the benefit of the parties and their respective heirs, representatives, successors and permitted assigns.

9.11.   Interpretation.  This Forbearance Agreement is the result of negotiations between, and has been reviewed by counsel to, Borrower, Guarantor, Agent and Lender, and is the product of all of the parties.  Accordingly, this Forbearance Agreement shall not be construed against Agent merely because of its involvement in the preparation of this Forbearance Agreement.

9.12.   Notices.  Any notice or request under this Forbearance Agreement shall be given to any party to this Forbearance Agreement at such party's address set forth below, or at such other address as such party may hereafter specify in a notice given in the manner required under this section.  Any notice or request under this Forbearance Agreement shall be given only by, and shall be deemed to have been received upon: (a) registered or certified mail, return receipt requested, on the date on which received as indicated in such return receipt, (b) delivery by a nationally recognized overnight courier, one Business Day after deposit with such courier for next business day delivery, or (c) electronic mail or facsimile transmission upon sender's receipt of confirmation of proper transmission during normal business hours (provided that a copy is sent out on the next business day by one of the methods set forth in (a) or (b) above unless waived by Borrower or Agent), as applicable:

To Borrower:        133 Salem Street, LLC
                    c/o Synergy Health Centers
                    2363 Lakewood Road, Suite 200
                    Toms River, NJ 08755
                    Attention: Zisha Lipschutz
                    E-Mail: zisha@synergyhs.com

With a courtesy
copy to:            Novack Burnbaum Crystal LLP
                    675 Third Avenue, Floor 8
                    New York, NY 10017

17

Attention: Edward Burnbaum
E-Mail: eburnbaum@nbclaw.com

To Agent:                  AP MA Funding LLC
                           4445 Willard Avenue, Suite 1100
                           Chevy Chase, MD 20815
                           Attention: Travis Moore, Director
                           E-Mail: portfolio_management@alliancepartners.com

With a courtesy
copy to:                   Katten Muchin Rosenman LLP
                           525 W. Monroe St.
                           Chicago, Illinois 60661
                           Attention: Kenneth J. Ottaviano
                           Kenneth.Ottaviano@kattenlaw.com

9.13.   No Third Party Beneficiary.  Nothing contained in this Forbearance Agreement is intended, nor shall it be construed or deemed, to confer any rights, powers, or privileges on any person or entity not a party or a permitted successor or assign of a party or any Lender's Related Person.

9.14.   No Reliance Upon Other Representations; Independent Counsel. The parties acknowledge that they have not executed this Forbearance Agreement in reliance upon any promises, representations, warranties or statements not set forth in writing herein, that they are not acting under any misrepresentation or misapprehension as to this Forbearance Agreement's legal effect, and that this Forbearance Agreement has not been executed under any kind of duress, intimidation, coercion or compulsion.  The parties further acknowledge and represent that that they (a) have been represented by legal counsel in connection with the negotiation of the terms of this Forbearance Agreement, (b) read this Forbearance Agreement carefully prior to signing it, and (c) understand its contents.

*(signature page to immediately follow)*

18

IN WITNESS WHEREOF, the Parties hereto have executed this Forbearance Agreement as of the year and date first set forth above.

**Borrower:**

133 Salem Street, LLC,
a Delaware limited liability company

By: _____
Name: _____
Its: _____


State of N̲e̲w̲ ̲J̲e̲r̲s̲e̲y̲          )
County of ̲O̲c̲e̲a̲n̲                )

On D̲e̲c̲.̲ ̲2̲9̲, 2016, before me the undersigned notary public in and for said state, personally appeared Avi "Zisha" Lipschutz, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity(ies), and that by his signature(s) on the instrument the individual(s) or the person upon behalf of which the individual(s) acted executed the instrument.


*Nechoma B. Press*

**NECHOMA B. PRESS**
**NOTARY PUBLIC OF NEW JERSEY**
**My Commission Expires Dec. 15, 2020**

Guarantor:

Avi "Zisha" Lipschutz

State of New Jersey                    )
County of Ocean                        )

On Dec. 29 , 2016, before me the undersigned notary public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity(ies), and that by his signature(s) on the instrument the individual(s) or the person upon behalf of which the individual(s) acted executed the instrument.

NECHOMA B. PRESS
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Dec. 15, 2020

Signature Page to Forbearance Agreement – 133 Salem Street

**Guarantor:**

Dov Newmark, solely as to Sections 4.2, 7.6, 8
and 9

_(signature)_

State of _New Jersey_                    )
County of _Ocean_                        )

On _Dec. 29th_, 2016, before me the undersigned notary public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity(ies), and that by his signature(s) on the instrument the individual(s) or the person upon behalf of which the individual(s) acted executed the instrument.

_(signature) Nechoma Press_

NECHOMA B. PRESS
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Dec. 15, 2020

**Agent:**

AP MA Funding LLC,
a Delaware limited liability company

By: _____
Name: John Gray
Its: Executive Vice President

State of _____Maryland_____    )
County of ____Montgomery_____    )

On _21 Dec_, 2016, before me the undersigned notary public in and for said state, personally appeared _____John Gray_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity(ies), and that by his signature(s) on the instrument the individual(s) or the person upon behalf of which the individual(s) acted executed the instrument.

CAROL D. BAKER
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
MY COMMISSION EXPIRES SEPT. 25, 2017

Signature Page to Forbearance Agreement – 133 Salem Street

**Lender:**

AP MA Funding LLC,
a Delaware limited liability company

By: _____

Name: John Gray

Its: Executive Vice President

State of _____Maryland_____        )
County of _____Montgomery_____    )

On 21 Dec , 2016, before me the undersigned notary public in and for said state, personally appeared _____John Gray_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity(ies), and that by his signature(s) on the instrument the individual(s) or the person upon behalf of which the individual(s) acted executed the instrument.

CAROL D. BAKER
NOTARY PUBLIC
MONTGOMERY COUNTY
MARYLAND
MY COMMISSION EXPIRES SEPT. 25, 2017

**Lender:**

BancAlliance, Inc.,
a Maryland corporation

By: AP Commercial LLC,
its attorney-in-fact

By: _____

Name: John Gray

Its: Executive Vice President

State of _____Maryland_____      )
County of _____Montgomery_____    )

On __21 Dec__, 2016, before me the undersigned notary public in and for said state, personally appeared ____John Gray_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity(ies), and that by his signature(s) on the instrument the individual(s) or the person upon behalf of which the individual(s) acted executed the instrument.

> CAROL D. BAKER
> NOTARY PUBLIC
> MONTGOMERY COUNTY
> MARYLAND
> MY COMMISSION EXPIRES SEPT. 25, 2017

**SCHEDULE 1**

**Existing Defaults**

1.  Borrower failed to meet the Fixed Charge Coverage Ratio covenant required section 1.2 of Exhibit C to the Loan Agreement as follows:

|      |                 |                                              |
| ---- | --------------- | -------------------------------------------- |
| a.   | April 2015:     | Minimum of 1.10x required; 1.00x achieved.   |
| b.   | May 2015:       | Minimum of 1.10x required; 1.01x achieved.   |
| c.   | June 2015:      | Minimum of 1.10x required; 0.67x achieved.   |
| d.   | July 2015:      | Minimum of 1.10x required; 0.72x achieved.   |
| e.   | August 2015:    | Minimum of 1.10x required; 0.79x achieved.   |
| f.   | September 2015: | Minimum of 1.10x required; 0.75x achieved.   |
| g.   | October 2015:   | Minimum of 1.10x required; 0.82x achieved.   |
| h.   | November 2015:  | Minimum of 1.10x required; 0.80x achieved.   |
| i.   | December 2015:  | Minimum of 1.10x required; 0.75x achieved.   |
| j.   | January 2016:   | Minimum of 1.10x required; 0.65x achieved.   |
| k.   | February 2016:  | Minimum of 1.10x required; 0.61x achieved.   |
| l.   | March 2016:     | Minimum of 1.10x required; 0.57x achieved.   |
| m.   | April 2016:     | Minimum of 1.10x required; 0.51x achieved.   |
| n.   | May 2016:       | Minimum of 1.10x required; 0.50x achieved.   |
| o.   | June 2016:      | Minimum of 1.10x required; 0.63x achieved.   |
| p.   | July 2016:      | Minimum of 1.10x required; 0.75x achieved.   |
| q.   | August 2016:    | Minimum of 1.10x required; 0.78x achieved.   |
| r.   | September 2016: | Minimum of 1.10x required; 0.79x achieved.   |
| s.   | October 2016:   | Minimum of 1.10x required; 0.86x achieved.   |

2.  Borrower failed to meet the Minimum EBITDAR covenant set forth in Section 1.2 of Exhibit C to the Loan Agreement as follows:

a.  October 2015:   EBITDAR is required to be greater than $750,000 on an annualized trailing three (3) month basis and the EBITDAR that was achieved was ($49,045).

b.  November 2015:   EBITDAR is required to be greater than $750,000 on an annualized trailing three (3) month basis and the EBITDAR that was achieved was ($495,555).

c.  December 2015:   EBITDAR is required to be greater than $750,000 on an annualized trailing three (3) month basis and the EBITDAR that was achieved was ($218,336).

d.  January 2016:   EBITDAR is required to be greater than $750,000 on an annualized trailing three (3) month basis and the EBITDAR that was achieved was ($412,519).

e.  February 2016:   EBITDAR is required to be greater than $750,000 on an annualized trailing three (3) month basis and the EBITDAR that was achieved was ($112,184).

f.  March 2016:      EBITDAR is required to be greater than $750,000 on an annualized trailing three (3) month basis and the EBITDAR that was achieved was ($220,622).

g.  April 2016:      EBITDAR is required to be greater than $1,000,000 on an annualized trailing six (6) month basis and the EBITDAR that was achieved was ($307,819).

h.  May 2016: EBITDAR is required to be greater than $1,000,000 on an annualized trailing six (6) month basis and the EBITDAR that was achieved was ($208,634).

i.  June 2016: EBITDAR is required to be greater than $1,000,000 on an annualized trailing six (6) month basis and the EBITDAR that was achieved was ($332,499).

j.  July 2016: EBITDAR is required to be greater than $1,000,000 on an annualized trailing six (6) month basis and the EBITDAR that was achieved was ($282,586).

k.  August 2016: EBITDAR is required to be greater than $1,000,000 on an annualized trailing six (6) month basis and the EBITDAR that was achieved was ($322,074).

l.  September 2016:   EBITDAR is required to be greater than $1,000,000 on an annualized trailing six (6) month basis and EBITDAR that was achieved was ($351,069).

m. October 2016: EBITDAR is required to be greater than $1,200,000 on an annualized trailing six (6) month basis and EBITDAR that was achieved was ($255,569).


3.  Borrower failed to complete, within six (6) months of the Closing Date, the Renovations required under Section 3.3(a) of the Loan Agreement at a minimum cost of $400,000.

**Exhibit H**

Notices of Events of Default

(see attached)

**AP MA FUNDING LLC**
4445 Willard Avenue, Suite 1100
Chevy Chase, MD 20815

July 24, 2017

**VIA E-MAIL AND**
**VIA FEDERAL EXPRESS**

133 Salem Street, LLC
c/o Synergy Health Centers
2363 Lakewood Road, Suite 200
Toms River, NJ 08755
Attention: Zisha Lipschutz
Email: Zisha@synergyhs.com

> **Re:** Term Loan and Security Agreement dated March 12, 2015, by and by and among **133 SALEM STREET, LLC**, a Delaware limited liability company (**"Borrower"**), **AP MA FUNDING LLC**, a Delaware limited liability company (**"AP MA Funding"**), and any other Person that now or hereafter becomes a lender under this Agreement, as co-lenders (collectively, the **"Lenders"** and individually a **"Lender"**) and **AP MA FUNDING LLC**, a Delaware limited liability company, in its capacity as administrative, payment and collateral agent for Lenders (**"Agent"**) (as amended, supplemented, modified or restated from time to time, the **"Loan Agreement"**), and guaranteed by Avi [Zisha] Lipschutz (**"Guarantor"**) pursuant to a certain Payment Guaranty dated March 12, 2015 (the **"Guaranty"**)

Dear Mr. Lipschutz:

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Loan Agreement.  Reference is further made to that certain Forbearance Agreement dated as of December 30, 2016 by and between Borrower, Agent, and Guarantor (the **"Forbearance Agreement"**).

This letter constitutes formal written notice of the existence of a new Events of Default under Loan Agreement, as set forth on Schedule 1 attached hereto, each of which occurred following the entry into the Forbearance Agreement and are continuing (the **"New Events of Default"**). The foregoing is not meant to be an exhaustive or all-encompassing list of all of the Defaults and Events of Defaults that have occurred or may be continuing under the Loan Agreement or any of the other Loan Documents, and Agent and Lenders hereby reserve and preserve any and all past, present and future violations, Defaults and Events of Default under the

133 Salem Street, LLC
Attention: Mr. Avi [Zisha] Lipschutz
July 24, 2017
Page - 2 -

Loan Agreement and the other Loan Documents, including as provided for in the Forbearance Agreement.

As a result of the occurrence and continuance of the New Events of Default, Agent and Lenders may, at any time and in their sole discretion, without notice, presentment or protest, among other things, declare a Forbearance Termination Event and, thereafter, (a) charge default interest, including on a retroactive basis, (b) declare all or any portion of the outstanding principal balance of the Term Loan, all interest thereon and all other Obligations to be due and payable immediately, (c) apply any Reserves held by Agent and any and all sums on deposit to reduce the Obligations, (d) foreclose the Liens created under the Security Documents, (e) realize upon, take possession of and/or sell any collateral or securities pledged, and (f) exercise any and all other remedies available to Agent and Lenders under the Loan Agreement, the Security Documents, the Guaranty, the Forbearance Agreement or any of the other documents executed in connection therewith (collectively, the "**Loan Documents**"), under the UCC or otherwise at law or in equity. Agent and Lenders hereby reserve all of their respective rights, privileges and remedies which shall remain and continue in full force and effect under the Loan Documents.

The foregoing provisions of this letter shall not constitute a waiver of the New Events of Default, or of any past, present or future violation, default, or Event of Default of Borrower or Guarantors under the Loan Documents, and shall not directly or indirectly in any way whatsoever either: (a) impair, prejudice or otherwise adversely affect Agent's or Lender's right at any time to exercise any right, privilege or remedy in connection with and as provided for under the Loan Documents, or (b) amend or alter any provision of the Loan Documents, or (c) constitute any course of dealing or other basis for altering any obligation of Borrower or Guarantors or any right, privilege or remedy of Agent under the Loan Documents, or constitute any consent by Agent or Lenders to any prior, existing or future violations of the Loan Documents.

Any partial payment by any Loan Party or any other Person of any amount owing to Agent or any Lender under the Loan Agreement or any of the other Loan Documents may, at Agent's or such Lender's option, be accepted and applied on account of any due and unpaid balance. If so accepted, however, such partial payment shall be without waiver of or prejudice to any rights or remedies available to Agent and Lenders on account of any violations of the Loan Agreement or any of the other Loan Documents. Any delay or forbearance by Agent or any Lender in the enforcement or pursuit of any of Agent's and Lenders' rights or remedies under the Loan Documents or applicable law shall not constitute a waiver thereof, nor shall it be a bar to the exercise of Agent's or any Lender's rights or remedies at a later date.

Very truly yours,

**AP MA FUNDING LLC**

By: _____
Name:  John Gray
Title:   Managing Director


cc:     Avi Lipschutz (aka Zisha Lipschutz)
        17 Van Winkle Road
        Wesley Hills, NY 10952

        Novack Burnbaum Crystal LLP
        675 Third Avenue, Floor 8
        New York, New York 10017
        Attention: Edward Burnbaum
        Email: eburnbaum@nbclaw.com

## Schedule 1

New Events of Default

1.    Borrower failed to meet the EBITDAR covenant required under section 1.2 of Exhibit C
to the Loan Agreement for the following Test Periods:

     a.    Test Period ending on April 30, 2017, whereby a minimum EBITDAR of
$228,000 was required and only $182,892 was achieved; and

     b.    Test Period ending on May 31, 2017, whereby a minimum EBITDAR of
$301,000 was required and only $149,776 was achieved.

**AP MA FUNDING LLC**
4445 Willard Avenue, Suite 1100
Chevy Chase, MD 20815


August 29, 2017


<u>VIA E-MAIL AND</u>
<u>VIA FEDERAL EXPRESS</u>


133 Salem Street, LLC
c/o Synergy Health Centers
2363 Lakewood Road, Suite 200
Toms River, NJ 08755
Attention: Zisha Lipschutz
Email: Zisha@synergyhs.com

**Re:**   Term Loan and Security Agreement dated March 12, 2015, by and by and among **133 SALEM STREET, LLC**, a Delaware limited liability company ("**Borrower**"), **AP MA FUNDING LLC**, a Delaware limited liability company ("**AP MA Funding**"), and any other Person that now or hereafter becomes a lender under this Agreement, as co-lenders (collectively, the "**Lenders**" and individually a "**Lender**") and **AP MA FUNDING LLC**, a Delaware limited liability company, in its capacity as administrative, payment and collateral agent for Lenders ("**Agent**") (as amended, supplemented, modified or restated from time to time, the "**Loan Agreement**"), and guaranteed by Avi [Zisha] Lipschutz ("**Guarantor**") pursuant to a certain Payment Guaranty dated March 12, 2015 (the "**Guaranty**")

Dear Mr. Lipschutz:

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Loan Agreement.  Reference is further made to that certain Forbearance Agreement dated as of December 30, 2016 by and between Borrower, Agent, and Guarantor (the "**Forbearance Agreement**").

As set forth in Agent's letter to Borrower dated July 24, 2017 (the "**Letter**"), Events of Default have occurred and continue under Loan Agreement.  Additional Events of Default have occurred since Agent issued the Letter.  Schedule 1 attached hereto includes Events of Default (the "**New Events of Default**") known to Agent as of the date of this letter that have occurred since the execution of the Forbearance Agreement.  This letter constitutes formal written notice of the existence of the New Events of Default.  The foregoing is not meant to be an exhaustive or all-encompassing list of all of the Defaults and Events of Defaults that have occurred or may be

133 Salem Street, LLC
Attention: Mr. Avi [Zisha] Lipschutz
August 29, 2017
Page - 2 -

continuing under the Loan Agreement or any of the other Loan Documents, and Agent and Lenders hereby reserve and preserve any and all past, present and future violations, Defaults and Events of Default under the Loan Agreement and the other Loan Documents, including as provided for in the Forbearance Agreement.

As a result of the occurrence and continuance of the New Events of Default, Agent and Lenders may, at any time and in their sole discretion, without notice, presentment or protest, among other things, declare a Forbearance Termination Event and, thereafter, (a) charge default interest, including on a retroactive basis, (b) declare all or any portion of the outstanding principal balance of the Term Loan, all interest thereon and all other Obligations to be due and payable immediately, (c) apply any Reserves held by Agent and any and all sums on deposit to reduce the Obligations, (d) foreclose the Liens created under the Security Documents, (e) realize upon, take possession of and/or sell any collateral or securities pledged, and (f) exercise any and all other remedies available to Agent and Lenders under the Loan Agreement, the Security Documents, the Guaranty, the Forbearance Agreement or any of the other documents executed in connection therewith (collectively, the "**Loan Documents**"), under the UCC or otherwise at law or in equity.  Agent and Lenders hereby reserve all of their respective rights, privileges and remedies which shall remain and continue in full force and effect under the Loan Documents.

The foregoing provisions of this letter shall not constitute a waiver of the New Events of Default, or of any past, present or future violation, default, or Event of Default of Borrower or Guarantors under the Loan Documents, and shall not directly or indirectly in any way whatsoever either: (a) impair, prejudice or otherwise adversely affect Agent's or Lender's right at any time to exercise any right, privilege or remedy in connection with and as provided for under the Loan Documents, or (b) amend or alter any provision of the Loan Documents, or (c) constitute any course of dealing or other basis for altering any obligation of Borrower or Guarantors or any right, privilege or remedy of Agent under the Loan Documents, or constitute any consent by Agent or Lenders to any prior, existing or future violations of the Loan Documents.

Any partial payment by any Loan Party or any other Person of any amount owing to Agent or any Lender under the Loan Agreement or any of the other Loan Documents may, at Agent's or such Lender's option, be accepted and applied on account of any due and unpaid balance.  If so accepted, however, such partial payment shall be without waiver of or prejudice to any rights or remedies available to Agent and Lenders on account of any violations of the Loan Agreement or any of the other Loan Documents.  Any delay or forbearance by Agent or any Lender in the enforcement or pursuit of any of Agent's and Lenders' rights or remedies under the Loan Documents or applicable law shall not constitute a waiver thereof, nor shall it be a bar to the exercise of Agent's or any Lender's rights or remedies at a later date.

Very truly yours,

**AP MA FUNDING LLC**

By: _____
Name: John Gray
Title:   Managing Director


cc:   Avi Lipschutz (aka Zisha Lipschutz)
      17 Van Winkle Road
      Wesley Hills, NY 10952

      Novack Burnbaum Crystal LLP
      675 Third Avenue, Floor 8
      New York, New York 10017
      Attention: Edward Burnbaum
      Email: eburnbaum@nbclaw.com

## Schedule 1

New Events of Default

1.    Borrower failed to meet the EBITDAR covenant required under section 1.2 of Exhibit C
to the Loan Agreement for the following Test Periods:

a.    Test Period ending on April 30, 2017, whereby a minimum EBITDAR of
$228,000 was required and only $182,892 was achieved; and

b.    Test Period ending on May 31, 2017, whereby a minimum EBITDAR of
$301,000 was required and only $149,776 was achieved.

c.    Test Period ending on June 30, 2017, whereby a minimum EBITDAR of
$386,000 was required and only $(5,887) was achieved.

**AP MA FUNDING LLC**
4445 Willard Avenue, Suite 1100
Chevy Chase, MD 20815

October 10, 2017

**VIA E-MAIL AND**
**VIA FEDERAL EXPRESS**

133 Salem Street, LLC
c/o Synergy Health Centers
2363 Lakewood Road, Suite 200
Toms River, NJ 08755
Attention: Zisha Lipschutz
Email: Zisha@synergyhs.com

      Re:     Notice of Application of Reserves to Obligations

Dear Mr. Lipschutz:

      Reference is made to that certain Term Loan and Security Agreement dated March 12, 2015, by and by and among **133 SALEM STREET, LLC**, a Delaware limited liability company ("**Borrower**"), **AP MA FUNDING LLC**, a Delaware limited liability company ("**AP MA Funding**"), and any other Person that now or hereafter becomes a lender under this Agreement, as co-lenders (collectively, the "**Lenders**" and individually a "**Lender**") and **AP MA FUNDING LLC**, a Delaware limited liability company, in its capacity as administrative, payment and collateral agent for Lenders ("**Agent**") (as amended, supplemented, modified or restated from time to time, the "**Loan Agreement**"), and guaranteed by Avi [Zisha] Lipschutz ("**Guarantor**") pursuant to a certain Payment Guaranty dated March 12, 2015 (the "**Guaranty**") and the notices of Events of Default issued by Agent to Borrower dated July 24, 2017 and August 29, 2019 (the "**Post-Forbearance Default Letters**").

      As you are aware, certain Events of Default have occurred and are existing under the Loan Agreement, including, without limitation, the Events of Default set forth in the Post-Forbearance Default Letters and the letter sent to you on the date hereof notifying you of additional Events of Default (collectively, the "**Specified Events of Default**").

      Please be advised that as a result of the occurrence and existence of the Specified Events of Default and effective October 10, 2017, Agent acting pursuant to McKinney's Consolidated Laws of New York State, Banking Law, Chapter 2, Article 1, Section 9-g, paragraph 2 and Section 3.9 of the Loan Agreement, has withdrawn $187,802.91 of the funds in the Reserves (the "Reserve Amount"). Following withdrawal of the Reserve Amount, $0.00 remains in the

133 Salem Street, LLC
Attention: Mr. Avi [Zisha] Lipschutz
October 10, 2017
Page - 2 -

Reserves.  Agent applied the Reserve Amount to the outstanding Obligations.  Following such events, the outstanding balance of the Obligations as of October 10, 2017 is $6,860,465.28, exclusive of accrued interest as well as accrued fees, costs and expenses that have been incurred by the Agent and the Lenders.  Agent and Lenders hereby reserve the right to charge any applicable prepayment fees in respect of the outstanding Obligations.

Such application of the Reserve Amount shall not limit Agent and Lenders' rights to restrict Agent and Lenders' right to apply any other proceeds of the Collateral to the Obligations as Agent and Lenders may in their sole discretion determine.  Agent expressly reserves all of its rights and remedies under the Loan Agreement and the other Loan Documents, together with all other rights and remedies of Agent and Lenders in equity, at law, by agreement or otherwise, and nothing herein shall be deemed to limit, restrict or constitute a waiver of any such rights and remedies.

The participation by Agent and Lenders in any discussions or negotiations with Borrower, shall not waive, release or modify, and shall not be deemed to constitute a waiver, release or modification of, Agent and Lenders' rights under the Loan Agreement or any of the other Loan Documents.

Any partial payment by Borrower of any amount owing to Agent and Lenders under the Loan Agreement, may, at Agent and Lenders' option, be accepted and applied on account of any due and unpaid balance. If so accepted, however, such partial payment shall be without waiver of or prejudice to any rights or remedies available to Agent and Lenders on account of any violations of the Loan Agreement or any of the other Loan Documents.  No delay by Agent or Lenders from exercising any of their rights or remedies under the Loan Agreement, the other Loan Documents or applicable law shall be deemed to be, nor shall be construed as or constitute, a waiver of such rights or remedies or any other rights or remedies that Agent and Lenders have or may have under the Loan Agreement or the other Loan Documents or a course of dealing or other basis for altering any rights or remedies of Agent and Lenders under the Loan Agreement or the other Loan Documents.

[Signatures on Following Page]

Very truly yours,

**AP MA FUNDING LLC**

By:
Name: John Gray
Title: Executive Vice President


cc:    Avi Lipschutz (aka Zisha Lipschutz)
17 Van Winkle Road
Wesley Hills, NY 10952

Novack Burnbaum Crystal LLP
675 Third Avenue, Floor 8
New York, New York 10017
Attention: Edward Burnbaum
Email: eburnbaum@nbclaw.com

**AP MA FUNDING LLC**
4445 Willard Avenue, Suite 1100
Chevy Chase, MD 20815


October 27, 2017


**VIA E-MAIL AND
VIA FEDERAL EXPRESS**


133 Salem Street, LLC
c/o Synergy Health Centers
2363 Lakewood Road, Suite 200
Toms River, NJ 08755
Attention: Zisha Lipschutz
Email: Zisha@synergyhs.com

> Re:   Term Loan and Security Agreement dated March 12, 2015, by and by and among **133 SALEM STREET, LLC**, a Delaware limited liability company ("**Borrower**"), **AP MA FUNDING LLC**, a Delaware limited liability company ("**AP MA Funding**"), and any other Person that now or hereafter becomes a lender under this Agreement, as co-lenders (collectively, the "**Lenders**" and individually a "**Lender**") and **AP MA FUNDING LLC**, a Delaware limited liability company, in its capacity as administrative, payment and collateral agent for Lenders ("**Agent**") (as amended, supplemented, modified or restated from time to time, the "**Loan Agreement**"), and guaranteed by Avi [Zisha] Lipschutz ("**Guarantor**") pursuant to a certain Payment Guaranty dated March 12, 2015 (the "**Guaranty**")

Dear Mr. Lipschutz:

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Loan Agreement.  Reference is further made to that certain Forbearance Agreement dated as of December 30, 2016 by and between Borrower, Agent, and Guarantor (the "**Forbearance Agreement**").

As set forth in Agent's letters to Borrower dated July 24, 2017, August 29, 2017 and October 10, 2017 (the "**Post-Forbearance Default Letters**"), Events of Default occurred following the entry into the Forbearance Agreement and are continuing.  This letter constitutes formal written notice of the existence of new Events of Default under Loan Agreement, as set forth on Schedule 1 attached hereto, each of which occurred following the issuance of the Post-Forbearance Default Letters and are continuing (the "**New Events of Default**"). The foregoing is not meant to be an exhaustive or all-encompassing list of all of the Defaults and Events of

133 Salem Street, LLC
Attention: Mr. Avi [Zisha] Lipschutz
October 27, 2017
Page - 2 -

Defaults that have occurred or may be continuing under the Loan Agreement or any of the other Loan Documents, and Agent and Lenders hereby reserve and preserve any and all past, present and future violations, Defaults and Events of Default under the Loan Agreement and the other Loan Documents, including as provided for in the Forbearance Agreement.

As a result of the occurrence and continuance of the New Events of Default, Agent and Lenders may, at any time and in their sole discretion, without notice, presentment or protest, among other things, declare a Forbearance Termination Event and, thereafter, (a) declare all or any portion of the outstanding principal balance of the Term Loan, all interest thereon and all other Obligations to be due and payable immediately, (b) apply any Reserves held by Agent and any and all sums on deposit to reduce the Obligations, (c) foreclose the Liens created under the Security Documents, (d) realize upon, take possession of and/or sell any collateral or securities pledged, (e) charge default interest, including on a retroactive basis and (f) exercise any and all other remedies available to Agent and Lenders under the Loan Agreement, the Security Documents, the Guaranty, the Forbearance Agreement or any of the other documents executed in connection therewith (collectively, the "**Loan Documents**"), under the UCC or otherwise at law or in equity. Agent and Lenders hereby reserve all of their respective rights, privileges and remedies which shall remain and continue in full force and effect under the Loan Documents.

The foregoing provisions of this letter shall not constitute a waiver of the New Events of Default, or of any past, present or future violation, default, or Event of Default of Borrower or Guarantors under the Loan Documents, and shall not directly or indirectly in any way whatsoever either: (a) impair, prejudice or otherwise adversely affect Agent's or Lender's right at any time to exercise any right, privilege or remedy in connection with and as provided for under the Loan Documents, or (b) amend or alter any provision of the Loan Documents, or (c) constitute any course of dealing or other basis for altering any obligation of Borrower or Guarantors or any right, privilege or remedy of Agent under the Loan Documents, or constitute any consent by Agent or Lenders to any prior, existing or future violations of the Loan Documents.

Any partial payment by any Loan Party or any other Person of any amount owing to Agent or any Lender under the Loan Agreement or any of the other Loan Documents may, at Agent's or such Lender's option, be accepted and applied on account of any due and unpaid balance. If so accepted, however, such partial payment shall be without waiver of or prejudice to any rights or remedies available to Agent and Lenders on account of any violations of the Loan Agreement or any of the other Loan Documents. Any delay or forbearance by Agent or any Lender in the enforcement or pursuit of any of Agent's and Lenders' rights or remedies under the Loan Documents or applicable law shall not constitute a waiver thereof, nor shall it be a bar to the exercise of Agent's or any Lender's rights or remedies at a later date.

Error,

Very truly yours,

**AP MA FUNDING LLC**

By: _____
Name: John Gray
Title:   Executive Vice President


cc:     Avi Lipschutz (aka Zisha Lipschutz)
        17 Van Winkle Road
        Wesley Hills, NY 10952

        Novack Burnbaum Crystal LLP
        675 Third Avenue, Floor 8
        New York, New York 10017
        Attention: Edward Burnbaum
        Email: eburnbaum@nbclaw.com

**Schedule 1**

New Events of Default

1.      Borrower failed to meet the EBITDAR covenant required under section 1.2 of Exhibit C to the Loan Agreement for the following Test Periods:

       a.      Test Period ending on April 30, 2017, whereby a minimum EBITDAR of $228,000 was required and only $182,892 was achieved; and

       b.      Test Period ending on May 31, 2017, whereby a minimum EBITDAR of $301,000 was required and only $149,776 was achieved.

       c.      Test Period ending on June 30, 2017, whereby a minimum EBITDAR of $386,000 was required and only $(5,887) was achieved.

       d.      Test Period ending on July 31, 2017, whereby a minimum EBITDAR of $412,000 was required and only $155,711 was achieved.

       e.      Test Period ending on August 31, 2017, whereby a minimum EBITDAR of $455,000 was required and only $302,226 was achieved.

2.      Borrower's breach of section 8.1(c) of the Loan Agreement because there was a Forbearance Termination Event as a result of the forgoing Events of Default under the Loan Agreement.

3.      Borrower's breach of section 8.1(c) of the Loan Agreement because there was a Forbearance Termination Event as a result of Borrowers' breach of Section 5.1.3 of the Forbearance Agreement because Operator, Next Step and Synergy failed to propose a new back office provider to Agent and Lender at least one (1) month prior to the Synergy Services Termination Date.

**AP MA FUNDING LLC**
4445 Willard Avenue, Suite 1100
Chevy Chase, MD 20815

November 21, 2017

**VIA E-MAIL AND
VIA FEDERAL EXPRESS**

133 Salem Street, LLC
c/o Synergy Health Centers
2363 Lakewood Road, Suite 200
Toms River, NJ 08755
Attention: Zisha Lipschutz
Email: Zisha@synergyhs.com

**Re:** Term Loan and Security Agreement dated March 12, 2015, by and by and among **133 SALEM STREET, LLC**, a Delaware limited liability company ("**Borrower**"), **AP MA FUNDING LLC**, a Delaware limited liability company ("**AP MA Funding**"), and any other Person that now or hereafter becomes a lender under this Agreement, as co-lenders (collectively, the "**Lenders**" and individually a "**Lender**") and **AP MA FUNDING LLC**, a Delaware limited liability company, in its capacity as administrative, payment and collateral agent for Lenders ("**Agent**") (as amended, supplemented, modified or restated from time to time, the "**Loan Agreement**"), and guaranteed by Avi [Zisha] Lipschutz ("**Guarantor**") pursuant to a certain Payment Guaranty dated March 12, 2015 (the "**Guaranty**")

Dear Mr. Lipschutz:

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Loan Agreement. Reference is further made to that certain Forbearance Agreement dated as of December 30, 2016 by and between Borrower, Agent, and Guarantor (the "**Forbearance Agreement**").

As set forth in Agent's letters to Borrower dated July 24, 2017, August 29, 2017, October 10, 2017 and October 27, 2017 (the "**Post-Forbearance Default Letters**"), Events of Default occurred following the entry into the Forbearance Agreement and are continuing. This letter constitutes formal written notice of the existence of new Events of Default under Loan Agreement, as set forth on Schedule 1 attached hereto, each of which occurred following the issuance of the Post-Forbearance Default Letters and are continuing (the "**New Events of Default**"). The foregoing is not meant to be an exhaustive or all-encompassing list of all of the

133 Salem Street, LLC
Attention: Mr. Avi [Zisha] Lipschutz
November 21, 2017
Page - 2 -

Defaults and Events of Defaults that have occurred or may be continuing under the Loan Agreement or any of the other Loan Documents, and Agent and Lenders hereby reserve and preserve any and all past, present and future violations, Defaults and Events of Default under the Loan Agreement and the other Loan Documents, including as provided for in the Forbearance Agreement.

As a result of the occurrence and continuance of the New Events of Default, Agent has charged the Default Interest Rate under the Loan Agreement retroactively to the first New Event of Default, which occurred on April 30, 2017, through the date of this letter. The amount of such Default Interest is $191,521.32. Agent shall continue to charge the Default Interest Rate under the Loan Agreement until you are further notified.

As a result of the occurrence and continuance of the New Events of Default, Agent and Lenders may, at any time and in their sole discretion, without notice, presentment or protest, among other things, declare a Forbearance Termination Event and, thereafter, (a) declare all or any portion of the outstanding principal balance of the Term Loan, all interest thereon and all other Obligations to be due and payable immediately, (b) apply any Reserves held by Agent and any and all sums on deposit to reduce the Obligations, (c) foreclose the Liens created under the Security Documents, (d) realize upon, take possession of and/or sell any collateral or securities pledged, and (e) exercise any and all other remedies available to Agent and Lenders under the Loan Agreement, the Security Documents, the Guaranty, the Forbearance Agreement or any of the other documents executed in connection therewith (collectively, the "**Loan Documents**"), under the UCC or otherwise at law or in equity. Agent and Lenders hereby reserve all of their respective rights, privileges and remedies which shall remain and continue in full force and effect under the Loan Documents.

The foregoing provisions of this letter shall not constitute a waiver of the New Events of Default, or of any past, present or future violation, default, or Event of Default of Borrower or Guarantors under the Loan Documents, and shall not directly or indirectly in any way whatsoever either: (a) impair, prejudice or otherwise adversely affect Agent's or Lender's right at any time to exercise any right, privilege or remedy in connection with and as provided for under the Loan Documents, or (b) amend or alter any provision of the Loan Documents, or (c) constitute any course of dealing or other basis for altering any obligation of Borrower or Guarantors or any right, privilege or remedy of Agent under the Loan Documents, or constitute any consent by Agent or Lenders to any prior, existing or future violations of the Loan Documents.

Any partial payment by any Loan Party or any other Person of any amount owing to Agent or any Lender under the Loan Agreement or any of the other Loan Documents may, at Agent's or such Lender's option, be accepted and applied on account of any due and unpaid balance. If so accepted, however, such partial payment shall be without waiver of or prejudice to

133 Salem Street, LLC
Attention: Mr. Avi [Zisha] Lipschutz
November 21, 2017
Page - 3 -

any rights or remedies available to Agent and Lenders on account of any violations of the Loan Agreement or any of the other Loan Documents.   Any delay or forbearance by Agent or any Lender in the enforcement or pursuit of any of Agent's and Lenders' rights or remedies under the Loan Documents or applicable law shall not constitute a waiver thereof, nor shall it be a bar to the exercise of Agent's or any Lender's rights or remedies at a later date.

Very truly yours,

**AP MA FUNDING LLC**

By: _____
Name: John Gray
Title:   Executive Vice President


cc:    Avi Lipschutz (aka Zisha Lipschutz)
       17 Van Winkle Road
       Wesley Hills, NY 10952

       Novack Burnbaum Crystal LLP
       675 Third Avenue, Floor 8
       New York, New York 10017
       Attention: Edward Burnbaum
       Email: eburnbaum@nbclaw.com

## Schedule 1

New Events of Default

1.      Borrower failed to meet the EBITDAR covenant required under section 1.2 of Exhibit C to the Loan Agreement for the following Test Periods:

       a.      Test Period ending on April 30, 2017, whereby a minimum EBITDAR of $228,000 was required and only $182,892 was achieved; and

       b.      Test Period ending on May 31, 2017, whereby a minimum EBITDAR of $301,000 was required and only $149,776 was achieved.

       c.      Test Period ending on June 30, 2017, whereby a minimum EBITDAR of $386,000 was required and only $(5,887) was achieved.

       d.      Test Period ending on July 31, 2017, whereby a minimum EBITDAR of $412,000 was required and only $155,711 was achieved.

       e.      Test Period ending on August 31, 2017, whereby a minimum EBITDAR of $455,000 was required and only $302,226 was achieved.

2.      Borrower's breach of section 8.1(c) of the Loan Agreement because there was a Forbearance Termination Event as a result of the forgoing Events of Default under the Loan Agreement.

3.      Borrower's breach of section 8.1(c) of the Loan Agreement because there was a Forbearance Termination Event as a result of Borrowers' breach of Section 5.1.3 of the Forbearance Agreement because Operator, Next Step and Synergy failed to propose a new back office provider to Agent and Lender at least one (1) month prior to the Synergy Services Termination Date.

**<u>Exhibit I</u>**

Financials

(see attached)

**West Revere - Monthly Trend**

| ($ in actuals) | Jan-17 | Feb-17 | Mar-17 | Apr-17 | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 | Total 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | 734,786 | 714,253 | 759,208 | 713,167 | 773,711 | 816,100 | 874,567 | 945,047 | 890,004 | 838,328 | 852,212 | 863,528 | 9,774,913 |
| Operating Expenses | 840,811 | 782,545 | 883,193 | 829,369 | 859,639 | 884,415 | 894,505 | 941,956 | 936,547 | 928,125 | 903,339 | 999,894 | 10,684,339 |
| Net Income | (106,025) | (68,292) | (123,985) | (116,202) | (85,928) | (68,315) | (19,938) | 3,091 | (46,543) | (89,796) | (51,127) | (136,365) | (909,426) |
| | | | | | | | | | | | | | |
| Net Income | (106,025) | (68,292) | (123,985) | (116,202) | (85,928) | (68,315) | (19,938) | 3,091 | (46,543) | (89,796) | (51,127) | (136,365) | (909,426) |
| Plus: Depreciation & Amortization | 12,091 | 12,336 | 12,187 | 12,240 | 12,360 | 12,372 | 12,436 | 12,580 | 12,679 | 12,698 | 12,715 | 12,744 | 149,438 |
| EBITDA | (93,935) | (55,956) | (111,798) | (103,962) | (73,569) | (55,943) | (7,502) | 15,672 | (33,864) | (77,098) | (38,412) | (123,621) | (759,988) |
| | | | | | | | | | | | | | |
| Equity at End of Month | (1,892,129) | (1,960,421) | (2,084,406) | (2,200,608) | (2,286,537) | (2,354,851) | (2,374,789) | (2,371,698) | (2,418,241) | (2,508,037) | (2,559,164) | (2,695,529) | |

| West Revere - Cumulative Financial Trends | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ($ in actuals) | Jan-17 | Feb-17 | Mar-17 | Apr-17 | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 |
| Net Income | (106,025) | (174,317) | (298,303) | (414,505) | (500,433) | (568,748) | (588,686) | (585,594) | (632,137) | (721,934) | (773,061) | (909,426) |
| EBITDA | (93,935) | (149,890) | (261,689) | (365,651) | (439,219) | (495,162) | (502,665) | (486,993) | (520,857) | (597,955) | (636,367) | (759,988) |
| Equity at End of Month | (1,892,129) | (1,960,421) | (2,084,406) | (2,200,608) | (2,286,537) | (2,354,851) | (2,374,789) | (2,371,698) | (2,418,241) | (2,508,037) | (2,559,164) | (2,695,529) |



West Revere Health Center - 2017 Cumulative Financial Trends

**West Revere Health Center**
**Accounts Payable Aging**
**As of 12/20/2017**

| Vendor Name | Current | <30 days | 31-60 days | 61-90 days | >90 days | Total | | Note |
|---|---|---|---|---|---|---|---|---|
| Commonwealth of Massachusetts - User Fee | - | - | - | 188,394 | 178,449 | 366,843 | | A |
| Partners Pharmacy Of MA | - | 45,470 | 24,861 | 59,135 | - | 129,467 | | A |
| HPC Food Service | 41,963 | 24,818 | 24,423 | 26,176 | (22) | 117,358 | | B |
| City Of Revere | - | 10,663 | 40,760 | - | 21,287 | 72,710 | | |
| HealthPro Therapy Services LLC | - | 50,708 | - | - | - | 50,708 | | C |
| **Total - Largest 5 Vendor Balances** | **41,963** | **131,659** | **90,044** | **273,705** | **199,714** | **737,085** | | |
| Other Vendors | 38,076 | 107,223 | 55,561 | 55,222 | 93,091 | 349,173 | | |
| **Total Accounts Payable** | **80,039** | **238,882** | **145,605** | **328,926** | **292,805** | **1,086,258** | | |
| Aging Bucket as a % of Total | 7.4% | 22.0% | 13.4% | 30.3% | 27.0% | 100.0% | | |

A   Critical vendors such as Partners Pharmacy, West Revere's pharmacy vendor, have been stretched due to financial underperformance and the lack of liquidity. The CEO of Partners' Pharmacy called Damian Dell'Anno on Friday, March 2, 2018 to personally complain about past-due balances.  As of March 2, 2018, the CEO asserted that West Revere and other Synergy controlled facilities owed over $1,000,000 to Partners Pharmacy which was over 100 days past due and threatened to cut-off the facility's credit and move it to cash-on-delivery ("COD") if balances were not paid immediately.

B   Critical vendors such as HPC Food Services, a food provider to West Revere, have been stretched due to financial underperformance and the lack of liquidity. Failure to pay vendors such as these jeopardizes the facility's patients.

C   Critical vendors such as HealthPro Therapy Services, West Revere's therapy provider, have been stretched due to financial underperformance and the lack of liquidity. Failure to pay vendors such as these jeopardizes the facility's patients.

| West Revere - Accounts Payable Trend - 2017 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ($ in actuals) | Jan-17 | Feb-17 | Mar-17 | Apr-17 | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 |
| Accounts payable | 444,073 | 325,194 | 287,276 | 770,006 | 601,148 | 707,752 | 745,129 | 868,759 | 951,700 | 1,204,567 | 1,048,898 | 1,094,382 |
| State user fee payable | 51,106 | 101,945 | 157,429 | 43,720 | 93,280 | 175,205 | 61,302 | 125,134 | 188,394 | 65,892 | 128,928 | 192,250 |
| Total Payables Including User Fee | 495,179 | 427,140 | 444,704 | 813,726 | 694,428 | 882,957 | 806,431 | 993,893 | 1,140,094 | 1,270,459 | 1,177,826 | 1,286,631 |

West Revere Health Center - Accounts Payable Trend - 2017



Total payables increased $791,452 or 160% from Jan-17 to Dec-17.

**User Fee Balances**

Interest Calculation Date  2/13/2018

| Invoice ID | CYQuarter | QTR End Date | OrgName | Balance | Note |
|---|---|---|---|---|---|
| 171104293013 | 2017Q1 | 3/31/2017 | WEST REVERE HEALTH CENTER | $5,542.68 | Interest |
| 172104293011 | 2017Q2 | 6/30/2017 | WEST REVERE HEALTH CENTER | $168,448.82 | |
| TBD | 2017Q2 | 6/30/2017 | WEST REVERE HEALTH CENTER | $16,592.21 | Estimate of Interest through 2/13/18 |
| 173104293019 | 2017Q3 | 9/30/2017 | WEST REVERE HEALTH CENTER | $188,394.00 | |
| TBD | 2017Q3 | 9/30/2017 | WEST REVERE HEALTH CENTER | $9,890.69 | Estimate of Interest through 2/13/18 |
| 174104293017 | 2017Q4 | 12/31/2017 | WEST REVERE HEALTH CENTER | $192,127.20 | |
| TBD | 2017Q4 | 12/31/2017 | WEST REVERE HEALTH CENTER | $1,248.83 | Estimate of Interest through 2/13/18 |
| **Total WEST REVERE HEALTH CENTER** | | | | **$582,244.42** | |

# **Exhibit J**

EOHHS Letter

(see attached)



**The Commonwealth of Massachusetts**
**Executive Office of Health and Human Services**
One Ashburton Place, 11th Floor
Boston, Massachusetts 02108

**CHARLES D. BAKER**
Governor

**KARYN E. POLITO**
Lieutenant Governor

**MARYLOU SUDDERS**
Secretary

Tel: (617) 573-1600
Fax: (617) 573-1891
www.mass.gov/eohhs

9/18/2017

WEST REVERE HEALTH CENTER
133 SALEM STREET
REVERE, MA, 02151

## **SECOND NOTICE**

Dear Provider:

In accordance with 101 CMR 512:05(5), Executive Office of Health and Human Services (EOHHS) may assess interest and late fees on unpaid user fee assessments. In addition to assessing interest and late fees, and pursuant to M.G.L. c. 118E, §63(f) and 101 CMR 512.05(7), EOHHS has authority to notify the Department of Public Health (DPH) if a facility fails to pay a required assessment by the required due date. Pursuant to M.G.L. c. 118E, §63(f), DPH will revoke licensure of a facility that fails to pay a delinquent assessment.

As of the date of this letter, the quarterly user fee payment for WEST REVERE HEALTH CENTER for the period ended 3/31/2017 has not been received.

The unpaid quarterly user fee payment must be received by 11/1/2017. In addition, interest will be assessed every day until full payment is received, beginning on the original due date. This is your second notice of sanction for failure to comply with 101 CMR 512.00. If EOHHS does not receive payment by 11/1/2017, a final notice will be issued. If EOHHS does not receive payment after the final notice, your facility will be referred to DPH for revocation of your licensure.

Payments must be made by mailing a check to the following address:

Executive Office of Health and Human Services
Commonwealth of Massachusetts – User Fee
Post Office Box 3538
Boston, MA 02241-3538

If you have any questions regarding this notice, please contact:

Thomas Lane
Director, Fee-For-Service Programs
MassHealth Office of Long Term Services and Supports
Thomas.Lane@state.ma.us

Sincerely,

Alda Rego
Assistant Secretary for Administration and Finance

CC: Sherman Lohnes, DPH



**The Commonwealth of Massachusetts**
**Executive Office of Health and Human Services**
**One Ashburton Place, 11th Floor**
**Boston, Massachusetts 02108**

**CHARLES D. BAKER**
Governor

**KARYN E. POLITO**
Lieutenant Governor

**MARYLOU SUDDERS**
Secretary

Tel: (617) 573-1600
Fax: (617) 573-1891
www.mass.gov/eohhs

September 18, 2017

WEST REVERE HEALTH CENTER
133 SALEM STREET
REVERE, MA, 02151

Dear Provider:

In accordance with 101 CMR 512:05(5), Executive Office of Health and Human Services (EOHHS) may assess interest and late fees on unpaid user fee assessments. In addition to assessing interest and late fees, and pursuant to M.G.L. c. 118E, §63(f) and 101 CMR 512.05(7), EOHHS has authority to notify the Department of Public Health (DPH) if a facility fails to pay a required assessment by the required due date. Pursuant to M.G.L. c. 118E, §63(f), DPH will revoke licensure of a facility that fails to pay a delinquent assessment.

As of the date of this letter, the quarterly user fee payment for WEST REVERE HEALTH CENTER for the period ended 6/30/2017 has not been received.

The unpaid quarterly user fee payment must be received by 11/1/2017. In addition, interest will be assessed every day until full payment is received, beginning on the original due date. This is your first notice of sanction for failure to comply with 101 CMR 512.00. If EOHHS does not receive payment by 11/1/2017, a second notice will be issued. If EOHHS does not receive payment after the second notice, a final notice will be issued and your facility will be referred to DPH for revocation of your licensure.

Payments must be made by mailing a check to the following address:

Executive Office of Health and Human Services
Commonwealth of Massachusetts – User Fee
Post Office Box 3538
Boston, MA 02241-3538

If you have any questions regarding this notice, please contact:

Thomas Lane
Director, Fee-For-Service Programs
MassHealth Office of Long Term Services and Supports
Thomas.Lane@state.ma.us

Sincerely,

Alda Rego
Assistant Secretary for Administration and Finance

CC: Sherman Lohnes, DPH

## **Exhibit K**

Next Step Letters

(see attached)



NIXON
PEABODY

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

**Jack H. Fainberg**
*Partner*
T (617) 345-6106
jfainberg@nixonpeabody.com

100 Summer Street
Boston, MA  02110-2131
617-345-1000

November 7, 2017

West Revere Health Center, LLC
c/o Synergy Health Centers, LLC
2362 Lakewood Road
Toms River, New Jersey 08755
Attn:  Zisha Lipschutz (zisha@synergyhs.com)

Re:  **Demand for Payment**

Ladies and Gentlemen:

This firm represents Next Step Healthcare, LLC ("<u>Next Step</u>") in connection with that certain Management Agreement, dated as of December 29, 2016 (the "<u>Management Agreement</u>"), by and among you and others, as Operators, Next Step, as Manager, and Synergy Health Centers, LLC.  Capitalized terms used herein and not otherwise defined shall have meanings ascribed to such terms in the Management Agreement.

You have failed to pay the amount of $35,063 in Management Fees (the "<u>Past Due Fees</u>") as and when required under the terms of the Management Agreement.  This notice is given to you pursuant to Section 4.3(b) of the Management Agreement.

You are hereby notified that, unless, on or before 5:00 p.m. on November 14, 2017, Next Step receives full payment of all of the Past Due Fees, Next Step intends to exercise all of its rights and remedies against you, including, without limitation, its rights and remedies under the Management Agreement and by operation of law, and Next Step will instruct its attorneys to commence to protect, exercise, and enforce whatever legal rights, remedies, actions, and powers are available to Next Step by agreement or by operation of law to collect all of the Past Due Fees owing by you to Next Step.

Please direct all inquiries regarding this matter to the undersigned at the number listed above.

Very truly yours,

NIXON PEABODY LLP

Jack H. Fainberg, Attorney for Next Step
Healthcare, LLC, on whose behalf this
notice is given

*BY E-MAIL AND OVERNIGHT DELIVERY*

cc:  Edward H. Burnham, Esq. (eburnbaum@nbclaw.com)
     Kenneth J. Ottaviano, Esq. (Kenneth.Ottaviano@kattenlaw.com)

4813-4241-0580.1



NIXON PEABODY LLP        **Jack H. Fainberg**
ATTORNEYS AT LAW         *Partner*
                         T (617) 345-6106
NIXONPEABODY.COM         jfainberg@nixonpeabody.com
@NIXONPEABODYLLP
                         100 Summer Street
                         Boston, MA  02110-2131
                         617-345-1000

October 20, 2017

West Revere Health Center, LLC
c/o Synergy Health Centers, LLC
2362 Lakewood Road
Toms River, New Jersey 08755
Attn:  Zisha Lipschutz (zisha@synergyhs.com)

     Re:    **Demand for Payment**

Ladies and Gentlemen:

This firm represents Next Step Healthcare, LLC ("Next Step") in connection with that certain Management Agreement, dated as of December 29, 2016 (the "Management Agreement"), by and among you and others, as Operators, Next Step, as Manager, and Synergy Health Centers, LLC.  Capitalized terms used herein and not otherwise defined shall have meanings ascribed to such terms in the Management Agreement.

You have failed to pay the amount of $30,173 in Management Fees (the "Past Due Fees") as and when required under the terms of the Management Agreement.  This notice is given to you pursuant to Section 4.3(b) of the Management Agreement.

You are hereby notified that, unless, on or before 5:00 p.m. on October 27, 2017, Next Step receives full payment of all of the Past Due Fees, Next Step intends to exercise all of its rights and remedies against you, including, without limitation, its rights and remedies under the Management Agreement and by operation of law, and Next Step will instruct its attorneys to commence to protect, exercise, and enforce whatever legal rights, remedies, actions, and powers are available to Next Step by agreement or by operation of law to collect all of the Past Due Fees owing by you to Next Step.

Please direct all inquiries regarding this matter to the undersigned at the number listed above.

                    Very truly yours,

                    NIXON PEABODY LLP

                    Jack H. Fainberg, Attorney for Next Step
                    Healthcare, LLC, on whose behalf this
                    notice is given

*BY E-MAIL AND OVERNIGHT DELIVERY*

cc:   Edward H. Burnham, Esq. (eburnbaum@nbclaw.com)
      Kenneth J. Ottaviano, Esq. (Kenneth.Ottaviano@kattenlaw.com)

4828-0200-9938.1

## **Exhibit L**

Y.C. Rubin Declaration

(see attached)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:                                              Chapter 11

22 Maple Street, LLC,                               Case No.
25 Oriol Drive, LLC,                                Case No.
59 Coolidge Road, LLC,                              Case No.
20 Kinmonth Road, LLC,                              Case No.

                              Debtors.[1]

-------------------------------------------------------------x

## CONSOLIDATED DECLARATION OF Y.C. RUBIN
## PURSUANT TO LOCAL BANKRUPTCY RULE 1007-4

Y.C. Rubin declares the following under penalties of perjury pursuant to 28

U.S.C. §1967:

1.      I am the Chief Restructuring Officer of 22 Maple Street, LLC, 25 Oriol Drive,

LLC, 59 Coolidge Road, LLC, and 20 Kinmonth Road, LLC (collectively, the "Debtors"). I

have been appointed by the active members to head-up the Debtors' efforts to restructure and

reorganize their financial and legal affairs.

### Overview

2.      This Chapter 11 filing is being made on an emergency basis in light of a pending

foreclosure action (since removed to the Federal Court) in which a motion for the appointment of

a receiver has been filed by the Debtors' lending banks, acting through their joint agent, Capital

Finance LLC ("CF"). The total secured debt owed to CF is approximately $31,110,000. From

my review of the loan documents, it appears that each of the Debtors is jointly and severally

liable for the entire secured debt.

---

[1] The Debtors intend to file a motion pursuant to Fed. R. Bank. P. 1015(b) for entry of an order directing joint
administration of these related Chapter 11 cases.

3.     While restructuring negotiations with CF have recently re-commenced in the hope of obtaining a Third Forbearance Agreement, the Debtors have opted to seek Chapter 11 relief in an effort to preserve the *status quo*.

4.     I am currently serving in a similar chief restructuring capacity in connection with the related Chapter 11 proceeding before this Court of 90 West Street LLC (Case No. 18-40515), ("90 West"). 90 West is an affiliate of the Debtors, having common principals and investors.

5.     Like 90 West, the Debtors are also real estate holding companies that own real property from which other affiliated entities operate nursing home facilities, commonly referred to by the parties as the "Villages".

6.     In my capacity as Chief Restructuring Officer, I respectfully submit this Consolidated Declaration in support of the Debtors' respective Chapter 11 filings in accordance with the Local Rules of this Court.

7.     The respective Debtors will be moving to have their cases jointly administered for procedural purposes. This Declaration is being filed for all of the Debtors and reflects the proposed joint caption for the related bankruptcy proceedings.

8.     The purpose of this Declaration is to provide pertinent information regarding the circumstances prompting the Chapter 11 filings, the Debtors' respective assets, capital structure, and strategies for reorganization.

### Salient Events Leading up to the Chapter 11 Filings

9.     The Debtors were organized on or about August 27, 2013 to acquire real property associated with four nursing homes under the so-called "Villages" portfolio. The acquisition included the following real property, together with the facilities located at each of the properties (the "Properties"):

2

| Name of Debtor | Address of Real Property | Operating Facility |
|---|---|---|
| 22 Maple Street, LLC | 22 Maple Street, Amesbury, MA | Merrimack Valley Health Center |
| 25 Oriol Drive, LLC | 25 Oriol Drive Worcester, MA | Worcester Health Center |
| 59 Coolidge Road, LLC | 59 Coolidge Road Watertown, MA | Watertown Health Center |
| 20 Kinmonth Road, LLC | 20 Kinmonth Road Newton, MA | Waban Health Center |

10.    The Properties are each encumbered by a first mortgage lien and security interest securing four term loans in the original aggregate balance of $36,856,627, made on or about March 4, 2014, with CF as the Agent for the four syndicated lenders.

11.    The facilities have been operating reasonably well, although not at a level which would allow refinancing of the underlying mortgage debt.

12.    On or about February 12, 2016, the Debtors entered into a forbearance agreement with CF.  This agreement was then extended through a second forbearance agreement as of December 30, 2016, which has now expired.

13.    In recent weeks, CF commenced foreclosure proceedings against the Debtors and the related operating facilities.  While this litigation is still in its infancy, CF has moved for an order appointing a receiver to take control of the Debtors' Properties.  The prospect of a receiver will adversely impact the Debtors' ability to obtain a negotiated restructuring from CF.  Accordingly, the goal of the Chapter 11 filings is to obtain a cooling-off period during which time good faith negotiations can proceed on a relatively level playing field.

3

## Local Rule 1007 Disclosures

14.     Pursuant to Local Rule 1007-4(a)(iii-iv), no committees were formed prior to the filing of the Petitions.

15.     Pursuant to Local Rule 1007-4(a)(v), a list of the names and addresses of the creditors holding the 20 largest unsecured claims against each of the Debtors is attached to the respective Petitions.

16.     Pursuant to Local Rule 1007-4(a)(v), CF, as agent, is the Debtors' primary secured creditor, with a current balance of $31,110,000.

17.     Pursuant to Local Rule 1007-4(a)(vii), the primary assets each Debtor consist of the respective real property housing the affiliated operating facilities, as listed above in paragraph "8".

18.     Pursuant to Local Rule 1007-4(a)(vii), the liabilities of each Debtor, including secured debt, plus certain real estate taxes and utilities.

19.     Pursuant to Local Rule 1007-4(a)(vii), a list of equity holders is attached to each of the respective Petitions.

20.     Pursuant to Local Rule 1007-4(a)(ix), (x) and (xi), the real property owned by the respective Debtors, as listed above, currently remains in the possession of the Debtors.

21.     Pursuant to Local Rule 1007-4(a)(xii), the Debtors' members receive no compensation.

22.     Pursuant to Local Rule 1007-4(a)(xix-xvi), a 30-day budget will be prepared shortly after the filing in connection with cash collateral negotiations with CF.

Dated: Brooklyn, NY
February 14, 2018                       /s/ Y.C. Rubin
                                        By: Y.C. Rubin
                                        Title: Chief Restructuring Officer

4

## MEMBER CONSENTS AND RESOLUTIONS OF
## 22 MAPLE STREET, LLC, 25 ORIOL DRIVE, LLC,
## 59 COOLIDGE ROAD, LLC AND 20 KINMONTH ROAD, LLC

WHEREAS, the Active Members of **22 Maple Street, LLC, 25 Oriol Drive, LLC, 59 Coolidge Road, LLC, and 20 Kinmonth Road, LLC** (collectively the "Companies") hereby resolve to take appropriate legal action in light of pending foreclosure proceedings in which the appointment of a receiver has been sought; and

WHEREAS, in view of the foregoing, the Companies believe that the filing of Chapter 11 cases will be beneficial to the interest of all the Companies; and

WHEREAS, the Active Members have previously been notified that Avi Lipschutz will resign from the Companies once a change in the operating licenses for Waban Health Center LLC, Merrimack Valley Health Center LLC, Watertown Health Center LLC and Worcester Health Center LLC have been approved by applicable state agencies; and

WHEREAS, in view of the pending foreclosure proceedings, including a motion for the appointment of a receiver, the Active Members have determined that it would also be in the best interest of the Companies to retain Y C Rubin as Chief Restructuring Officer for the purpose of commencing voluntary cases under title 11 of the United States Code on behalf of each of the Companies;

NOW, THEREFORE, the undersigned, being the Active Members of the Companies, do hereby certify that we waive any meeting and adopt the following resolutions:

RESOLVED, that the Companies are authorized to retain Y C Rubin effective immediately as Chief Restructuring Officer to lead the restructure of the Companies' respective business and legal affairs; and it is further

RESOLVED, that each of the Companies is authorized to file for relief under the provisions of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court (the ("Bankruptcy Court") for the Eastern District of York (the "District"); and it is further

RESOLVED, that Y C Rubin is hereby authorized, directed and empowered to execute and deliver, on behalf of each of the Companies, the bankruptcy petition and all documents and other instruments that may be required in connection with the respective bankruptcy proceedings (the "Bankruptcy Proceeding"), and to do all such other things on behalf of the Companies as may be required in connection with the Bankruptcy Proceeding; and it is further

RESOLVED,  that the Companies are authorized to retain Kevin J. Nash and the firm of
Goldberg Weprin Finkel Goldstein LLC as its bankruptcy counsel for the
Bankruptcy Proceeding.

Dated: Brooklyn, New York
February 14, 2018

Massachusetts Centers LLC

By: _____

Name: Zigmond Brach

Title: manager

_____
Larry Lipschutz

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:                                                    Chapter 11

20 Kinmonth Road, LLC,                                    Case No.

                              Debtor.
-------------------------------------------------------------x

### LIST OF EQUITY HOLDERS

Massachusetts Centers LLC

Avi "Zisha" Lipshutz (Resigned)

Larry Lipschutz

Dated: Brooklyn, New York
       February 14, 2018

                         20 Kinmonth Road, LLC

                    By:   /s/ Y.C. Rubin
                          Name:  Y C Rubin
                          Title:  Chief Restructuring Officer

**<u>Exhibit M</u>**

KCP's Experience and Qualifications

(see attached)



# KCP
## advisory group

# Restructuring & Advisory Services
## *For Healthcare*

kcpadvisory.com
Boston | Chicago | New York



KCP Advisory Group is a leading business advisory firm built on the success of its professionals who specialize in providing creative solutions and aiding clients in rehabilitating their businesses. Recognizing the uniqueness of each engagement, KCP assists clients whether they are healthy, challenged, or distressed.

We are pleased to submit this Statement of Qualifications for Financial Advisory and Restructuring Management for clients in the Healthcare & Medical related industries. We understand and recognize the challenges faced by the industry and are ready to assist.

To the business owners, executive management, lenders, investors, law firms and others who retain KCP we are trusted advisors whose goal is to bring to each situation strategic thinking, critical insight, and actionable expertise. If you have any questions, please contact us at your convenience. We will provide references upon request.

Jacen Dinoff, CTP
KCP Advisory Group

kcpadvisory.com
Boston | Chicago | New York

# *Comprehensive Operational, Financial and Restructuring Services Delivered by a Flexible and Experienced Team of Senior Executives*

**Transaction Advisory**
KCP Advisory's transaction advisory services provide in-depth, customized and highly applicable information and recommendations for specific situations or opportunities.

**Interim Management**
The professionals at KCP Advisory have filled senior executive positions over short and long term periods to provide leadership, stabilization and rehabilitation for companies in crisis or to lead through a reorganization process.

**Restructuring & Turnaround Advisory**
KCP Advisory's professionals have provided decades of strong and insightful turnaround management and restructuring leadership in numerous industries that allows them to quickly assess the development and implementation of effective plans to address the strategic, operational and financial needs of an organization in distress.

**Financial Advisory**
KCP Advisory's professionals have led hundreds of transactions totaling billions of dollars. We will apply our in-depth knowledge to evaluating the viability of the financial plan and sources of capital.

**Forensic Analysis & Litigation Support**
The professionals at KCP Advisory can present critical insight and support in the areas of Reorganization and Bankruptcy, Forensic Analysis, Expert Testimony, evaluating insider transactions for avoidance actions or fraudulent conveyance, assistance in determining if the corporate veil has been pierced, evaluating solvency for avoidance actions, helping to assess the validity and enforceability of secured claims, valuation services to help assure that assets are being sold for a fair price, and assisting with administration of the estate.

kcpadvisory.com
Boston | Chicago | New York

# KCP Core Services

### Evaluation and Analytical Capabilities

Assessment of liquidity, operations, management and capital structure including weekly cash flow analysis, business viability and reorganization planning is key. KCP has proven experience in both preparation of such reporting as well as providing a clear picture of a Company's restructuring alternatives, both in and out of court.

### Experienced Negotiation

KCP professionals have significant experience communicating and negotiating with creditors, customers, employees and other stakeholders. By leveraging their extensive network of lenders, KCP can assist with securing financing and restructuring debt. If necessary, KCP will assume senior executive positions to stabilize and rehabilitate organizations in crisis.

### Creative Solutions

With an unfavorable projection for recovery in a challenging economic climate, the ability for a Company to survive relies on the development of creative solutions such as recovery on off-balance sheet assets (leaseholds, insurance premiums, avoidance actions, etc). KCP is renown for their ability to find innovative results.

### Forensic Capabilities

The professionals of KCP have provided significant forensic experience in fraud detection, identification of material deficiencies in accounting systems, fraudulent operating activities, and other episodes of misreporting.

kcpadvisory.com

Boston | Chicago | New York

# KCP Operational Roles in Healthcare

| Company | Roles & Responsibilities |
|---|---|
| Deloitte | Supervisor, specializing in audits of healthcare organizations, primarily hospitals |
| Fresenius Medical Care | Vice President of Finance/Treasurer, Grew business from $185 million to $2.5 billion, participated in 200 acquisitions, Led spin-off from W.R. Grace |
| Rynel, Inc. | Chief Financial Officer for this medical device manufacturer |
| Children's Medical Ventures | President of this neonatal medical device manufacturer and distributor |
| Sleep HealthCenters | President/CEO of the second largest sleep center company in the U.S. |
| AmbreHealth Technologies | CEO of startup healthcare predictive analytics company |

kcpadvisory.com
Boston | Chicago | New York

# KCP Select Healthcare Projects

## Healthcare Facilities

- Rural hospital bankruptcy
- Nursing Home Receivership
- LTAC Hospital receivership
- Senior Living Center turnaround
- Acute care hospital post-Chapter 11 confirmation trustee
- Nursing home turnaround
- Acute care hospital turnaround
- Ambulatory surgical center revenue/cost and managerial performance assessment
- Nursing homes lender financial and operational assessment

## Medical Device

- Spine surgical instruments restructuring and refinancing
- Go-to-market strategic planning for startup non-invasive insomnia solution
- Market entry assistance for non-US heart and sleep monitoring

**KCP** advisory group

kcpadvisory.com
Boston | Chicago | New York

# KCP Select Healthcare Projects

## Medical Services

- Sleep disorder centers restructuring and receivership
- Durable medical equipment performance improvement
- Medical specialty practice strategic and financial planning
- Fertility clinics expert valuation, resulting in fraudulent conveyance settlement
- Sleep centers financial/operational assessment for restructuring/strategic planning
- Caribbean-based medical specialty program part-time chief strategy officer
- Medical practices valuation and expert testimony regarding valuation of professional goodwill

## Other Healthcare

- Healthcare analytics part-time CEO of startup to commercialize university-based technology
- Homecare turnaround, refinancing, and eventual strategic sale
- Medical college independent auditor
- Multi-state home nursing care agency turnaround and sale



kcpadvisory.com

Boston | Chicago | New York

# KCP Key Staff Biographies

## Jacen A. Dinoff

*Principal & Co-Founder*

Jacen Dinoff is an experienced and highly-regarded corporate restructuring and turnaround management advisor with over 20 years of hands-on accounting, finance, management and operations experience that complements his technical expertise in bankruptcy case administration. His career has included engagements in financial and operational restructurings, asset divestitures through sale and liquidation, and senior debtor/creditor advisor roles for many well-known companies.

Mr. Dinoff has provided management advisory services to both privately and publicly held retail and consumer goods companies such as fine department stores, supermarket chains, furniture, jewelry, sporting goods, books and specialty clothing. He has also worked for clients in healthcare, manufacturing, oil and gas, renewable energy, seafood, business services and finance companies. During these many engagements, Mr. Dinoff has been called upon to act at executive level management, both formally and informally titled. Prior to consulting he held a number of positions at Paragon Capital, LLC (now Wells Fargo Retail Finance). The group provided secured debt financing to regional and national retail and consumer product companies; specializing in expansion working capital for early stage and emerging growth companies as well as those pursuing reorganization.

Mr. Dinoff holds a B.S. in Business Administration from the Whittemore School of Business and Economics at the University of New Hampshire, and an M.B.A in Finance from Bentley College. He is an active member of the Turnaround Management Association and American Bankruptcy Institute.



kcpadvisory.com
Boston | Chicago | New York

# KCP Key Staff Biographies - *continued*

## Paul S. Valentine
*Senior Managing Director, Healthcare Lead*

Paul Valentine specializes in the management, development and operation of high-quality, fast-growth, small-to-mid-size organizations. Mr. Valentine brings a diverse industry background to KCP, including roles in healthcare services, medical devices, retail products and manufacturing. His formal education in accounting and finance is further enhanced by his corporate roles in sales, operations and product development, as well as a number of officer roles including the chief executive position.

Mr. Valentine focuses his case matters on Performance Improvement and Corporate Renewal, providing his clients with strategic and marketing advice, while maintaining a solid focus on financial structure and operational efficiencies. Recent notable engagements include restructuring of debt for a regional home healthcare business with debts that exceeded cash flow and significant tax obligations, business performance improvement services including sales growth, strategic relationships and margin enhancement activities for a regional medical supplier, strategic development and go-to-market strategy for a sleep therapy developer, restructuring for a national reseller and value-added technology solutions provider.

Mr. Valentine has a Bachelor of Science degree in Accounting and a Master of Business Administration degree in Finance and Entrepreneurship, both from Babson College, Wellesley, MA. He is a member of the Turnaround Management Association.



kcpadvisory.com
Boston | Chicago | New York



**KCP**
advisory group

781-313-8123
www.kcpadvisory.com

**New York**
1001 Sixth Avenue - 10th Floor
New York, NY 10018

**Boston**
2400 District Avenue - Suite 215
Burlington, MA 01803

**Chicago**
655 Deerfield Rd. Suite 100 PMB 325
Deerfield, IL 60015



## Exhibit N

Proposed Order

(see attached)

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                          BUSINESS LITIGATION SESSION
                                                     Civil Action No. _____

| | |
|---|---|
| AP MA FUNDING LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| 133 SALEM STREET, LLC and | ) |
| WEST REVERE HEALTH CENTER, LLC | ) |
| | ) |
| Defendants. | ) |

This matter came before the court on the Motion (the "Motion") of AP MA Funding LLC

(the "Agent"), by and through its counsel, files this Motion for Appointment of Receiver against

133 Salem Street, LLC (the "Owner Defendant") and West Revere Health Center, LLC (the

"Operator Defendant" and together with the Owner Defendant, the "Defendants"), the Court

having considered the Motion, the Verified Complaint and any oral argument thereon and any

objections thereto,

Now it is ORDERED that:

1.      KCP Advisory Group LLC, 2400 District Avenue, Suite 215, Burlington, MA

01803, by and through Jacen Dinoff, its Principal and Co-Founder, is hereby appointed receiver

("Receiver") of the Defendants' assets (the "Receivership Assets"), with all of the powers and

obligations set forth herein.

2.      The Receiver shall take immediate possession and full control of all of the

Receivership Assets and shall take such other actions as the Receiver deems reasonable and

appropriate to effect this Order, to prevent waste, and to preserve, manage, secure, and safeguard

the Receivership Assets in accordance with the powers granted herein.

3.     Subject to the Budget (defined below), the Receiver shall have and may exercise the following powers, and such additional powers that are provided by law and that the court may from time to time direct or confer:

a.     take and maintain possession of all documents, books, records, papers, and deposit accounts relating to the Receivership Assets;

b.     exclude the Defendants, the Guarantors[1] and their respective agents, servants, and employees wholly from the Receivership Assets, except as necessary for the Defendants to carry out their duties with respect to the Nursing Facility' license;

c.     execute and deliver, in the name of the Defendants or in the Receiver's own name, such documents and instruments as are necessary or appropriate to consummate transactions authorized hereunder;

d.     manage, operate, preserve and maintain the Receivership Assets as a prudent person would, including, without limitation, the power to enter into, terminate or negotiate contracts and make repairs or alterations to the Receivership Assets that the Receiver in its business judgment reasonably believes necessary for the management, operation, preservation and maintenance of the Receivership Assets;

e.     enter into leases, whether of real or personal property, or tenancy agreements, under such terms and conditions as the Receiver may deem appropriate or desirable to preserve the Receivership Assets;

f.     employ such contractors, subcontractors, materialmen, architects, engineers, consultants, managers, brokers, marketing agents, or other employees, agents,

---

[1] All capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Verified Complaint.

independent contractors, or professionals as the Receiver may in its discretion deem appropriate or desirable to implement and effectuate the rights and powers herein granted;

   g.  engage attorneys or other professionals, as appropriate, in order to advise and assist the Receiver in carrying out its duties and appearing in court or other proceedings on its behalf;

   h.  collect the rents, accounts receivable, insurance claim proceeds, real estate tax refunds, utility deposits, security deposits, proceeds, earnest money deposits and profits from the Receivership Assets, if any, from any time period whether historical, current or prospective, and receive any such assets presently in the possession of the Defendants and/or their agents;

   i.  repossess personal property, as provided by law, for breaches of the conditions of their leases or other agreements;

   j.  sue for unpaid receivables, income, or proceeds in the name of the Defendants;

   k.  subject to the Agent's prior written consent, compromise or give acquittance for receivables, income, or proceeds that may become due;

   l.  deal with issues and other matters with vendors, municipalities, and other governmental entities, as necessary;

   m.  open any mail intended for and/or directed to the Defendants;

   n.  hire, fire, select, and retain employees of the Defendants as the Receiver deems reasonable or necessary to preserve and maintain the value of the Receivership Assets, including as necessary or desirable to provide appropriate quality patient care;

o.      upon prior written consent of the Agent, retain Next Step Healthcare, LLC as manager of the Nursing Facilities or hire a qualified replacement healthcare facility management company;

p.      upon prior written consent of the Agent, hire a qualified company or individual to handle the Defendants' back-office services;

q.      with respect to taxes:  (i) use all tax identification numbers of the Defendants and cause to be filed all federal, state, and local income tax returns of the Defendants for the period through termination of this receivership, including, without limitation, for the calendar years 2016, 2017 and thereafter; (ii) communicate with, negotiate with, and serve as nonexclusive representative of the Defendants to all taxing authorities; provided, however, that the Receiver shall use reasonable efforts to keep all managers of the Defendants apprised of all communications with taxing authorities by notice delivered to the address for such managers provided by each Defendant; (iii) use reasonable efforts to issue all tax related forms on behalf of the Defendants, including, without limitation, Internal Revenue Service Forms W-2, 1099, and K-1; and (iv) to the extent funds are available and authorized pursuant to the procedures set forth in this Order, pay taxes which may have been or may be levied against the Receivership Assets or which are otherwise due and payable with respect to the Receivership Assets, including, without limitation, payment of the provider taxes outstanding to the Commonwealth of Massachusetts, provided, however, that the Receiver is authorized to and may pay taxes which are or become due and payable which relate to the Receiver's custody, control or operation of the Receivership Assets for the period from the date of the entry of this Order through the date the Receivership is terminated and for which personal liability could be imposed;

r.      take all actions necessary to maintain and/or transfer existing licenses, permits and authority from all relevant governmental agencies, managed care contracts, and third-party payor agreements, and to take all actions necessary to enroll or re-enroll the Nursing Facility in any and all available state and federal subsidy and reimbursement programs, including but not limited to Medicare and Medicaid;

s.      subject to the prior written consent of the Agent, conduct a marketing or leasing program with respect to all or a portion of the Receivership Assets, or employ a marketing or leasing agent or agents to do so, direct to the leasing or sale of all or portions of the Receivership Assets under such terms and conditions as the Agent may in its sole discretion deem appropriate or desirable, provided, however, that the Receiver shall seek court approval for any sale of Receivership Assets outside the ordinary course of business;

t.      communicate and share information with prospective purchasers and provide the Agent with copies of such information;

u.      in accordance with Paragraph 18 below, borrow monies from the Agent and the Lenders secured by a senior and paramount lien upon the Receivership Assets for the purposes of performing the Receiver's obligations under this or other orders of this court, and preserving or enhancing the value of the Receivership Assets, on terms and conditions agreed upon by the Agent and the Lenders;

v.      take possession or control of all existing bank accounts, cash and funds belonging to or for the benefit of the Defendants in bank accounts associated with the Receivership Assets (regardless from what time period), whether in the name of the Defendants, or their agents or employees, and to open, transfer, and change all such bank accounts into the name of the Receiver, if appropriate, or otherwise take such actions as necessary to ensure such

bank accounts are under the control of the Receiver and ensure Defendants do not have access to such accounts without consultation with the Receiver, all in compliance with legal requirements; and

        w.    take all such further actions and enter into all such other agreements as the Receiver in its professional discretion deems appropriate or desirable to preserve, protect and maximize the value of the Receivership Assets.

    4.    The Defendants shall have neither possession nor control of, nor any right to, the Receivership Assets or money or other proceeds derived from the Receivership Assets unless and until the receivership is terminated and the Receiver is discharged.  The Defendants shall in all respects comply with this Order, and are hereby enjoined and restrained from impeding or interfering in any manner with the exercise by the Receiver of its rights, powers, and duties hereunder.  From and after the date of this Order, neither the Defendants, the Guarantors, nor any agents of the Defendants or Guarantors shall enter into any lease, contract, or agreement of any kind or character relating to the Receivership Assets, and shall not grant any lien upon or security interest in the Receivership Assets.

    5.    Without the consent of the Receiver, none of the Defendants, the Guarantors, or any agents of the Defendants or Guarantors shall enter or be present at any of the Nursing Facility, communicate in any manner with the employees or residents at the Nursing Facility, or modify, terminate or cause to be modified or terminated any license, permit, lease, easement, contract or agreement, if any, relating to the Receivership Assets.

    6.    The Defendants are hereby enjoined and restrained from collecting any revenues, receivables, proceeds, or other sums payable with respect to the Receivership Assets.  Should the Defendants, or any of their respective partners, affiliates, employees, members, shareholders,

representatives, and agents come into possession of any such revenues, receivables, proceeds, or other sums subsequent to the date of entry of this Order, the Defendants, or their respective partners, affiliates, employees, members, shareholders, representatives, and agents shall promptly remit the same to the Receiver in the form received.

7.      Neither the Defendants nor anyone associated therewith or acting under the Defendants' authority or control shall:  (a) remove or destroy any property from the Nursing Facility whether constituting Receivership Assets or otherwise; (b) terminate or cause to be terminated any license, permit, lease, contract, or agreement relating to the operation of the Nursing Facility, including, without limitation, third-party payor agreements; (c) make any disparaging statement to residents, employees, or third parties regarding the Receiver or cause such persons or entities to resign, transfer to a new skilled nursing facility or refuse to deal with the Receiver; or (d) otherwise interfere with the Receiver in carrying out its duties under this Order and applicable law.

8.      Until further order of this court, all tenants, bailees, or other persons in possession of the Receivership Assets or any portion thereof shall turn over such Assets to the Receiver, and until further order of this court (a) shall pay over to the Receiver, or its duly designated agent, all rents, revenues, receivables, proceeds, or other sums payable with respect to the Receivership Assets which are now due and unpaid or hereafter become due; and (b) they are hereby enjoined and restrained from paying to the Defendants or their agents, officers, directors, employees, or attorneys any such rents, receivables, revenues, proceeds, or other sums.

9.      Within five (5) calendar days from the entry of this Order, and thereafter, forthwith upon request of the Receiver (but no later than five (5) calendar days following such request), the Defendants, Synergy Health Centers, LLC, and/or their respective agents and

employees shall provide to the Receiver, make available to the Receiver, or cause their manager or employees to deliver or make available to the Receiver the following, to the extent such items and things exist:

a.     all Receivership Assets and funds generated by or from the Receivership Assets, whether such funds are held in a collateral related account or not, including but not limited to:  (i) all cash on hand; (ii) all cash equivalents and negotiable instruments (such as checks, notes, drafts or other related documents or instruments); and (iii) all sums held in accounts in any financial institutions, including but not limited to (A) tenant/lessee security deposits received by the Defendants from residents of the Nursing Facility, (B) deposits held in escrow by the Defendants for any purpose, such as for payment of real estate taxes and insurance premiums, (C) proceeds of insurance maintained for, or pertaining to, the Receivership Assets, (D) rent or prepaid rent from the residents of the Nursing Facility, (E) funds designated or intended for capital improvements, repairs, or renovations to, or in connection with, the Receivership Assets, and (F) all other sums of any kind relating to the use, enjoyment, possession, improvement, or occupancy of all or any portion of the Receivership Assets;

b.     copies of any and all service contracts pertaining to the Receivership Assets and/or to which the Defendants are a party;

c.     copies of any and all management contracts and/or agreements pertaining to the Receivership Assets and/or to which the Defendants are a party;

d.     copies of any and all leases, lease abstracts, purchase agreements and the like pertaining to the Receivership Assets and/or to which the Defendants are a party;

e.     all open invoices for services or goods relating to the Receivership Assets and/or to which the Defendants are a party;

f.      all records evidencing the Defendants' accounts receivable, and any and all agreements, documented and undocumented, with any creditor, respecting any payment plan or agreement, demand, or suit;

g.      copies of the 2015, 2016, and 2017 year-end and 2018 year-to-date, in both full and summary format, financial statements (and month by month detail) for each Defendant and on a consolidated basis, in both hard copy and electronic formats; balance sheets, income statements, accounts receivables (and receivables/arrearages aging), operating statements, current year budgets, sources and uses of cash flows, detailed rent rolls, accounts payable, check registers, security deposit listings, trial balances, general ledgers, contractor statements, lien waivers, sworn owner statements, construction draws, bank reconciliations, and bank statements, including any passwords which may be associated with any financial documents or accounts and copies of borrowing base certificates or similar submissions for the prior six (6) loan requests;

h.      a complete set of keys (including all masters) and all security and/or access codes and/or cards to the Nursing Facilities and a schedule (including full contact information) identifying each person or entity (including security companies, municipal/governmental agencies and utility companies), who currently has one or more keys and/or access cards to the Nursing Facilities or who has knowledge of any access codes thereto;

i.      any and all records and information the Defendants or Synergy Health Centers, LLC or their agents, affiliates or employees may have concerning the Receivership Assets for each Defendant and on a consolidated basis as applicable, including without limitation all written and electronic books, records, correspondence, and other information (including any computer hardware or software login and password information) related to: (i) any agreements

to which the Defendants and/or the Receivership Assets are or may be subject; (ii) any amounts received from the residents or other tenants of the Nursing Facility, including resident funds, including revenue by payor type for each of the prior two fiscal quarters; (iii) all liens or other encumbrances on the Receivership Assets or against the Defendants; (iv) taxes, assessments and related appeals; (v) insurance of all types for the Defendants (including, but not limited to, liability, property, excess liability, auto liability, boiler and machinery, business interruption, professional liability, employee dishonesty, builders risk, construction related insurance and worker's compensation) including information regarding insurance which may be issued to any defendant; (vi) all invoices for services at the Nursing Facility; (viii) all resident and other tenant files, including leases, lease abstracts, purchase agreements, and sample leases; (ix) all marketing information (in hard copy and electronic format) including but not limited to brochures, photographs (including aerial), maps, and signage; (x) copies of all state and federal tax returns signed and filed by the Defendants for calendar years 2015, 2016 and 2017; (xi) all state survey results and correspondence with any regulators; and (xii) all other records related to the Receivership Assets that are or may be necessary or pertinent to the Receiver's management, maintenance, operation and/or sale of the Receivership Assets;

        j.     any and all insurance loss histories and/or claims related to the Receivership Assets and/or the Defendants;

        k.     all property and all other things of value associated with use, operation and maintenance of the Receivership Assets; and

        l.     all correspondence with regulators and/or licensing entities regarding the Receivership Assets.

10.     By this Order, the Receiver shall be deemed a business associate of the Defendants pursuant to the Health Information Portability and Accountability Act and its implementing regulations.

11.     The Defendants shall cause, and Receiver shall be authorized on the Defendant's behalf to cause, the Receiver and its agents to be named as an additional insured on any insurance policies covering the Receivership Assets.  Subject to the prior written consent of the Agent and in accordance with the Budget (as defined in paragraph 15 below), the Receiver may obtain insurance covering the Receivership Assets, and such insurance expense shall be deemed a normal, ordinary, and necessary operating expense of the Receivership Assets.

12.     The Defendants shall at all times after the entry of this Order provide full cooperation to, and shall not in any way interfere with, the Receiver in carrying out its duties hereunder, and shall timely respond to all reasonable requests made by the Receiver.  The Defendants' obligations pursuant to this Order shall be continuing.  Neither the Defendants nor anyone associated therewith or acting under their authority or control shall in any way directly or indirectly impair the value of the Receivership Assets or interfere with the Receiver in the exercise of its duties pursuant to this Order.

13.     The Defendants' deposit accounts (collectively, the "Deposit Accounts") and current cash management system shall remain in place, and the Receiver shall deposit all proceeds of receivables, all other cash collections and all other proceeds of the Receivership Assets into the Defendants' operating, payroll or other accounts at The Private Bank & Trust Company.  Receiver is authorized to open and maintain appropriate business accounts for the Receivership Assets at The Private Bank & Trust Company.  The Receiver is authorized to utilize the Defendants' cash management system in accordance with and subject to the terms of

this Order.  All deposit account agreements, blocked account agreements and similar bank account agreements that were in place prior to the entry of this Order shall remain in effect and are hereby ratified and reaffirmed.  The Receiver is authorized, and the Defendants are directed, to take necessary or desirable actions to effectuate this arrangement.

14.     Subject to the Budget (as defined in paragraph 15 below) and the other provisions of this Order, the Receiver shall pay, from the Receivership Assets, all such reasonable costs and expenses as shall be incurred by the Receiver in the ordinary course of business in connection with the operation, maintenance, management, protection, and preservation of the Receivership Assets, including, without limitation, reasonable expenses required to put the Receivership Assets in a rentable and/or saleable market-ready condition or otherwise necessary to realize the value thereof.  None of the Receiver, the Agent or the Lenders shall be liable for any expenses incurred with regard to the Receivership Assets prior to the Receiver taking possession of the Receivership Assets, nor shall the Receiver, the Agent or the Lenders be required to use the Receivership Assets for payment of any expenses incurred with regard to the Receivership Assets prior to the date of this Order.  Notwithstanding the foregoing, the Receiver may, in the Receiver's sole discretion, pay those expenses which were incurred in the normal and ordinary course of business of the Receivership Assets prior to the Receiver taking possession of the Receivership Assets if, and only if, (a) the Receiver determines that payment of any such pre-existing expense is necessary and critical to the ongoing operation, maintenance, management, protection, and preservation of the Receivership Assets; and (b) the Receiver has received the Agent's prior written consent.  Except as provided in, and in all events in accordance with the immediately preceding sentence, no pre-existing expenses shall be paid by the Receiver.  The Receiver shall not be required to perform under any contract or lease entered

into prior to the date on which he assumes possession of the Receivership Assets. Notwithstanding the foregoing, the Receiver may, in the Receiver's sole discretion, perform under such contracts or leases.

15.    The Receiver shall perform its obligations hereunder and make disbursements in accordance with, and subject to, the terms of this Order and the Budgets (as defined in this paragraph 15).   Prior to the Receiver and the Agent's agreement on the Initial Budget, the Receiver shall submit disbursement requests to the Agent and disbursements may be made in the Agent's sole and absolute discretion.   Within fourteen (14) calendar days of the entry of this Order, unless the Receiver and the Agent agree to another period of time, the Receiver shall deliver to the Agent a cash flow forecast for the Defendants for the upcoming 13-week period (commencing with the calendar week in which the cash flow forecast is delivered to the Agent), in form and detail acceptable to the Agent (the "Initial Budget").   On Thursday of each calendar week after delivery of the Initial Budget (or the next succeeding business day if Thursday is not a business day), the Receiver shall regularly deliver a 13-week cash flow forecast (together with the Initial Budget, the "Budgets" and, individually, a "Budget") to the Agent.   Each Budget shall (a) be prepared on a reasonable basis and in good faith, and based upon assumptions believed by the Receiver to be reasonable at the time made and upon the best information then reasonably available to the Receiver, and (b) be subject to review and written approval by the Agent.   To the extent a proposed Budget is not approved, the Receiver may submit a revised Budget for the Agent's review and written approval, it being understood and agreed that the Receiver may not make any disbursements and the Agent shall have no obligation to fund any disbursements pursuant to this Order, the Loan Agreements or otherwise, if a Budget has not been approved for the week in which such expenses are to be disbursed.   The Receiver shall not make

disbursements in excess of those Budgeted Items (as defined in paragraph 17 below) listed in the Budget; provided that there shall be an allowed 10% variance to the cumulative aggregate amount of disbursements scheduled to be made during the period from the Initial Budget through and including the then-current calendar week (e.g., on a cumulative aggregate weekly Budgeted Item basis). Without limiting the foregoing, notwithstanding any relief granted in any other order entered by the court, the Receiver shall not make any expenditures authorized by such orders unless, and to the extent that, such expenditures are encompassed and expressly included in this Order and the Budget. The Receiver may submit disbursement requests to the Agent for items not covered by an Approved Budget, and such disbursements may be made in the Agent's sole and absolute discretion. Copies of approved Budgets shall be emailed to counsel for the Defendants.

16.     The Defendants shall continue to comply with their reporting requirements under the Loan Agreement following entry of this Order. To the extent the Defendants fail to provide the reporting, the Receiver, in consultation with the Agent, shall use his best efforts to timely provide the reporting required under the Loan Agreements. The Defendants are authorized and directed to provide all information as and when required by the Receiver to fulfill reporting obligations.

17.     The Receiver shall deliver to the Agent and its counsel by 5:00 p.m. (Eastern time) on the first Wednesday of the calendar week after seven (7) days have passed after the approval of the first Budget, and on each Wednesday of each calendar week thereafter (in each case, for the immediately preceding calendar week) or at such time as otherwise agreed in writing by the Agent, in form and substance satisfactory to the Agent, a compliance report (the "Compliance Reports") documenting and detailing: (a) all cash receipts of the Defendants and

their operations; (b) all payments and disbursements made by the Receiver; (c) the updated weekly actual performance compared to the Budget on both an aggregate basis and a line-item by line-item basis (each particular line-item set forth on the Budget being referred to herein as a "Budgeted Item"), stating all variances and providing a narrative discussion and analysis by the Receiver with respect to any and all negative variances; and (d) such other reports as the Agent may reasonably request from time to time.  Compliance Reports shall be emailed to counsel for the Defendants.

18.    The Receiver shall have no obligation to expend funds in excess of the receipts actually collected or received by the Receiver.  The Lenders shall have no obligation to provide funds to the Receiver.  The Receiver is authorized to borrow funds from the Lenders at the Lenders' sole discretion and subject to the terms and conditions of the Loan Agreement.  Any funds borrowed from the Lenders by the Receiver shall be secured by a first, valid and perfected lien and security interest in the Receivership Assets senior to all other liens and security interests in the Receivership Assets, which lien shall be valid and perfected without the necessity of recordation, filing, or any other act of the Agent or the Lenders, and the Receiver is authorized, but not required, to issue receivership certificate(s) to evidence and secure any such protective advances by the Lenders.

19.    The liability of the Receiver and any person engaged by the Receiver hereunder is and shall be limited to the Receivership Assets, and neither the Receiver nor any person or entity engaged by the Receiver hereunder shall be personally liable for any actions taken pursuant to this Order or carrying out the Receiver's duties, excepting only claims which arise from the willful misconduct of such person as determined by a final order of this or another court of competent jurisdiction.

20.     The Receiver's compensation shall be on an hourly basis, plus expenses incurred, as agreed to by the Agent and provided for in the Budget.  The Receiver's compensation shall be paid (a) in accordance with the Budget or as otherwise agreed upon in writing by the Receiver and the Agent; (b) first from the Receivership Assets including all monies or other proceeds derived therefrom, and, next; (c) from secured advances, if any, that the Lenders, in their sole discretion in accordance with this Order, make to the Receiver to pay such fees and expenses, but only to the extent that the Receivership Assets are insufficient to pay the Receiver's compensation.  The Receiver shall maintain records of its professionals' time.  The Receiver shall include a report of its compensation in its filings with the court set forth in Paragraph 21 below.

21.     The Receiver shall make an initial report to this court and to the Agent on or before thirty days from the entry of this Order regarding its initial findings and a second report to the court within sixty days thereafter.  The Receiver shall thereafter submit an updated status report on a quarterly basis or as otherwise ordered by the court.  Copies of all such reports shall be served upon all parties appearing in this case by the court's electronic filing system.

22.     The Receiver may at any time request from the court that it be exonerated, discharged and released from its appointment as Receiver.  The Receiver shall, during the pendency of this action, have the right to apply to this court for further instructions or directions.

23.     As of the date of this Order, all persons and entities, including but not limited to the Defendants' creditors and their respective officers, agents, representative and all other persons or entities acting under or in concert with such creditors are hereby placed on notice that all Receivership Assets are in *custodia legis*, and, as such, under the protection of this court,

immune from attachment or other legal process, and subject entirely to control by the Receiver as this court's appointee.

24.     The authority granted to the Receiver herein is self-executing.  The Receiver is authorized to act in accordance with this Order on behalf of, and in the Defendants' (or the Receiver's) name, as the Receiver deems appropriate without further order of this court and without personal recourse against the Receiver (subject to any recourse described herein).

25.     This Order may be modified by order of the court after notice to the Receiver, the Defendants and the Agent.

26.     Nothing in this Order shall impair the Agent of its rights and remedies against the Guarantors of the loans at issue in this matter.

27.     The court shall retain jurisdiction and supervision of all matters concerning the Receiver, the receivership created hereby and the Receivership Assets.  Any and all actions which affect the Receiver or the Receivership Assets shall be brought in this court.  The Receiver may seek instructions and additional authority from this court upon written notice to the Agent and the Defendants.

_____        _____
        Date

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, S.S.

BUSINESS LITIGATION SESSION
Civil Action No. _____

| | |
|---|---|
| AP MA FUNDING LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| 133 SALEM STREET, LLC and | ) |
| WEST REVERE HEALTH CENTER, LLC | ) |
| | ) |
| Defendants. | ) |
| | ) |

## EMERGENCY MOTION FOR APPOINTMENT OF RECEIVER

Pursuant to Rule 66 of the Massachusetts Rules of Civil Procedure and this Court's

general equity powers, AP MA Funding LLC (the "Agent") by and through its counsel files this

Motion for Appointment of Receiver against 133 Salem Street, LLC (the "Owner Defendant")

and West Revere Health Center, LLC (the "Operator Defendant" and together with the Owner

Defendant, the "Defendants") and states as follows in support thereof:

### NATURE OF THE MATTER

This is an action for breach of contract and for the appointment of a receiver to operate a

140-licensed bed skilled nursing facility within the Commonwealth of Massachusetts (the

"Nursing Facility"). The Owner Defendant in this case is in payment default on its obligations to

the Agent and lenders under its loan agreement and has been unable to cure the defaults despite a

forbearance agreement, which has now expired. The Operator Defendant pledged its assets to

the Agent as security for the loan to the Owner Defendant. The Operator Defendant has

jeopardized its pledged collateral by failing to pay its vendors, its manager, and the

Commonwealth of Massachusetts. As a result, vendors have threatened to terminate services. The manager has threatened to terminate its agreement with the Operator Defendant, which would leave the nursing facility without a manager. The Operator Defendant further risks termination of its operating license by the Commonwealth of Massachusetts due to unpaid bed taxes. The Defendants do not have the funds to maintain their operations. There is an imminent danger that the Agent's collateral will be lost or diminished in value. A receiver is needed to assume the financial management of the nursing facility, to stabilize the operations and to ensure that the residents will continue to receive care.

The United States District Court for the District of Massachusetts has already appointed a receiver over four affiliates of the Defendants in *Capital Finance, LLC, et al. v. 22 Maple Street, LLC*, 18:CV 10172 – RWZ, a case originally filed in this Court as Case No. SUCV2018-00156-BLS1, and removed to the Federal Court (the "22 Maple Case"). A copy of the order from the 22 Maple Case is attached to the Verified Complaint filed herewith as **Exhibit A**. The Superior Court in Middlesex County also recently appointed a receiver over another affiliate of the Defendants. *See Oxford Finance LLC v. 90 West Street LLC and Woodbriar Health Center LLC*, Case No. 1781CV03295 (Commonwealth of Massachusetts Superior Court, Middlesex County) (the "Woodbriar Case"). A copy of the order from the 22 Maple Case is attached to the Verified Complaint filed herewith as **Exhibit B**. The Agent seeks appointment of the same receiver that was appointed in the 22 Maple Case and the Woodbriar Case.

## FACTS

The facts supporting this Motion are fully addressed in the Verified Complaint filed by the Agent herewith. All undefined capitalized terms used herein shall have the meaning set forth in the Verified Complaint.

# ARGUMENT

This Court has jurisdiction under its general equity powers to appoint a receiver over the Defendants to provide for the conservation of assets and other appropriate purposes at the instance of a creditor. *Albre v. Sinclair Const. Co.*, 345 Mass. 712, 716 (1963); *U.S. Bank Nat'l Ass'n v. Pendleton Westbrook SPE, LLC*, No. 2:16-CV-00411, 2016 WL 6808141, at *3 (D. Me. Nov. 17, 2016) (citing *United States v. Quintana-Aguayo*, 235 F.3d 682, 686 & n.8 (1st Cir. 2000)). "A receivership is an equitable remedy designed to protect and preserve the assets of a corporate debtor for those creditors who the court ultimately decides are entitled to them." *Charlette v. Charlette Bros. Foundry*, 59 Mass. App. Ct. 34, 45-46 (2003) (quoting *Shapiro, Perlin & Connors, Collection Law* § 13.1 (3d ed. 2000).

Receivership is an extraordinary remedy, justified only when a clear showing is made that an "emergency exists, in order to protect the interests of the plaintiff in the property." *Commodity Futures Trading Comm. v. Comvest Trading Corp.*, 481 F.Supp. 438, 441 (D. Mass. 1979). To warrant the appointment of a receiver to manage and operate a business, "there must be at the least a 'sufficient showing' of something more than the inadequacy of the security and the doubtful financial standing of the debtor." *Chase Manhattan Bank, N. A. v. Turabo Shopping Ctr., Inc.*, 683 F.2d 25, 26 (1st Cir. 1982) (quoting *Garden Homes, Inc. v. United States*, 200 F.2d 299, 301 (1st Cir. 1952)). In determining the presence *vel non* of "something more," courts look to factors such as "fraudulent conduct on the part of the defendant; imminent danger that property would be lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and the plaintiff's probable

success in the action and the possibility of irreparable injury to his interests in the property." *Id.*
at 26-27.

"'[I]n order to justify the appointment of [a receiver] on the application of a creditor, it
should at least appear that [it] has a valid claim against the [debtor], that there are assets
applicable to its payment, and that [it] has exhausted his legal remedies, or that the circumstances
are such that to deny the application would lead to a wasting and loss of property which
otherwise might be made available for the payment of the debts of the [debtor], and which could
not be availed of in any other matter so satisfactorily as by the appointment of a receiver.'"
*George Altman, Inc. v. Vogue Intl., Inc.*, 366 Mass. 176, 180 (1974) (quoting *Falmouth Natl.
Bank v. Cape Cod Ship Canal Co.*, 166 Mass. 550, 568-569 (1896)).

A receiver should be appointed if the Defendants are wasting and/or losing property that
otherwise might be made available for the payment of the debts of the corporation. *Albre*, 345
Mass. at 717-718.  Insolvency, coupled with mismanagement, so that there is a danger that assets
will be wasted or lost, supports the appointment of a receiver. *Id.* at 717.

Ultimately, "the decision to appoint a receiver clearly lies within the discretion of the
court." *Consol. Rail Corp. v. Fore River Ry. Co.*, 861 F.2d 322, 326 (1st Cir. 1988).

As fully set forth in the Verified Complaint, a receiver is necessary because the
Defendants' careless and negligent behavior has not only jeopardized the Agent's Collateral, but
it has put the residents at the Nursing Facility at risk.  In addition to being in default on their loan
obligations, the Defendants are unable to keep up with payments to vendors such that there exists
a real and alarming threat that the Nursing Facility will falter and all revenues will cease.  A
receivership is also in the public interest given the threat to residents if the Nursing Facility fails.

The Agent's probability of success in this action is considerable.  The Loan has matured and the Owner Defendant has not repaid it in full.  The possibility of irreparable injury to Agent's collateral is also considerable.  The Defendants' operations are seriously threatened because their income stream is insufficient to cover their operating expenses and outstanding debts.  For example, Operator Defendant's 2017 revenue was $9,774,913 and its operating expenses were $10,684,339, resulting in a deficiency of $909,426.  Incredibly, the dollar amount of the Operator Defendant's accounts payable has increased from $444,073 in January 2017 to $1,094,382 in December 2017.  Because the vendors are likely to cease providing services if these debts are not paid, and because the Commonwealth may revoke Defendant's license if the bed taxes are not paid, the continued operation of the Nursing Facility is at risk.

The Agent requests that the Court appoint KCP Advisory Group ("KCP"), by and through Jacen Dinoff, its Principal and Co-Founder, as the receiver in this action.  KCP is prepared to serve immediately upon appointment by this Court.  KCP has already been appointed as receiver in the 22 Maple Case and the Woodbriar Case.  A summary of KCP's experience and qualifications and Mr. Dinoff's resume, which illustrates KCP's suitability to serve as Receiver by virtue of his experience, is attached to the Verified Complaint as **Exhibit L**.

Pursuant to Superior Court Rule 9A(e)(1), this Motion is excused from compliance with paragraphs (b)(1) and (b)(2) of Rule 9A.  The Agent has filed a Motion for Short Order of Notice on this Motion, contemporaneously herewith.

**WHEREFORE**, the Agent respectfully prays this Court:

(a)      allow this Motion;

(b)      endorse the proposed Order (which is filed contemporaneously herewith) as an Order of the Court; and

(c)     grant the Agent such other relief as this Court deems just and proper.

AP MA Funding LLC

_____

John O. Mirick
BBO #349240
Eva M. Zelnick
BBO #676890
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608
508-860-1550
jmirick@mirickoconnell.com

Dated:  April 3, 2018

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                    BUSINESS LITIGATION SESSION
                                               Civil Action No. _____

```
                                      )
AP MA FUNDING LLC,                    )
                                      )
              Plaintiff,              )
                                      )
v.                                    )
                                      )
133 SALEM STREET, LLC and             )
WEST REVERE HEALTH CENTER, LLC        )
                                      )
              Defendants.             )
                                      )
```

This matter came before the court on the Motion (the "Motion") of AP MA Funding LLC (the "Agent"), by and through its counsel, files this Motion for Appointment of Receiver against 133 Salem Street, LLC (the "Owner Defendant") and West Revere Health Center, LLC (the "Operator Defendant" and together with the Owner Defendant, the "Defendants"), the Court having considered the Motion, the Verified Complaint and any oral argument thereon and any objections thereto,

Now it is ORDERED that:

1.     KCP Advisory Group LLC, 2400 District Avenue, Suite 215, Burlington, MA 01803, by and through Jacen Dinoff, its Principal and Co-Founder, is hereby appointed receiver ("Receiver") of the Defendants' assets (the "Receivership Assets"), with all of the powers and obligations set forth herein.

2.     The Receiver shall take immediate possession and full control of all of the Receivership Assets and shall take such other actions as the Receiver deems reasonable and appropriate to effect this Order, to prevent waste, and to preserve, manage, secure, and safeguard the Receivership Assets in accordance with the powers granted herein.

3.      Subject to the Budget (defined below), the Receiver shall have and may exercise the following powers, and such additional powers that are provided by law and that the court may from time to time direct or confer:

a.      take and maintain possession of all documents, books, records, papers, and deposit accounts relating to the Receivership Assets;

b.      exclude the Defendants, the Guarantors[1] and their respective agents, servants, and employees wholly from the Receivership Assets, except as necessary for the Defendants to carry out their duties with respect to the Nursing Facility' license;

c.      execute and deliver, in the name of the Defendants or in the Receiver's own name, such documents and instruments as are necessary or appropriate to consummate transactions authorized hereunder;

d.      manage, operate, preserve and maintain the Receivership Assets as a prudent person would, including, without limitation, the power to enter into, terminate or negotiate contracts and make repairs or alterations to the Receivership Assets that the Receiver in its business judgment reasonably believes necessary for the management, operation, preservation and maintenance of the Receivership Assets;

e.      enter into leases, whether of real or personal property, or tenancy agreements, under such terms and conditions as the Receiver may deem appropriate or desirable to preserve the Receivership Assets;

f.      employ such contractors, subcontractors, materialmen, architects, engineers, consultants, managers, brokers, marketing agents, or other employees, agents,

---

[1] All capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Verified Complaint.

independent contractors, or professionals as the Receiver may in its discretion deem appropriate or desirable to implement and effectuate the rights and powers herein granted;

      g.      engage attorneys or other professionals, as appropriate, in order to advise and assist the Receiver in carrying out its duties and appearing in court or other proceedings on its behalf;

      h.      collect the rents, accounts receivable, insurance claim proceeds, real estate tax refunds, utility deposits, security deposits, proceeds, earnest money deposits and profits from the Receivership Assets, if any, from any time period whether historical, current or prospective, and receive any such assets presently in the possession of the Defendants and/or their agents;

      i.      repossess personal property, as provided by law, for breaches of the conditions of their leases or other agreements;

      j.      sue for unpaid receivables, income, or proceeds in the name of the Defendants;

      k.      subject to the Agent's prior written consent, compromise or give acquittance for receivables, income, or proceeds that may become due;

      l.      deal with issues and other matters with vendors, municipalities, and other governmental entities, as necessary;

      m.      open any mail intended for and/or directed to the Defendants;

      n.      hire, fire, select, and retain employees of the Defendants as the Receiver deems reasonable or necessary to preserve and maintain the value of the Receivership Assets, including as necessary or desirable to provide appropriate quality patient care;

o.      upon prior written consent of the Agent, retain Next Step Healthcare, LLC as manager of the Nursing Facilities or hire a qualified replacement healthcare facility management company;

p.      upon prior written consent of the Agent, hire a qualified company or individual to handle the Defendants' back-office services;

q.      with respect to taxes:   (i) use all tax identification numbers of the Defendants and cause to be filed all federal, state, and local income tax returns of the Defendants for the period through termination of this receivership, including, without limitation, for the calendar years 2016, 2017 and thereafter; (ii) communicate with, negotiate with, and serve as nonexclusive representative of the Defendants to all taxing authorities; provided, however, that the Receiver shall use reasonable efforts to keep all managers of the Defendants apprised of all communications with taxing authorities by notice delivered to the address for such managers provided by each Defendant; (iii) use reasonable efforts to issue all tax related forms on behalf of the Defendants, including, without limitation, Internal Revenue Service Forms W-2, 1099, and K-1; and (iv) to the extent funds are available and authorized pursuant to the procedures set forth in this Order, pay taxes which may have been or may be levied against the Receivership Assets or which are otherwise due and payable with respect to the Receivership Assets, including, without limitation, payment of the provider taxes outstanding to the Commonwealth of Massachusetts, provided, however, that the Receiver is authorized to and may pay taxes which are or become due and payable which relate to the Receiver's custody, control or operation of the Receivership Assets for the period from the date of the entry of this Order through the date the Receivership is terminated and for which personal liability could be imposed;

r.     take all actions necessary to maintain and/or transfer existing licenses, permits and authority from all relevant governmental agencies, managed care contracts, and third-party payor agreements, and to take all actions necessary to enroll or re-enroll the Nursing Facility in any and all available state and federal subsidy and reimbursement programs, including but not limited to Medicare and Medicaid;

s.     subject to the prior written consent of the Agent, conduct a marketing or leasing program with respect to all or a portion of the Receivership Assets, or employ a marketing or leasing agent or agents to do so, direct to the leasing or sale of all or portions of the Receivership Assets under such terms and conditions as the Agent may in its sole discretion deem appropriate or desirable, provided, however, that the Receiver shall seek court approval for any sale of Receivership Assets outside the ordinary course of business;

t.     communicate and share information with prospective purchasers and provide the Agent with copies of such information;

u.     in accordance with Paragraph 18 below, borrow monies from the Agent and the Lenders secured by a senior and paramount lien upon the Receivership Assets for the purposes of performing the Receiver's obligations under this or other orders of this court, and preserving or enhancing the value of the Receivership Assets, on terms and conditions agreed upon by the Agent and the Lenders;

v.     take possession or control of all existing bank accounts, cash and funds belonging to or for the benefit of the Defendants in bank accounts associated with the Receivership Assets (regardless from what time period), whether in the name of the Defendants, or their agents or employees, and to open, transfer, and change all such bank accounts into the name of the Receiver, if appropriate, or otherwise take such actions as necessary to ensure such

bank accounts are under the control of the Receiver and ensure Defendants do not have access to such accounts without consultation with the Receiver, all in compliance with legal requirements; and

          w.    take all such further actions and enter into all such other agreements as the Receiver in its professional discretion deems appropriate or desirable to preserve, protect and maximize the value of the Receivership Assets.

4.    The Defendants shall have neither possession nor control of, nor any right to, the Receivership Assets or money or other proceeds derived from the Receivership Assets unless and until the receivership is terminated and the Receiver is discharged. The Defendants shall in all respects comply with this Order, and are hereby enjoined and restrained from impeding or interfering in any manner with the exercise by the Receiver of its rights, powers, and duties hereunder. From and after the date of this Order, neither the Defendants, the Guarantors, nor any agents of the Defendants or Guarantors shall enter into any lease, contract, or agreement of any kind or character relating to the Receivership Assets, and shall not grant any lien upon or security interest in the Receivership Assets.

5.    Without the consent of the Receiver, none of the Defendants, the Guarantors, or any agents of the Defendants or Guarantors shall enter or be present at any of the Nursing Facility, communicate in any manner with the employees or residents at the Nursing Facility, or modify, terminate or cause to be modified or terminated any license, permit, lease, easement, contract or agreement, if any, relating to the Receivership Assets.

6.    The Defendants are hereby enjoined and restrained from collecting any revenues, receivables, proceeds, or other sums payable with respect to the Receivership Assets. Should the Defendants, or any of their respective partners, affiliates, employees, members, shareholders,

representatives, and agents come into possession of any such revenues, receivables, proceeds, or other sums subsequent to the date of entry of this Order, the Defendants, or their respective partners, affiliates, employees, members, shareholders, representatives, and agents shall promptly remit the same to the Receiver in the form received.

7.     Neither the Defendants nor anyone associated therewith or acting under the Defendants' authority or control shall:  (a) remove or destroy any property from the Nursing Facility whether constituting Receivership Assets or otherwise; (b) terminate or cause to be terminated any license, permit, lease, contract, or agreement relating to the operation of the Nursing Facility, including, without limitation, third-party payor agreements; (c) make any disparaging statement to residents, employees, or third parties regarding the Receiver or cause such persons or entities to resign, transfer to a new skilled nursing facility or refuse to deal with the Receiver; or (d) otherwise interfere with the Receiver in carrying out its duties under this Order and applicable law.

8.     Until further order of this court, all tenants, bailees, or other persons in possession of the Receivership Assets or any portion thereof shall turn over such Assets to the Receiver, and until further order of this court (a) shall pay over to the Receiver, or its duly designated agent, all rents, revenues, receivables, proceeds, or other sums payable with respect to the Receivership Assets which are now due and unpaid or hereafter become due; and (b) they are hereby enjoined and restrained from paying to the Defendants or their agents, officers, directors, employees, or attorneys any such rents, receivables, revenues, proceeds, or other sums.

9.     Within five (5) calendar days from the entry of this Order, and thereafter, forthwith upon request of the Receiver (but no later than five (5) calendar days following such request), the Defendants, Synergy Health Centers, LLC, and/or their respective agents and

employees shall provide to the Receiver, make available to the Receiver, or cause their manager or employees to deliver or make available to the Receiver the following, to the extent such items and things exist:

   a. all Receivership Assets and funds generated by or from the Receivership Assets, whether such funds are held in a collateral related account or not, including but not limited to:  (i) all cash on hand; (ii) all cash equivalents and negotiable instruments (such as checks, notes, drafts or other related documents or instruments); and (iii) all sums held in accounts in any financial institutions, including but not limited to (A) tenant/lessee security deposits received by the Defendants from residents of the Nursing Facility, (B) deposits held in escrow by the Defendants for any purpose, such as for payment of real estate taxes and insurance premiums, (C) proceeds of insurance maintained for, or pertaining to, the Receivership Assets, (D) rent or prepaid rent from the residents of the Nursing Facility, (E) funds designated or intended for capital improvements, repairs, or renovations to, or in connection with, the Receivership Assets, and (F) all other sums of any kind relating to the use, enjoyment, possession, improvement, or occupancy of all or any portion of the Receivership Assets;

   b. copies of any and all service contracts pertaining to the Receivership Assets and/or to which the Defendants are a party;

   c. copies of any and all management contracts and/or agreements pertaining to the Receivership Assets and/or to which the Defendants are a party;

   d. copies of any and all leases, lease abstracts, purchase agreements and the like pertaining to the Receivership Assets and/or to which the Defendants are a party;

   e. all open invoices for services or goods relating to the Receivership Assets and/or to which the Defendants are a party;

f. all records evidencing the Defendants' accounts receivable, and any and all agreements, documented and undocumented, with any creditor, respecting any payment plan or agreement, demand, or suit;

g. copies of the 2015, 2016, and 2017 year-end and 2018 year-to-date, in both full and summary format, financial statements (and month by month detail) for each Defendant and on a consolidated basis, in both hard copy and electronic formats; balance sheets, income statements, accounts receivables (and receivables/arrearages aging), operating statements, current year budgets, sources and uses of cash flows, detailed rent rolls, accounts payable, check registers, security deposit listings, trial balances, general ledgers, contractor statements, lien waivers, sworn owner statements, construction draws, bank reconciliations, and bank statements, including any passwords which may be associated with any financial documents or accounts and copies of borrowing base certificates or similar submissions for the prior six (6) loan requests;

h. a complete set of keys (including all masters) and all security and/or access codes and/or cards to the Nursing Facilities and a schedule (including full contact information) identifying each person or entity (including security companies, municipal/governmental agencies and utility companies), who currently has one or more keys and/or access cards to the Nursing Facilities or who has knowledge of any access codes thereto;

i. any and all records and information the Defendants or Synergy Health Centers, LLC or their agents, affiliates or employees may have concerning the Receivership Assets for each Defendant and on a consolidated basis as applicable, including without limitation all written and electronic books, records, correspondence, and other information (including any computer hardware or software login and password information) related to: (i) any agreements

to which the Defendants and/or the Receivership Assets are or may be subject; (ii) any amounts received from the residents or other tenants of the Nursing Facility, including resident funds, including revenue by payor type for each of the prior two fiscal quarters; (iii) all liens or other encumbrances on the Receivership Assets or against the Defendants; (iv) taxes, assessments and related appeals; (v) insurance of all types for the Defendants (including, but not limited to, liability, property, excess liability, auto liability, boiler and machinery, business interruption, professional liability, employee dishonesty, builders risk, construction related insurance and worker's compensation) including information regarding insurance which may be issued to any defendant; (vi) all invoices for services at the Nursing Facility; (viii) all resident and other tenant files, including leases, lease abstracts, purchase agreements, and sample leases; (ix) all marketing information (in hard copy and electronic format) including but not limited to brochures, photographs (including aerial), maps, and signage; (x) copies of all state and federal tax returns signed and filed by the Defendants for calendar years 2015, 2016 and 2017; (xi) all state survey results and correspondence with any regulators; and (xii) all other records related to the Receivership Assets that are or may be necessary or pertinent to the Receiver's management, maintenance, operation and/or sale of the Receivership Assets;

        j.      any and all insurance loss histories and/or claims related to the Receivership Assets and/or the Defendants;

        k.      all property and all other things of value associated with use, operation and maintenance of the Receivership Assets; and

        l.      all correspondence with regulators and/or licensing entities regarding the Receivership Assets.

10.     By this Order, the Receiver shall be deemed a business associate of the Defendants pursuant to the Health Information Portability and Accountability Act and its implementing regulations.

11.     The Defendants shall cause, and Receiver shall be authorized on the Defendant's behalf to cause, the Receiver and its agents to be named as an additional insured on any insurance policies covering the Receivership Assets.  Subject to the prior written consent of the Agent and in accordance with the Budget (as defined in paragraph 15 below), the Receiver may obtain insurance covering the Receivership Assets, and such insurance expense shall be deemed a normal, ordinary, and necessary operating expense of the Receivership Assets.

12.     The Defendants shall at all times after the entry of this Order provide full cooperation to, and shall not in any way interfere with, the Receiver in carrying out its duties hereunder, and shall timely respond to all reasonable requests made by the Receiver.  The Defendants' obligations pursuant to this Order shall be continuing.  Neither the Defendants nor anyone associated therewith or acting under their authority or control shall in any way directly or indirectly impair the value of the Receivership Assets or interfere with the Receiver in the exercise of its duties pursuant to this Order.

13.     The Defendants' deposit accounts (collectively, the "Deposit Accounts") and current cash management system shall remain in place, and the Receiver shall deposit all proceeds of receivables, all other cash collections and all other proceeds of the Receivership Assets into the Defendants' operating, payroll or other accounts at The Private Bank & Trust Company.  Receiver is authorized to open and maintain appropriate business accounts for the Receivership Assets at The Private Bank & Trust Company.  The Receiver is authorized to utilize the Defendants' cash management system in accordance with and subject to the terms of

this Order.  All deposit account agreements, blocked account agreements and similar bank account agreements that were in place prior to the entry of this Order shall remain in effect and are hereby ratified and reaffirmed.  The Receiver is authorized, and the Defendants are directed, to take necessary or desirable actions to effectuate this arrangement.

14.     Subject to the Budget (as defined in paragraph 15 below) and the other provisions of this Order, the Receiver shall pay, from the Receivership Assets, all such reasonable costs and expenses as shall be incurred by the Receiver in the ordinary course of business in connection with the operation, maintenance, management, protection, and preservation of the Receivership Assets, including, without limitation, reasonable expenses required to put the Receivership Assets in a rentable and/or saleable market-ready condition or otherwise necessary to realize the value thereof.  None of the Receiver, the Agent or the Lenders shall be liable for any expenses incurred with regard to the Receivership Assets prior to the Receiver taking possession of the Receivership Assets, nor shall the Receiver, the Agent or the Lenders be required to use the Receivership Assets for payment of any expenses incurred with regard to the Receivership Assets prior to the date of this Order.  Notwithstanding the foregoing, the Receiver may, in the Receiver's sole discretion, pay those expenses which were incurred in the normal and ordinary course of business of the Receivership Assets prior to the Receiver taking possession of the Receivership Assets if, and only if, (a) the Receiver determines that payment of any such pre-existing expense is necessary and critical to the ongoing operation, maintenance, management, protection, and preservation of the Receivership Assets; and (b) the Receiver has received the Agent's prior written consent.  Except as provided in, and in all events in accordance with the immediately preceding sentence, no pre-existing expenses shall be paid by the Receiver.  The Receiver shall not be required to perform under any contract or lease entered

into prior to the date on which he assumes possession of the Receivership Assets. Notwithstanding the foregoing, the Receiver may, in the Receiver's sole discretion, perform under such contracts or leases.

15.     The Receiver shall perform its obligations hereunder and make disbursements in accordance with, and subject to, the terms of this Order and the Budgets (as defined in this paragraph 15).   Prior to the Receiver and the Agent's agreement on the Initial Budget, the Receiver shall submit disbursement requests to the Agent and disbursements may be made in the Agent's sole and absolute discretion.   Within fourteen (14) calendar days of the entry of this Order, unless the Receiver and the Agent agree to another period of time, the Receiver shall deliver to the Agent a cash flow forecast for the Defendants for the upcoming 13-week period (commencing with the calendar week in which the cash flow forecast is delivered to the Agent), in form and detail acceptable to the Agent (the "Initial Budget").   On Thursday of each calendar week after delivery of the Initial Budget (or the next succeeding business day if Thursday is not a business day), the Receiver shall regularly deliver a 13-week cash flow forecast (together with the Initial Budget, the "Budgets" and, individually, a "Budget") to the Agent.   Each Budget shall (a) be prepared on a reasonable basis and in good faith, and based upon assumptions believed by the Receiver to be reasonable at the time made and upon the best information then reasonably available to the Receiver, and (b) be subject to review and written approval by the Agent.   To the extent a proposed Budget is not approved, the Receiver may submit a revised Budget for the Agent's review and written approval, it being understood and agreed that the Receiver may not make any disbursements and the Agent shall have no obligation to fund any disbursements pursuant to this Order, the Loan Agreements or otherwise, if a Budget has not been approved for the week in which such expenses are to be disbursed.   The Receiver shall not make

disbursements in excess of those Budgeted Items (as defined in paragraph 17 below) listed in the Budget; provided that there shall be an allowed 10% variance to the cumulative aggregate amount of disbursements scheduled to be made during the period from the Initial Budget through and including the then-current calendar week (e.g., on a cumulative aggregate weekly Budgeted Item basis). Without limiting the foregoing, notwithstanding any relief granted in any other order entered by the court, the Receiver shall not make any expenditures authorized by such orders unless, and to the extent that, such expenditures are encompassed and expressly included in this Order and the Budget. The Receiver may submit disbursement requests to the Agent for items not covered by an Approved Budget, and such disbursements may be made in the Agent's sole and absolute discretion. Copies of approved Budgets shall be emailed to counsel for the Defendants.

16.    The Defendants shall continue to comply with their reporting requirements under the Loan Agreement following entry of this Order. To the extent the Defendants fail to provide the reporting, the Receiver, in consultation with the Agent, shall use his best efforts to timely provide the reporting required under the Loan Agreements. The Defendants are authorized and directed to provide all information as and when required by the Receiver to fulfill reporting obligations.

17.    The Receiver shall deliver to the Agent and its counsel by 5:00 p.m. (Eastern time) on the first Wednesday of the calendar week after seven (7) days have passed after the approval of the first Budget, and on each Wednesday of each calendar week thereafter (in each case, for the immediately preceding calendar week) or at such time as otherwise agreed in writing by the Agent, in form and substance satisfactory to the Agent, a compliance report (the "Compliance Reports") documenting and detailing:  (a) all cash receipts of the Defendants and

their operations; (b) all payments and disbursements made by the Receiver; (c) the updated weekly actual performance compared to the Budget on both an aggregate basis and a line-item by line-item basis (each particular line-item set forth on the Budget being referred to herein as a "Budgeted Item"), stating all variances and providing a narrative discussion and analysis by the Receiver with respect to any and all negative variances; and (d) such other reports as the Agent may reasonably request from time to time.  Compliance Reports shall be emailed to counsel for the Defendants.

18.    The Receiver shall have no obligation to expend funds in excess of the receipts actually collected or received by the Receiver.  The Lenders shall have no obligation to provide funds to the Receiver.   The Receiver is authorized to borrow funds from the Lenders at the Lenders' sole discretion and subject to the terms and conditions of the Loan Agreement.  Any funds borrowed from the Lenders by the Receiver shall be secured by a first, valid and perfected lien and security interest in the Receivership Assets senior to all other liens and security interests in the Receivership Assets, which lien shall be valid and perfected without the necessity of recordation, filing, or any other act of the Agent or the Lenders, and the Receiver is authorized, but not required, to issue receivership certificate(s) to evidence and secure any such protective advances by the Lenders.

19.    The liability of the Receiver and any person engaged by the Receiver hereunder is and shall be limited to the Receivership Assets, and neither the Receiver nor any person or entity engaged by the Receiver hereunder shall be personally liable for any actions taken pursuant to this Order or carrying out the Receiver's duties, excepting only claims which arise from the willful misconduct of such person as determined by a final order of this or another court of competent jurisdiction.

20.     The Receiver's compensation shall be on an hourly basis, plus expenses incurred, as agreed to by the Agent and provided for in the Budget. The Receiver's compensation shall be paid (a) in accordance with the Budget or as otherwise agreed upon in writing by the Receiver and the Agent; (b) first from the Receivership Assets including all monies or other proceeds derived therefrom, and, next; (c) from secured advances, if any, that the Lenders, in their sole discretion in accordance with this Order, make to the Receiver to pay such fees and expenses, but only to the extent that the Receivership Assets are insufficient to pay the Receiver's compensation. The Receiver shall maintain records of its professionals' time. The Receiver shall include a report of its compensation in its filings with the court set forth in Paragraph 21 below.

21.     The Receiver shall make an initial report to this court and to the Agent on or before thirty days from the entry of this Order regarding its initial findings and a second report to the court within sixty days thereafter. The Receiver shall thereafter submit an updated status report on a quarterly basis or as otherwise ordered by the court. Copies of all such reports shall be served upon all parties appearing in this case by the court's electronic filing system.

22.     The Receiver may at any time request from the court that it be exonerated, discharged and released from its appointment as Receiver. The Receiver shall, during the pendency of this action, have the right to apply to this court for further instructions or directions.

23.     As of the date of this Order, all persons and entities, including but not limited to the Defendants' creditors and their respective officers, agents, representative and all other persons or entities acting under or in concert with such creditors are hereby placed on notice that all Receivership Assets are in *custodia legis*, and, as such, under the protection of this court,

immune from attachment or other legal process, and subject entirely to control by the Receiver as this court's appointee.

24.     The authority granted to the Receiver herein is self-executing.  The Receiver is authorized to act in accordance with this Order on behalf of, and in the Defendants' (or the Receiver's) name, as the Receiver deems appropriate without further order of this court and without personal recourse against the Receiver (subject to any recourse described herein).

25.     This Order may be modified by order of the court after notice to the Receiver, the Defendants and the Agent.

26.     Nothing in this Order shall impair the Agent of its rights and remedies against the Guarantors of the loans at issue in this matter.

27.     The court shall retain jurisdiction and supervision of all matters concerning the Receiver, the receivership created hereby and the Receivership Assets.  Any and all actions which affect the Receiver or the Receivership Assets shall be brought in this court.  The Receiver may seek instructions and additional authority from this court upon written notice to the Agent and the Defendants.


_____          _____

          Date

| CIVIL ACTION COVER SHEET | DOCKET NO(S) **B.L.S.** | Trial Court Of Massachusetts Superior Court Department County: SUFFOLK |
|---|---|---|
| PLAINTIFF(S)   AP MA FUNDING LLC | | DEFENDANT(S)   133 SALEM STREET, LLC and WEST REVERE  HEALTH CENTER, LLC |
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Board of Bar Overseers number John O. Mirick, Esq.   BBO#349240 Eva M. Zelnick, Esq.  BBO#676890 Mirick O'Connell DeMallie & Lougee, LLC 100 Front Street Worcester, MA 01608 | | ATTORNEY (if known) |

Origin Code Original Complaint

   B

TYPE OF ACTION AND TRACK DESIGNATION (See reverse side) CODE NO. TYPE OF ACTION (specify) TRACK IS THIS A JURY CASE? * _____
___BK-1_____ (B) ( ) Yes (X No

   Other Commercial Claim

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.

This is an action for breach of contract and for the appointment of a receiver to operate a nursing facility in Suffolk County.  The nursing facility is owned by one legal entity and operated by a separate legal entity, but both entities are under common control and management.  The Defendants are in payment default on their obligations to the Plaintiff under the loan documents and have been unable to cure the defaults despite a forbearance agreement which has now expired.  The Defendants have failed to meet their financial obligations not only to the Plaintiff, but also to their vendors, their facilities manager, and the Commonwealth of Massachusetts.  As a result, the manager has threatened to terminate its agreement with the Defendants, which would leave the facilities without a manager, and the Defendants risk termination of their operating license by the Commonwealth of Massachusetts due to unpaid bed days.  A receiver is needed to assume the financial management of the nursing facilities, to stabilize the operations and to ensure that the residents will continue to receive care.

There is a second action being filed simultaneously concerning a nursing facility in Plymouth County with the same corporate structure and same operational problems.  AP MA Funding LLC v. 34 N. Pearl Street, LLC and Braemoor Health Center, LLC.  In the interests of judicial economy, both actions should be accepted into the BLS.

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT.

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods." Signature of Attorney of Record_____
DATE:  April 3, 2018